# Exhibit 12

# INDIA 2021 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

India is a multiparty, federal, parliamentary democracy with a bicameral legislature.  The president, elected by an electoral college composed of the state assemblies and parliament, is the head of state, and the prime minister is the head of government.  The constitution gives the country's 28 states and nine union territories a high degree of autonomy and primary responsibility for law and order. Electors chose President Ram Nath Kovind in 2017 to serve a five-year term, and Narendra Modi became prime minister for the second time following the victory of the National Democratic Alliance coalition led by the Bharatiya Janata Party in the 2019 general election.  Observers considered the parliamentary elections, which included more than 600 million voters, to be free and fair, but there were reports of isolated instances of violence.

The states and union territories have primary responsibility for maintaining law and order, with policy oversight from the central government.  Police are within state jurisdiction.  The Ministry of Home Affairs controls most paramilitary forces, the internal intelligence bureaus, and national law enforcement agencies, and provides training for senior officials from state police forces.  Civilian authorities maintained effective control over the security forces.  Members of the security forces committed some abuses.

Significant human rights issues included credible reports of:  unlawful and arbitrary killings, including extrajudicial killings by the government or its agents; torture and cases of cruel, inhuman, or degrading treatment or punishment by police and prison officials; harsh and life-threatening prison conditions; arbitrary arrest and detention by government authorities; political prisoners or detainees; arbitrary or unlawful interference with privacy; restrictions on free expression and media, including violence, threats of violence, or unjustified arrests or prosecutions against journalists, use of criminal libel laws to prosecute social media speech; restrictions on internet freedom; overly restrictive laws on the organization, funding, or operations of nongovernmental organizations and civil society organizations; refoulement of refugees; serious government corruption;

Country Reports on Human Rights Practices for 2021
United States Department of State • Bureau of Democracy, Human Rights and Labor

298
RJN Exhibit 12

government harassment of domestic and international human rights organizations; lack of investigation of and accountability for gender-based violence; crimes involving violence and discrimination targeting members of minority groups based on religious affiliation, social status or sexual orientation or gender identity; and forced and compulsory labor, including child labor and bonded labor.

Despite government efforts to address abuses and corruption, a lack of accountability for official misconduct persisted at all levels of government, contributing to widespread impunity.  Investigations and prosecutions of individual cases took place, but lax enforcement, a shortage of trained police officers, and an overburdened and underresourced court system contributed to a low number of convictions.

Terrorists in Jammu and Kashmir, northeastern states, and Maoist terrorism-affected areas committed serious abuses, including killings and torture of armed forces personnel, police, government officials, and civilians, kidnapping, and recruitment and use of child soldiers.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed arbitrary or unlawful killings, including extrajudicial killings of suspected criminals and terrorists.

Military courts are primarily responsible for investigating killings by security forces and paramilitary forces.

Reports of prisoners or detainees who were killed or died in police and judicial custody continued.  In March the National Campaign Against Torture reported the deaths of 111 persons in police custody in 2020.  The report stated 82 of the deaths were due to alleged torture or foul play.  Uttar Pradesh and Gujarat reported the highest number of custodial deaths at 11 each, followed by Madhya Pradesh with 10 deaths.  A separate Prison Statistics of India (PSI) report from the National Crime Records Bureau (NCRB) documented 1,887 inmate deaths in judicial

299
RJN Exhibit 12

custody in 2020.  The report attributed most prison deaths to natural causes and stated the highest number of custodial deaths occurred in Uttar Pradesh and West Bengal.

In September the National Human Rights Commission required Assam's director general of police to compile a report in connection with a complaint alleging that police committed extrajudicial killings of more than 20 petty criminals.

On June 18, a Dalit woman collapsed and died while in police custody for suspected theft.  The Telangana High Court ordered an investigation into allegations the victim was beaten to death.  The Telangana government fired three police officers for their involvement in the custodial death and provided compensation to family members.

On July 22, Ravi Jadav and Sunil Pawar, two members of a tribal community accused of involvement in a bicycle theft case, were found hanging inside a police station in the Navsari District of Gujarat.  Three police officials were arrested in connection with the custodial deaths, and on September 18, Navsari police provided compensation to family members of the victims.

In September 2020 the Central Bureau of Investigation filed charges against nine police officials in connection with the custodial deaths of Ponraj and Beniks Jeyaraj in Tamil Nadu.  The two men were arrested in June 2020 for violating COVID-19 regulations; police allegedly beat them while in custody, and they subsequently died.  The Tamil Nadu government arrested and held without bail 10 police officials alleged to be involved in the deaths, but one official has since died from COVID-19.  The trial of the remaining nine was underway.

Killings by government and nongovernment forces were reported in Jammu and Kashmir, northeastern states, and Maoist-affected areas of the country (see section 1.g.).  The South Asia Terrorism Portal reported the deaths of 23 civilians throughout the country as a result of terrorism as of November 27.

In July police arrested five persons in connection with the 2018 killing of *Rising Kashmir* editor in chief Shujaat Bukhari and his two police bodyguards.  A police investigation alleged that terrorists belonging to Lashkar-e-Tayyiba targeted Bukhari in retaliation for his support of a government-backed peace effort.

Terrorists committed numerous killings.  Maoist terrorists in Jharkhand and Bihar continued to attack security forces and infrastructure facilities, including roads, railways, and communication towers.

Terrorists killed 10 political party leaders in Jammu and Kashmir.  On August 9, terrorists fatally shot Bharatiya Janata Party (BJP) leader Gulam Rasool Dar and his wife in Anantnag District.  Apni Party leader Ghulam Hassan Lone was killed by terrorists on August 19 in Kulgam District.

## b. Disappearance

There were allegations police failed to file required arrest reports for detained persons, resulting in unresolved disappearances.  Police and government officials denied these claims.  The central government reported state government screening committees informed families regarding the status of detainees.  There were reports that prison guards sometimes required bribes from families to confirm the detention of their relatives.

Disappearances attributed to government forces, paramilitary forces, and terrorists occurred in areas of conflict during the year (see section 1.g.).

On March 31, UN special rapporteurs asked the central government to provide details regarding allegations of arbitrary detention, extrajudicial killings, and disappearances in Jammu and Kashmir, including the status of Naseer Ahmad Wani, who disappeared in 2019 after being questioned by army soldiers.

The Association of Parents of Disappeared Persons, Kashmir (APDP) reported two cases of disappearances during the year, one in Bandipora District of North Kashmir in July and another in Baramullah in June.  Both persons remained missing, and the APDP claimed the National Human Rights Commission declined to investigate the cases.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits torture, but there were reports that police forces employed such practices.

Police beatings of prisoners resulted in custodial deaths (see section 1.a.).

The law does not permit authorities to admit coerced confessions into evidence, but nongovernmental organizations (NGOs) alleged authorities used torture to coerce confessions.  Authorities allegedly also used torture to extort money or as summary punishment.

There were reports of abuse in prisons at the hands of guards and inmates, as well as reports that police raped female and male detainees.

On May 23, Karnataka police suspended Subinspector Arjun Honkera after Punith K.L, a Dalit man, filed a complaint against Honkera for forcing him to lick the urine of another inmate while he was in police custody.  The complainant also alleged police beat him for hours.  The Criminal Investigation Department of the Karnataka police arrested Honkera on September 2.

The government authorized the National Human Rights Commission (NHRC) to investigate rape cases involving police officers.  By law the NHRC may also request information regarding cases involving the army and paramilitary forces, but it has no mandate to investigate those cases.  NGOs claimed NHRC statistics undercounted the number of rapes committed in police custody.  Some rape victims were unwilling to report crimes due to social stigma and fear of retribution if the perpetrator was a police officer or official.  There were reports police officials refused to register rape cases.

Victims of crime were sometimes subjected to intimidation, threats, and attacks.

There were reports of security forces acting with impunity, but members were also held accountable for illegal actions.  In December 2020 the army indicted an officer and two others for extrajudicial killings in Jammu and Kashmir; a court trial was underway.  Jammu and Kashmir police also filed local charges against the accused.

**Prison and Detention Center Conditions**

Prison conditions were frequently life threatening, most notably due to inadequate sanitary conditions, lack of medical care, and extreme overcrowding.

302
RJN Exhibit 12

**Physical Conditions:**  Prisons were often severely overcrowded, and food, medical care, sanitation, and environmental conditions frequently were inadequate. Potable water was not universally available.  Prisons and detention centers remained underfunded and understaffed and lacked sufficient infrastructure. Prisoners were sometimes physically mistreated.

According to the *PSI 2020* report released in December, there were 1,306 prisons in the country with a total authorized capacity of 414,033 persons.  The actual incarcerated population was 488,511.  Persons awaiting trial accounted for approximately 76 percent of the prison population.  The law requires detention of juveniles in rehabilitative facilities, but at times authorities detained juveniles in adult prisons, especially in rural areas.  Authorities often held pretrial detainees with convicted prisoners.  The *PSI 2020* report acknowledged overcrowding as "one of the biggest problems faced by prison inmates."

According to the *India Justice Report 2020*, in Uttar Pradesh each correctional officer is responsible for more than 25,000 inmates.  In 21 states and union territories, the occupancy rate for prisons was more than 100 percent.  The most crowded prisons were Delhi (at 175 percent of capacity), Uttar Pradesh (at 168 percent), and Uttarakhand (at 159 percent).

In May the Odisha Directorate of Prisons set up an exclusive ward in Bhubaneswar to house up to 10 transgender persons.  The ward had beds, separate washroom blocks, a hall, and a reading room.  State officials announced that similar exclusive wards for transgender persons will be opened in all other prisons in a phased manner.  A representative of the transgender community welcomed the move, pointing out that there were previous reports of sexual harassment of transgender inmates held in the regular wards.

On May 7, the Supreme Court ordered state law enforcement agencies to reduce arrests and decongest prisons.  The Supreme Court issued a similar ruling in March 2020, which ordered states and union territories to release certain prisoners on parole or interim bail.  The state governments of Goa, Chhattisgarh, Madhya Pradesh, Gujarat, and Maharashtra independently ordered their prison systems to parole or furlough inmates to reduce prison overcrowding during the COVID-19 pandemic.

303
RJN Exhibit 12

**Administration:**  Authorities permitted prisoners to register complaints with state and national human rights commissions, but the authority of the commissions extended only to making recommendations.  Government officials reportedly often failed to comply with a Supreme Court order instructing the central government and local authorities to conduct regular checks on police stations to monitor custodial violence.

Authorities permitted visitors limited access to prisoners, but some family members claimed authorities denied access to relatives, particularly in areas experiencing high levels of violence, including Jammu and Kashmir.

**Independent Monitoring:**  The NHRC received and investigated prisoner complaints of human rights violations throughout the year.  Civil society representatives believed few prisoners filed complaints due to fear of retribution from prison guards or officials.

The NHRC made unannounced visits to monitor state prisons in multiple states.  NHRC special rapporteurs visited state prisons on a regular basis throughout the year to verify that authorities provided medical care to all inmates.  The NHRC has not publicly released reports on their findings.  NHRC jurisdiction does not extend to military detention centers.

Courts sometimes ordered prisoners released on bail to receive medical treatment.

## d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention, but both occurred during the year.  Police also used special security laws to postpone judicial reviews of arrests.  Pretrial detention was arbitrary and lengthy, sometimes exceeding the duration of the sentence given to those convicted.

According to human rights NGOs, police used torture, mistreatment, and arbitrary detention to obtain forced or false confessions.  In some cases police reportedly held suspects without registering their arrests and denied detainees sufficient food and water.

Following the 2019 abrogation of autonomous status for Jammu and Kashmir,

RJN Exhibit 12

authorities used a public safety law to detain local politicians without trial, but most were subsequently released.  Media reports indicated some of those released were asked to sign bonds agreeing not to engage in political activity after release.  A few prominent politicians declined to sign and were still released.  Former Jammu and Kashmir chief minister Mehbooba Mufti, who was released in October 2020, alleged that she was frequently subjected to periods of house arrest.

On February 13, New Delhi police arrested climate activist Disha Ravi in Bengaluru on sedition charges.  The authorities accused Ravi of creating and sharing a document that included instructions on fomenting violence.  After Ravi spent 10 days in jail, a New Delhi court granted her bail on February 23, noting a citizen's right to dissent from the government.

**Arrest Procedures and Treatment of Detainees**

In cases other than those involving security risks, terrorism, or insurgency, police may detain an individual without charge for up to 30 days, but an arrested person must be brought before a judge within 24 hours of arrest.  Lengthy arbitrary detention remained a significant problem due to overburdened and underresourced court systems and a lack of legal safeguards.

Arraignment of detainees must occur within 24 hours unless authorities hold the suspect under a preventive detention law.  The law allows police to summon individuals for questioning, but it does not grant police prearrest investigative detention authority.  There were incidents in which authorities allegedly detained suspects beyond legal limits.  By law authorities must allow family member access to detainees, but this law was not always observed.

Due to delays in completing repatriation procedures, foreign nationals often remained incarcerated beyond the expiration of their sentences, including those charged under the immigration act for irregular entry or stay.  The *PSI 2020* noted a category of 765 "other" prisoners pending release; experts analyzing the previous editions of the PSI report stated this category most likely represented those who had completed sentences but had not yet been released.  This included approximately 270 Rohingya arrested for illegal entry, of whom 147 had reportedly completed their sentences.

