# Exhibit 25



# International Protection Considerations

# with Regard to People Fleeing **Somalia**

**September 2022**

**HCR/IPC/SOM/2022/01**



RJN Exhibit 25

# Table of Contents

I. EXECUTIVE SUMMARY ...................................................................................6

   A. REFUGEE STATUS UNDER THE 1951 CONVENTION...................................................... 7

   B. BROADER UNHCR MANDATE CRITERIA, REGIONAL INSTRUMENTS AND COMPLEMENTARY FORMS OF PROTECTION.......................................................................................... 8

   C. INTERNAL FLIGHT OR RELOCATION ALTERNATIVE (IFA/IRA).................................... 12

   D. EXCLUSION CONSIDERATIONS ............................................................................ 14

II. OVERVIEW OF THE SITUATION IN SOMALIA...........................................15

   A. SOMALI CLANS, CUSTOMARY LAW, SOCIAL NORMS AND STRUCTURES .................................. 15

     1) Customary Law (Xeer) .............................................................. 17

     2) Interaction with Other Ethnic Groups.......................................... 18

     3) Clan Protection and Customary Justice........................................ 20

   B. MAIN DEVELOPMENTS IN SOMALIA ...................................................................... 21

     1) Background and Actors............................................................... 22

     2) Political Developments............................................................... 27

     3) Economic Developments ............................................................ 37

   C. THE SECURITY SITUATION IN SOMALIA: IMPACT OF THE CONFLICT ON CIVILIANS..................... 37

     1) Civilian Casualties.................................................................... 38

     2) Security Situation and Security Incidents ..................................... 39

   D. HUMAN RIGHTS SITUATION ............................................................................... 41

     1) Violations of International Humanitarian Law and Human Rights Violations and Abuses ................................................................................ 41

     2) The Ability and Willingness of the State to Protect Civilians from Human Rights Violations and Abuses ............................................... 44

   E. HUMANITARIAN SITUATION................................................................................ 46

   F. CONFLICT-INDUCED DISPLACEMENT ..................................................................... 50

   G. REFUGEES AND RETURNEES................................................................................ 53

III. ASSESSMENT OF INTERNATIONAL PROTECTION NEEDS...................54

   A. RISK PROFILES .............................................................................................. 55

     1) Individuals (Perceived as) Supporting the FGS, FMS and/or Related Actors ............. 55

     2) Members of Minority Religions and those Accused of Blasphemy or Apostasy by Actors other than Al-Shabaab ..................................................... 64

     3) Individuals (Perceived as) Contravening Sharia and Decrees Imposed by Al-Shabaab, Including those Deemed to Be "Apostates" by Al-Shabaab ......................................... 65

     4) Members of Minority Groups Including: Ethnic Minorities and Minority Clans, Groups Defined by Religious Origin and Occupational Caste Groups...................................... 69

     5) Journalists, Human Rights Defenders and Government Critics ................................. 76

431
RJN Exhibit 25

6) Children Exposed to Underage and Forced Recruitment and Adults Who Resist the Recruitment of Children ................................................................. 82

7) Al-Shabaab Defectors ................................................................. 86

8) Individuals Belonging to a Clan Engaged in Inter-Clan Conflicts, Including Blood Feuds ................................................................. 88

9) Individuals Targeted for Taxation and/or Extortion by Al-Shabaab ............................ 92

10) Women and Girls ................................................................. 94

11) Children ................................................................. 104

12) Survivors of Trafficking and Persons at Risk of Being Trafficked ............................ 111

13) Individuals of Diverse Sexual Orientations and/or Gender Identities (SOGI) ............. 114

14) Persons Living with Disabilities (PLWD) and Persons Living with HIV ..................... 116

B. REFUGEE STATUS UNDER UNHCR'S BROADER MANDATE CRITERIA OR REGIONAL INSTRUMENTS, OR ELIGIBILITY FOR COMPLEMENTARY FORMS OF PROTECTION ............................ 120

1) Refugee Status under UNHCR's Broader Mandate Criteria and Regional Instruments .. ................................................................. 120

2) Eligibility for Subsidiary Protection under the EU Qualification Directive ................. 122

C. INTERNAL FLIGHT, RELOCATION OR PROTECTION ALTERNATIVE ........................... 124

1) Relevance Analysis ................................................................. 125

2) Reasonableness Analysis ................................................................. 126

3) Internal Flight or Relocation Alternative in Benadir/Mogadishu ................................ 129

4) Internal Flight or Relocation Alternative in Garowe .................................... 132

5) Internal Flight or Relocation Alternative in Hargeisa .................................... 134

D. EXCLUSION CONSIDERATIONS ................................................................. 137

432
RJN Exhibit 25

# List of Abbreviations

| | |
|---|---|
| **ACLED** | Armed Conflict Location & Event Data |
| **AP** | Associated Press |
| **ASWJ** | Ahlu Sunna wal Jama'a |
| **BBC** | British Broadcasting Corporation |
| **CEDAW** | Committee on the Elimination of All Forms of Discrimination Against Women |
| **CFR** | Council on Foreign Relations |
| **COHF** | Candle of Hope Foundation |
| **CPJ** | Committee to Protect Journalists |
| **CPU** | Child Protection Unit |
| **CRC** | Convention on the Rights of the Child |
| **CSIS** | Center for Strategic and International Studies |
| **CTFMR** | Country Task Force on Monitoring and Reporting |
| **DCAF** | Geneva Centre for Security Sector Governance |
| **DRR** | Disarmament, Rehabilitation, and Reintegration |
| **DW** | Deutsche Welle |
| **EASO** | European Asylum Support Office (now the EUAA) |
| **EUAA** | European Union Agency for Asylum (formerly EASO) |
| **FAO** | Food and Agriculture Organization |
| **FGM** | Female Genital Mutilation |
| **FGS** | Federal Government of Somalia |
| **FMS** | Federal Member State |
| **GBV** | Gender-Based Violence |
| **HPRD** | Horn Population Research & Development |
| **HRW** | Human Rights Watch |
| **IDMC** | Internal Displacement Monitoring Centre |
| **IDP** | Internally Displaced Person |
| **IED** | Improvised Explosive Device |
| **IFA/IRA** | Internal Flight Alternative / Internal Relocation Alternative |
| **IFJ** | International Federation of Journalists |
| **ICG** | International Crisis Group |
| **ICRC** | International Committee of the Red Cross |
| **IHL** | International Humanitarian Law |
| **ILGA** | International Lesbian, Gay, Bisexual, Trans and Intersex Association |
| **ILO** | International Labour Organization |
| **IOM** | International Organization for Migration |
| **IPI** | International Peace Institute |
| **ISS** | Islamic State in Somalia |
| **LSE** | London School of Economics and Political Science |
| **MRG** | Minority Rights Group International |
| **NCC** | National Consultative Council |
| **NGO** | Non-Governmental Organization |
| **NISA** | National Intelligence and Security Agency |
| **NRC** | Norwegian Refugee Council |

433
RJN Exhibit 25

| | |
|---|---|
| **NUSOJ** | National Union of Somali Journalists |
| **OAU** | Organization of African Unity (succeeded by the AU) |
| **OCHA** | United Nations Office for the Coordination of Humanitarian Affairs |
| **OHCHR** | Office of the High Commissioner for Human Rights |
| **PLWD** | Persons Living With Disabilities |
| **RSF** | *Reporters Sans Frontières* (Reporters Without Borders) |
| **SOGI** | Sexual Orientation and/or Gender Identity |
| **SJS** | Somali Journalists Syndicate |
| **SMSJ** | Somali Mechanism for Safety of Journalists |
| **SNA** | Somali National Army |
| **SPF** | Somali Police Force |
| **UN** | United Nations |
| **UNCRC** | United Nations Committee on the Rights of the Child |
| **UNDP** | United Nations Development Programme |
| **UNFPA** | United Nations Population Fund |
| **UNHCR** | United Nations High Commissioner for Refugees |
| **UNICEF** | United Nations Children's Fund |
| **UNSOM** | United Nations Assistance Mission in Somalia |
| **USCIRF** | US Commission on International Religious Freedom |
| **VOA** | Voice of America |
| **VOSOMWO** | Voices of Somaliland Minority Women Organization |

434
RJN Exhibit 25

INTERNATIONAL PROTECTION CONSIDERATIONS WITH REGARD TO PEOPLE FLEEING SOMALIA



This map is reproduced from the UN Geospatial Information Section. © United Nations

# I.   Executive Summary

This document supersedes previous country guidance published by UNHCR on Somalia, including, most recently, the May 2016 *UNHCR Position on Returns to Southern and Central Somalia (Update I)*.[1] It is issued against a background of continuing concerns about the security situation in the country and

---

[1]   UNHCR, *UNHCR Position on Returns to Southern and Central Somalia (Update I)*, May 2016, www.refworld.org/docid/573de9fe4.html. Other positions superseded by this documentinclude: UNHCR, *UNHCR Position on Returns to Southern and Central Somalia*, 17 June 2014, www.refworld.org/docid/53a04d044.html; UNHCR, *International Protection Considerations with Regard to people fleeing Southern and Central Somalia*, 17 January 2014, www.refworld.org/docid/52d7fc5f4.html; UNHCR, *Addendum to 2010 UNHCR Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Somalia, Relating Specifically to the City of Galkacyo*, 16 March 2012, www.refworld.org/docid/4f675c5e2.html; UNHCR, *UNHCR Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Somalia*, 5 May 2010, www.refworld.org/docid/4be3b9142.html.

435
RJN Exhibit 25

widespread human rights abuses. It contains information on particular profiles of persons for whom international protection needs may arise in the current context in Somalia.

This document includes the most up-to-date information available at the time of writing, from a wide variety of sources.[2] The analysis contained in this document is informed by publicly available information and by information collected and obtained by UNHCR in the course of its operations in Somalia and elsewhere, as well as by other United Nations (UN) agencies and partner organizations.

All claims lodged by asylum-seekers need to be considered on their own merits according to fair and efficient status determination procedures and up-to-date and relevant country of origin information. This applies whether the claims are analysed on the basis of the refugee criteria contained in the 1951 Convention Relating to the Status of Refugees ("1951 Convention")[3] and its 1967 Protocol,[4] UNHCR's mandate, regional refugee instruments, or on the basis of broader international protection criteria, including complementary forms of protection.