The law requires every arrested person to be produced before a judicial magistrate within 24 hours of arrest.  Other than in Jammu and Kashmir, the National Security Act allows police to detain persons considered security risks without charge or trial for as long as one year.  The law allows family members and lawyers to visit national security detainees and requires authorities to inform a detainee of the grounds for detention within five days, or 10 to 15 days in exceptional circumstances.  Nonetheless, rights activists noted instances where these provisions were not followed in Odisha, Manipur, Andhra Pradesh, and Maharashtra.  Under the Armed Forces Special Powers Act (AFSPA), the central government may designate a state or union territory as a "disturbed area," authorizing security forces in the state to use deadly force to "maintain law and order" and to arrest any person "against whom reasonable suspicion exists" without informing the detainee of the grounds for arrest.  The law also provides security forces immunity from civilian prosecution for acts committed in regions under the AFSPA.

The designation as a disturbed area under the AFSPA remained in effect in Nagaland, parts of Arunachal Pradesh, Manipur, and Assam, and a version of the law was in effect in Jammu and Kashmir.  The AFSPA was renewed through January, and again in June in Nagaland, which has been under the AFSPA for nearly six decades.  It was also extended in Assam, Manipur, and in three districts of Arunachal Pradesh.  On December 27, the Ministry of Home Affairs announced the creation of a committee to review the continuation of the AFSPA in Nagaland.

Human rights organizations asserted the law is in violation of Article 21 of the constitution and continued to call for its repeal, citing numerous alleged human rights violations.

The Public Safety Act (PSA), which applies only in Jammu and Kashmir, permits authorities to detain persons without charge or judicial review for up to two years without visitation from family members.  The press reported that the number of PSA detentions rose to 331 from 134 in 2020.

Authorities in Jammu and Kashmir allowed detainees access to a lawyer during interrogation, but human rights groups documented that police routinely employed arbitrary detention and denied detainees access to lawyers and medical attention.

Authorities must promptly inform persons detained on criminal charges of the charges against them and of their right to legal counsel.  By law a magistrate may authorize the detention of an accused person for a period of no more than 90 days prior to filing charges.  Under standard criminal procedure, authorities must release the accused on bail after 90 days if charges are not filed.

NCRB data from January 2020 showed that most individuals awaiting trial spent more than three months in jail before they could secure bail, and more than 63 percent spent between three months and five years before being released on bail.  According to the *India Justice Report 2020*, one in four court cases have been pending for more than five years.

The law also permits authorities to hold a detainee in judicial custody without charge for up to 180 days (including the 30 days in police custody).  The Unlawful Activities Prevention Act (UAPA), which gives authorities the ability to detain persons for up to 180 days without charge in cases related to insurgency or terrorism, makes no bail provisions for foreign nationals, and it allows courts to deny bail in the case of detained citizens.  The UAPA presumes the accused to be guilty if the prosecution can produce evidence of the possession of firearms or explosives or the presence of fingerprints at a crime scene, regardless of whether authorities demonstrate criminal intent.  State governments also reportedly held persons without bail for extended periods before filing formal charges under the UAPA.  The NCRB *Crime in India 2020* report released in September revealed that 796 new UAPA cases were registered in 2020.

In 2019 parliament passed an amendment to the UAPA that allows the government to designate individuals as terrorists and provides new authorities to the National Investigation Agency (NIA) to seize properties acquired from proceeds of terrorism.

States and union territories with terrorist activity, including Manipur and Jammu and Kashmir, also saw an increase in the application of the UAPA.  Media reported that since 2019, the Jammu and Kashmir administration had booked more than 2,300 persons in approximately 1,200 cases under the UAPA.  Of those, 46 percent remained in jail as of August, according to government figures.

On November 23, Kashmiri human rights defender Khurram Parvez was arrested by the NIA for "terror funding" and "conspiracy"; both his home and office were raided. His arrest was immediately criticized by domestic and international civil society. UN Special Rapporteur on the Situation of Human Rights Defenders Mary Lawlor and other UN experts called for his immediate release in a joint statement on December 22.

In September 2020 former Jawaharlal Nehru University student leader Umar Khalid was arrested under the UAPA for making a speech during protests against the Citizenship Amendment Act, 2019 (CAA). He remained in jail and claimed prosecutors were delaying the start of his trial. In a related case, the Delhi High Court ordered the release of student leaders Asif Iqbal Tanha, Natasha Narwal, and Devangana Kalita in June. The three had been charged under the UAPA for allegedly conspiring to incite the 2020 Delhi riots.

Multiple courts have denied bail to the majority of 15 activists incarcerated on conspiracy charges related to the Elgaar Parishad Bhima Koregaon protests that resulted in several deaths. The accused claimed the charges were politically motivated. On February 21, the Bombay High Court granted conditional bail on medical grounds for six months to Varvara Rao, an 81-year-old human rights activist, following his hospitalization for COVID-19 in June 2020. The NIA petitioned for Rao's return to prison following several bail extensions despite his health's improvement; in December the Bombay High Court ordered the matter be discussed during a further hearing early in 2022.

On July 5, 84-year-old human rights activist and Jesuit priest Father Stan Swamy died in a private hospital after contracting COVID-19 in prison. A NIA Special Court had rejected multiple bail pleas submitted on medical grounds, including Swamy's diagnosis of Parkinson's disease, other age-related illnesses, and multiple falling incidents in prison, in the months following Father Swamy's arrest in October 2020. Activist Sudha Bharadwaj was released on bail in December.

**Arbitrary Arrest:** The law prohibits arbitrary arrest or detention, but in some cases, police reportedly continued to arrest persons arbitrarily. There were reports of police detaining individuals for custodial interrogation without identifying themselves or providing arrest warrants.

On March 9, paramilitary personnel and local police of the Dantewada District in Chhattisgarh detained human rights activist Hidme Markam without a warrant during an event to recognize International Women's Day and Adivasi rights.  She remained in jail after charges were filed under the UAPA.

On June 15, police in Jammu and Kashmir detained political activist Sajad Sofi after he criticized government officers who were posted in Jammu and Kashmir from other parts of the country.  Sofi was released four days later.

**Pretrial Detention:**  NCRB data reported 371,848 prisoners were awaiting trial at the end of 2020, totaling 76 percent of the country's prison population.  Media reported the high numbers of pretrial detainees contributed to prison overcrowding.

The Telangana Prisons Department stated that since 2019 a total of 429 persons facing trial remained in prisons despite securing bail.  The report noted the accused belonged to low-income families that did not have sufficient money to pay for bail.  Telangana officials said COVID-19 had hampered the activities of the NGOs that visit prisons and pay bail money.

## e. Denial of Fair Public Trial

The law provides for an independent judiciary and the government generally respected judicial independence, but the judicial system experienced delays, capacity challenges, and corruption.

The judicial system remained seriously overburdened and lacked modern case management systems, often delaying or denying justice.  According to Department of Justice statistics released in January, there were 402 judicial vacancies out of 1,098 positions on the country's 25 high courts.

**Trial Procedures**

The law provides for the right to a fair and public trial, except in proceedings that involve official secrets or state security.  Defendants enjoy the presumption of innocence, except as described under UAPA conditions, and may choose their counsel.  The constitution specifies the state should provide free legal counsel to defendants who cannot afford it to ensure that opportunities for securing justice are

not denied to any citizen, but circumstances often limited access to competent counsel.  An overburdened justice system resulted in lengthy delays in court cases, with disposition sometimes taking more than a decade.

There were reported cases in which police denied suspects the right to meet with legal counsel as well as cases in which police unlawfully monitored suspects' conversations and violated their confidentiality rights.

While defendants have the right to confront accusers and present their own witnesses and evidence, defendants sometimes did not exercise this right due to lack of proper legal representation.  Defendants have the right not to testify or confess guilt.  Courts must announce sentences publicly, and there are effective channels for appeal at most levels of the judicial system.

**Political Prisoners and Detainees**

There were reports of political prisoners and detainees.  NGOs reported the central government held political prisoners and temporarily detained individuals in Jammu and Kashmir under the PSA.  In August the lieutenant governor of Jammu and Kashmir, Manoj Sinha, announced the formation of a committee to investigate the cases of political prisoners detained under the PSA.  Sinha stated no politician remained in detention under the PSA in Jammu and Kashmir.

**Civil Judicial Procedures and Remedies**

Individuals or NGOs on behalf of individuals or groups may file public-interest litigation petitions in any high court or directly to the Supreme Court to seek judicial redress of public injury.  Grievances may include a breach of public duty by a government agent or a violation of a constitutional provision.  NGOs credited public-interest litigation petitions with making government officials accountable to civil society organizations in cases involving allegations of corruption and partiality.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

While the constitution does not contain an explicit right to privacy, the Supreme

Court ruled in 2017 that privacy is a "fundamental right."

The law, with some exceptions, prohibits arbitrary interference. The government generally respected this provision; at times authorities infringed upon the privacy rights of citizens. The law requires police to obtain warrants to conduct searches and seizures, except for cases in which such actions would cause undue delay. Police must justify warrantless searches in writing to the nearest magistrate with jurisdiction over the offense.

Both the central and state governments legally intercepted communications. A Group of Experts on Privacy convened in 2018 by the central government noted the country lacked a comprehensive consumer data-protection framework.

The UAPA also allows use of evidence obtained from intercepted communications in terrorism cases. In Jammu and Kashmir, Punjab, and Manipur, security officials have special authorities to search and arrest without a warrant.

There were reports that government authorities accessed, collected, or used private communication arbitrarily or unlawfully or without appropriate legal authority and developed practices that allow for the arbitrary or unlawful interference with privacy, including the use of technology to arbitrarily or unlawfully surveil or interfere with the privacy of individuals.

Privacy concerns were raised by *The Wire*, an online media outlet, that published a series of stories alleging dozens of journalists were potential targets for surveillance by Pegasus malware developed by NSO Group Technologies. *The Wire* cited forensic analysis conducted by Amnesty International on phone numbers that showed signs of either attempted or successful infiltration. In October the Supreme Court ordered an independent probe on these allegations.

The government denied conducting surveillance activities that violated laws or formally established procedures. Laws permit the government to intercept calls to protect the sovereignty and integrity of the country, the security of the state, friendly relations with foreign states, for public order, or for preventing incitement to the commission of an offense.

311

RJN Exhibit 12

## g. Conflict-related Abuses

The country's armed forces, the security forces of individual states, and paramilitary forces engaged with terrorist groups in several northeastern states and Jammu and Kashmir, and with Maoist terrorists in the northern, central, and eastern parts of the country.  The intensity of these conflicts continued to decline.  The army and security forces remained stationed in conflict areas in the northeastern states, Jharkhand, and Bihar.  The armed forces and police also engaged with terrorist groups in Jammu and Kashmir.

The use of force by all parties resulted in deaths and injuries to both conflict participants and civilians.  There were reports government security forces committed extrajudicial killings.  Human rights groups claimed police sometimes refused to release bodies.  Authorities did not require the armed forces to report custodial deaths to the NHRC.

There were few investigations and prosecutions of human rights violations or abuses arising from internal conflicts.

**Killings:**  Terrorists used violence against the state, including killings, while government security forces conducted operations against these groups sometimes leading to the deaths of intended targets or nonparticipants.

On October 8, Parvez Ahmad Bokda died when members of the Central Reserve Police Force opened fire in what they claimed was self-defense at a checkpoint in Jammu and Kashmir.  Local observers said the death was the result of "disproportionate force" and pressed for action against the security personnel involved.  On October 24, Shahid Ajaz was killed in crossfire between security forces and terrorists, according to initial police reports.  Media reported 12 civilian deaths in Jammu and Kashmir by terrorist or security forces in October.

On April 3, Maoist terrorists killed 22 members of security forces in Chhattisgarh.  The ambush marked the largest death toll for security forces battling the guerrillas since 2017.

Maoist insurgents allegedly killed former colleagues on suspicion of acting as informants for law enforcement.  Korra Pilku of Andhra Pradesh and Santosh

RJN Exhibit 12

Dandasena of Odisha were allegedly killed for working with police officials.

**Abductions:**  Human rights groups maintained that insurgent groups abducted persons in Chhattisgarh, Manipur, Jharkhand, and Jammu and Kashmir.

Maoist groups in Chhattisgarh used abduction to intimidate law enforcement and the local population.  Media reports alleged Maoists killed Constable Sannu Punem after abducting him in Bijapur District of Chhattisgarh.  Additionally, Maoist rebels were suspected of kidnapping 11 persons who attended a police recruitment event.

**Physical Abuse, Punishment, and Torture:**  There were reports government security forces tortured and mistreated insurgents in custody and injured demonstrators.  Human rights activists alleged some prisoners were tortured or killed during detention.

The postmortem report on A Velmurugan, a member of a Maoist terrorist group killed by anti-insurgency forces in Kerala in November 2020, showed he "sustained 44 lacerated penetrative and nonpenetrative wounds on all sides of his body," leading human rights activists to allege torture.

Waheed-Ur-Rehman Parra, a Kashmiri politician detained by the National Intelligence Agency on alleged terrorist charges, was granted bail in January.  On March 31, UN Special Rapporteur on Torture Nils Melzer cosigned a report raising concerns of Parra's alleged torture in custody.  The government denied these allegations, and soon after the report was made public, Parra was re-arrested.  Parra was still in custody at year's end.

**Child Soldiers:**  In May the United Nations released the *Children and Armed Conflict* report, which identified the recruitment of two minors by unidentified perpetrators.  The United Nations also stated it was investigating reports that security forces used three minors for less than 24 hours.

Insurgent groups reportedly recruited teenagers for support roles.  There were reports terrorist groups recruited children from schools in Chhattisgarh.

On July 27, the federal minister of state for home affairs informed parliament that

Maoist terrorists in Chhattisgarh and Jharkhand states were recruiting children and providing them military training.