## A. Refugee Status under the 1951 Convention

People fleeing Somalia may be at risk of persecution for reasons that are related to the ongoing armed conflict in Somalia, or on the basis of serious human rights violations that are not directly related to the conflict, or a combination of the two. UNHCR considers that individuals falling into one or more of the following risk profiles may be in need of international protection, depending on the individual circumstances of the case:

(1)    Individuals (Perceived as) Supporting the Federal Government of Somalia (FGS), Federal Member States (FMS) and/or Related Actors;

(2)    Members of Minority Religions and Those Accused of Blasphemy or Apostasy by Actors other than Al-Shabaab;

(3)    Individuals (Perceived as) Contravening Islamic Sharia and Decrees Imposed by Al-Shabaab, Including Those Deemed to Be "Apostates" by Al-Shabaab;

(4)    Members of Minority Groups Including: Ethnic Minorities and Minority Clans, Groups Defined by Religious Origin and Occupational Caste Groups

(5)    Journalists and Human Rights Defenders;

(6)    Children Exposed to Underage and Forced Recruitment and Adults Who Resist the Recruitment of Children;

(7)    Al-Shabaab Defectors;

(8)    Individuals Belonging to a Clan Engaged in Inter-Clan Conflicts, Including Blood Feuds

(9)    Individuals Targeted for Taxation and/or Extortion by Al-Shabaab;

(10)   Women and Girls;

(11)   Children;

(12)   Survivors of Trafficking and Persons at Risk of Being Trafficked;

(13)   Individuals of Diverse Sexual Orientations and/or Gender Identities (SOGI);

(14)   Persons Living with Disabilities (PLWD) and Persons Living with HIV/AIDS.

This list is not necessarily exhaustive and is based on information available to UNHCR at the time of writing. A claim should not automatically be considered as without merit simply because it does not fall within any of the profiles identified here. Depending on the specific circumstances of the case, family members or other members of the households of individuals found to be at risk of persecution may also be in need of international protection on the basis of their association with individuals at risk.

---

[2]    These Guidelines are based on information available to UNHCR as of 25 August 2022, unless otherwise stated.

[3]    UN General Assembly, *Convention Relating to the Status of Refugees*, 28 July 1951, United Nations Treaty Series, Vol. 189, p. 137, www.refworld.org/docid/3be01b964.html.

[4]    UN General Assembly, *Protocol Relating to the Status of Refugees*, 31 January 1967, United Nations Treaty Series, Vol. 606, p. 267, www.refworld.org/docid/3ae6b3ae4.html.

436

RJN Exhibit 25

Somalia continues to be affected by a non-international armed conflict.[5] Individuals fleeing violence or the threat of violence in the context of this conflict may meet the criteria for refugee status as contained in Article 1(A)(2) of the 1951 Convention.

For this to be the case, the feared persecution arising from the violence must be for reason of a 1951 Convention ground. In the context of Somalia, examples of circumstances where civilians are subjected to violence for reason of a 1951 Convention ground include situations where violence is targeted at areas where civilians of specific clans or specific ethnic, political or religious profiles predominantly reside, or at locations where civilians of such profiles predominantly gather (including markets, mosques, schools, or large social gatherings such as weddings). To qualify for refugee status there is no requirement that an individual be known personally to the agent(s) of persecution or be sought out personally by those agents. Similarly, entire communities may have a well-founded fear of persecution for one or more of the 1951 Convention grounds; there is no requirement that an individual suffer a form or degree of harm above that suffered by other individuals with the same profile.[6]

For civilians fleeing violence to come within the scope of Article 1(A)(2) of the 1951 Convention, the impact of the violence must be sufficiently serious to amount to persecution. A risk of regular exposure to violent conduct or to the consequences of such conduct can amount to persecution within Article 1(A)(2) of the 1951 Convention, either independently or cumulatively.[7] In the context of the conflict in Somalia, relevant considerations to determine whether the consequences of conflict-related violence for civilians are sufficiently serious to meet the threshold of persecution include the number of civilian casualties and the number of security incidents, as well as the existence of serious violations of international humanitarian law which constitute threats to life or freedom or other serious harm. Such considerations are not, however, limited to the direct impact of the violence, but also encompass the long-term and indirect consequences of violence, including the impact of the conflict on the human rights situation and the extent to which it impedes the ability of the State to protect human rights.

Relevant factors in this respect are: (i) territorial and social control exercised by Al-Shabaab over the civilian population in South and Central Somalia (see map on page 10), including through illegal taxation, the meting out of illegal punishments via parallel justice systems, restrictions on social conduct and freedom of movement, and threats and intimidation against civilians; (ii) forced recruitment; (iii) the impact of violence and insecurity on the humanitarian situation as manifested by food insecurity, poverty and the destruction of livelihoods and the loss of assets; (iv) high levels of crime and corruption and the ability of clan leaders and corrupt government officials to operate with impunity; (v) systematic constraints on access to education and basic health care as a result of insecurity; (vi) systematic constraints on participation in public life, in particular for women; and (vii) localized violence and revenge killings as a result of clan-based disputes.

## B. Broader UNHCR Mandate Criteria, Regional Instruments and Complementary Forms of Protection

The 1951 Convention forms the cornerstone of the international refugee protection regime. The criteria for refugee status in the 1951 Convention should be interpreted in such a manner that individuals or groups of persons who meet these criteria are duly recognized and protected under that instrument. Only when an asylum-seeker is found not to meet the refugee criteria in the 1951 Convention should broader international protection criteria as contained in UNHCR's mandate and regional instruments be examined, including subsidiary protection.[8]

Individuals who flee situations of violence where there is no nexus with a 1951 Convention ground would not ordinarily come within the scope of the 1951 Convention. Such individuals may nevertheless

---

[5]   Rule of Law in Armed Conflict Project (RULAC), *Non-international Armed Conflict in Somalia*, accessed 25 August 2022, www.rulac.org/browse/conflicts/non-international-armed-conflict-in-somalia.

[6]   UNHCR, *Guidelines on International Protection No. 12: Claims for Refugee Status Related to Situations of Armed Conflict and Violence under Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees and the Regional Refugee Definitions*, 2 December 2016, HCR/GIP/16/12, www.refworld.org/docid/583595ff4.html, paras 22-23.

[7]   Ibid., para. 18.

[8]   See UNHCR Executive Committee, *Conclusion on the Provision on International Protection Including through Complementary Forms of Protection*, No. 103 (LVI) – 2005, 7 October 2005, www.refworld.org/docid/43576e292.html.

437
RJN Exhibit 25

come within the terms of UNHCR's broader mandate criteria, or the criteria set out in regional instruments.

UNHCR's mandate encompasses individuals who meet the refugee criteria under the 1951 Convention and its 1967 Protocol, but has been broadened through successive UN General Assembly and ECOSOC resolutions to a variety of other situations of forced displacement resulting from indiscriminate violence or public disorder.[9] In light of this evolution, UNHCR's competence to provide international protection to refugees extends to individuals who are outside their country of origin or of habitual residence and who are unable or unwilling to return there owing to serious threats to life, physical integrity or freedom resulting from generalized violence or events seriously disturbing public order.[10]

In Somalia, indicators to assess the threat to life, physical integrity or freedom resulting from generalized violence include: (i) the number of civilian casualties as a result of indiscriminate acts of violence, including suicide attacks, the use of improvised explosive devices (IEDs),[11] landmines and air strikes; (ii) the number of conflict-related security incidents (see Section II.C.2); and (iii) the number of people who have been forcibly displaced due to conflict (see Section II.F). Such considerations are not, however, limited to the direct impact of the violence. They also encompass the longer-term, more indirect consequences of conflict-related violence that, either alone or cumulatively, give rise to threats to life, physical integrity or freedom.

In the exceptional circumstances of Somalia, relevant considerations to assess the threat to life, physical integrity or freedom resulting from events seriously disturbing public order include the fact that Al-Shabaab controls large parts of South and Central Somalia and exercises partial control and influence throughout almost the entire area. The following map shows areas under Al-Shabaab control as of December 2021.[12]

---

[9] UNHCR, *Providing International Protection Including Through Complementary Forms of Protection*, 2 June 2005, EC/55/SC/CRP.16, www.refworld.org/docid/47fdfb49d.html; UN General Assembly, *Note on International Protection*, 7 September 1994, A/AC.96/830, www.refworld.org/docid/3f0a935f2.html.

[10] See, for example, UNHCR, *Note on the Mandate of the High Commissioner for Refugees and His Office*, October 2013, www.refworld.org/docid/5268c9474.html, p. 3; UNHCR, *MM (Iran) v. Secretary of State for the Home Department - Written Submission on Behalf of the United Nations High Commissioner for Refugees*, 3 August 2010, C5/2009/2479, www.refworld.org/docid/4c6aa7db2.html, para. 10.

[11] "An IED, as defined by the United Nations Improvised Explosive Device Disposal Standards (May 2018) is 'a device placed or fabricated in an improvised manner incorporating destructive, lethal, noxious, pyrotechnic or incendiary chemicals and designed to destroy, incapacitate, harass or distract. It may incorporate military stores, but is normally devised from non-military components.' UN Security Council, *Implementation Assistance Notice No. 3: Summary of the Improvised Explosive Device (IED) Components Ban and Regulations in Place for Exportation of Explosive Materials to Somalia*, www.un.org/securitycouncil/sites/www.un.org.securitycouncil/files/ian_3_english_final_3_august.pdf, p. 1.

[12] Political Geography Now, *Somalia Control Map & Timeline - December 2021*, 14 December 2021, www.polgeonow.com/2021/12/who-controls-somalia-crisis-timeline.html. See also, UN Security Council, *Letter Dated 5 October 2021 from the Chair of the Security Council Committee Pursuant to Resolution 751 (1992) Concerning Somalia Addressed to the President of the Security Council*, 6 October 2021, S/2021/849, www.ecoi.net/en/file/local/2062553/S_2021_849_E.pdf (hereafter: UN Security Council, *Letter Dated 5 October*, 6 October 2021, S/2021/849, www.ecoi.net/en/file/local/2062553/S_2021_849_E.pdf), Annex 2.3. An estimated 900,000 persons "live in areas controlled by non-State armed groups, with serious access challenges that hinder humanitarian reach." UN Security Council, *Situation in Somalia*, 13 May 2022, S/2022/392, www.ecoi.net/en/file/local/2073538/N2233663.pdf, para. 47.

438
RJN Exhibit 25

INTERNATIONAL PROTECTION CONSIDERATIONS WITH REGARD TO PEOPLE FLEEING SOMALIA



Map reproduced with permission from *www.polgeonow.com*, created by Evan Centanni and Djordje Djukic (*direct link*). The boundaries and names shown and the designations used on this map do not imply official endorsement or acceptance by the United Nations.

439
RJN Exhibit 25

Available information indicates that the exercise of control by Al-Shabaab over key aspects of people's lives in these areas is repressive, coercive and undermines an *ordre public* based on respect for the rule of law and human dignity. Such situations are characterized by the systematic use of intimidation and violence against the civilian population, in a climate of widespread human rights abuses.[13]

UNHCR considers that individuals who originate from areas affected by active combat between government-affiliated forces and Al-Shabaab or from areas under the full or partial control of Al-Shabaab as characterized above, may, depending on the circumstances of their case, be in need of international protection. Those who are found not to meet the refugee criteria of the 1951 Convention may be eligible for international protection under UNHCR's broader mandate on the grounds of serious threats to life, physical integrity or freedom resulting from generalized violence or events seriously disturbing public order.