Speaking at the UN Security Council's Open Debate on Children and Armed Conflict on July 28, the foreign secretary called for an end to impunity for all those involved in recruiting child soldiers. He called for greater accountability and sincere efforts in bringing the perpetrators to justice.

**Other Conflict-related Abuse:** In 2020 the Ministry of Home Affairs informed parliament's lower house there were approximately 65,000 registered Kashmiri migrant families across the country. Tens of thousands of Hindus, known as Kashmiri Pandits, fled the Kashmir Valley after 1990 because of violent intimidation that included murders, destruction of temples, and rapes by Kashmiri Muslim residents.

In March the Ministry of Home Affairs informed parliament that 3,800 Kashmiri Pandit migrants had returned to Jammu and Kashmir since the 1990s, 520 of whom had returned after August 2019. In July the Ministry of Home Affairs reported to parliament that 1,997 candidates from the Kashmiri Pandit community had been selected for jobs in Jammu and Kashmir.

In the central and eastern areas, armed conflicts between Maoist insurgents and government security forces over land and mineral resources in tribal forest areas continued. According to the South Asia Terrorism Portal's existing-conflict map, Maoist-affected states included Madhya Pradesh, Maharashtra, Karnataka, Kerala, Tamil Nadu, Andhra Pradesh, Telangana, Odisha, Chhattisgarh, Jharkhand, West Bengal, Bihar, Uttar Pradesh, and Assam. Human rights advocates alleged the security operations sought not only to suppress terrorism but also to force tribal populations from their land.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provides for freedom of expression, but it does not explicitly mention freedom of the press. The government generally respected this right, but

RJN Exhibit 12

there were instances in which the government or actors considered close to the government allegedly pressured or harassed media outlets critical of the government, including through online trolling.  There were also reports of terrorists and extremists perpetrating killings, violence, and intimidation against journalists critical of the government.

**Freedom of Expression:**  Individuals routinely criticized the government publicly and privately via online platforms, television, radio, or in print media.  According to the HRW *World Report 2021*, the government "increasingly harassed, arrested, and prosecuted rights defenders, activists, journalists, students, academics, and others critical of the government or its policies."  Harassment and detainment of journalists critical of the government in their reporting or social media messaging continued.

Freedom House's *Freedom in the World 2021* report downgraded the country's ranking from "Free" to "Partly Free," due in part to "a crackdown on expressions of dissent by media, academics, civil society groups, and protesters."  The Freedom House report stated authorities used security, defamation, sedition, and hate speech laws, as well as contempt-of-court charges, to curb critical voices.  Media contacts said that some media outlets practiced self-censorship in response to the government reportedly withholding public-sector advertising from some outlets critical of the government.

On January 1, Madhya Pradesh police arrested stand-up comedian Munawar Faruqui and four other persons for offending religious sentiments with jokes he allegedly planned to perform.  The Supreme Court granted Faruqui bail in February, stating the allegations against him were vague.

On February 1, the government ordered Twitter to block accounts belonging to journalists covering the protests against agricultural reform laws, stating the order was to prevent a potential escalation of violence.  Twitter initially complied with the government's request, but subsequently restored access to the accounts after conducting an internal review.

On May 13, Manipur police arrested social activist Erendro Leichombam for a Facebook post critical of a BJP leader who advocated cow dung and cow urine as

cures for COVID-19.  On July 19, the Supreme Court granted bail to Leichombam, who was previously kept in preventive detention under the National Security Act after being granted bail by a lower court.

On July 24, Tamil Nadu police arrested Father George Ponnaiah, a Catholic priest, for alleged hate speech against the prime minister and home minister.  The priest was attending a July 18 meeting honoring deceased tribal rights activist Father Stan Swamy.  The court remanded Ponnaiah to judicial custody for 15 days, and the Madras High Court granted conditional bail on August 10.

**Freedom of Expression for Members of the Press and Other Media, Including Online Media:**  Independent media were active and generally expressed a wide variety of views.  The law prohibits content that could harm religious sentiments or provoke enmity among groups, and authorities invoked these provisions to restrict print media; broadcast media; digital media platforms, including streaming services; and publication or distribution of books.

There were reports from journalists and NGOs that government officials at both the local and national levels were involved in intimidating critical media outlets through physical harassment and attacks, pressuring owners, targeting sponsors, encouraging frivolous lawsuits, and in some areas blocking communication services, such as mobile telephones and the internet, and constraining freedom of movement.

NGOs alleged criminal prosecutions and investigations were used to intimidate journalists critical of the government.

The Reporters without Borders *2021 World Press Freedom Index* described the country as very dangerous for journalists, with press freedom violations by police, political activists, criminal groups, and local officials.  The report also identified "coordinated hate campaigns waged on social networks," encouraging threats against journalists as a major area of concern.  Harassment and violence were particularly acute for female journalists.  Journalists working in Jammu and Kashmir continued to face barriers to free reporting through communications and movement restrictions.

In Jammu and Kashmir at least six journalists were assaulted, detained, or

questioned by police through August according to the Jammu Kashmir Coalition of Civil Society.  In 2020 the government introduced a new media regulation in Jammu and Kashmir empowering local administration to determine "fake and antinational news" and to initiate criminal charges against journalists.  The Kashmir Press Club protested the policy and alleged that the government was institutionalizing intimidation by exploiting the policy against media platforms critical of the government.

In January, Uttar Pradesh, Haryana, Gujarat, Karnataka, and New Delhi police filed charges against *India Today* anchor Rajdeep Sardesai; *National Herald* senior consulting editor Mrinal Pande; *Qaumi Awaz* editor Zafar Agha; the *Caravan* founder Paresh Nath, editor Anant Nath, and executive editor Vinod K. Jose; and Member of Parliament Shashi Tharoor.  The charges included sedition, intent to cause riot, and other charges through their coverage of a violent January 26 protest.  The Supreme Court granted the individuals a stay of arrest on February 9.

On March 5, journalists Shafat Farooq and Saqib Majeed said they were beaten by police during a protest in Srinagar.  On July 17, Kashmiri journalist Aakash Hassan was allegedly assaulted by police.  In August, Jammu and Kashmir police detained and questioned journalist Irfan Malik concerning tweets critical of the Jammu Kashmir government's film promotion policy.

On April 7, Jammu and Kashmir Police inspector general Vijay Kumar issued a warning that police would file criminal charges against journalists who approached ongoing police counterterrorism operations, on the grounds that such reporting was "likely to incite violence" or promote "antinational sentiment."  The Editors Guild of India criticized the prohibitions as "draconian and undemocratic."

Media reported criminal charges were filed against individuals who posted requests for oxygen supplies via social media during the second wave of the COVID-19 pandemic.  On April 28, police in Amethi, Uttar Pradesh, filed charges against 26-year-old Shashank Yadav for tweeting a plea for oxygen for his grandfather.  On April 30, the Supreme Court warned that states should protect citizens' right to communicate their grievances regarding the COVID-19 pandemic on social media.

On June 15, Uttar Pradesh police filed charges against Twitter; online news platform *The Wire*; journalists Rana Ayyub, Saba Naqvi, and Mohammad Zubair; and Congress leaders Salman Nizami, Masqoor Usmani, and Sama Mohammad for "stoking communal unrest" by posting video footage of the assault of an elderly Muslim man.

On July 22, the Income Tax Department searched 32 office and residential locations affiliated with the Dainik Bhaskar Group, publisher of *Dainik Bhaskar*, the country's second-most-read Hindi language newspaper.  The Income Tax Department also raided the offices of Hindi language television station Bharat Samachar.  Government sources asserted the raids were a result of alleged tax evasion by the media groups.  The media groups claimed the raids were conducted as retaliation for investigative reporting during the second wave of the COVID-19 pandemic.

In February the Kashmir Press Club stated security agencies had routinely deployed intimidation tactics such as threats, summonses, and physical attacks on journalists in Jammu and Kashmir.  On February 8, police summoned journalists Naseer Ganai and Haroon Nabi to the police facility, where they were questioned for reporting on a statement by the Jammu Kashmir Liberation Front.

In June the Jammu and Kashmir government released *Media Policy – 2020*, a policy which authorizes the Directorate of Information and Publication Relations to "examine" the content of print, electronic, and other forms of media for "fake news, plagiarism, and unethical or antinational activities" in the name of law and order.  Under the new media policy, government action could range from legal proceedings against journalists for "indulging in fake news, unethical or antinational activities, or plagiarism" to withholding advertisements from any media that "incite or tends to incite violence, question sovereignty and the integrity of India, or violate the accepted norms of public decency and behavior."

On June 13, Uttar Pradesh authorities charged *Scroll.in* executive editor Supriya Sharma for a news report critical of the COVID-19 lockdown; she was charged with violating the Scheduled Castes and Scheduled Tribes (Prevention of Atrocities) Act, 1989, and sections of the penal code regarding printing defamatory matter and negligent acts likely to spread infection of disease dangerous to life.

RJN Exhibit 12

Police also charged the Mumbai-based editor in chief of *Scroll.in*.  On August 26, the Allahabad High Court granted Sharma protection from immediate arrest in the case but allowed the investigation to continue.

On July 1, UNESCO director general Audrey Azoulay called for authorities to end "gunpoint censorship" and prosecute those responsible for the killing of Shubham Mani Tripathi, a journalist for the newspaper *Kampu Mail*.  Tripathi died on June 19 when he was shot six times by two gunmen in Uttar Pradesh.  His killing was allegedly in retaliation for his investigative reports into connections between illegal sand mining and corruption allegations.  The two assailants, along with a third individual, were arrested.

The government maintained a monopoly on AM radio stations, limiting broadcasting to the state-owned All India Radio, and restricted FM radio licenses to entertainment and educational content.  Widely distributed private satellite television provided competition for Doordarshan, the government-owned television network.  There were accusations of political interference in the state-owned broadcasters.  State governments banned the import or sale of selected books that contained material government officials deemed could be inflammatory or provoke communal or religious tensions.

On May 14, Andhra Pradesh police filed sedition charges against Telugu news channels TV5 and ABN Andhra Jyothi for broadcasting the speeches and statements of Member of Parliament K. Raghu Ramakrishna Raju that allegedly "promoted enmity and hatred among different communities."  Police arrested Raju and filed sedition charges against him.  On May 21, the Supreme Court granted bail to the lawmaker; on May 31, the Supreme Court blocked Andhra Pradesh police from acting against the two channels.

**Violence and Harassment:**  The Committee to Protect Journalists reported five journalists were killed during the year.  Journalists were threatened online with violence and, in the case of female journalists, rape.

On March 24, *Syandan Patrika* journalist Bikash Das was assaulted in Tripura while covering a story on corruption.  A group of assailants attacked Das, inflicting serious injuries before he was able to escape.

On June 13, Uttar Pradesh journalist Sulabh Srivastava was found dead under mysterious circumstances.  On the day before his death, Sulabh wrote to seek protection from Uttar Pradesh police, claiming he faced danger after reporting on organized crime in the city.  Police reported the cause of Srivastava's death as a motorcycle accident.

In July photojournalist Masrat Zahra, who relocated to Germany after UAPA charges were filed against her, alleged her parents were beaten by Jammu and Kashmir police because of her work.

On August 8, journalist Chennakeshavalu was stabbed to death by two suspects allegedly for his reporting on illegal gambling activities in Andhra Pradesh.  Police arrested Venkata Subbaiah, a police officer, and his brother Nani for suspected murder.

Online and mobile harassment was prevalent, and reports of internet "trolling," continued to rise.  In some instances police used information provided by anonymous social media users as a pretext to initiate criminal proceedings against journalists.

**Censorship or Content Restrictions:**  Citizens generally enjoyed freedom of speech, but the government continued to censor and restrict content based on broad public and national interest provisions in Article 19 of the constitution.

On February 25, the government published new regulations to govern social media platforms, messaging services, and streaming service that delivers content directly to the consumer over the internet.  Human rights advocates and journalists expressed concerns that these rules would curtail freedom of speech and expression, and several media organizations filed legal actions against the regulations.  They contended that parts of IT Rules 2021 are unconstitutional and contrary to the necessity and proportionality standard laid down by the Supreme Court in the 2018 Puttaswamy v. India decision guaranteeing the right to privacy in the constitution.  In response to one such challenge on August 14, the Mumbai High Court ordered a stay on implementation of Rules 9(1) and 9(3) of the IT Rules 2021, which require digital news media and online publishers to adhere to a prescribed code of ethics and establish a three-tier grievance redressal mechanism.

**Libel/Slander Laws:**  Individuals continued to face legal action for posting offensive or derogatory material on social media.  In January the Delhi High Court dismissed a criminal defamation case filed by a former senior official against Priya Ramani, accusing Ramani of sexual harassment.  The court noted, "a woman cannot be punished for raising her voice against sexual abuse."

**National Security:**  In some cases government authorities cited laws protecting national interest to restrict media content.  The government banned more than 200 Chinese mobile apps because they were "prejudicial" to the sovereignty and security of the country.

## Internet Freedom

There were government restrictions on access to the internet, disruptions of access to the internet, censorship of online content, and there were reports the government occasionally monitored users of digital media, such as chat rooms and person-to-person communications.  The law permits the government to block internet sites and content and criminalizes sending messages the government deems inflammatory or offensive.  Both central and state governments have the power to issue directives for blocking, intercepting, monitoring, or decrypting computer information.  The government temporarily blocked telecommunications and internet connections in certain regions during periods of political unrest.

In January 2020 the Supreme Court declared access to the internet a fundamental right guaranteed by the constitution.  In 2015 the Supreme Court overturned some provisions of the information technology law that restricted content published on social media but upheld the government's authority to block online content "in the interest of sovereignty and integrity of India, defense of India, security of the state, and friendly relations with foreign states or public order" without court approval.  The government may shut telephone and internet services temporarily during a "public emergency" or for "public safety."  A suspension order can be issued by a "competent authority" at either the federal or the state level.