Somalis and others originating from Somalia who seek international protection in countries that are States Parties to the Convention Governing the Specific Aspects of Refugee Problems in Africa ("1969 OAU Convention")[14], and who have been found not to meet the criteria of the 1951 Refugee Convention, may qualify for refugee status under Article I(2) of the 1969 OAU Convention. In particular, UNHCR considers that individuals originating from areas of Somalia that are affected by active combat between government-affiliated forces and Al-Shabaab as well as areas of Somalia that are under the full or partial control of Al-Shabaab, may be in need of international protection under the terms of Article I(2) of the 1969 OAU Convention on the grounds that they were compelled to leave their place of habitual residence owing to threats to their lives, freedom or security as a result of events seriously disturbing public order.[15]

Somali asylum-seekers who seek international protection in any of the countries that have incorporated the Cartagena Declaration on Refugees ("Cartagena Declaration")[16] into their national legislation may qualify for refugee status under the terms of the Cartagena Declaration. In particular, UNHCR considers that individuals originating from areas in Somalia affected by active combat between government-affiliated forces and Al-Shabaab or from areas under the full or partial control of Al-Shabaab, and who have been found not to meet the criteria of the 1951 Refugee Convention, may be in need of international protection under the terms of the Cartagena Declaration on the grounds that their lives, safety or freedom were threatened by circumstances that have seriously disturbed public order.

Somalis who seek international protection in Member States of the European Union (EU) and who are found not to be refugees under the 1951 Convention may qualify for subsidiary protection under Article 15 of EU Directive 2011/95/EU (Qualification Directive), if there are substantial grounds for believing that they would face a real risk of serious harm in Somalia.[17] In light of the information presented in

---

13   See Section II.D.1.c of these Guidelines.
14   Organization of African Unity, *Convention Governing the Specific Aspects of Refugee Problems in Africa ("OAU Convention")*, 10 September 1969, 1001 U.N.T.S. 45, www.refworld.org/docid/3ae6b36018.html. The definition of the term "refugee" as contained in Article I of the 1969 OAU Convention has been incorporated into Article I of the *Bangkok Principles on the Status and Treatment of Refugees* (Bangkok Principles). See Asian-African Legal Consultative Organization (AALCO), *Bangkok Principles on the Status and Treatment of Refugees* (Final Text of the AALCO's 1966 Bangkok Principles on Status and Treatment of Refugees, as adopted on 24 June 2001 at the AALCO's 40th Session, New Delhi), www.refworld.org/docid/3de5f2d52.html.
15   On the meaning of the phrase "events seriously disturbing public order" in the 1969 OAU Convention, see Marina Sharpe, *The 1969 OAU Refugee Convention and the Protection of People Fleeing Armed Conflict and Other Situations of Violence in the Context of Individual Refugee Status Determination*, January 2013, www.refworld.org/docid/50fd3edb2.html; A. Edwards, *Refugee Status Determination in Africa*, 14 African Journal of International and Comparative Law 204-233 (2006), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1535377; UNHCR, *Extending the Limits or Narrowing the Scope? Deconstructing the OAU Refugee Definition Thirty Years On*, April 2005, www.refworld.org/docid/4ff168782.html.
16   *Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America*, Mexico and Panama, 22 November 1984, www.refworld.org/docid/3ae6b36ec.html. Although the Cartagena Declaration is a non-binding regional instrument, the Cartagena refugee definition has attained a particular standing in the region, not least through its incorporation into 15 national laws and State practice. For guidance on the interpretation of the refugee definition in the Cartagena Declaration, see UNHCR, *Guidelines on International Protection No. 12: Claims for Refugee Status Related to Situations of Armed Conflict and Violence under Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees and the Regional Refugee Definitions*, 2 December 2016, HCR/GIP/16/12, www.refworld.org/docid/583595ff4.html, paras 61-85.
17   Serious harm for the purposes of the Qualification Directive is defined as (a) the death penalty or execution; or (b) torture or inhuman or degrading treatment or punishment of an applicant in the country of origin; or (c) serious and individual threat to a civilian's life or person by reason of indiscriminate violence in situations of international or internal armed conflict. European Union, *Directive 2011/95/EU of the European Parliament and of the Council on Standards for the Qualification of Third-Country Nationals or Stateless Persons as Beneficiaries of International Protection, for a Uniform Status for Refugees or for Persons Eligible for Subsidiary Protection, and for the Content of the Protection Granted (Recast)*, 13 December 2011, https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32011L0095&from=EN (hereafter: EU, *Qualification Directive*, 2011, https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32011L0095&from=EN), Articles 2(f), 15.

440
RJN Exhibit 25

Section II.D of these Guidelines, applicants may, depending on the individual circumstances of the case, be in need of subsidiary protection under Article 15(a) or Article 15(b) on the grounds that they would face a real risk of the relevant forms of serious harm (death penalty[18] or execution; or torture or inhuman or degrading treatment or punishment), either at the hands of the State or its agents, or at the hands of Al-Shabaab.[19] Equally, in light of the fact that Somalia continues to be affected by a non-international armed conflict and in light of the information presented in Sections II.C, II.D, II.E and II.F of these Guidelines, applicants originating from or previously residing in conflict-affected areas may, depending on the individual circumstances of the case, be in need of subsidiary protection under Article 15(c) on the grounds that they would face a serious and individual threat to their life or person because of indiscriminate violence.

Given the fluid nature of the conflict in Somalia, applications by Somalis for international protection under UNHCR's mandate or under the definitions contained in regional instruments should each be assessed carefully in light of the evidence presented by the applicant and other current and reliable information about the situation in the country, giving due weight to the future-oriented nature of assessments of protection needs.

## C. Internal Flight or Relocation Alternative (IFA/IRA)

In light of the available evidence of serious and widespread human rights abuses by Al-Shabaab across South and Central Somalia in areas they fully or partially control, paired with the inability of the State to provide protection against such abuses in these areas, **UNHCR considers that an IFA/IRA is not available in areas of the country that are under the full or partial control of Al-Shabaab**.

**UNHCR considers that an IFA/IRA is also not available in areas of the country affected by active combat between government-affiliated forces and Al-Shabaab.**

For detailed guidance on the assessment of the availability of an IFA/IRA in parts of Somalia that are neither under the control of Al-Shabaab nor affected by active combat, please see Sections III.C.1 (relevance analysis) and III.C.2 (reasonableness analysis).

In the case of Benadir/Mogadishu as a proposed area of IFA/IRA, UNHCR provides the following guidance (see Section III.C.3): to assess the **relevance** of Mogadishu as a proposed IFA/IRA, and in particular the risk that the applicant would face a real risk of serious harm, including a serious risk to life, safety, liberty or health, or of serious discrimination, decision-makers must pay due regard to the negative trends in relation to the security situation for civilians in Mogadishu and the ability of Al-Shabaab to carry out attacks in Mogadishu. Notably, Al-Shabaab taxes and extorts persons in Mogadishu and carries out attacks that cause significant civilian casualties. UNHCR notes that civilians who partake in day-to-day economic and social activities in Mogadishu are exposed to a risk of falling victim to a violent attack in the city. Such activities include travelling to and from a place of work, travelling to hospitals and clinics, or travelling to school; livelihood activities that take place in the city's

---

18   Somalia's Penal Code "retains the death penalty for twenty crimes, including many that do not constitute the 'most serious' crimes […]. In addition to murder, they include crimes against the State, such as treason, espionage, bearing arms against the State, and disclosure of State secrets, and crimes endangering public safety, such as polluting the food or water supply, or causing an epidemic, resulting in death." Advocates for Human Rights / World Coalition against the Death Penalty, *Somalia: Stakeholder Report for the United Nations Universal Periodic Review*, 15 October 2020, www.upr-info.org/sites/default/files/documents/2021-07/js2_upr38_som_e_main.pdf, para. 10. See also, Federal Government of Somalia, *Somalia: Penal Code*, 3 April 1964, www.refworld.org/docid/4bc5906e2.html, Arts 184-186, 190, 196, 198-201, 204-206, 221-223, 329, 334 and 335, 434, 436. As of August 2022, there are 139 persons on death row in Somalia. The country executed 22 persons in 2021, 20 persons in 2020 and 13 persons in 2019. World Coalition Against the Death Penalty, *Somalia*, accessed 25 August 2022, https://worldcoalition.org/pays/somalia/. The death penalty is regularly carried out after military court sentences, particularly for persons convicted of being members of Al-Shabaab. See UN Security Council, *Situation in Somalia*, 13 May 2022, S/2022/392, www.ecoi.net/en/file/local/2073538/N2233663.pdf, para. 53; UN Security Council, *Situation in Somalia*, 10 August 2021, S/2021/723, www.ecoi.net/en/file/local/2058501/S_2021_723_E.pdf, para. 43; UN General Assembly, *Situation of Human Rights in Somalia*, 14 July 2021, A/HRC/48/80, www.ecoi.net/en/file/local/2058956/A_HRC_48_80_E.pdf, para. 26. Al-Shabaab uses the death penalty on, *inter alia*, spies and persons accused of witchcraft, blasphemy or adultery. See Section III.A.3.b.

19   It should be noted that where applicants face a real risk of such treatment for reason of a 1951 Convention ground, they should be accorded refugee status under the Convention (unless they are to be excluded from the benefit of protection under the Refugee Convention under Article 1F); only where there is no nexus between the risk of serious harm and one of the Convention grounds should the applicant be accorded subsidiary protection. See also, UNHCR, *UNHCR Annotated Comments on the EC Council Directive 2004/83/EC of 29 April 2004 on Minimum Standards for the Qualification and Status of Third Country Nationals or Stateless Persons as Refugees or as Persons Who Otherwise need International Protection and the Content of the Protection Granted (OJ L 304/12 of 30.9.2004)*, January 2005, www.unhcr.org/43661eee2.pdf, p. 32.

441
RJN Exhibit 25

streets, such as street vending; as well as going to markets, mosques and other places where people gather.

To assess the **reasonableness** of Mogadishu as a proposed IFA/IRA, it must be established that the applicant will have access in Mogadishu to:

(i)      shelter;
(ii)     essential services, such as potable water and sanitation, health care and education;
(iii)    livelihood opportunities, or proven and sustainable support to enable access to an adequate standard of living.

Particularly relevant in this regard are patterns of displacement to Mogadishu, where most displaced persons end up living in districts on the outskirts of the city. The city has high levels of poverty and large numbers of people in need of humanitarian assistance. Influxes of IDPs have strained Mogadishu's resources and services, and IDPs struggle to find livelihoods. Additionally, IDPs face forced evictions and secondary displacement.

**UNHCR considers that given the current security, human rights, economic and humanitarian situation in Mogadishu, an IFA/IRA is generally not available in the city.** An IFA/IRA may be available in exceptional cases, for example, for single healthy and able-bodied men of working age without identified vulnerabilities (or married couples without children where both spouses are healthy, able-bodied and of working age without identified vulnerabilities), and who belong to a local majority clan such as the Abgaal subclan of the Hawiye through which they have access to (i) shelter outside an IDP settlement and without risk of eviction, (ii) essential services such as potable water and sanitation, health care and education; and (iii) a livelihood that does not place the person at an elevated risk of the indiscriminate violence affecting Mogadishu, or proven and sustainable support to enable access to an adequate standard of living.