NGO Software Freedom Law Center reported the central and state governments conducted localized internet shutdowns 36 times as of October.  For example, according to Jammu Kashmir Coalition of Civil Society, Jammu and Kashmir

experienced 19 instances of internet shutdown as of August.

Press outlets reported instances in which individuals and journalists were arrested or detained for online activity.  Police continued to arrest individuals based on the Information Technology Act for legitimate online activity, despite a 2015 Supreme Court ruling striking down the statute as unconstitutional; experts claimed the arrests were an abuse of legal processes.

The Central Monitoring System continued to allow government agencies to monitor electronic communications in real time without informing the subject or a judge.  The monitoring system is an indigenous mass electronic surveillance data mining program installed by the Center for Development of Telematics, a government-owned telecommunications technology development center.

**Academic Freedom and Cultural Events**

Contacts reported a few Kashmiri academics attempting to travel internationally to attend academic conferences or pursue professional assignments were prohibited from leaving the country.

In January the Ministry of Education issued guidelines for holding virtual conferences and seminars that required local universities to seek government approval for any virtual discussions, including approval of the names of all participants, and prohibited virtual events related to security matters.  The academic community, including the country's two largest science academies representing 1,500 scientists, protested and requested the elimination of these regulations.  In February the government withdrew the guidelines and left in place a 2008 rule that only concerned in-person conferences.

In July, Madhya Pradesh police warned the administration of Dr. Harisingh Gour University of possible action based on the national penal code "if religious and caste sentiments are hurt" during an international webinar titled *Culture and Linguistic Hurdles in the Achievement of Scientific Temper*.  The police warning was prompted by a complaint from the Akhil Bharatiya Vidyarthi Parishad, which objected to the topic as well as past statements and "antinational mentality" of the academic participants.

## b. Freedoms of Peaceful Assembly and Association

The law provides for the freedoms of peaceful assembly and association, and the government generally respected these rights.

### Freedom of Peaceful Assembly

The law provides for freedom of assembly.  Authorities often required permits and notification before parades or demonstrations, and local governments generally respected the right to protest peacefully.  Jammu and Kashmir was an exception, where the state government sometimes denied permits to separatist political parties for public gatherings, and security forces reportedly detained and assaulted members of political groups engaged in peaceful protest (see section 1.g.).  During periods of civil unrest in Jammu and Kashmir, authorities used the law to ban public assemblies and impose curfews.

### Freedom of Association

The law provides for freedom of association.  While the government generally respected this right, the government's increased monitoring and regulation of NGOs that received foreign funding caused concern.  In certain cases the government suspended foreign banking licenses or froze accounts of NGOs that allegedly received foreign funding without authorization or that unlawfully mixed foreign and domestic funding.  In other instances the government canceled or declined to renew Foreign Contribution (Regulation) Act (FCRA) registrations.

In September 2020 parliament passed amendments to the FCRA that placed additional limitations on the international funding of nongovernmental organizations.  Financial consultants and NGO leaders believed the new legislation would severely restrict the ability of smaller, regional organizations to raise funds and diminish collaboration between the government and civil society.

Some NGOs reported an increase in random FCRA compliance inspections by Ministry of Home Affairs officials.  FCRA licenses were also reportedly canceled periodically based on confidential investigations by the Intelligence Bureau.

Some NGOs stated they were targeted as a reprisal for their work on "politically

sensitive" topics such as human rights or environmental activism. In September 2020 Amnesty International India (AII) closed its offices after a two-year FCRA investigation charged the organization with financial irregularities resulting in the suspension of its local bank accounts. In February the Enforcement Directorate froze access to AII assets worth more than 170 million rupees ($2.3 million) as part of a money-laundering investigation.

On March 31, the National Investigation Agency conducted searches of suspected terrorist organizations at 31 locations across Andhra Pradesh and Telangana. The Human Rights Forum described the searches as intimidation intended to stifle lawful protest, while a representative of the People's Union for Civil Liberties alleged that human rights activists were being deliberately targeted and silenced by this law enforcement action.

On June 7, the government temporarily suspended the FCRA license of Commonwealth Human Rights Initiative (CHRI) for alleged violations. CHRI lawyers believe the enforcement action was taken as retribution for CHRI's human rights work. Subsequently, the Delhi High Court allowed the human rights organization access up to 25 percent of the impounded funds to pay staff salaries.

On September 16, Enforcement Directorate officials raided the home and office of human rights activist Harsh Mander. Authorities alleged Mander violated provisions of the FCRA. Human Rights Watch claimed authorities repeatedly targeted Mander, who has criticized the government's "discriminatory policies against religious minorities." On September 29, more than 30 activists and intellectuals released a statement condemning the raids as a tactic to harass and intimidate Mander.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The law provides for freedom of internal movement, foreign travel, emigration, and repatriation. The government generally respected these rights.

RJN Exhibit 12

**In-country Movement:**  The central government relaxed restrictions on travel by foreigners to Arunachal Pradesh, Nagaland, Mizoram, Manipur, and parts of Jammu and Kashmir, excluding foreign nationals from Pakistan, China, and Burma.  The Ministry of Home Affairs and state governments required citizens to obtain special permits when traveling to certain states.  Inner Line Permits are required in the states of Arunachal Pradesh, Nagaland, Mizoram, and Manipur.

**Foreign Travel:**  The government may legally deny a passport to any applicant for engaging in activities outside the country "prejudicial to the sovereignty and integrity of the nation."

The government delayed issuance and renewal of passports to citizens from Jammu and Kashmir, sometimes for up to two years.  The government reportedly subjected applicants born in Jammu and Kashmir, including children born to military officers deployed there, to additional scrutiny and police clearances before issuing them passports.

**Citizenship:**  In 2019 parliament passed the Citizenship Amendment Act, which provides an expedited path to citizenship for Hindu, Sikh, Buddhist, Jain, Parsi, and Christian religious minorities from Afghanistan, Bangladesh, and Pakistan.  The act does not include Muslims from those countries and does not apply to the tribal areas of Assam and Tripura, most of Meghalaya, Mizoram, Manipur, Nagaland, Arunachal Pradesh, or Tripura.  Following passage of the act, widespread protests against its passage and the exclusion of Muslims from the statute occurred throughout the country, leading to arrests, targeted communications shutdowns, bans on assembly, and deaths in a few instances.

On July 27, the minister of state for home affairs notified parliament that the government required additional time to further develop and notify the rules for the CAA, effectively meaning that the law was not in effect during the year.

Approximately 1.9 million residents of the state of Assam, which borders Bangladesh, were left off the Supreme Court-mandated National Register of Citizens (NRC) register in Assam.  The government established procedures for appeals.  The nationality status of those excluded remained unclear, pending the adjudication of appeals.  On May 13, Assam's NRC authorities requested Supreme

Court permission for a reverification of the NRC list.

## e. Status and Treatment of Internally Displaced Persons

Settlements of internally displaced persons (IDPs) existed throughout the country. In 2020 approximately 3,900 persons were displaced because of conflicts and violence, while natural disasters displaced almost four million persons.

Precise numbers of those displaced by conflict or violence were difficult to obtain because the government does not monitor the movements of displaced persons, and humanitarian and human rights agencies had limited access to camps and affected regions.  While authorities registered residents of IDP camps, an unknown number of displaced persons resided outside the camps.  Many IDPs lacked sufficient food, clean water, shelter, and health care (see section 1.g., Other Conflict-related Abuse).

National policy or legislation did not address the matter of internal displacement resulting from armed conflict or from ethnic or communal violence.  The welfare of IDPs was generally the purview of state governments and local authorities, allowing for gaps in services and poor accountability.  The central government provided limited assistance to IDPs but allowed NGOs and human rights organizations access to IDPs; neither access nor assistance was standard for all IDPs or all situations.

On April 20, nearly 400 families of Mizoram's Bru tribe left a temporary camp and relocated to permanent homes.  Since 1997, nearly 37,000 Brus have lived in six relief camps after they fled Mizoram's Mamit, Kolasib, and Lunglei Districts.  In 2020 the central government, along with the state governments of Tripura and Mizoram, signed an agreement with the leaders of the Mizoram Bru Displaced People's Forum that allowed Brus to settle permanently in Tripura.

## f. Protection of Refugees

The government generally cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing minimal protection and assistance to refugees, returning refugees, or asylum seekers, as well as other persons of concern.  While UNHCR does not have

RJN Exhibit 12

an official agreement with the government, it is able to assist asylum seekers and refugees from noncontiguous countries.  UNHCR did not have direct access to newly arriving refugees on the country's border with Burma or protracted Sri Lankan refugees in Tamil Nadu.

The country hosted a large refugee population, including more than 73,404 Tibetan refugees, per the latest census conducted by Central Tibetan Relief Committee. More than 92,000 refugees from Sri Lanka lived in the country as of July 1.  In February, Burmese nationals fleeing violence in Burma began arriving in Mizoram, Manipur, and Nagaland states.  The estimated number of Burmese refugees varied widely from approximately 5,000 to 20,000.  A protection working group consisting of civil society and humanitarian organizations provides basic humanitarian assistance to this population.

UNHCR reported 736 Afghans registered for protection between August 1 and September 30, and it established a telephone helpline to answer queries from this population.  The Ministry of Home Affairs announced an emergency e-visa for Afghan nationals seeking emergency entry into India on August 17 after the collapse of the previous Afghan government.  On September 5, a Ministry of Home Affairs official stated that no Afghan national would be required to leave the country without prior approval of the Home Ministry.

The courts protected refugees and asylum seekers in accordance with the constitution.  The Supreme Court, however, issued an order allowing the deportation of a group of Rohingya on April 8.  The group of more than 150 Rohingya were detained on March 6 for illegally residing in Jammu and Kashmir. The government argued Rohingya were illegal migrants who had crossed the border.  They enjoyed equal protection of law, but their right to movement was restricted.

In many cases refugees and asylum seekers under UNHCR's mandate reported increased obstacles to regularizing their status through long-term visas and residence permits.

**Access to Asylum:**  The law does not provide for the granting of asylum or refugee status, and the government has not established a system for providing

protection to refugees.  Absent a legal framework, the government sometimes granted asylum on a situational basis on humanitarian grounds in accordance with international law.  This approach resulted in varying standards of protection for different refugee and asylum-seeker groups.  The government recognized refugees from Tibet and Sri Lanka and generally honored UNHCR decisions on refugee status determination for individuals from other countries.

UNHCR maintained an office in New Delhi, where it registered refugees and asylum seekers, made refugee status determinations, and provided some services. The government permitted UNHCR and its partner staff access to refugees in other urban centers and allowed it to operate in Tamil Nadu to assist with Sri Lankan refugee repatriation.  Access to some refugees or asylum seekers in detention was granted.

The government generally permitted NGOs, international humanitarian organizations, and foreign governments access to Sri Lankan refugee camps and Tibetan settlements, but it generally denied access to asylum seekers in Mizoram, Manipur, and Jammu and Kashmir.  The government denied requests for some foreigners to visit Tibetan settlements in Ladakh.

After the end of the Sri Lankan civil war, the government ceased registering Sri Lankans as refugees.  The Tamil Nadu government cooperated with UNHCR by providing exit permission for Sri Lankan refugees to repatriate voluntarily; however, UNHCR did not have access to Sri Lankan refugees who remained in Tamil Nadu.

Excluding Tibetan and Sri Lankan refugees, 43,157 persons of concern were registered by UNHCR as of the end of August.

**Refoulement:**  The government advocated for the return of refugees to Burma. According to UNHCR, at least 26 non-Rohingya refugees (of an estimated 40,000) have been deported since late 2016.

On April 2, Assam police took a 14-year-old Rohingya girl from a shelter home to the international border in Manipur for deportation to Burma.  Burmese immigration officials reportedly refused to accept the girl, and police returned the girl to the shelter home.

On May 3, the High Court of Manipur granted seven Burmese nationals who illegally entered the country permission to approach the UNHCR office in New Delhi.  The High Court interpreted Article 21 of the constitution as protecting the principle of nonrefoulement.

On August 9, the minister of state for defense informed parliament that 8,486 Burmese refugees entered the country after the military coup in February.  The minister noted that 5,796 refugees were "pushed back" into Burma while 2,690 remained in the country.

**Abuse of Migrants and Refugees:**  The law does not contain the term "refugee," treating refugees as any other foreigner.  Undocumented physical presence in the country is a criminal offense.  Persons without documentation were vulnerable to detention, forced returns, and abuse.  The country historically treated persons as refugees based on the merits and circumstances of the cases.

Refugees reported exploitation by nongovernment actors, including assaults, gender-based violence, fraud, and labor and sex trafficking.  Most urban refugees worked in the informal sector or in occupations such as street vending, where they suffered from police extortion, nonpayment of wages, and exploitation.

NGOs claimed law enforcement officials harassed and intimidated Rohingya refugees, including by confiscating UNHCR-issued refugee cards and government identification documents.  NGOs also alleged Delhi police handcuffed, physically abused, and covered refugees' heads with hoods while detaining them for routine questioning.

UNHCR continued to advocate for the release of detained refugees, for asylum seekers to freely move within the country and have their claims assessed, and for refugees to benefit from protection in the state where they arrived, and which has jurisdiction over them.

**Freedom of Movement:**  UNHCR registered 43,157 refugees and asylum seekers as of August 31.  This included 23,518 persons from Burma.  On August 10, the minister of state for home affairs told the lower house of parliament the government did not have accurate data on the number of illegal migrants in the country and responded to questions from parliamentarians that there were reports

of Rohingya migrants committing illegal activities.