In the case of Garowe as a proposed area of IFA/IRA, UNHCR provides the following guidance (see Section III.C.4): to assess the **relevance** of Garowe as a proposed IFA/IRA, decision-makers must assess whether an applicant can access Garowe by air as road travel is unsafe in South and Central Somalia.

To assess the **reasonableness** of Garowe as a proposed IFA/IRA, it must be established that the applicant will have access in Garowe to:

(i)      shelter;
(ii)     essential services, such as potable water and sanitation, health care and education;
(iii)    livelihood opportunities, or proven and sustainable support to enable access to an adequate standard of living.

Particularly relevant in this regard is the high number of IDPs in Garowe, making up one-third of the population of the city, and the situation of IDPs in Garowe, who face rising food insecurity, poverty, insufficient livelihoods, forced evictions and lack of access to healthcare or sanitation. Additionally, it is reported that clan background is extremely important in Puntland and minority clans, as well as persons from majority clans that are in a minority in Puntland, suffer discrimination and may struggle to find livelihoods or provide for themselves in Garowe.

**UNHCR considers that given the current economic and humanitarian situation in Garowe, an IFA/IRA would be available only for single, healthy and able-bodied men of working age without identified vulnerabilities (or married couples without children where both spouses are healthy, able-bodied and of working age without identified vulnerabilities), who belong to a clan in Puntland through patrilinear descent through which they have access to (i) shelter outside an IDP settlement and without risk of eviction, (ii) essential services such as potable water and sanitation, health care and education; and (iii) a livelihood or proven and sustainable support to enable access to an adequate standard of living.**

RJN Exhibit 25

UNHCR considers that an IFA is generally not reasonable for members of minority groups, families with children, female-headed households, persons who do not have access to any kind of support network in Garowe, and persons from a majority clan who are otherwise in the minority in Garowe, for example, the Rahanweyn.

In the case of Hargeisa as a proposed area of IFA/IRA, UNHCR provides the following guidance (see Section III.C.5): to assess the **relevance** of Hargeisa as a proposed IFA/IRA, decision-makers must take into account documentation and visa requirements, including for Somali citizens not originating from Somaliland.

To assess the **reasonableness** of Hargeisa as a proposed IFA/IRA, it must be established that the applicant will have access in Hargeisa to:

(i)     shelter;
(ii)    essential services, such as potable water and sanitation, health care and education;
(iii)   livelihood opportunities, or proven and sustainable support to enable access to an adequate standard of living.

Particularly relevant in this regard is the situation of IDPs from South and Central Somalia in Hargeisa, who lack access to livelihoods, water and sanitation as well as other basic necessities. IDPs from South and Central Somalia face discrimination and lack access to justice. The Isaaq clan is dominant in the city, and minority groups, as well as majority clan members who are not from the Isaaq clan, do not have the same access to property, services or livelihoods.

**UNHCR considers that given the current socio-economic and humanitarian situation[20] in Hargeisa, including for IDPs and specifically for IDPs who do not originate from Somaliland, an IFA/IRA would be available only for single, healthy and able-bodied men of working age without identified vulnerabilities (or married couples without children where both spouses are healthy, able-bodied and of working age without identified vulnerabilities), who originate from Somaliland and who have access to a local support network through which they have access to (i) shelter outside an IDP settlement and without risk of eviction, (ii) essential services such as potable water and sanitation, health care and education; and (iii) a livelihood or proven and sustainable support to enable access to an adequate standard of living.**

UNHCR considers that an IFA is generally not reasonable for families with children and female-headed households, even if they originate from Somaliland.

## D. Exclusion Considerations

Somalia has a long history of armed conflict, serious human rights violations and transgressions of international humanitarian law — in light of this, exclusion considerations under Article 1F of the 1951 Convention may arise in relation to individual asylum claims by Somali asylum-seekers. Exclusion considerations may be triggered in any individual case if there are elements in the applicant's claim that suggest that he or she may have been associated or involved with criminal acts that fall within the scope of Article 1F of the 1951 Convention. Exclusion considerations may arise in the cases of Somali asylum-seekers with certain backgrounds and profiles, including persons who have been engaged in the hostilities and armed conflict.[21]

---

[20]   "The protracted humanitarian crisis in Somaliland is multi-layered and complex. Limited development coupled with recurring climatic shocks, such as drought, riverine and flash-flooding, give rise to high levels of need among affected populations. The majority of internally displaced persons (IDPs) reside in overcrowded shelters in densely populated urban areas, further increasing their exposure to the risks and impacts of COVID-19." REACH, *Detailed Site Assessment (DSA): Hargeysa District, Woqooyi Galbeed Region, Somalia*, 7 April 2022, https://reliefweb.int/report/somalia/detailed-site-assessment-dsa-hargeysa-district-woqooyi-galbeed-region-somalia-march, p. 1, see also pp. 3-5.
[21]   See for example, Global Centre for the Responsibility to Protect, *Somalia: Populations at Risk*, 5 April 2022, www.globalr2p.org/countries/somalia/ and the UN Secretary-General's reports on Somalia, available at https://unsom.unmissions.org/secretary-generals-reports.

443
RJN Exhibit 25

Robow Abu Mansur, defected to the government, Al-Shabaab accused him of apostasy and stated that: "Anybody who joins the line of non-Muslims is an apostate who can be killed."[559]

> Based on the evidence presented above, UNHCR considers that persons living in areas controlled by Al-Shabaab who are perceived as contravening Islamic laws or decrees by Al-Shabaab, including people deemed to be apostates or blasphemers, are likely to be in need of international refugee protection on the basis of a well-founded fear of persecution at the hands of a non-State actor for reasons of religion, imputed political opinion, or other relevant Convention grounds, combined with a general inability of the State to provide protection from such persecution. Depending on the individual circumstances of the case, persons of this profile who live outside areas controlled by Al-Shabaab may also be in need of international protection.
>
> Persons who have been accused by Al-Shabaab of ordinary crimes carrying harsh penalties, including in particular the death penalty or corporal punishments,[560] such as robbery or theft, are likely to be in need of international protection on the basis of a well-founded fear of persecution at the hands of a non-State actor for reasons of religion, imputed political opinion, or other relevant Convention grounds, combined with a general inability of the State to provide protection from such persecution. Claims for international protection of this kind may, depending on the alleged crime, give rise to the need to examine possible exclusion from refugee status.

### 4)  Members of Minority Groups Including: Ethnic Minorities and Minority Clans, Groups Defined by Religious Origin and Occupational Caste Groups

Minority groups in Somalia include ethnic minorities and minority clans, groups defined by religious origin and caste-like groups previously defined by their occupations. The country's political and social system is largely clan-based and the traditional clan structure may define whether a person has, *inter alia*, protection against violation of their rights, access to services, access to justice mechanisms, or any type of social safety net.[561] No reliable estimates exist for the total size of minority groups in Somalia given the general unavailability of census data; the last estimate, which is almost two decades old, is that minority groups make up 30 per cent of the population.[562]

---

[559] Reuters, *Somalia's Al Shabaab Denounces Ex-Spokesman as Apostate Who Could Be Killed*, 16 January 2018, www.reuters.com/article/us-somalia-insurgency-idUSKBN1F50IH.

[560] This includes *hudud* crimes, namely "illicit sexual relations (zina), theft, making unproven accusations of zina, drinking intoxication, apostasy and highway robbery", but it may also include lesser crimes where Al-Shabaab prescribes punishment that is in violation of international human rights law. Pact / ABA ROLI, *The Shari'ah in Somalia*, March 2020, www.usaid.gov/sites/default/files/documents/1860/Shariah-in-Somalia.pdf, p. 46. See also, M. Skjelderup, *Hudud Punishments in the Forefront: Application of Islamic Criminal Law by Harakat Al-Shabaab Al-Mujahideen*, 2014, www.jstor.org/stable/24739145.

[561] Because of the shifting nature of clan alliances and the high number of subclans, it can be very difficult to find information regarding specifics on minority groups in Somalia. For more information generally on the clan structure and how it shapes Somali society, as well as the position of persons who are not members of majority clans, please see the resources quoted in this section and in particular: EASO, *Somalia: Targeted Profiles*, September 2021, www.ecoi.net/en/file/local/2060580/2021_09_EASO_COI_Report_Somalia_Targeted_profiles.pdf; SEM, *Focus Somalie : Clans et minorités*, 31 May 2017, www.sem.admin.ch/dam/sem/fr/data/internationales/herkunftslaender/afrika/som/SOM-clans-f.pdf.download.pdf/SOM-clans-f.pdf; ACCORD, *Clans in Somalia: Report on a Lecture by Joakim Gundel, COI Workshop Vienna*, December 2009, www.refworld.org/docid/4b29f5e82.html. Additionally, individual persons may identify with specific genealogical lineage, which is in turn identified with the larger minority group. For example, one elder interviewed by an expert identified as Cali Abokor, part of the Gaboye clan called Musse Dheriyo. E. Vitturini, *Caste, Hierarchy, and Social Change: Tools for the Study of the Gaboye of Somaliland and African Hereditary Groups of Occupational Specialists*, 67(1) Africa Today 3-23 (2020), https://muse.jhu.edu/article/776308, p. 9. UNHCR notes that in individual cases identification of clan or ethnic group membership, or membership in occupational caste, can be difficult as occupation, geographic origin, language and other indicators may fluctuate even within groupings. See, for example, Protection Cluster / UNHCR, *Analysis and Recommendations on Data Collection: Marginalized and Minority Groups*, March 2021, www.globalprotectioncluster.org/wp-content/uploads/Analysis-and-Recommendations-on-Data-Collection_Marginalized-and-Minority-Groups_March-2021.pdf, p. 7.

[562] OCHA, *2022 Humanitarian Needs Overview: Somalia*, October 2021, www.ecoi.net/en/file/local/2062935/2022+Somalia+HNO.pdf, p. 25. "Somalia has not published a national census since 1975 and since then major international refugee flows and significant internal displacement have occurred. (Somaliland has never conducted a full census). It is thus extremely difficult to calculate or even estimate with a high degree of accuracy numbers of people living across Somalia/Somaliland and their situation, let alone the proportions of the minority or majority clan heritage of those people and how the situation of each compares with the population as a whole. The UN has nonetheless estimated that minority communities could form 30% of the population." MRG, *Minority Inclusion Learning Review of the Ministry of Foreign Affairs of Switzerland: Programmes in the Horn of Africa*, 24 July 2021, https://reliefweb.int/sites/reliefweb.int/files/resources/revised-final-report_minority-inclusion-learning-review_13_07.pdf, pp. 14-15.