The country hosted more than 92,000 Sri Lankan Tamil refugees.  In August, 29 Sri Lankan Tamil refugees attempted suicide in two separate incidents at a detention camp in Tamil Nadu.  Media reports stated nearly 80 Sri Lankan Tamils conducted a protest for weeks demanding their release and alleging false detention. The refugees were reportedly dissatisfied after meeting Tamil Nadu government officials in May who determined that their release would be delayed.  Tamil Nadu has 107 refugee camps across the state, including one detention camp for refugees with criminal records.

**Employment:**  Most UNHCR-registered refugees found employment in the informal sector.  Some refugees reported discrimination by employers and landlords.  According to UNHCR, obtaining formal employment was difficult for refugees because they did not possess government-issued documents such as long-term visas, which the government stopped issuing to refugees in 2017.

**Access to Basic Services:**  Refugees and asylum seekers had access to housing, primary and secondary education, and health care.  In cases where refugees were denied access, it was often due to a lack of knowledge of refugee rights by the service provider.  In many cases UNHCR or its partners were able to intervene successfully and advocate for refugee access.

For asylum seekers UNHCR provided a letter upon registration indicating the person was being considered for UNHCR refugee status.

Sri Lankan refugees were permitted to work in Tamil Nadu.  Police, however, reportedly summoned refugees back into the camps on short notice, particularly during elections and required refugees or asylum seekers to remain in the camps for several days.

On August 27, Tamil Nadu chief minister M.K. Stalin announced a special welfare package of 3.17 billion rupees ($42 million) for Sri Lankan Tamil refugees living in Tamil Nadu.  The assistance will support refugee housing, cooking gas subsidies, and education allowances for refugee children.  This allocation followed the disbursement of 4,000 rupees ($53) per Sri Lankan refugee family earlier in the year.

RJN Exhibit 12

Government services, such as mother and child health programs, were available. According to a factsheet published by UNHCR in June, 6,561 refugees and asylum seekers were vaccinated against COVID-19 across the country during the year.

Refugees were able to request protection from police and courts as needed.

**Durable Solutions:**  The government did not accept refugees for resettlement from other countries.

According to UNHCR an April 2020 moratorium on the repatriation of Sri Lankans remained in effect since the COVID-19 pandemic forced the suspension of commercial flight operations.  A ferry project jointly proposed by the government and the government of Sri Lanka for the repatriation of refugees remained on hold.  Departures for voluntary repatriation, third country resettlement, and complementary pathways continued.

## g. Stateless Persons

By law parents confer citizenship, and birth in the country does not automatically result in citizenship.  Any person born in the country on or after January 26, 1950, but before July 1, 1987, obtained citizenship by birth.  A child born in the country on or after July 1, 1987, obtained citizenship if either parent was a citizen at the time of the child's birth.  Authorities consider those born in the country on or after December 3, 2004, citizens only if at least one parent was a citizen and the other was not illegally present in the country at the time of the child's birth.  Authorities considered persons born outside the country on or after December 10, 1992, citizens if either parent was a citizen at the time of birth, but authorities do not consider those born outside the country after December 3, 2004, citizens unless their birth was registered at a consulate within one year of the date of birth.  Authorities may also confer citizenship through registration in specific categories and via naturalization after residing in the country for 12 years.

Children born in Sri Lankan refugee camps received birth certificates.  While these certificates alone do not entitle refugees to citizenship, refugees may present birth certificates to the Sri Lankan High Commission to obtain a consular birth certificate, which entitles them to pursue Sri Lankan citizenship.

# Section 3. Freedom to Participate in the Political Process

The constitution provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

## Elections and Political Participation

**Recent Elections:**  The Election Commission is an independent constitutional body responsible for administering all elections at the central and state level throughout the country.  In May 2019 voters re-elected the BJP-led National Democratic Alliance in the country's general elections, which involved more than 600 million eligible voters.  During the year state assembly elections took place in Tamil Nadu, Kerala, Puducherry, West Bengal, and Assam.  Observers considered these elections free and fair.

**Political Parties and Political Participation:**  The constitution provides for universal voting rights for all citizens 18 and older.  There are no restrictions placed on the formation of political parties or on individuals of any community from participating in the election process.  The election law bans the use of government resources for political campaigning, and the Election Commission effectively enforced the law.  The commission's guidelines ban opinion polls 48 hours prior to an election and exit poll results may not be released until completion of the last phase (in a multiphase election).

**Participation of Women and Members of Minority Groups:**  No laws limit participation of women or members of minority groups in the political process, and they freely participated.  The law reserves one-third of the seats in local councils for women.  Religious, cultural, and traditional practices prevented women from proportional participation in political office.  Nonetheless, women held many high-level political offices, including two positions as cabinet ministers.  This represented a decline from the first Modi government when nine women served in the cabinet.  The 2019 general election resulted in 78 women elected to the lower house of parliament, compared with 66 in the 2014 general election.  The sole female chief minister leads West Bengal.

The constitution stipulates that, to protect historically marginalized groups and provide for representation in the lower house of parliament, each state must reserve seats for Scheduled Castes and Scheduled Tribes in proportion to their population in the state.  Only candidates belonging to these groups may contest elections in reserved constituencies.  Members of minority populations had previously served or currently served as prime minister, president, vice president, cabinet ministers, Supreme Court justices, members of parliament, and state chief ministers.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials at all levels of government.  Officials frequently engaged in corrupt practices with impunity.  There were numerous reports of government corruption during the year.

**Corruption:**  Corruption was present at multiple levels of government.  In June the country's anticorruption ombudsman reported it had received 110 corruption complaints, including four against members of parliament, during the year.

NGOs reported the payment of bribes to expedite services, such as police protection, school admission, water supply, and government assistance.  Civil society organizations drew public attention to corruption throughout the year, including through demonstrations and websites that featured stories of corruption.

# Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

Most domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases.  In some circumstances groups faced restrictions (see section 2.b., Freedom of Association).  There were reportedly more than three million NGOs in the country, but definitive numbers were not available.  The government generally met with domestic NGOs, responded to their inquiries, and acted in response to their reports or recommendations.

The NHRC worked cooperatively with numerous NGOs, and several NHRC committees had NGO representation.  Some human rights monitors in Jammu and Kashmir were able to document human rights violations, but periodically security forces, police, and other law enforcement authorities reportedly restrained or harassed them.  Representatives of certain international human rights NGOs sometimes faced difficulties obtaining visas and reported that occasional official harassment and restrictions limited their public distribution of materials.

**The United Nations or Other International Bodies:**  The United Nations had limited access to Jammu and Kashmir and the northeastern states.  In September UN High Commissioner for Human Rights Michelle Bachelet raised concerns regarding restrictions on public assembly, internet shutdowns, and the use of UAPA charges in the country.

**Government Human Rights Bodies:**  The NHRC is an independent and impartial investigatory and advisory body established by the central government, with a dual mandate to investigate and remedy instances of human rights violations and to promote public awareness of human rights.  It is directly accountable to parliament but works in close coordination with the Ministry of Home Affairs and the Ministry of Law and Justice.  It has a mandate to address official violations of human rights or negligence in the prevention of violations, intervene in judicial proceedings involving allegations of human rights violations, and review any factors (including acts of terrorism) that infringe on human rights.  The law authorizes the NHRC to issue summonses and compel testimony, produce documentation, and requisition public records.  The NHRC also recommends appropriate remedies for abuses in the form of compensation to the victims of government killings or their families.

The NHRC has neither the authority to enforce the implementation of its recommendations nor the power to address allegations against military and paramilitary personnel.  Human rights groups claimed these limitations hampered the work of the NHRC.  Some human rights NGOs criticized the NHRC dependence on the government funding and its policy of not conducting investigations that last more than one year.  Some claimed the NHRC did not register all complaints, dismissed cases arbitrarily, rerouted complaints back to the alleged violator, and did not adequately protect complainants.

Of 28 states, 24 have human rights commissions, which operated independently under the auspices of the NHRC.  Some human rights groups alleged local politics influenced state committees, which they claimed were less likely to offer fair judgments than the NHRC.  The Human Rights Law Network observed most state committees had few or no minority, civil society, or female representatives.  The group claimed the committees were ineffective and at times hostile toward victims, hampered by political appointments, understaffed, and underfunded.

The government closed the Jammu and Kashmir Human Rights Commission in 2019 and ordered the NHRC to oversee human rights violations in Jammu and Kashmir.  The NHRC has jurisdiction over all human rights violations, except in certain cases involving the military.  The NHRC has authority to investigate cases of human rights violations committed by the Ministry of Home Affairs and paramilitary forces operating under the AFSPA in the northeast states.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalizes rape in most cases, but marital rape is not illegal when the woman is older than 15.  According to legal experts, the law does not criminalize rape of adult men.  Rape of minors is covered by the gender-neutral Protection of Children from Sexual Offenses Act (POCSO).  Official statistics reported rape as one of the country's fastest-growing crimes, prompted at least in part by the increasing willingness of survivors to report rapes, but observers believed the number of rapes remained vastly underreported.

Law enforcement and legal recourse for rape survivors were inadequate, and the judicial system was unable to address the problem effectively.  Police sometimes worked to reconcile rape survivors and their attackers.  In some cases they encouraged female rape survivors to marry their attackers.

The NGO International Center for Research on Women noted low conviction rates in rape cases was one of the main reasons sexual violence continued unabated and at times unreported.  NGOs observed the length of trials, lack of victim support, and inadequate protection of witnesses and survivors remained major concerns and

were more pronounced during the COVID-19 pandemic.  The government sought to expedite cases involving women by setting up more than a thousand fast-track special courts to handle pending rape cases.  In addition, several high courts have also directed state governments to establish more fast-track courts to promptly dispose of pending rape cases.

Civil society organizations provided awareness and survivor-centered, nonstigmatizing, confidential and free care to victims of violence and facilitate referrals to tertiary care, social welfare, and legal services.  Some also provided short-term shelter for women and child survivors of rape.  These services were intended to encourage women and children to come forward and report cases.

Additionally, the central government implemented interventions to improve the safety and security of women while reporting violence.  This includes centers for reporting and accessing health support, women help desks at police stations to facilitate reporting, emergency response support system via a mobile application for reporting emergencies, and training programs for police, prosecutors, medical officers, and the judiciary to respond to victims in compassionate and respectful ways.

Rape continued to be a persistent problem, including gang rape, rape of minors, rape against lower-caste women or women from religious and nonreligious minority communities by upper-caste men, and rape by government officials.

The minimum mandatory punishment for rape is 10 years' imprisonment.  The minimum sentence for the rape of a girl younger than age 16 is between 20 years' and life imprisonment; the minimum sentence of gang rape of a girl younger than 12 is either life imprisonment or the death penalty.  The Investigation Tracking System for Sexual Offenses monitors sexual assault investigations.  According to latest government data, 77 cases of rape per day were reported across the country in 2020.

On April 7, a 24-year-old Delhi woman was gang raped by five men in Gurugram, Haryana.  The woman was raped repeatedly and left near Farrukhnagar, Haryana.  To date, no suspects have been arrested.

On June 11, two minor tribal girls in Assam's Kokrajhar District were found

hanging from a tree after they were raped and killed.  Police arrested seven suspects.

On August 1, a nine-year-old Dalit girl was allegedly raped, suffocated to death, and her body cremated in New Delhi.  Police arrested and charged four suspects, two of whom admitted to raping her because she was a Dalit.

Women in areas such as in Jammu and Kashmir, northeastern states, Jharkhand, and Chhattisgarh, as well as vulnerable Dalit or tribal women, were often victims of rape or threats of rape.  National crime statistics indicated Dalit women were disproportionately victimized.  Domestic violence continued to be a problem.  The COVID-19 pandemic and lockdown led to increased instances of domestic violence.  Women and children were more vulnerable due to loss of livelihood of the perpetrator and the family being forced to remain indoors, where victims were locked in with their abusers with limited means to escape or access to resources.

Local authorities made efforts to address the safety of women.  The NCRB's *2021 Crime in India* report revealed that overall crime against women fell by 8 percent from 405,326 cases in 2019 to 371,503 cases in 2020.  West Bengal and Odisha reported the highest increase in crimes against women while Uttar Pradesh recorded a 17 percent decline in registered cases.  Madhya Pradesh reported the largest number of domestic violence cases while Rajasthan reported the highest number of rapes.

**Female Genital Mutilation/Cutting (FGM/C):**  No national law addresses the practice of FGM/C.  According to human rights groups and media reports, between 70 and 90 percent of Dawoodi Bohras, a population of approximately one million persons concentrated in the states of Maharashtra, Gujarat, Rajasthan, and Delhi, practiced FGM/C.

**Other Harmful Traditional Practices:**  The law forbids the acceptance of marriage dowries, but many families continued to offer and accept dowries, and dowry disputes remained a serious problem.  NCRB data showed a total of 7,045 dowry-related deaths in 2020 as compared with 7,141 in 2019.  The highest number of cases were registered in Uttar Pradesh with 2,302 victims.  Most states employed dowry prohibition officers.  A 2010 Supreme Court ruling mandates all

trial courts to charge defendants in dowry death cases with murder.

Acid attacks against men and women continued to cause death and permanent disfigurement.  On April 16, a man from Patiala threw acid on his wife for not giving birth to a son.  The woman sustained burns on nearly 58 percent of her body in the acid attack.  Police charged the man with attempted murder and voluntarily causing grievous hurt.