444

RJN Exhibit 25

The electoral system in Somalia is based upon the traditional clan structure and uses a "4.5 formula", where the majority of seats in parliament are allocated to members of the four majority clans,[563] while the small remainder of seats is meant to represent all other minority groups.[564] The 4.5 power sharing formula contributes to the exclusion and marginalization of minority groups in Somalia.[565] Minority groups in Somalia have "been completely left out of the development of the country's government, with no opportunities for participation and influence in official institutions."[566]

In October 2020, however, Puntland began holding a local electoral process based on universal suffrage where each person has one vote.[567] Somaliland also holds elections on the same basis, but with a minimum quota (3 of 82) for seats filled by minority candidates, which is nevertheless below the estimated proportion of the minority population in Somaliland.[568]

Minority groups such as "the Bantu, Tumaal, Reer Hamar/Benadiri, and Madhiban" experience racism and discrimination, and are generally "in a bad position" in Somali society.[569] Because of their low standing in society and their lack of protection or assistance from a broader clan network, people from minority groups and minority clans are vulnerable to conflict-related displacement.[570] Additionally, discrimination and segregation of minority groups can be a driver which causes and prolongs displacement.[571]

In general, persons from minority groups may struggle to access reliable livelihoods,[572] are generally unable to engage in pastoralist activities (reserved for majority clans) or hold important positions in businesses or in the government,[573] and are likely more vulnerable to "economic or crisis related

---

[563] The four majority clans are the Hawiye, the Darood, the Dir, and the Rahanweyn. The Hawiye, the Darood, and the Dir (including the Isaaq) are traditionally pastoralist nomads and are also sometimes referred to as the "noble" clans. The Rahanweyn were mainly sedentary, but are still considered a majority clan. ACCORD, *Clans in Somalia: Report on a Lecture by Joakim Gundel, COI Workshop Vienna*, December 2009, www.refworld.org/docid/4b29f5e82.html, pp. 11-13.

[564] The system "gives each of the four major clan groups an equal share in parliament and half a share to minority groups. That sharing also extends to a certain extent throughout the executive and other branches of government." DW, *Somalia's Clan System: Undermining Democracy?*, 9 February 2021, www.dw.com/en/somalias-clan-system-undermining-democracy/a-56512779.

[565] "Patterns of marginalization that differentiate and systematically exclude some social groups have been further entrenched through structural processes, such as the 4.5 political system. The clan based 4.5 power sharing formula, introduced as an attempt to reconcile the nation at the end of the civil war, has seen the grouping of the minority clans and ethnic groups that constitute the 0.5 continue to remain inequitably excluded from assistance." OCHA, *2022 Humanitarian Needs Overview: Somalia*, October 2021, www.ecoi.net/en/file/local/2062935/2022+Somalia+HNO.pdf, p. 24.

[566] Finnish Immigration Service, *Somalia: Fact-Finding Mission to Mogadishu in March 2020*, 7 August 2020, www.ecoi.net/en/document/2047285.html, p. 43.

[567] UNSOM, *International Partners Welcome Local Elections in Puntland*, 29 October 2021, https://unsom.unmissions.org/international-partners-welcome-local-elections-puntland-0.

[568] A constitutional amendment in 2018 created the quota. "In late 2020, there was an opportunity to amend this provision to increase the number of reserved seats for both women and minorities. However, Somaliland's Parliamentarians opted to not take advantage of this opportunity and both reservations remain well below the estimated proportions of the populations in question." MRG, *Minority Inclusion Learning Review of the Ministry of Foreign Affairs of Switzerland: Programmes in the Horn of Africa*, 24 July 2021, https://reliefweb.int/sites/reliefweb.int/files/resources/revised-final-report_minority-inclusion-learning-review_13_07.pdf, p. 24.

[569] Finnish Immigration Service, *Somalia: Fact-Finding Mission to Mogadishu in March 2020*, 7 August 2020, www.ecoi.net/en/document/2047285.html, p. 41. Minority groups are "considered inferior, which results in systematic exclusion, stigma, social segregation, denial of rights, and low social, economic and political status." UN Somalia, *UN Common Country Analysis: Somalia 2020*, 25 September 2020, www.ecoi.net/en/file/local/2052858/UN+Somalia+Common+Country+Analysis+2020_3.pdf, p. 49.

[570] UN Somalia, *UN Common Country Analysis: Somalia 2020*, 25 September 2020, www.ecoi.net/en/file/local/2052858/UN+Somalia+Common+Country+Analysis+2020_3.pdf, p. 49.

[571] "The marginalization and social segregation of vulnerable groups is one of the key driving forces of the protracted massive displacement of people and the difficulty to find durable solutions for them." MRG, *Minority Inclusion Learning Review of the Ministry of Foreign Affairs of Switzerland: Programmes in the Horn of Africa*, 24 July 2021, https://reliefweb.int/sites/reliefweb.int/files/resources/revised-final-report_minority-inclusion-learning-review_13_07.pdf, p. 111.

[572] "Most members of marginal groups do menial and physical work, such as at building sites. According to a representative of a Somali NGO, marginal group members include 5,000 women with a university degree. Only some of them have a job, and even that means cleaning in shops and businesses. They have no chance of being employed in the Somali government or international organisations." Finnish Immigration Service, *Somalia: Fact-Finding Mission to Mogadishu in March 2020*, 7 August 2020, www.ecoi.net/en/document/2047285.html, p. 43.

[573] "Minority representatives are generally excluded from executive positions and public service appointments." UN Somalia, *UN Common Country Analysis: Somalia 2020*, 25 September 2020, www.ecoi.net/en/file/local/2052858/UN+Somalia+Common+Country+Analysis+2020_3.pdf, p. 49.

445
RJN Exhibit 25

shocks".[574] Reportedly, the Somali armed forces are made up mostly of persons from majority clans and there are no minority group members in any senior positions.[575]

Members of minority groups may also be more food insecure,[576] and "experience more conflict related attacks on their households relative to majority clan members".[577] In urban IDP camps which are primarily inhabited by minority group members, people "have higher levels of food insecurity, are less likely to be receiving food or cash assistance, and are more likely to be dependent on casual labour as a livelihood."[578] Minority clan members are often denied or excluded from access to humanitarian assistance, and suffer more extreme poverty and less access to livelihoods than persons from majority clans when displaced to urban areas.[579]

Because the customary dispute mechanism of *Xeer* is based on the ability of "powerful clans of equal strength" to negotiate settlements, minority groups have "no access or opportunity to seek justice and indemnification for legal infringements they have experienced through [*Xeer*]".[580] Members of minority groups lack the protection that majority clans provide to their members, and therefore members are disproportionately affected by "killings, torture, rape, kidnapping for ransom, and looting of land and property with impunity by faction militias and majority clan members, often with the acquiescence of federal and local authorities."[581] Minority groups are unable to help defend their members or avenge any violations against them.[582]

Women from minority groups are highly vulnerable to gender-based violence.[583] Minority group children face bullying at school for their ethnic or clan background.[584]

According to one source, the situation of minority groups is improving slightly with more and more persons pursuing higher education and the younger generation less concerned with clan or ethnic background.[585] Some minority groups may seek or find ways to acquire the protection of a larger clan, via inter-marriage, when permitted, or via local alliances.[586]

---

[574] Researchers surveyed persons in IDP camps and minority-only settlements, and found that: "Those in minority settlements were most likely to report having no source of income (24% minorities; 19% IDPs, 20% host communities) and least likely to report having two incomes per household (3.4% minorities; 6.1% IDPs; 9.3% host communities). Moreover, for those with an income, almost half (45%) of those living in a minority settlement were dependent on casual labour for their main source of income […]. This was more than double those in IDP camps (17%) and host communities (21%)". MRG, *Minority Inclusion Learning Review of the Ministry of Foreign Affairs of Switzerland: Programmes in the Horn of Africa*, 24 July 2021, https://reliefweb.int/sites/reliefweb.int/files/resources/revised-final-report_minority-inclusion-learning-review_13_07.pdf, p. 26.
[575] One NGO said this was likely because the "Somali government does not want to arm members of marginal groups to a large extent, because they could challenge the position of the powerful clans". Finnish Immigration Service, *Somalia: Fact-Finding Mission to Mogadishu in March 2020*, 7 August 2020, www.ecoi.net/en/document/2047285.html, p. 44.
[576] An "analysis of food security based on the self-identification provided by 35% of [the] sample" showed that "self-identified minorities report[ed] significantly higher food insecurity scores on average". MRG, *Minority Inclusion Learning Review of the Ministry of Foreign Affairs of Switzerland: Programmes in the Horn of Africa*, 24 July 2021, https://reliefweb.int/sites/reliefweb.int/files/resources/revised-final-report_minority-inclusion-learning-review_13_07.pdf, p. 26.
[577] OCHA, *2022 Humanitarian Needs Overview: Somalia*, October 2021, www.ecoi.net/en/file/local/2062935/2022+Somalia+HNO.pdf, p. 23.
[578] Ibid., p. 24.
[579] Ibid., pp. 39, 46.
[580] Finnish Immigration Service, *Somalia: Fact-Finding Mission to Mogadishu in March 2020*, 7 August 2020, www.ecoi.net/en/document/2047285.html, p. 42. See also, Lifos, *Government and Clan System in Somalia*, 5 March 2013, https://lifos.migrationsverket.se/dokument?documentAttachmentId=38611, p. 28. This is especially concerning considering that, by some estimates, the vast majority of disputes are settled via *Xeer* and other alternative dispute mechanisms, and not in the formal justice system. Heritage Institute, *Rebuilding Somalia's Broken Justice System*, 6 January 2021, www.heritageinstitute.org/wp-content/uploads/2021/01/Justice-Report-Jan-6-.pdf, p. 28. See also Section II.A.
[581] US Department of State, *2021 Country Report on Human Rights Practices: Somalia*, 12 April 2022, www.ecoi.net/en/document/2071126.html. One woman from a minority clan explained that she was unable in her area to move freely, due to checkpoints where women from her clan were targeted by "other clans' militia and SNA from other clans." She concluded: "There are no [justice] mechanisms that can support the victim". UN Security Council, *Letter Dated 5 October*, 6 October 2021, S/2021/849, www.ecoi.net/en/file/local/2062553/S_2021_849_E.pdf, p. 89. "Minority groups (ethnic minorities such as Bantu, Bajuni, Benadiri, RerXamar, Bravanese; or occupational groups such as Midgan/Gaboye, Tumal, Yibir, Galgala) that are estimated to represent up to 1/3 of the population in Somalia, continue to be excluded from political participation, have limited access to justice, are denied multiple rights and are disproportionately affected by natural hazards and conflicts." MRG, *Minority Inclusion Learning Review of the Ministry of Foreign Affairs of Switzerland: Programmes in the Horn of Africa*, 24 July 2021, https://reliefweb.int/sites/reliefweb.int/files/resources/revised-final-report_minority-inclusion-learning-review_13_07.pdf, p. 111.
[582] Finnish Immigration Service, *Somalia: Fact-Finding Mission to Mogadishu in March 2020*, 7 August 2020, www.ecoi.net/en/document/2047285.html, p. 42.
[583] "Female members of marginal groups are in a desperate position, finding it difficult to obtain protection from legal infringements against them. Eighty percent of the victims of violence against women in Mogadishu belong to marginal groups, and most of them live in camps of internally displaced people. Women who belong to marginal groups are often subjected to sexual or other violence." Ibid., p. 44.
[584] Ibid., p. 45.
[585] Ibid., p. 45.
[586] See, for example, ibid., p. 44. See also, Section II.A.3.