On May 21, a woman contracted to have acid thrown on her boyfriend after he rejected her marriage proposal.  Police arrested the perpetrator.

So-called honor killings remained a problem, especially in Punjab, Uttar Pradesh, and Haryana; they were usually attributable to the victim marrying against his or her family's wishes.

In August, Gwalior police in Madhya Pradesh arrested the father and brother of a 22-year-old woman found hanging at her home after a reported "honor killing." Police also charged the woman's uncle and two cousins with murder, as the family had opposed her choice to marry outside of her community.

Andhra Pradesh police registered a case of suspicious death as murder in response to a complaint that the parents of an 18-year-old girl allegedly killed and cremated her when she refused to end her relationship with a man of another caste.

The Telangana High Court questioned police statistics that reported only four "honor killings" and three cases of assault on individuals who married outside of their caste in the preceding four years in the state.  A social activist filed a petition alleging 36 "honor killings" took place in the state in recent years.

There were reports women and girls in the *devadasi* system of symbolic marriages to Hindu deities (a form of so-called ritual prostitution) were victims of rape or sexual abuse at the hands of priests and temple patrons, including sex trafficking. This practice was found in Karnataka, Maharashtra, Andhra Pradesh, and Tamil Nadu, and almost always targeted girls from Scheduled Caste and Scheduled Tribe communities.  NGOs suggested families exploited some girls from lower castes to mitigate household financial burdens and the prospect of marriage dowries.  The practice deprived girls of their education and reproductive rights and subjected

them to stigma and discrimination.

Tamil Nadu, Andhra Pradesh, Karnataka, and Maharashtra have legislation that prohibits the devadasi system and provides rehabilitation services to women and girls affected by the practice.  Enforcement of these laws remained lax.

In February police rescued a 19-year-old girl from Karnataka after she alerted them to her parents' plan to force her into the devadasi system.  Officials noted the victim's mother was a former devadasi and insisted her daughter join the practice.

No federal law addresses accusations of witchcraft; however, authorities may use other legal provisions as an alternative for an individual accused of witchcraft. The NCRB reported 88 deaths with witchcraft listed as the motive in 2020. Madhya Pradesh registered 17 cases of murder against those accused of witchcraft. Bihar, Odisha, Chhattisgarh, Rajasthan, Assam, and Jharkhand have laws criminalizing accusing others of witchcraft.

On March 9, a woman's dismembered body was found buried in Jharkhand. According to police, villagers suspected the woman of practicing witchcraft.

On May 25, a group of villagers in Assam's Baksa District beat a 50-year-old tribal man to death.  Police suspected a case of witch hunting and detained five persons.

**Sexual Harassment:**  Sexual harassment remained a serious problem.  Authorities required all state departments and institutions with more than 50 employees to operate committees to prevent and address sexual harassment, often referred to as "eve teasing."  By law sexual harassment includes one or more unwelcome acts or behavior, such as physical contact, a request for sexual favors, making sexually suggestive remarks, or showing pornography.

**Reproductive Rights:**  There were reports of coerced and involuntary sterilization. The government promoted female sterilization as a form of family planning for decades.  Some women, especially poor and lower-caste women, reportedly were pressured by their husbands and families to have tubal ligations or hysterectomies. The government provided monetary compensation for the wage loss, transportation costs, drugs and dressing, and follow-up visits to women accepting contraceptive methods, including voluntary sterilization.  There were no formal restrictions on

access to other forms of family planning; however, despite recent efforts to expand the range of contraceptive choices, voluntary sterilization remained the preferred method due to the costs and limited availability of alternative contraceptive choices.

Policies and guidelines that penalized families with more than two children were not widely enforced but remained in place in various states.  Certain states continued to maintain quotas for government jobs and subsidies for adults with no more than two children.  For example, Assam linked a two-child norm to accessing state government benefits and running for certain offices.

Many states promoted female sterilization as a family planning method, which resulted in risky, substandard procedures and limited access to nonpermanent methods.  The central government does not have the authority to regulate state public health policies.  Some women, particularly poor and lower-caste women, were reportedly pressured to have tubal ligations, hysterectomies, or other forms of sterilization.

The government recognized the role of health-care professionals in treating survivors of sexual violence and implemented protocols that meet international standards for such medical care.  Government directives instruct health facilities to ensure survivors of all forms of sexual violence receive immediate access to health care services, including emergency contraception, police protection, emergency shelter, forensic services, and referrals for legal aid and other services.  Implementation of the guidelines was uneven, however, due to limited resources and social stigma.

In February the Ministry of Health and Family Welfare released the *Sample Registration Report for Maternal Mortality Rates between 2016 and 2018*, which estimated that the maternal mortality ratio declined to 113 deaths per 100,000 live births in 2016-18, compared with 130 such deaths per 100,000 live births in 2014-16.  The report indicated Assam's maternal mortality rate, at 215 per 100,000 live births, was the highest in the country, while Kerala recorded the lowest maternal mortality ratio at 43 per 100,000 live births.

Care received by women, especially those from marginalized and low-income

groups, at public health facilities was often inadequate, contributing to a reluctance
to seek treatment.  Government initiatives resulted in a significant increase in
institutional births, but there were reports that health facilities continued to be
overburdened, underequipped, and undersupplied.

Policies penalizing families with more than two children remained in place in
seven states, but some authorities did not enforce them.  There were reports these
policies created pressure on women with more than two children to use
contraception, including permanent methods such as sterilization, or even
termination of subsequent pregnancies.

To counter sex selection, almost all states introduced "girl child promotion" plans
to promote the education and well-being of girls; some plans required a certificate
of sterilization for the parents to collect benefits.

**Discrimination:**  The law prohibits discrimination in the workplace and requires
equal pay for equal work, but employers reportedly often paid women less than
men for the same job, discriminated against women in employment and credit
applications, and promoted women less frequently than men.  The government did
not effectively enforce discrimination laws.

Many tribal land systems, including in Bihar, deny tribal women the right to own
land.  Other laws or customs relating to the ownership of assets and land accord
women little control over land use, retention, or sale.

**Gender-biased Sex Selection:**  The law bans sex determination tests, the use of all
technologies for the purpose of selecting a fetus's gender, and sex-based abortions;
however, NGOs claimed the practice of abortion based on sex was widely
practiced across the country despite government efforts to enforce the legislation.
This resulted in a sex ratio of 889 females per 1,000 males (or 112 males per 100
females) per the 2011 census.

States implement "girl child promotion" programs to counter prenatal sex
selection.  In 2015 the national government launched the *Beti Bachao Beti Padhao*
program to arrest the decline in the child sex ratio.  According to government data,
the sex ratio at birth improved from 918 girls per 1,000 boys in 2014-15 (109 boys
per 100 girls) to 934 girls per 1,000 boys in 2019-20 (107 boys per 100 girls).

According to media reports, fear of giving birth to a girl child drove some women toward sex-selective abortion or attempts to sell baby girls.

## Systemic Racial or Ethnic Violence and Discrimination

The constitution prohibits discrimination against any citizen on the grounds of religion, race, caste, or place of birth.  The registration of castes and tribes continued for the purpose of affirmative action programs, as the federal and state governments continued to implement programs for members of lower-caste groups to provide better quality housing, quotas in schools, government jobs, and access to subsidized foods.  Critics claimed many of the programs to assist the lower castes suffered from poor implementation, corruption, or both.

The term *Dalit*, derived from Sanskrit for "oppressed" or "crushed," refers to members of what society regarded as the lowest of the Scheduled Castes.  According to the 2011 census, Scheduled Caste members constituted 17 percent of the population (approximately 200 million persons).  The NCRB reported 50,291 crimes against Scheduled Castes in 2020 – an increase of 9.4 percent from 2019.  Crimes committed against Dalits reportedly often went unpunished, either because authorities failed to prosecute perpetrators or because victims did not report crimes due to fear of retaliation.

Discrimination based on caste remained prevalent, particularly in rural areas.  In August Haridwar police arrested two suspects for using caste-based slurs against Indian hockey player Vandana Katariya.  The suspects were charged with insult with intent to provoke breach of the peace and violation of the Scheduled Castes and Scheduled Tribes Act.

The law protects Dalits, but there were numerous reports of violence and significant discrimination in access to services, such as health care, education, access to justice, freedom of movement, access to institutions (such as temples), and marriage.  Many Dalits were malnourished.  Most bonded laborers were Dalits, and those who asserted their rights were often victims of attacks, especially in rural areas.  As agricultural laborers for higher-caste landowners, Dalits reportedly often worked without pay.

NGOs reported Dalit students were sometimes denied admission to certain schools

because of their caste, required to present caste certification prior to admission, barred from morning prayers, asked to sit in the back of the class, or forced to clean school toilets while being denied access to the same facilities.  There were also reports some teachers refused to correct the homework of Dalit children, refused to provide midday meals to Dalit children, and asked Dalit children to sit separately from children of upper-caste families.

In September an Uttar Pradesh school principal was suspended and a police report filed for using caste-based slurs and discriminating against Dalit children.

On February 2, the minister for social justice and empowerment told parliament that Uttar Pradesh reported the highest number of deaths of persons who died while cleaning sewers and septic tanks, work often performed by Dalits, between 2016 to December 2020.  While Uttar Pradesh recorded 52 deaths, Tamil Nadu registered 43 deaths.  Most manual-scavenging accidents occurred due to asphyxiation and exposure to poisonous gases when workers were inside the sewer systems and septic tanks.  NGOs estimated the number of deaths was underreported.

On September 8, the Madras High Court directed the heads of corporations and municipalities in Tamil Nadu to submit a written report that no manual-scavenging work would be permitted in their jurisdiction.  The court had previously indicated the heads of corporations and municipalities would be held personally liable for any manual-scavenging activity or mishap occurring in their jurisdiction.  The court also recommended the state government obtain appropriate machinery and improve sewer lines to eliminate manual scavenging in the state.

## Indigenous Peoples

The constitution provides for the social, economic, and political rights of disadvantaged groups of indigenous persons.  The law provides special status for indigenous individuals, but authorities often denied their rights in practice.

In most of the northeastern states, where indigenous groups constituted most of the states' populations, the law provides for tribal rights, but some local authorities disregarded these provisions.  The law prohibits any nontribal person, including citizens from other states, from crossing a government-established inner boundary without a valid permit.  No one may remove rubber, wax, ivory, or other forest

products from protected areas without authorization.  Tribal authorities must also approve the sale of land to nontribal persons.

Tribal leaders in Telangana accused the state government of impinging on the forest rights of tribal communities.  Farmers contended the state forest department destroyed their crops without prior notice and attempted to forcibly remove them from their land.  On August 6, police arrested 23 tribal farmers for attempted murder when tribal members "forcefully tried to recover farmland that the villagers have been cultivating for decades."  Tribal leaders criticized the arrests as "persecution" for defending their rights.

On August 26, a tribal man from Madhya Pradesh died after several persons tied him to a van and dragged him on the road following a minor traffic dispute.  Madhya Pradesh police identified and arrested five of the eight accused after a video of the incident was disseminated widely on social media.

## Children

According to a *Lancet* report, more than 100,000 children lost either one or both parents during the COVID-19 pandemic.  The National Commission for Protection of Child Rights (NCPCR) filed a Supreme Court affidavit reporting 8,161 children were orphaned, 92,475 children lost one parent, and 396 were abandoned between April 2020 and August.

After the NCPCR raised concerns regarding complaints of illegal adoption of children orphaned by COVID-19, the Supreme Court directed states to take stringent measures against illegal adoptions and to increase publicity of the laws and regulations.

**Birth Registration:**  The law establishes state government procedures for birth registration.  Analysis of government data from 2015-16 noted approximately 62 percent of children younger than five had their births registered and their parent or parents received a birth certificate.

Children lacking citizenship or registration may not be able to access public services, enroll in school, or obtain identification documents later in life.

**Education:**  The constitution provides for free education for all children from ages six to 14, with a compulsory education age through age 15, but the government did not always comply with this requirement.  Since the minimum age for work is lower than the compulsory education age, children may be encouraged to leave school before the completion of compulsory education.

The COVID-19 pandemic affected children's right to education and nutrition.  A UNICEF India report found that during the pandemic 1.5 million schools were closed, which affected 247 million children enrolled in elementary and secondary schools.  Socioeconomic inequality and lack of resources, including internet and technological devices as well as limited access to electricity, resulted in less educational opportunities for some children.  The report projected that 8 percent of all children may not return to school.  To reduce the risk of children dropping out, the Supreme Court ordered private schools to waive fees and for the state to pay fees to ensure children remain enrolled.

According to UNICEF, more than 60 percent of secondary school-age children with disabilities did not attend school.  Additionally, children with disabilities faced additional challenges with online education.

Since the minimum age for work is lower than the compulsory education age, children may be encouraged to leave school before the completion of compulsory education.

**Child Abuse:**  The law prohibits child abuse, but it does not recognize physical abuse by caregivers, neglect, or psychological abuse as punishable offenses.

The India Child Protection Fund reported increased incidences of cyber or sexual abuse involving children.  With children spending more time indoors and online during the COVID-19 pandemic, often without supervision, the report expressed concern that children were more vulnerable to online sexual predators.

A Karnataka Commission for the Protection of Child Rights study, released in July, concluded that physical, online, and mental abuse against children sharply increased during the COVID-19 pandemic.

**Child, Early, and Forced Marriage:**  The law sets the legal age of marriage for

women at 18 and men at 21, and it empowers courts to annul early and forced marriages.  The law does not characterize a marriage between a girl younger than 18 and a boy younger than 21 as illegal but recognizes such unions as voidable.  The law also sets penalties for persons who perform, arrange, or participate in child marriages.  Authorities did not consistently enforce the law nor address the practice of rape survivors being forced into marriage.