446
RJN Exhibit 25

In Somaliland, minority clans face marginalization and discrimination.[587] They are often only able to work undesirable jobs and many live in poverty, including in IDP camps.[588]

### a)   Members of Ethnic Minorities

The principal minority ethnic groups in Somalia are the Bantu and the Benadiri and associated groups, the Bajunis[589] and Barawanis.[590] These groups may be known by various other names,[591] and are generally found in the southern region of Somalia.[592]

The Bantu are stigmatized as the descendants of slaves and are characterized as African, not Somali.[593] The Bantu have historically experienced discrimination and marginalization in Somalia, and are excluded from some livelihoods, including government jobs[594] and professional positions, and often work instead in manual trades or agriculture.[595] Bantu persons reportedly have a generally low level of education, and even when educated will not be hired for anything other than manual work.[596] Bantu persons are not able to access the *Xeer* system of customary law.[597] In Al-Shabaab-controlled areas,

---

[587]   Freedom House, *Freedom in the World 2021: Somaliland*, 3 March 2021, www.ecoi.net/en/document/2077302.html. Somaliland is populated mostly by the Isaaq clan and sub-clans of the Darood. Minorities are often drawn from other clans who have come from Somalia, or Gabooye/occupational caste groups. Canada: Immigration and Refugee Board (IRB), *Somalia: Treatment of Returnees in Somaliland by Authorities and Society; Ability of an Individual to Relocate to Somaliland, Including Access to Employment, Housing, and Social Services (2018-March 2019) [SOM106246.E]*, 19 March 2019, www.ecoi.net/en/document/2005868.html.

[588]   IRB, *Somalia: Treatment of Returnees in Somaliland by Authorities and Society; Ability of an Individual to Relocate to Somaliland, Including Access to Employment, Housing, and Social Services (2018-March 2019) [SOM106246.E]*, 19 March 2019, www.ecoi.net/en/document/2005868.html.

[589]   The Bajunis are a cross-border people group which speak a northern dialect of Swahili and live on the islands in southern Somalia. The community is currently thought to be very small (a few hundred or less). Given that they are also technically Bantu, they likely experience similar discrimination to southern Somali Bantu. D. Nurse, *Documenting Language Shift and Loss: Bajuni in Somalia*, 15 Language Documentation and Description 123-150 (2018), www.elpublishing.org/docs/1/15/ldd15_05.pdf, p. 124.

[590]   SEM, *Focus Somalie : Clans et minorités*, 31 May 2017, www.sem.admin.ch/dam/sem/fr/data/internationales/herkunftslaender/afrika/som/SOM-clans-f.pdf.download.pdf/SOM-clans-f.pdf, pp. 12-13 ; ACCORD, *Clans in Somalia: Report on a Lecture by Joakim Gundel, COI Workshop Vienna*, December 2009, www.refworld.org/docid/4b29f5e82.html, p. 14. The Barawanis are also called the bravanese, and are sometimes considered part of the Benadiri as they are also of Arab descent. See MRG, *Somalia: Benadiri*, updated March 2018, https://minorityrights.org/minorities/benadiri/.

[591]   For example, the Bantu people are called different names depending on their location (e.g. Gosha, Makane, Shiidle, Reer Shabelle, or Mushungli). ACCORD, *Clans in Somalia: Report on a Lecture by Joakim Gundel, COI Workshop Vienna*, December 2009, www.refworld.org/docid/4b29f5e82.html, p. 16. Benadir is sometimes considered an umbrella term including a variety of groups from Mogadishu and the coast south of Mogadishu who are generally descendants of Arabs and are thus lighter skinned. IRB, *Somalia: The Reer Hamar and/or Benadiri, Including the Location of their Traditional Homeland, Affiliated Clans and Risks They Face from Other Clans*, 3 December 2012, www.refworld.org/docid/51e4facb4.html. See also, SEM, *Focus Somalie : Clans et minorités*, 31 May 2017, www.sem.admin.ch/dam/sem/fr/data/internationales/herkunftslaender/afrika/som/SOM-clans-f.pdf.download.pdf/SOM-clans-f.pdf, p. 13. The Bantu are also sometimes called *Jareer*, a derogatory term that refers to their hair. However, the term has "been embraced" by many Bantu. L. J. Benstead and D. Van Lehman, *Two Classes of "Marriage": Race and Sexual Slavery in Al-Shabaab-Controlled Somalia*, The Journal of the Middle East and Africa (2021), https://doi.org/10.1080/21520844.2021.1923998, p. 2. See also, D. J. Van Lehman and E. M. McKee, *Removals to Somalia in Light of the Convention against Torture: Recent Evidence from Somali Bantu Deportees*, 33(3) Georgetown Immigration Law Journal 357-397 (2019), www.law.georgetown.edu/immigration-law-journal/wp-content/uploads/sites/19/2019/08/GT-GILJ190032.pdf, p. 361.

[592]   FAO, *National Gender Profile of Agriculture and Rural Livelihoods*, 2021, https://reliefweb.int/sites/reliefweb.int/files/resources/NATIONAL%20GENDER%20PROFILE%20Somalia.pdf, p. 5.

[593]   Bantu communities have existed for a long time in Somalia, but some Bantu were brought by the slave trade. L. J. Benstead and D. Van Lehman, *Two Classes of "Marriage": Race and Sexual Slavery in Al-Shabaab-Controlled Somalia*, The Journal of the Middle East and Africa (2021), https://doi.org/10.1080/21520844.2021.1923998, p. 2; D. J. Van Lehman and E. M. McKee, *Removals to Somalia in Light of the Convention against Torture: Recent Evidence from Somali Bantu Deportees*, 33(3) Georgetown Immigration Law Journal 357-397 (2019), www.law.georgetown.edu/immigration-law-journal/wp-content/uploads/sites/19/2019/08/GT-GILJ190032.pdf, pp. 361-362. See also, M. A. Eno and A. M. Kusow, *Racial and Caste Prejudice in Somalia*, Journal of Somali Studies 91-118 (2014), https://lib.ir.iastate.edu/cgi/viewcontent.cgi?article=1007&context=soc_las_pubs, pp. 108-112.

[594]   "The clan background is also highly relevant in the administration of the city and use of power there. Administration of districts is usually the responsibility of the powerful clan in the district. [...] Although a significant number of the Bantu live in the capital city, they do not hold influential positions in the administration of the city or its districts." Finnish Immigration Service, *Somalia: Fact-Finding Mission to Mogadishu in March 2020*, 7 August 2020, www.ecoi.net/en/document/2047285.html, p. 40.

[595]   D. J. Van Lehman and E. M. McKee, *Removals to Somalia in Light of the Convention against Torture: Recent Evidence from Somali Bantu Deportees*, 33(3) Georgetown Immigration Law Journal 357-397 (2019), www.law.georgetown.edu/immigration-law-journal/wp-content/uploads/sites/19/2019/08/GT-GILJ190032.pdf, pp. 361-362, see also p. 363. See also, MRG, *Somalia: Bantu*, updated March 2018, https://minorityrights.org/minorities/bantu/. "Bantu communities, primarily living between the Juba and Shabelle Rivers in the southern part of the country, continued to face discrimination, including verbal abuse and being forced to adopt Arabic names. The discrimination also occurred in IDP camps, where Bantu women were not protected by traditional clan structure." US Department of State, *2021 Country Report on Human Rights Practices: Somalia*, 12 April 2022, www.ecoi.net/en/document/2071126.html. For example, while fishermen may be from majority clans, the "labourers who slaughter, distribute or carry the fish are often from minority groups, such as Bantu or Madiban". EASO, *Somalia: Key Socio-Economic Indicators*, September 2021, https://coi.easo.europa.eu/administration/easo/PLib/2021_09_EASO_COI_Report_Somalia_Key_socio_economic_indicators.pdf, p. 28.

[596]   Finnish Immigration Service, *Somalia: Fact-Finding Mission to Mogadishu in March 2020*, 7 August 2020, www.ecoi.net/en/document/2047285.html, p. 43.

[597]   L. J. Benstead and D. Van Lehman, *Two Classes of "Marriage": Race and Sexual Slavery in Al-Shabaab-Controlled Somalia*, The Journal of the Middle East and Africa (2021), https://doi.org/10.1080/21520844.2021.1923998, p. 8. "The opportunity for negotiations under the *Xeer* system is only reserved for powerful clans of equal strength who can avenge violations of their rights." Finnish Immigration Service, *Somalia: Fact-Finding Mission to Mogadishu in March 2020*, 7 August 2020, www.ecoi.net/en/document/2047285.html, p. 42.

447
RJN Exhibit 25

Bantu persons are forced to pay taxes and are subjected to extortion.[598] They are also forced into slave labour.[599]

Bantu women in Al-Shabaab-controlled areas are often forced into marriages with fighters, sometimes under threat of death or other serious penalties for them or their families.[600] Two researchers found that Bantu girls were forced into marriage to fighters at a younger age than other Somali girls, were not incorporated into the fighter's households, and the children of such marriages are ignored; this led the researchers to conclude that Al-Shabaab subjugates Bantu women in a form of sexual slavery rather than forced marriage.[601] Men and women from majority clans and powerful clan groups are generally not permitted to marry Bantu persons.[602] In 2018, a man was murdered because his nephew, a Bantu man, had married a Somali woman from a larger clan.[603] His nephew and his nephew's wife remained in hiding as of August 2020.[604]

Bantu and Bajuni people have also suffered "persistent confiscation of land and property".[605]

The other of the two principal minority ethnic groups are the Benadiri, which in reality comprise many smaller groups of persons descended from Arab traders who historically lived in Mogadishu and the coast south of Mogadishu.[606] One important Benadiri clan, the Reer Hamar, holds more power than other minority groups and its members have been able to obtain some government positions and also have been able to intermarry with members of more powerful clans.[607]

### b)   Minority Groups Defined by Religious Origin

Somalia has two main groups that are defined by their religious origin, the Ashraf and the Sheikhal; these are sometimes labelled as minority clans or ethnic groups.[608] Both groups are considered "dispersed religious communit[ies] of claimed Arabian and early Islamic origin."[609] While both are seen as individual minority communities, both the Ashraf and the Sheikhal have affiliated with larger clan groups.[610]

There are two sub-sets of the Ashraf, those affiliated with the majority Rahanweyn clan, and those who live along the coast and are associated with the Benadiri.[611] According to one researcher, the Ashraf are not generally "targeted as a minority" but "may suffer the same problems as their 'host' clans", such

[598]   L. J. Benstead and D. Van Lehman, *Two Classes of "Marriage": Race and Sexual Slavery in Al-Shabaab-Controlled Somalia*, The Journal of the Middle East and Africa (2021), https://doi.org/10.1080/21520844.2021.1923998, p. 8.