In 2020 the government constituted a task force to review the increase of the minimum permissible age for marriage of girls from 18 to 21 years.  Critics believed the proposal did not address the core concerns regarding child marriage, such as extreme poverty and lack of education.

The law establishes a full-time child marriage prohibition officer in every state to prevent child marriage.  These individuals have the power to intervene when a child marriage is taking place, document violations of the law, file charges against parents, remove children from dangerous situations, and deliver them to local child protection authorities.

Financial distress, parental deaths, and school closures have put more girls at risk of child marriage.  According to media reports, more than 500 cases of child marriage took place in West Bengal between March and June 2020 during the COVID-19 national lockdown.  The NCRB reported 785 cases of child marriages were registered throughout the country in 2020, an increase of 50 percent from the previous year.  Officials reported that in most cases underage girls were forced to marry because of their family's loss of earnings and financial distress caused by the lockdown.  According to a recent study, 65 percent of the child marriage cases were related to so-called romantic marriages, another 30 percent were arranged, and 5 percent were forced.

**Sexual Exploitation of Children:**  The law prohibits child pornography and sets the legal age of consent at 18.  It is illegal to pay for sex with a minor, to induce a minor into commercial sexual or any form of "illicit sexual intercourse," or to sell or buy a minor for the purposes of commercial sex exploitation or child sex trafficking.  Violators are subject to 10 years' imprisonment and a fine.

The law provides for at least one special court dedicated to sexual offenses against

children (POCSO court) to be set up in each district, but implementation of this provision lagged.

NCRB data showed that the number of 16- to 18-year-old victims under the POCSO Act was higher than the number of child victims from all the other age groups. Some NGOs noted several adolescent boys entered the juvenile justice system having been charged with rape because of the changes in the law.

Media reports indicated that the COVID-19 pandemic resulted in a rise in cases filed under the POCSO Act. Data from Child Welfare Committees showed a 36.5 percent increase in the number of POCSO cases registered from January to July when compared with the number recorded for the same period in 2020. The rise in POCSO cases was attributed to increased time spent online which increased exposure to online traffickers.

On March 13, the Ministry of Women and Child Development published new rules to protect children from sexual offenses. The rules provide for immediate compensation, increased public awareness regarding services from the CHILDLINE India Foundation, and legal aid assistance. The rules advise state governments to enact a child protection policy to re-enforce the prohibition of violence against children. A new provision also directs immediate financial help to victims of child sexual abuse by the Child Welfare Committees. NGOs noted the procedure was not being implemented in a standardized fashion across jurisdictions.

In January the Bombay High Court ruled that groping a child is not considered sexual assault if there is no "skin-to-skin contact" or "sexual intent." The National Commission for Women criticized the ruling and appealed to the Supreme Court. The Supreme Court reversed the Bombay's High Court's decision.

In a June 2020 ruling the Delhi High Court mandated notice to complainants in child assault cases to ensure their presence in every bail application filed by the accused in their case. This ensured the complainant is informed of the proceedings and has an opportunity to argue against bail. Other high courts were expected to follow suit. For instance, the Orissa High Court issued similar directions to the POCSO courts operating under its jurisdiction.

RJN Exhibit 12

In June 2020 the Delhi High Court held that the POCSO Act does not prevent a victim from applying for monetary compensation more than once if their circumstances required.  Court cases typically last for years, and a victim's financial needs may grow as time passes.

There was a continued focus on providing speedy justice to victims of sexual abuse.  A 2016 study by the NGO Counsel to Secure Justice highlighted many child sexual abuse cases were pending trial or delayed in trial.  The government stated 49,000 pending cases related to rape and sexual offenses against children were addressed during the COVID-19 pandemic with the use of 1,023 fast-track courts.  Critics alleged fast-track courts established for POCSO cases were often unable to function on a timely basis because of pandemic restrictions.  As a remedy, the Supreme Court directed the states of Assam, West Bengal, and Rajasthan to initiate a pilot project to test videoconferencing facilities for recording testimony.

**Displaced Children:**  Displaced children, including refugees, IDPs, and street children, faced restrictions on access to government services (see also section 2.d.).

**Institutionalized Children:**  Lax law enforcement and a lack of safeguards encouraged an atmosphere of impunity in several group homes and orphanages.

A National Commission for Protection for Child Rights audit found that out of 7,163 childcare institutions in the country, as many as 2,039 or 28.5 percent were not registered with state governments as mandated by the Juvenile Justice Act, 2015.  In several cases government-funded shelter homes continued to operate despite significant gaps in mandatory reporting and allegations of abuse.

In 2020 the Supreme Court directed state governments to improve the handling of the COVID-19 crisis among institutionalized children.  States were asked to file detailed reports, and various guidelines were issued to different childcare institutions on how to deal with the pandemic-induced crisis.  NCPCR stated more than 720 children in childcare institutions in 11 states and union territories contracted COVID-19 as of August, but no fatalities were reported.

In January 2020 the Supreme Court revised the Juvenile Justice (Care and Protection of Children) Act, 2015, to prevent children from being tried as adults.

The Supreme Court ruled that children can be tried as an adult only for "heinous" crimes that have a minimum punishment of seven years.  In view of this judgment, the Juvenile Justice Board may conduct a preliminary assessment into a child's mental and physical capacity to decide whether the child should be tried as an adult.

Many children continued to stay in institutions.  Children accused of committing crimes often did not appear before juvenile justice boards for up to a year, and in many cases, children were required to stay in institutions for extended periods of time.

**International Child Abductions:**  The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.  See the Department of State's *Annual Report on International Parental Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html

## Anti-Semitism

Jewish groups from the 4,650-member Jewish community cited no reports of anti-Semitic acts during the year.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at www.state.gov/trafficking-in-persons-report.

## Organ Harvesting

Buying and selling of human organs are prohibited by the Transplantation of Human Organs Act.  Organs can be donated to close relatives as well as others in need of transplantation for medical reasons after proper authorization.

In July, Assam police arrested three persons for trading in human organs – mainly kidneys harvested from approximately 12 victims.  Other reports indicated almost 30 individuals may have been victims.  Reports suggested that pandemic-induced financial hardship led villagers to fall prey to those involved in the organ trade.

## Persons with Disabilities

The constitution does not explicitly mention disability.  The law provides equal rights for persons with a variety of disabilities, and a 2016 law increased the number of recognized disabilities, including persons with Parkinson's disease and victims of acid attacks.  The law requires the government to provide persons with disabilities with unrestricted free access to physical infrastructure and public transportation systems.

The law states the government should take necessary measures for persons with disabilities to provide barrier-free access in government, private hospitals, and healthcare institutions.

The law further states the government shall take measures to provide:  (1) facilities for persons with disabilities at bus stops, railway stations, and airports conforming to the accessibility standards relating to parking spaces, toilets, ticketing counters, and ticketing machines; (2) access to all modes of transport that conform with design standards including retrofitting old modes of transport, wherever technically feasible and safe for persons with disabilities, economically viable and without entailing major structural changes in design; and (3) accessible roads to address mobility necessary for persons with disabilities.

According to the National Center for Promotion of Employment for Disabled People (NCPEDP), only 494 state government buildings in 15 states were accessible by persons with disabilities.  The Central Public Works Department has made 1,030 central government buildings accessible, while 603 railway stations and 44,153 buses were partially accessible by persons with disabilities.

The law establishes quotas of 3 percent of all educational seats and 4 percent of government jobs for persons with disabilities.  The government allocated funds to programs and NGOs to increase the number of jobs filled.  In 2017 a government panel decided that private news networks must accompany public broadcasts with sign language interpretations and closed captions to accommodate persons with disabilities.

Access to education continued to be a challenge for students with disabilities.  During the pandemic the closure of schools led to an increase in the number of

350
RJN Exhibit 12

students with disabilities dropping out.  According to NGOs the digital divide has led to increased exclusion of persons with disabilities due to lack of access to technology.

The law states that the appropriate government and local authorities shall endeavor that all educational institutions provide inclusive education to children with disabilities.  Toward that end, they should:  (1) admit them without discrimination and provide education and opportunities for sports and recreation activities equally with others; (2) make buildings, campuses, and facilities accessible; and (3) provide reasonable accommodation according to the individual's requirement.  According to the law, the government shall take measures to promote, protect, and ensure participation of persons with disabilities in adult education and continuing education programs equally with others.

Private-sector employment of persons with disabilities remained low, despite governmental incentives.  Discrimination against persons with disabilities in employment, education, and access to health care was more pervasive in rural areas, and 45 percent of the country's population of persons with disabilities were illiterate.

The Ministry of Health and Family Welfare estimated 25 percent of individuals with mental disabilities were homeless.  Mainstream schools remained inadequately equipped with teachers trained in inclusive education, resource material, and appropriate curricula.  Patients in some mental-health institutions faced food shortages, inadequate sanitary conditions, and lack of adequate medical care.

The NCPEDP reported the government allowed persons with disability to access COVID-19 vaccination services using the Unique Disability ID cards.

In May the NCPCR reported a total of 99 sexual abuse cases relating to children with disabilities had been registered from 2017 to 2020.

## HIV and AIDS Social Stigma

The estimated HIV prevalence has been declining since the epidemic's peak in 2000 and has stabilized in recent years.  According to the National AIDS Control

Organization, there were approximately 70,000 newly diagnosed HIV infections in 2019.  The epidemic persisted among the most vulnerable and high-risk populations that include female sex workers, men who have sex with men, transgender persons, and persons who inject drugs.  UNAIDS 2018 data indicated new HIV infections were declining among sex workers and men who have sex with men, but stigma related to key populations continued to limit their access to HIV testing and treatment.  The data showed 79 percent of individuals were aware of their HIV status and that 71 percent of individuals with HIV were receiving treatment.

According to the National AIDS Control Organization 2019 report, Maharashtra was estimated to have the highest number of new HIV infections, followed by Bihar, Uttar Pradesh, West Bengal, Gujarat, and Delhi.

The National AIDS Control Program prioritized HIV prevention, care, and treatment interventions for high-risk groups and advocated for the rights of persons with HIV.  The National AIDS Control Organization worked actively with NGOs to train women's HIV and AIDS self-help groups.  Police engaged in programs to strengthen their role in protecting communities vulnerable to HIV.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation and Gender Identity

NGO activists reported heightened discrimination and violence against the lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) community in the eastern area of the country during the COVID-19 lockdown.

LGBTQI+ persons faced physical attacks, and rape.  LGBTQI+ groups reported they experienced widespread societal discrimination and violence, particularly in rural areas.  Activists reported that transgender persons continued to face difficulty obtaining medical treatment.  Some police officers committed crimes against LGBTQI+ persons and used the threat of arrest to coerce victims not to report the incidents.  With the aid of NGOs, several states offered education and sensitivity training to police.

In June the Madras High Court ordered the state and union governments to draw

up plans for reforms that protect sexual orientation and gender identity rights.  The High Court recommended awareness training for government officials and police, separate housing for gender-nonconforming and transgender persons in prison, revocation of licenses from doctors who claim "cures" for homosexuality, and gender-neutral bathrooms at school and colleges.

On June 13, the Odisha state government began recruitment for police positions of candidates who self-identified as transgender.  A Bhubaneswar-based transgender activist welcomed the move as one of the several protransgender policy decisions taken by the Odisha government in recent years.

On July 6, the Karnataka state government amended its civil services rules to enable a 1 percent quota of government jobs for transgender individuals to be filled through direct recruitment.

## Other Societal Violence or Discrimination

Societal violence based on religion and by religiously associated groups continued to be a serious concern.  The National Crime Records Bureau reported 857 cases of communal (religious) offenses in 2020.  Muslim communities in certain areas remained vulnerable to communal violence and discrimination.  Media and NGO sources reported violence against Muslim communities continued during the year with cases of physical abuse, discrimination, forcible displacement, and lynching for suspected cow smuggling.

On March 15, a 14-year-old Muslim boy was beaten after entering a Hindu temple to drink water.  Ghaziabad police arrested the caretaker who allegedly attacked the boy.

On June 11, Sher Khan, an Uttar Pradesh cattle trader, was killed over suspected cow smuggling.

On June 21, Alwar police arrested Nawal Kishor Sharma, a local leader of the Vishwa Hindu Parishad (Council), in connection with the 2018 attempted lynching of cattle trader Rakbar Khan, who later died in custody.

In August, Asrar Ahmad, a Muslim man, was beaten and forced to march while

chanting a Hindu slogan in Kanpur, Uttar Pradesh.  Police intervened and arrested three persons for rioting, criminal intimidation, and voluntarily causing hurt.  The suspects were later released on bond.

State governments continued to pass laws intended to end forced religious conversion for the purpose of marriage.  These "love jihad" laws seek to make forced religious conversion by marriage a criminal offense and have mainly targeted Muslim men attempting to marry Hindu women.  Civil society groups criticized these laws as violating constitutional protections on freedom of religion, but some survey data suggested religious minority communities themselves sometimes expressed support for anticonversion measures.

Police reported more than 80 persons, mostly Muslim men, have been arrested for violation of an anticonversion law passed in Uttar Pradesh in February.  In December 2020 the Madhya Pradesh state government passed similar legislation regulating interfaith couples and religious conversion.  The Supreme Court declined legal petitions challenging the constitutionality of the Uttar Pradesh law, instead deferring the matter to a lower court.  On November 18, the Allahabad High Court underscored the right of interfaith couples to marry without the approval of district officials in contravention to Uttar Pradesh's anticonversion law and ordered district police to provide protection to 17 interfaith couples.