[599]   Ibid.

[600]   Ibid., p. 3.

[601]   "The authors argue that the unions of Somali Bantu girls and women with Al-Shabaab fighters are not "marriage" but sexual and domestic slavery – a form of extraction that works to ethnically cleanse the Somali Bantu from their ancestral land. Minority Bantu families are subject to harsh punishment – up to and including execution – for refusing 'marriage.'" Ibid., p. 17, see also p. 11.

[602]   "Inter-clan marriages between people from marginalised and major clans are traditionally prohibited, with more powerful clans refusing to allow marriages with Bantu people and members of other marginalised clans. Such married couples face hostility, frequently being cut off from family contact and even violence". Ibid, pp. 4, 10.

[603]   Special Broadcasting Service (SBS), *Somalis Hope to End Inter-Clan Marriage Discrimination after Violent Dispute*, 22 October 2018, www.sbs.com.au/language/english/somalis-hope-to-end-inter-clan-marriage-discrimination-after-violent-dispute; Wardheer News, *A Hate Crime in Mogadishu: An Introspective Time*, 28 September 2018, https://wardheernews.com/a-hate-crime-in-mogadishu-an-introspective-time/.

[604]   Finnish Immigration Service, *Somalia: Fact-Finding Mission to Mogadishu in March 2020*, 7 August 2020, www.ecoi.net/en/document/2047285.html, p. 44.

[605]   UN Somalia, *UN Common Country Analysis: Somalia 2020*, 25 September 2020, www.ecoi.net/en/file/local/2052858/UN+Somalia+Common+Country+Analysis+2020_3.pdf, p. 49.

[606]   MRG, *Somalia: Benadiri*, updated March 2018, https://minorityrights.org/minorities/benadiri/.

[607]   While the Reer Hamar may not be subject to "the kind of targeted violence committed with impunity by the major warring clans that was the case during the early civil war years" and "are 'not without power'", this does not imply that the Reer Hamar no longer experience discrimination but rather that there are "a number of mitigating factors to their benefit", especially when compared to the situation, for example, of the Bantu. ACCORD, *Clans in Somalia: Report on a Lecture by Joakim Gundel, COI Workshop Vienna*, December 2009, www.refworld.org/docid/4b29f5e82.html, p. 17.

[608]   ACCORD, *Clans in Somalia: Report on a Lecture by Joakim Gundel, COI Workshop Vienna*, December 2009, www.refworld.org/docid/4b29f5e82.html, pp. 19-20.

[609]   MRG, *Somalia*, updated May 2018, https://minorityrights.org/country/somalia/.

[610]   For example, the Sheikhal in 2009 were associated with the Hirab section of the Hawiye majority clan, while a section of the Ashraf is affiliated with the Rahanweyn majority clan. ACCORD, *Clans in Somalia: Report on a Lecture by Joakim Gundel, COI Workshop Vienna*, December 2009, www.refworld.org/docid/4b29f5e82.html, pp. 19-20. "Ces deux groupes entretiennent des rapports de type *sheegad* [les relations de patronage] avec plusieurs clans majoritaires et minoritaires, selon la région où ils habitent." SEM, *Focus Somalie : Clans et minorités*, 31 May 2017, www.sem.admin.ch/dam/sem/fr/data/internationales/herkunftslaender/afrika/som/SOM-clans-f.pdf.download.pdf/SOM-clans-f.pdf, p. 14.

[611]   Landinfo, *Query Response Somalia: The Ashraf*, 10 August 2018, https://landinfo.no/wp-content/uploads/2018/11/Query-response-The-Ashraf-10082018.pdf, p. 2; ACCORD, *Clans in Somalia: Report on a Lecture by Joakim Gundel, COI Workshop Vienna*, December 2009, www.refworld.org/docid/4b29f5e82.html, pp. 19-20.

448

RJN Exhibit 25

as the Benadiri.[612] While the Ashraf affiliated with the Rahanweyn clan have the protection of being part of a majority clan, the Ashraf affiliated with the Benadiri are a minority group and may suffer the same discrimination and lack of protection that other minority groups experience.[613]

Many of the Sheikhal have reportedly affiliated with the Hayiwe majority clan and benefit from that clan's protection.[614] Some sub-groups may nevertheless be minority groups and suffer marginalization and discrimination, especially the Gendarshe and Jasirhe groups which are reportedly connected with the Benadiri rather than a majority clan.[615]

### c)   Occupational Caste Groups

In Somalia, certain groups have traditionally been defined by their occupations, usually in less desirable or 'unclean' jobs often involving manual labour, for example hunting, hairdressing, blacksmithing or shoemaking.[616] These groups are structured like clans, live in certain areas and neighbourhoods and are referred to by a variety of terms including Tumaal, Waable, Sab, Madhibaan, Boon, Gabooye and Midgan.[617] These terms may also refer to sub-groups within these occupational castes, and may differ by area.[618] Additionally, a variety of derogatory terms are used for persons from occupational caste groups, especially by people from majority clans, which refer to their positions in society or the myths surrounding their origins.[619]

The most important sub-groups include the Madhibaan, the Tumaal, the Muse Dheriyon, the Yibir[620] and the Boon.[621] Occupational caste groups are frequently confined to their historic profession, or at least to professions that are not considered desirable by majority clans.[622] However, members of minority clans may engage in occupations traditionally reserved for caste groups out of economic need and the lack of other jobs.[623]

According to one scholar, the "Gaboye groups, like other occupational specialists in Africa, suffer a range of restrictions regarding economic, social and political exchange with the dominant groups they

---

[612]   ACCORD, *Clans in Somalia: Report on a Lecture by Joakim Gundel, COI Workshop Vienna*, December 2009, www.refworld.org/docid/4b29f5e82.html, p. 20.

[613]   Landinfo, *Query Response Somalia: The Ashraf*, 10 August 2018, https://landinfo.no/wp-content/uploads/2018/11/Query-response-The-Ashraf-10082018.pdf, p. 4. See also, MRG, *Somalia*, updated May 2018, https://minorityrights.org/country/somalia/; ACCORD, *Clans in Somalia: Report on a Lecture by Joakim Gundel, COI Workshop Vienna*, December 2009, www.refworld.org/docid/4b29f5e82.html, pp. 19-20.

[614]   SEM, *Focus Somalie : Clans et minorités*, 31 May 2017, www.sem.admin.ch/dam/sem/fr/data/internationales/herkunftslaender/afrika/som/SOM-clans-f.pdf.download.pdf/SOM-clans-f.pdf, p. 14.

[615]   EASO, *Somalia: Targeted Profiles*, September 2021, www.ecoi.net/en/file/local/2060580/2021_09_EASO_COI_Report_Somalia_Targeted_profiles.pdf, p. 71.

[616]   SEM, *Focus Somalie : Clans et minorités*, 31 May 2017, www.sem.admin.ch/dam/sem/fr/data/internationales/herkunftslaender/afrika/som/SOM-clans-f.pdf.download.pdf/SOM-clans-f.pdf; ACCORD, *Clans in Somalia: Report on a Lecture by Joakim Gundel, COI Workshop Vienna*, December 2009, www.refworld.org/docid/4b29f5e82.html, p. 15.

[617]   Some sources separate these terms by occupation, for example, the Tumaal as blacksmiths, Midgan as shoemakers, hunters, hairdressers, etc. See ACCORD, *Clans in Somalia: Report on a Lecture by Joakim Gundel, COI Workshop Vienna*, December 2009, www.refworld.org/docid/4b29f5e82.html, p. 15. Midgan is a term reportedly used throughout the country but means "untouchable" and is therefore considered as an insult by some members of these groups. SEM, *Focus Somalie : Clans et minorités*, 31 May 2017, www.sem.admin.ch/dam/sem/fr/data/internationales/herkunftslaender/afrika/som/SOM-clans-f.pdf, p. 16; IRB, *Somalia: The Gabooye (Midgan) People, Including the Location of their Traditional Homeland, Affiliated Clans, and Risks They Face from Other Clans*, 4 December 2012, www.refworld.org/docid/51e4fce94.html.

[618]   For example, Gabooye, a term that originally referred to hunters, is a term used notably in the North for all profession-based castes. SEM, *Focus Somalie : Clans et minorités*, 31 May 2017, www.sem.admin.ch/dam/sem/fr/data/internationales/herkunftslaender/afrika/som/SOM-clans-f.pdf, p. 16.

[619]   "Unlike that of the Somali Jareer Bantu, the history, social, and ethnic formation of the Somali caste communities is hardly distinguishable from that of other Somalis. The difference is that these communities are stigmatized because mythical narratives claim that (a) they are of unholy origin, and (b) they engage in denigrated occupations." For example, some targeted epithets refer to their lowly occupations (i.e. calling them shoemakers) while others (such as dead-animal-eater for the Gabooye) refer to the myth of how a group came about. M. A. Eno and A. M. Kusow, *Racial and Caste Prejudice in Somalia*, Journal of Somali Studies 91-118 (2014), https://lib.dr.iastate.edu/cgi/viewcontent.cgi?article=1007&context=soc_las_pubs, p. 95, see also pp. 104-108.

[620]   See, Genetic Literacy Project, *Ethiopian Jews in Somalia: Tracing Remnants of the Yibir*, 3 September 2013, https://geneticliteracyproject.org/2013/09/03/ethiopian-jews-in-somalia-tracing-remnants-of-the-yibir/.

[621]   For a description of which jobs are performed by these groups and where each group is located, see SEM, *Focus Somalie : Clans et minorités*, 31 May 2017, www.sem.admin.ch/dam/sem/fr/data/internationales/herkunftslaender/afrika/som/SOM-clans-f.pdf, p. 17.

[622]   EASO, *Somalia: Targeted Profiles*, September 2021, www.ecoi.net/en/file/local/2060580/2021_09_EASO_COI_Report_Somalia_Targeted_profiles.pdf, pp. 62-66.

[623]   Protection Cluster / UNHCR, *Analysis and Recommendations on Data Collection: Marginalized and Minority Groups*, March 2021, www.globalprotectioncluster.org/wp-content/uploads/Analysis-and-Recommendations-on-Data-Collection_Marginalized-and-Minority-Groups_March-2021.pdf, p. 8.