On August 19, the Gujarat High Court suspended six provisions the state government added to an existing anticonversion law, stating the mere act of an interfaith marriage cannot be treated as a forceful or "unlawful conversion by deceit or allurement."  Prior to the high court's intervention, Gujarat police arrested several Muslim individuals under the amended provisions of the anticonversion law.

Human rights activists criticized actions by the Assam government evicting members of the Miya Muslim community to make way for an agriculture project.  During the eviction on September 23, mosques were demolished, and police fired on protesters, killing two persons, including a 12-year-old boy.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provides for the right to form and join unions and to bargain collectively, but there is no legal obligation for employers to recognize a union or engage in collective bargaining.  In Sikkim, trade union registration was subject to prior permission from the state government.  The law limits the organizing rights of federal and state government employees.

The law provides for the right to strike but places restrictions on this right for some workers.  As an example, in export-processing zones (EPZs), a 45-day notice is required because of the EPZs' designation as a "public utility."  The law also allows the government to ban strikes in government-owned enterprises and requires arbitration in specified "essential industries."  Definitions of essential industries vary from state to state.  The law prohibits antiunion discrimination and retribution for involvement in legal strikes and provides for reinstatement of employees fired for union activity.  Union leaders generally operated free from threats and violence from government and employers.  Employers rarely refused to bargain with worker led unions.

On February 3, industrial workers across the country observed a day of protest against the government's plans to privatize state-owned companies and to press for the repeal of labor codes passed by parliament in September 2020.  In September approximately 25 million workers across the country went on a day-long strike in support of the farmers' protest demanding the repeal of farm reform legislation.

Enforcement of the law varied from state to state and from sector to sector. Enforcement was generally better in the larger, organized-sector industries. Authorities generally prosecuted and punished individuals responsible for intimidation or suppression of legitimate trade union activities in the industrial sector.  Civil judicial procedures addressed abuses because the Trade Union Act does not specify penalties for such abuses.  Penalties were commensurate with those for other laws involving denials of civil rights, such as discrimination. Specialized labor courts adjudicate labor disputes, but there were long delays and a backlog of unresolved cases.

Employers generally respected freedom of association and the right to organize and bargain collectively in the formal industrial sector but not in the larger, informal economy.  Most union members worked in the formal sector, and trade unions represented a small number of agricultural and informal-sector workers. Membership-based organizations such as the Self-Employed Women's Association successfully organized informal-sector workers and helped them to gain higher payment for their work or products.

An estimated 80 percent of unionized workers were affiliated with one of the five major trade union federations.  Unions were independent of the government, but four of the five major federations were associated with major political parties.

State and local authorities sometimes impeded registration of unions, repressed independent union activity, and used their power to declare strikes illegal and force adjudication.  Labor groups reported that some employers continued to refuse to recognize established unions, and some instead established "workers' committees" and employer-controlled unions to prevent independent unions from organizing. EPZs often employed workers on temporary contracts.  Additionally, employee-only restrictions on entry to the EPZs limited union organizers' access.

In November 2020 a nationwide general strike took place.  More than 250 million public- and private-sector workers participated in the strike, called by 10 central trade unions and hundreds of worker associations and federations.  Trade union leaders demanded that the government repeal certain labor codes and three recently passed farm laws.  In November parliament passed a law to repeal three agricultural reform laws after farmers largely concentrated in Punjab, Haryana, and Uttar Pradesh protested for their repeal.  The Indian National Trade Union Congress congratulated the farmers' union for their protests.

In January labor and Dalit activists Shiv Kumar and Nodeep Kaur were arrested after their protest against the alleged harassment of factory workers in the Kundli Industrial Area in the state of Haryana, which turned violent on January 12.  While in police custody, the families of both activists alleged they were subject to physical abuse.  Nodeep Kaur was granted bail on February 26, and on March 4, a judge granted bail to Shiv Kumar.

## b. Prohibition of Forced or Compulsory Labor

The law prohibits all forms of forced or compulsory labor, but forced labor, including bonded labor for both adults and children (see section 7.c.), remained widespread.  Internal forced labor constituted the country's largest labor-trafficking problem; traffickers use debt-based coercion (bonded labor) to compel men, women, and children to work in agriculture, brick kilns, rice mills, embroidery and textile factories, and stone quarries.  Women and children from the Dalit and tribal communities were vulnerable to forced labor, as were children of migrant laborers.  The increase in economic insecurity and unemployment due to the pandemic further increased vulnerability to forced labor.

Enforcement and compensation for victims is the responsibility of state and local governments and varied in effectiveness.  Some local governments did not effectively enforce laws related to bonded labor or labor trafficking laws, such as the Bonded Labor System (Abolition) Act.  When inspectors referred violations for prosecution, court backlogs, inadequate preparation, and a lack of prioritization of the cases by prosecuting authorities sometimes resulted in acquittals.  In addition, when authorities reported violations, they sometimes reported them to civil courts to assess fines and did not refer them to police for criminal investigation of labor trafficking.  Legal penalties varied based on the type of forced labor and included fines and prison terms; penalties were not commensurate with those for analogous serious crimes, such as kidnapping.  For example, bonded labor is specifically criminalized by the Scheduled Castes and Scheduled Tribes (Prevention of Atrocities) Act, which prescribes sufficiently stringent penalties, and the Bonded Labor System (Abolition) Act, which prescribes penalties that were not sufficiently stringent.

Investigations, prosecutions, and case convictions of traffickers decreased in 2020.  NGOs estimated at least eight million trafficking victims in the country, mostly in bonded labor, and reported that police often did not file reports.  Authorities penalized some adult and child victims for crimes their traffickers compelled them to commit.

On July 22, officials in Tamil Nadu's Virudhunagar District rescued 14 adolescent bonded laborers from two plastics factories; three had been trafficked from Bihar.

On August 26, Thane District officials in Maharashtra rescued 43 individuals belonging to a traditional tribal group who were kept in bondage at a stone quarry. Police also opened an investigation after two of the rescued women accused the quarry owners of sexual abuse.

Scheduled Caste and Scheduled Tribe members lived and worked under traditional arrangements of servitude in many areas of the country. The central government had long abolished forced labor servitude, but these social groups remained impoverished and vulnerable to forced exploitation.

In May the National Human Rights Commission (NHRC) issued three advisories to states and union territories, recommending measures to address the mental health of vulnerable populations, release and rehabilitation of bonded laborers, and safeguarding rights of informal workers. The NHRC noted that all levels of government must ensure that medical resources are provided to bonded laborers.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/

## c. Prohibition of Child Labor and Minimum Age for Employment

All the worst forms of child labor were prohibited. The law prohibits employment of children younger than 14. The law also bans the employment of children between 14 and 18 in hazardous work. Children are barred from using flammable substances, explosives, or other hazardous material, as defined by the law. In 2017 the Ministry of Labor and Employment added 16 industries and 59 processes to the list of hazardous industries where employment of children younger than 18 is prohibited and where children younger than 14 are precluded from helping, including family enterprises.

Despite evidence that children worked in unsafe and unhealthy environments for long periods of time in spinning mills, garment production, carpet making, and domestic work, not all children younger than 18 are prohibited from working in occupations related to these sectors. The law permits employment of children in family-owned enterprises involving nonhazardous activities after school hours. Nevertheless, child labor remained common.

Law enforcement agencies took actions to combat child labor.  State governments enforced labor laws and employed labor inspectors, while the Ministry of Labor and Employment provided oversight and coordination.  Nonetheless, gaps existed within the operations of the state government labor inspectorate that hindered adequate labor law enforcement.  Violations remained common.  The law establishes penalties that are not commensurate with those for other analogous serious crimes, such as kidnapping, and authorities sporadically enforced them.  The fines collected are deposited in a welfare fund for formerly employed children.

The International Labor Organization estimated there were 10 million child workers between ages five and 14 in the country.  Most of the child labor occurred in agriculture and the informal economy, particularly in stone quarries, in the rolling of cigarettes, and in informal food-service establishments.  Children were also exploited in domestic service and in the sugarcane, construction, textile, cotton, and glass-bangle industries in addition to begging.

Commercial sexual exploitation of children occurred (see section 6, Children).

Forced child labor, including bonded labor, also remained a serious problem.  Employers engaged children in forced or indentured labor as domestic servants and beggars, as well as in quarrying, brick kilns, rice mills, silk-thread production, and textile embroidery.  Children typically entered debt bondage along with their entire family, and trafficked children were also employed in cotton farms, home-based embroidery businesses, and roadside restaurants.

In July, Telangana police rescued 172 child workers as part of a campaign to detect child labor and locate missing children.  Police arrested 37 persons for employing children and filed 18 cases against employers.

In June, UNICEF reported it expected that COVID-19 and subsequent economic distress would have increased the risk of child labor.  The closure of 1.5 million schools due to the pandemic and lockdowns increased the risk of child labor and unsafe migration for children enrolled in elementary and secondary schools.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings and the Department of Labor's *List of Goods Produced by Child Labor or Forced Labor* at

https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods

## d. Discrimination with Respect to Employment and Occupation

The law prohibits discrimination based on race, sex, gender, disability, language, sexual orientation, gender identity, or social status with respect to employment and occupation. A separate law bans discrimination against individuals suffering from HIV or AIDs. The law does not forbid employment discrimination against individuals with communicable diseases or based on color, religion, political opinion, national origin, or citizenship.

The law prohibits women from working in jobs that are physically or morally harmful.

The government effectively enforced the law and regulations within the formal sector; however, penalties were not sufficient to defer violations. The law and regulations do not protect informal-sector workers (industries and establishments that do not fall within the purview of the Factories Act), who made up an estimated 90 percent of the workforce.

Discrimination occurred in the informal sector with respect to Dalits, indigenous persons, and persons with disabilities. The American Bar Association report, *Challenges for Dalits in South Asia*, noted, "Dalits have been provided with reservations (or quotas) for government jobs; however, reservations do not apply to private sector jobs." Gender discrimination with respect to wages was prevalent. Foreign migrant workers were largely undocumented and typically did not enjoy the legal protections available to workers who are nationals of the country.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:** State government laws set minimum wages and hours of work. The daily minimum wage varied but was more than the official estimate of poverty level income. State governments set a separate minimum wage for agricultural workers. Laws on wages, hours, and occupational health and safety do not apply to the large informal sector.

The law mandates a maximum eight-hour workday and 48-hour workweek as well

as safe working conditions, which include provisions for restrooms, cafeterias, medical facilities, and ventilation.  The law mandates a minimum rest period of 30 minutes after every four hours of work and premium pay for overtime, but it does not mandate paid holidays.  The law prohibits compulsory overtime and limits the amount of overtime a worker may perform.  Occupational safety and health standards set by the government were generally up to date and covered the main industries in the country.

State governments are responsible for enforcing minimum wages and hours of work.  The number of inspectors generally was insufficient to enforce labor law.  Inspectors have the authority to make unannounced inspections and initiate sanctions.  State governments often did not effectively enforce the minimum wage law for agricultural workers.

To boost the economy following the COVID-19-induced lockdown, many state governments relaxed labor laws to permit overtime work beyond legislated limits.  The state governments of Uttar Pradesh and Gujarat passed executive orders to suspend enforcement of most labor laws for a period of up to three years to promote industrial production.

**Occupational Safety and Health:**  Federal law sets safety and health standards.  State governments enforced additional state-specific regulations.  Enforcement of safety and health standards was poor, especially in the informal sector, but also in some formal-sector industries.  Penalties for violation of occupational safety and health standards were commensurate with those for crimes such as negligence.

Small, low-technology factories frequently exposed workers to hazardous working conditions.  Undocumented foreign workers did not receive basic occupational health and safety protections.  In many instances workers could not remove themselves from situations that endangered health or safety without jeopardizing their employment.

On February 23, two workers were killed, and 26 others injured in a blast at the United Phosphorous Limited plant in Jhagadia, Gujarat.  State authorities shut down the plant following the blast.

On June 7, a fire at the SVS Aqua Technologies chemical plant near Pune in

Maharashtra killed 18 persons.  Preliminary investigations revealed that flammable materials had been stored in the plant without following prescribed safety norms.  On June 8, police arrested the factory director on charges of culpable homicide not amounting to murder and subsequently released him on bail.  In March, Geneva-based IndustriALL noted high accident rates continued in factories, chemical plants, and mines.  According to IndustriALL, the 14 accidents reported during the year resulted in 42 workers' deaths and approximately 100 workers being injured.

**Informal Sector:**  Violations of wage, overtime, and occupational safety and health standards were common in the informal sector.  The World Bank reported most of the labor force is employed in the informal sector.  A report issued by the State Bank of India in October estimated the size of the informal sector was more than 52 percent of the total labor sector, but other estimates placed the percentage much higher.  On August 26, the Ministry of Labor and Employment launched the e-Shram portal to develop a national database of unorganized workers including migrant workers, construction workers, and gig and platform workers.  The portal will facilitate the extension of social-sector benefits to workers in the unorganized sector.  More than 30 million unorganized workers registered on the portal as of October 8, nearly half of them women.

According to the World Bank's *Shifting Gears:  Digitization and Services-Led Development* report, low-skilled and urban workers faced the brunt of employment shocks due to the second wave of COVID-19, and their earnings have yet to return to 2019 levels.  In December 2020 a World Bank economist for South Asia and other experts noted more than 44 percent of the country's informal workers were unemployed in April 2020.  In 2020 the International Labor Organization connected the high rate of informal work to a low level of education and skill levels of the overall workforce.  Within the informal sector, casual or temporary wage workers were more likely to lose employment than self-employed workers, regardless of industry, location, education, or caste.

362
RJN Exhibit 12