449
RJN Exhibit 25

live with."[624] Gabooye groups in Somaliland are economically disadvantaged, continue to be confined to their traditional low-paying occupations, and as a whole are unable to achieve "upward social or economic ability" due to societal discrimination and lack of access to resources.[625] Children of occupational caste groups suffer bullying at school.[626]

Although there are differences between the experiences of the various occupation-based groups, generally all occupation-based groups are excluded from the clan structures and have limited access to education, professional jobs or government positions, recompense for violations against them and political participation.[627] Minority occupation-based groups lack the protection of a clan and are marginalized, harassed, and discriminated against by persons from majority clans.[628] In disagreements, they are unable to enforce negotiated settlements and do not have the same bargaining power as a majority clan, thus putting them in a weaker position, unless they are affiliated with a majority clan that can negotiate on their behalf.[629]

Reportedly, the Tumal and the Gabooye "enjoy more rights and are in a slightly better position" in Puntland than in Somaliland and in South and Central Somalia.[630]

### d)   Individuals Who Live Outside the Area Where their Clan Is Able to Provide Protection

Members of majority clans may constitute a minority in certain areas and may lack the protections of their clan or group.[631]

People who flee from South and Central Somalia to Somaliland are considered as refugees by the Somaliland authorities, not as IDPs, which affects "access to services, land ownership as well as documentation and legal papers".[632]

### e)   Summary

Based on the foregoing, UNHCR considers that individuals who belong to one of Somalia's minority groups (minority ethnic groups, minority groups defined by religious origin, and occupational caste groups, as described above), particularly in areas where they do not constitute a local majority, may, depending on the individual circumstances of the case, be in need of international refugee protection on the basis of a well-founded fear of persecution at the hands of State or non-State actors for reasons of their nationality or ethnicity/race, or other relevant Convention grounds, combined with a general inability of the State to provide protection from such persecution where the actors of persecution are non-State actors. Relevant considerations to assess the well-foundedness of the fear of persecution include the relative power position of the ethnic group in the applicant's area of origin and/or settlement, the history of inter-ethnic relations in that area and the relative enfranchisement of that specific minority group.

Individuals who belong to one of Somalia's majority clans but who live in an area where their clan is a minority may, depending on the individual circumstances of the case, also be in need of international refugee protection on the basis of a well-founded fear of persecution at the hands of the

---

[624]   E. Vitturini, *The Gaboye of Somaliland: Transformations and Historical Continuities of the Labour Exploitation and Marginalisation of Hereditary Groups of Occupational Specialists*, 14(3) Journal of Eastern African Studies 473-491 (2020), https://doi.org/10.1080/17531055.2020.1773070, p. 474.

[625]   Ibid., p. 485.

[626]   M. A. Eno and A. M. Kusow, *Racial and Caste Prejudice in Somalia*, Journal of Somali Studies 91-118 (2014), https://lib.dr.iastate.edu/cgi/viewcontent.cgi?article=1007&context=soc_las_pubs, p. 105.

[627]   EASO, *Somalia: Targeted Profiles*, September 2021, www.ecoi.net/en/file/local/2060580/2021_09_EASO_COI_Report_Somalia_Targeted_profiles.pdf, pp. 62-66.

[628]   Ibid., p. 66.

[629]   Lifos, *Government and Clan System in Somalia*, 5 March 2013, https://lifos.migrationsverket.se/dokument?documentAttachmentId=38611, pp. 31-32.

[630]   EASO, *Somalia: Targeted Profiles*, September 2021, www.ecoi.net/en/file/local/2060580/2021_09_EASO_COI_Report_Somalia_Targeted_profiles.pdf, p. 62.

[631]   "Des membres d'un clan « fort » peuvent également être ramenés au statut d'une minorité. Ce sera le cas lorsqu'ils habitent dans une région où un autre clan est dominant. Cela peut concerner des individus ou des groupes entiers." SEM, *Focus Somalie : Clans et minorités*, 31 May 2017, www.sem.admin.ch/dam/sem/fr/data/internationales/herkunftslaender/afrika/som/SOM-clans-f.pdf.download.pdf/SOM-clans-f.pdf, p. 12. See also, Lifos, *Somalia: The Position of Women in the Clan System*, 27 April 2018, https://lifos.migrationsverket.se/dokument?documentAttachmentId=45863, pp. 9-10.

[632]   Somaliland Human Rights Center, *Hargeisa's Unrecognized IDPs*, 2018, http://hrcsomaliland.org/wp-content/uploads/2018/07/HRC-Draft-IDPs-report-1.pdf, p. 12.

450
RJN Exhibit 25

> state or non-State actors for reasons of their nationality or ethnicity/race, or other relevant Convention
> grounds, combined with a general inability of the State to provide protection from such persecution
> where the actors of persecution are non-State actors.
>
> International protection needs based on ethnicity/race may overlap with those based on religion
> and/or (imputed) political opinion. Due consideration should also be given to whether other risk
> profiles outlined in these Guidelines apply to the person concerned.

### 5) Journalists, Human Rights Defenders and Government Critics [633]

The 2012 Provisional Constitution guarantees the right to freedom of expression, including "freedom of speech, and freedom of the media, including all forms of electronic and web-based media."[634] In January 2016, Somalia passed a Media Law that was criticized by human rights organizations as overly restrictive and potentially reducing freedom of the press.[635] In August 2020 the President signed into law a series of amendments to the 2016 Media Law, which did explicitly provide for freedom of expression, media freedom and the right to information; however, the amendments were immediately criticized by rights groups for retaining draconian criminal provisions and allowing the imposition of heavy fines.[636] The National Union of Somali Journalists stated that the amendments only serve to "further exacerbate the previous shortcomings" of the 2016 Media Law.[637]

Somalia's Penal Code contains provisions criminalizing insults,[638] the publication or circulation of false news,[639] sedition[640] and defamation,[641] which hamper press freedom.[642] While the President committed to change these in May 2020, no further actions have since been taken by the Somali government.[643]

---

[633]  For the situation of humanitarian workers, see Section III.A.1.e.
[634]  Federal Republic of Somalia, *Provisional Constitution*, 1 August 2012, www.refworld.org/docid/51b6d0c94.html, para. 18.
[635]  "Journalists' unions and media advocates have criticized the legislation for creating onerous restrictions, such as a requirement that all reporters have a university degree in journalism and pass a state test. The law compels journalists to disclose sources of information upon official request, establishes heavy fines for libel, and empowers authorities to block websites as punishment for media offenses despite a provision prohibiting censorship." Freedom House, *Freedom of the Press 2016: Somalia*, 28 September 2016, www.refworld.org/docid/57f361cfc.html. See also, HRW, *"Like Fish in Poisonous Waters": Attacks on Media Freedom in Somalia*, 3 May 2016, www.hrw.org/report/2016/05/03/fish-poisonous-waters/attacks-media-freedom-somalia.
[636]  HRW, *Joint Letter Re: Concerns and Recommendations on Somalia's New Media Law*, 5 October 2020, www.hrw.org/news/2020/10/05/joint-letter-re-concerns-and-recommendations-somalias-new-media-law; International Federation of Journalists (IFJ), *Somalia: New Media Law Fails to Comply with International Standards on Press Freedom*, 26 August 2020, www.ifj.org/media-centre/news/detail/category/press-releases/article/somalia-new-media-law-fails-to-comply-with-international-standards-on-press-freedom.htm. "There are major concerns about the new law's criminalization of journalistic activities. Article 3 makes it illegal for journalists to be compelled by threat or force – for example, by political or armed actors – to publish 'information which conflicts with the interests of the country, society, the economy, politics and society.' The new law does not protect the confidentiality of sources and makes it possible for journalists to be held responsible for the consequences of disclosing confidential information. It allows journalists to be fined for violations without limiting the size of the fines. And it says that verdicts and sentences can be appealed before unspecified 'competent jurisdictions,' opening the way to prison sentences." Reporters Without Borders (RSF), *Somalia's New Media Law Ignores Calls for Journalists to be Protected*, 28 August 2020, https://rsf.org/en/news/somalias-new-media-law-ignores-calls-journalists-be-protected. See also, Freedom House, *Freedom in the World 2022: Somalia*, 28 February 2022, www.ecoi.net/en/document/2074674.html.
[637]  National Union of Somali Journalists (NUSOJ), *Submission by the National Union of Somali Journalists (NUSOJ) and the International Federation of Journalists (IFJ)*, October 2020, www.upr-info.org/sites/default/files/document/somalia/session_38_-_may_2021/js5_upr38_som_e_main.pdf, para. 10.
[638]  Federal Government of Somalia, *Somalia: Penal Code*, 3 April 1964, www.refworld.org/docid/4bc5906e2.html, Art. 268 ("Insult to a Public Officer"); Art. 269 ("Insult to a Political, Administrative or Judicial Body"); Art. 270 ("Insult to a Judge During a Hearing"); and Art. 451 (offending the honour or dignity of a person).
[639]  Ibid., Art. 328 ("Publication or Circulation of False, Exaggerated or Tendencious News Capable of Disturbing Public Order"). In December 2020, journalist Kilwe Adan Farah was arrested in Puntland; in February 2021, he was charged with multiple crimes including the publication of false news under Article 328, a move that SJS said was "intended to harass and silence" him. SJS, *After 60 Days in Jail, Freelance Journalist Kilwe Faces New Charges by Puntland Authorities*, 25 February 2021, https://sjsyndicate.org/2021/02/25/after-60-days-in-jail-freelance-journalist-kilwe-faces-new-charges-by-puntland-authorities/. See also, UN Human Rights Council, *Opinion No. 17/2022 Concerning Kilwe Adan Farah (Somalia)*, 31 May 2022, A/HRC/WGAD/2022/17, www.ohchr.org/sites/default/files/documents/issues/detention/opinions/session93/2022-08-04/A-HRC-WGAD-2022-17-SOM-AEV.pdf, paras 16, 62.
[640]  Federal Government of Somalia, *Somalia: Penal Code*, 3 April 1964, www.refworld.org/docid/4bc5906e2.html, Art. 509 ("Seditious Cries and Manifestations") and Art. 510 ("Seditious Assembly")
[641]  Ibid., Art. 452 ("Defamation")
[642]  NUSOJ, *Trail of Violence: Somali Journalists Bear the Brunt of Impunity*, 9 February 2022, www.nusoj.org/wp-content/uploads/2022/02/NUSOJ-State-of-the-media-report.pdf, p. 6.
[643]  IFJ, *Somalia: IFJ Commends Declaration to Decriminalise Journalism and Freedom of Expression in Somalia*, 4 May 2020, www.ifj.org/media-centre/news/detail/category/press-releases/article/somalia-ifj-commends-declaration-to-decriminalise-journalism-and-freedom-of-expression-in-somalia.html. See also, HRW, *Joint Letter Re: Concerns and Recommendations on Somalia's New Media Law*, 5 October 2020, www.hrw.org/news/2020/10/05/joint-letter-re-concerns-and-recommendations-somalias-new-media-law. In July 2020, one journalist was arrested for his reporting and sentenced under article 328 of the Penal Code. US Department of State, *2020 Country Report on Human Rights Practices: Somalia*, 30 March 2021, www.ecoi.net/en/document/2048104.html.

451

RJN Exhibit 25