# Exhibit 26

United Nations



# General Assembly

A/HRC/31/56

Distr.: General
28 January 2016

Original: English

---

**Human Rights Council**
**Thirty-first session**
Agenda item 3
**Promotion and protection of all human rights, civil,**
**political, economic, social and cultural rights,**
**including the right to development**

## Report of the Special Rapporteur on minority issues

### Note by the Secretariat

The Secretariat has the honour to transmit to the Human Rights Council the report of the Special Rapporteur on minority issues, Rita Izsák. The report provides an update of her activities during 2015. It includes a thematic analysis on the topic of minorities and discrimination based on caste and analogous systems of inherited status.

GE.16-01186(E)



Please recycle 

RJN Exhibit 26

A/HRC/31/56

# Report of the Special Rapporteur on minority issues

## Contents

|  |  | *Page* |
|---|---|---|
| I. | Introduction | 3 |
| II. | Activities of the Special Rapporteur | 3 |
|  | A. Country visits | 3 |
|  | B. Communications | 3 |
|  | C. Additional activities | 3 |
|  | D. Update on the Forum on Minority Issues | 4 |
| III. | Minorities and discrimination based on caste and analogous systems of inherited status | 5 |
|  | A. Introduction | 5 |
|  | B. Definition and characteristics of caste-based discrimination | 6 |
|  | C. Global overview of caste-affected groups | 7 |
|  | D. International legal framework | 10 |
| IV. | Specific areas of impact of discrimination in caste-based and analogous systems | 12 |
|  | A. Civil and political rights | 12 |
|  | B. Economic, social and cultural rights | 14 |
| V. | Situation of caste-affected women and girls | 19 |
| VI. | Initiatives and good practices to address caste-based discrimination | 20 |
|  | A. United Nations system | 20 |
|  | B. National legislation and special measures | 21 |
|  | C. Civil society initiatives | 23 |
| VII. | Conclusions and recommendations | 23 |

454
RJN Exhibit 26

# I.  Introduction

1.      The present report is submitted by the Special Rapporteur on minority issues, Rita Izsák. The mandate of the Special Rapporteur on minority issues was established by the Commission on Human Rights in its resolution 2005/79, as an independent expert. It was renewed by the Human Rights Council in its resolutions 7/6 of 27 March 2008, 16/6 of 24 March 2011 and 25/5 of 28 March 2014.

# II.  Activities of the Special Rapporteur

2.      The Special Rapporteur wishes to draw the attention of the Council to the bulletin published on her website every six months, which summarizes all the activities of the mandate, including communications, press statements, public appearances, country visits and thematic reports.[1]

## A.  Country visits

3.      The Special Rapporteur visited Brazil from 14 to 24 September 2015.[2] Brazil is a highly diverse society with countless minority groups, who migrated there as a result of a wide range of factors, including colonialism, slavery and targeted migration policies. A large focus of the visit was the situation of Afro-Brazilians, including Quilombos and other traditional communities, who remain marginalized due to historical patterns of discrimination against them; Brazilian Roma; and religious communities of African origin, including Candomblé and Umbanda communities.

## B.  Communications

4.      The Special Rapporteur sent letters of allegation and urgent action letters to the Member States concerned based on information received from diverse sources about human rights violations perpetrated against national, ethnic, religious and linguistic minorities. Those communications and the responses thereto are publicly available.[3]

## C.  Additional activities

**Events, conferences and outreach**

5.      On 20 March 2015, the Special Rapporteur participated in a side event on implementing linguistic minority rights, organized by the Permanent Delegation of the Council of Europe to the United Nations Office and other international organizations in Geneva.

6.      On 16 June 2015, the Special Rapporteur held a side event in Geneva, in collaboration with the Council of Europe, the European Union and the Organization for Security and Cooperation in Europe, on combating discrimination as a root cause of Roma marginalization. She has also established a website dedicated to the protection of Roma,

---

[1]   www.ohchr.org/EN/Issues/Minorities/SRMinorities/Pages/SRminorityissuesIndex.aspx.
[2]   A/HRC/31/56/Add.1.
[3]   www.ohchr.org/EN/HRBodies/SP/Pages/CommunicationsreportsSP.aspx.

455
RJN Exhibit 26

including background information about her study of the human rights situation of Roma worldwide.[4]

7.      On 16 June 2015, she participated in a side event to commemorate the first-ever International Albinism Awareness Day (13 June).

8.      On the occasion of the fifth annual meeting of the Global Network of the Responsibility to Protect Focal Points, held in Madrid on 23 and 24 June 2015, she sent a video message on violence against minorities.

9.      On 25 September 2015, she convened a one-day workshop in Brasilia on the situation of Roma in the Americas. A summary of the workshop will be presented to the Human Rights Council at its thirty-first session.

10.     On 27 October 2015, she convened, jointly with three other special rapporteurs, a side event during the seventieth session of the General Assembly on guaranteeing attention to vulnerable groups in the 2030 Agenda for Sustainable Development.

11.     On 28 October 2015, she presented her annual report to the General Assembly (A/70/212), which focused on minorities in the criminal justice system.

12.     On 2 November 2015, she delivered a speech titled "An American tragedy, a bloody injustice: police killings of unarmed black men and boys" at Michigan State University.

13.     On 23 November 2015, she moderated an expert meeting in Geneva on "Minorities in the criminal justice system: discussion on the draft recommendations of the eighth Forum on Minority Issues".

14.     On 24 November 2015, she participated as a keynote speaker in a side event in Geneva on combating impunity, and the need for effective justice system action on behalf of minorities, organized by Minority Rights Group and the Permanent Mission of Austria to the United Nations Office and other international organizations in Geneva.

15.     On 25 November 2015, she moderated a side event in Geneva on "Minority rights protection in the United Nations system: looking back and looking ahead — a forum for the future", organized by the Office of the United Nations High Commissioner for Human Rights (OHCHR) and by her mandate.

16.     On 26 November 2015 in Geneva, she delivered a speech at an event commemorating the fiftieth anniversary of the adoption of the International Convention on the Elimination of All Forms of Racial Discrimination on "Fifty years of achievements: lessons learned and good practices".

**Statements**

17.     The Special Rapporteur issued several public statements, many jointly with other mandates, highlighting issues of concern involving minorities. Those statements are available on her website.

## D.     Update on the Forum on Minority Issues

18.     The Special Rapporteur was requested by the Human Rights Council, in its resolutions 6/15 and 19/23, to guide the work of the Forum on Minority Issues. The eighth session of the Forum was held in Geneva on 24 and 25 November 2015, with a thematic focus on minorities in the criminal justice system.

---

[4]   www.ohchr.org/EN/Issues/Minorities/SRMinorities/Pages/StudyProtectionRoma.aspx.

456
RJN Exhibit 26

19.    Over 500 delegates participated, including representatives of Member States, United Nations mechanisms, regional intergovernmental bodies, non-governmental organizations (NGOs) and minorities. They identified challenges involving minorities, as well as effective practices to combat discrimination against minorities during all stages of the criminal justice process. Recommendations from the Forum will be presented to the Council at its thirty-first session.

## III.    Minorities and discrimination based on caste and analogous systems of inherited status

### A.    Introduction

20.    The Special Rapporteur is concerned by information she has received regarding incidents of discrimination in caste-based and analogous systems of inherited status, including atrocities committed against individuals ascribed to the lowest strata by virtue of their caste status. During the course of her work, she regularly addressed the continued plight of such people through press statements,[5] consultations, side events and thematic reports to the Human Rights Council.[6]

21.    The Special Rapporteur recognizes the complexity of addressing this topic within the minority rights framework, as there exists the view that caste systems are a way to organize society without the domination of majority groups, and that therefore, "lower caste" groups may not strictly fall under the category of minority groups. However, she believes that, while many caste-affected groups may belong to the same larger ethnic, religious or linguistic community, they often share minority-like characteristics, particularly their non-dominant and often marginalized position, stigma, and the historic use of the minority rights framework to claim their rights. She further acknowledges that caste and caste-like systems are present in other groups, including some indigenous communities. Moreover, she highlights that minority groups who are characterized by their non-dominant position and whose members possess ethnic, religious or linguistic characteristics differing from those of the rest of the population are also, in many cases, caste-affected groups, and therefore face multiple and intersecting forms of discrimination on the grounds of both their minority status and descent. Consequently, she believes that a minority rights approach can provide a valuable platform for the protection of the rights of caste-affected communities and that minority rights standards, including equality, non-discrimination, consultation, participation and special measures, should be applied to combat discrimination based on caste and analogous systems.

22.    The Special Rapporteur stresses that discrimination based on caste and analogous systems exists in many countries. While acknowledging important differences between affected communities in terms of the manifestation, severity and experience of caste-based discrimination, she firmly believes that there are common characteristics to caste and caste-like systems that inherently contradict the principles of human dignity, equality and non-discrimination, particularly differentiated social status, whereby individuals placed in the lowest positions are regarded as "inferior" and "non-human". The resulting extreme exclusion and dehumanization of caste-affected groups translates into individuals and communities often being deprived of or severely restricted from enjoying their most basic civil, political, economic, social and cultural rights.

---

[5]    www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=13352.
[6]    See, inter alia, A/69/266, A/HRC/25/56 and A/HRC/19/56.

23.    Following an analysis of the information received, she further considers that caste and analogous forms of discrimination are a major cause of poverty and perpetuate poverty in affected communities. As stressed previously,[7] the relationship between inequality, discrimination and poverty and their impact on disadvantaged minority groups cannot be ignored or underestimated. Targeted attention to the situation of the poorest and most socially and economically excluded and marginalized communities is essential to break the vicious cycle of discrimination, exclusion, poverty and underdevelopment.

24.    Research on caste-based discrimination outside the South Asian context is underdeveloped and the lack of official, up-to-date and disaggregated data poses additional difficulties in terms of providing a comprehensive overview of the issue. Nevertheless, the Special Rapporteur considers that devoting a thematic report to this particular topic is necessary, given that discrimination based on caste and analogous systems of inherited status constitutes a serious violation of human rights and deserves specific attention. She hopes that the present report will serve as an incentive to stimulate further and more in-depth research and investigation into caste-based discrimination around the globe.

## B.    Definition and characteristics of caste-based discrimination

25.    Discrimination based on caste and analogous systems of inherited status refers to a form of discrimination based on descent.[8] Because one's caste can be determinative of one's occupation, it is also referred to as "discrimination based on work and descent" and defined as "any distinction, exclusion, restriction or preference based on inherited status such as caste, including present or ancestral occupation, family, community or social origin, name, birthplace, place of residence, dialect and accent that has the purpose or effect of nullifying or impairing the recognition, enjoyment, or exercise, on an equal footing, of human rights and fundamental freedoms in the political, economic, social, cultural or any other field of public life".

26.    The term "caste" refers to a strict hierarchical social system that is often based on the notions of purity and pollution, in which individuals placed at the bottom of the system may face exclusion and discrimination in a wide range of areas. The concept of "caste system" is primarily associated with the South Asian region, where its existence is linked to the religiously sanctioned social structure of Hinduism, which identified four original and endogamous groups, or castes, called varnas.

27.    At present, the term "caste" has broadened in meaning, transcending religious affiliation. Caste and caste-like systems may be based on either a religious or a secular background and can be found within diverse religious and/or ethnic groups in all geographical regions, including within diaspora communities.

28.    Caste and analogous systems present distinguishing characteristics:

        (a) Hereditary nature: caste status is inherited by birth and follows the individual until death;

        (b) Labour stratification and occupational segregation: caste status determines and is confined to certain occupations, which are compulsory and endogenous. Individuals from lower-caste strata are traditionally assigned to tasks deemed "polluting" or menial by higher

---

[7]  See A/HRC/25/56, para. 31.
[8]  Committee on the Elimination of Racial Discrimination, general recommendation No. 29 (2002) on article 1, paragraph 1, of the Convention (Descent).

caste groups, including sweeping, manual scavenging (cleaning of excreta from dry latrines) and disposal of dead animals;

(c) Untouchability practices: a set of collective behaviours and norms stemming from the belief that contact with individuals from lower castes is "polluting";

(d) Enforced endogamy: inter-caste interactions are limited and in some cases de facto prohibited. Manifestations of enforced endogamy include limitations or prohibitions on inter-caste marriages, commensality (the practice of eating together) and sharing common goods or services. Attempts to challenge these prohibitions are often severely punished through violence against caste-affected individuals and retaliation against their communities.

29.    Existing pervasive and entrenched stigma of individuals and groups ascribed to "lower caste" strata permeates caste systems. As highlighted by the former Special Rapporteur on the human right to safe drinking water and sanitation, stigma can be understood as "a process of dehumanizing, degrading, discrediting and devaluing people in certain population groups, often based on a feeling of disgust".[9] The process of "dehumanization" of individuals and groups owing to their low caste status begins with the association between such status and the notions of "pollution", "filthiness" and "untouchability", resulting in them being considered "impure" and "unworthy". This process evolves into widespread social segregation of affected individuals and communities who are confined to separate physical spaces and, as mentioned above, to certain degrading jobs from which they cannot break free. This imposed marginalization becomes an externalized and internalized social norm that eventually legitimatizes mistreatment and abuses against affected communities, perpetuating discrimination and patterns of human rights violations against them.

30.    Stigmatization and dehumanization of affected communities is further reinforced by negative stereotypes in the media and, as the Special Rapporteur has noted previously,[10] the repeated presentation of broad negative stereotypes of minority groups as, inter alia, "dirty", which nurtures inaccurate and false assumptions and opinions that may eventually develop into discriminatory attitudes and entrenched prejudices.

## C.    Global overview of caste-affected groups

31.    Estimates indicate that over 250 million people suffer from caste-based discrimination worldwide.[11] Though the highest numbers of affected communities are concentrated in South Asia, particularly India and Nepal, discrimination on the grounds of caste or analogous status is a global phenomenon and can be found in other geographical contexts, including in Africa, the Middle East and the Pacific region, as well as in diaspora communities. Although the following examples are not exhaustive, they aim to be illustrative of caste-affected communities in different regions.

**Asia**

32.    Dalits constitute the largest caste-affected group in South Asia. They comprise a myriad of sub-caste groups and, although subjected to similar forms of discrimination across the region, the situation of Dalits in caste-affected countries differs for historical and

---

[9]   See A/HRC/21/42, para. 12.
[10]   See A/HRC/28/64, para. 62.
[11]   www.unicef.org/protection/discrimination.html.

political reasons.[12] Dalits represent the victims of the most grave forms of caste discrimination, are often assigned the most degrading jobs and subjected to forced and bonded labour, have limited or unequal access to resources (including economic resources, land and water) and services, and are disproportionately affected by poverty.

33.     In India, according to official data,[13] Dalits (referred to as "scheduled castes") constitute more than 201 million people. This figure does not include Dalits who have converted or are born and raised within non-Hindu religious communities, such as the Dalit Muslim and Christian communities; unofficial statistics estimate that the actual number of Dalits in India is much higher.[14]

34.     In Nepal, official data indicate that the Dalit population comprises approximately 3.6 million people,[15] although civil society organizations estimate that number at 5 million. In Bangladesh and Pakistan, where most Dalits belong to the Hindu minority, the figures are also contested. In Bangladesh, unofficial data estimate the Dalit population to range between 3.5 and 5.5 million people.[16] In Pakistan, the most recent official data, from 1998, estimate the Dalit population to be 330,000,[17] but researchers calculate that the actual number could be at least two million.[18]

35.     In Sri Lanka, three parallel caste systems (Sinhala, Sri Lanka Tamil and Indian Tamil groups) coexist; caste discrimination is found in each one. Within the Sinhala system, lower-caste groups, including the Rodi, have low levels of education, suffer extreme poverty and lack of assets and are under continued pressure to pursue hereditary caste occupations, such as removing dead animals and dirt.[19] In the Sri Lanka Tamil caste system, the bottom stratum is comprised of a myriad of groups collectively labelled as *Panchamar* and regarded as "untouchables". Population displacement due to war and the 2004 tsunami has resulted in a large internal displaced population in the Jaffna peninsula, with a disproportionate presence of *Panchamar* groups now in camps for internally displaced persons.[20] The caste system among Indian Tamils traces its origins to their arrival to the plantations as indentured labourers during the colonial era and presents unique characteristics, which differ from the traditional Indian caste system. Some features are common, however, including the avoidance of inter-caste marriage and the link between lower castes and greater levels of poverty.[21]

---

[12] "Caste-based discrimination in South Asia", study commissioned by the European Commission to the International Dalit Solidarity Network (June 2009), pp. 2 ff.

[13] www.censusindia.gov.in/2011census/PCA/PCA_Highlights/pca_highlights_file/India/Chapter-2.pdf.

[14] http://idsn.org/countries/india.

[15] Central Bureau of Statistics of Nepal, "National population and housing census 2011 (national report)" (November 2012).

[16] Iftekhar Uddin Chowdhury, "Caste-based discrimination in South Asia: a study of Bangladesh", working paper series, vol. III, No. 07 (Indian Institute of Dalit Studies, 2009), p. 2.

[17] www.pbs.gov.pk/population-tables.

[18] "Caste-based discrimination in Pakistan", International Dalit Solidarity Network briefing note (May 2014).

[19] Kalinga Tudor Silva and others "Caste discrimination and social justice in Sri Lanka: an overview", working paper series, vol. III, No. 6 (Indian Institute of Dalit Studies, 2009), pp. 3–6.

[20] Paramsothy Thanges and Kalinga Tudor Silva, "Caste discrimination in war-affected Jaffna society" in Kalinga Tudor Silva and others, *Casteless or Caste-blind? Dynamics of Concealed Caste Discrimination, Social Exclusion and Protest in Sri Lanka* (International Dalit Solidarity Network, Indian Institute of Dalit Studies and Kumaran Book House, 2009), pp. 50-77.

[21] Sasikumar Balasundaram and others, "Caste discrimination among Indian Tamil plantation workers in Sri Lanka" in Tudor Silva and others, *Casteless or Caste-blind?*, pp. 78-96.

460
RJN Exhibit 26

36.     In Japan, feudal society stratification during the Tokunaga regime (1603-1867) placed two groups at the bottom of the system, referring to them as the *senmin* (humble people): the *eta* (extreme filth) and *hinin* (non-human). Although the Emancipation Edict was promulgated in 1871 to include the *senmin* in mainstream society, the Burakumin, as their descendants are now known, continue to be considered as an outcast group, subjected to prejudice and discrimination, including in employment, education and marriage, and physically segregated in Buraku districts.[22] Official figures estimate the total Buraku population to be 1.2 million; however, unofficial figures place the number at almost 3 million.[23]

**Middle East**

37.     In Yemen, the Muhamasheen ("marginalized ones"), also known as Al Akhdam, constitute a minority group subjected to descent-based discrimination. There are no official data, but unofficial sources estimate their number at between 500,000 and 3.5 million. Their occupational roles include garbage collection, street sweeping and cleaning toilets and drains. They suffer from social stigma and discrimination, which exacerbate their socioeconomic exclusion and poverty.[24]

**Africa**

38.     According to the former Special Rapporteur on contemporary forms of racism, racial discrimination, xenophobia and related intolerance, there are three types of descent-based discrimination in Africa, including caste systems based on "occupational specialization of endogamous groups in which membership is based on ascription and between which social distance is regulated by the concept of pollution" and those in which discrimination is based "on real or perceived descent from slaves, leaving many in 'virtual' slavery, unable to leave their owner's employ for fear of reprisals or starvation".[25]

39.     In Mauritania, the two major cultural and ethnolinguistic groups, the Arab-Berber (commonly referred to as Moors), which includes the Beidane and the Haratines (also known as black moors) and some of the Afro-Mauritanian communities (including the Peuhl, Soninke, Wolof and Bambara), present divisions along ethnic and caste lines. The Moors are further divided into tribes and castes by profession, including blacksmiths, religious leaders and warriors. Relations among the different castes are very hierarchical and result in the exclusion and marginalization of certain castes, such as blacksmiths.[26] The Haratine constitute the largest ethnic group (40 to 60 per cent of the population) but remain economically and politically marginalized. Regarded as the "slave caste", most of the present-day victims of slavery and slavery-like practices are Haratine.[27]

40.     In Madagascar, there are 18 main tribes, some of which have their own caste systems, such as the Merina and the Bara. Within the Merina hierarchy, there are four main castes: the Andriana, the Hova, the Mainty and the Andevo. The Andevo (descendants of

---

[22]   "Reality of Buraku discrimination in Japan: history, situation, challenges" (International Movement against all Forms of Discrimination and Racism, Buraku Liberation League and Buraku Liberation and Human Rights Research Institute, February 2001). See also E/CN.4/Sub.2/2001/16, para. 40.

[23]   www.bll.gr.jp/eng.html.

[24]   See A/HRC/30/31, para. 77.

[25]   See A/HRC/17/40, para. 56.

[26]   See A/HRC/26/49/Add.1, para. 9.

[27]   See A/HRC/15/20/Add.2, para. 12.

slaves) face caste discrimination, especially in marriage, and are particularly vulnerable to exploitation, poverty and slavery-like practices.[28]

41.     In Nigeria, discrimination against Osu descendants persists. Osu people were historically considered a property of the local deities among communities in Igboland, in south-east Nigeria. The Osu were dedicated and "sacrificed" to these gods and forced to live on the outskirts of the villages. In 1958, the Osu Abolition Law was passed, but members of the Osu are still subjected to social exclusion, segregation and mistreatment, and discrimination in employment and marriage.[29]

42.     In Senegal, caste systems exist within several ethnic groups, particularly among the Wolof community, which is divided between the Geer and the Neeno. Some forms of untouchability are allegedly practised against some Neeno groups, including prohibition from residing or remaining in particular places and avoidance of physical contact.[30]

43.     In Somalia, clan structure determines the composition of society, which is divided into ranked clan groups. Somalia's minorities are diverse and comprise three distinct social groups: Bantu, Benadiri and the "occupational groups".[31] The "occupational groups", also referred to as "sab" (a collective term for "low-caste"), include the Midgan (also known as Gaboye, Madguban and Musse Deriyo), Tumal and Yibro. These groups are stigmatized as being of "unholy origin" and dedicated to "polluting" occupations. Discrimination against them includes being targeted for hate speech and prohibition of intermarriage.[32]

44.     Caste-affected groups have also been identified in other countries, such as Burkina Faso, Burundi, Cameroon, Côte d'Ivoire, the Gambia, Guinea, Guinea-Bissau, Liberia, Madagascar, Mali and Sierra Leone.

**Diaspora communities**

45.     The caste system migrated with the South Asian diaspora to other regions, including Africa (Mauritius, South Africa), Europe (United Kingdom of Great Britain and Northern Ireland), the Americas (United States of America, Canada and Suriname), the Middle East (Bahrain, Kuwait and United Arab Emirates), Malaysia, Australia and the Pacific (Fiji).

## D.   International legal framework

46.     The Universal Declaration of Human Rights establishes that all human beings are born free and equal in dignity and rights. The principle of inherent dignity of all persons permeates the entire Declaration; the preamble refers to this principle, together with the equality of human rights, as the "foundation of freedom, justice and peace in the world".

47.     The Declaration on the Rights of Persons Belonging to National or Ethnic, Religious and Linguistic Minorities requires States to take measures to ensure "that persons belonging to minorities may exercise fully and effectively all their human rights and fundamental freedoms without any discrimination and in full equality before the law" (art. 4 (1)).

---

[28]  See A/HRC/24/43/Add.2, paras. 7-14.
[29]  See A/HRC/17/40, paras. 58 and 59; and CERD/C/NGA/CO/18, para. 15.
[30]  Abdoulaye Bara Diop, *La Société Wolof: Tradition et Changement* (Karthala, 2012), pp. 25 ff.
[31]  Martin Hill, "No redress: Somalia's forgotten minorities" (Minority Rights Group International, 2010), p. 8.
[32]  Mohamed Eno and Abdi Kusow, "Racial and caste prejudice in Somalia", *Journal of Somali Studies*, vol. 1, Issue 2 (2014), pp. 91-118.

48.      Core international human rights treaties[33] build upon the principle of the inherent
dignity and equality of all persons, which is recalled in their respective preambles, and
enshrine the rights to equality and non-discrimination of all persons, as well as the equal
enjoyment of human rights for men and women.

49.      In its general recommendation No. 29 (2002), on article 1, paragraph 1, of the
Convention (Descent), the Committee on the Elimination of Racial Discrimination
confirmed that the term "descent" did not solely refer to "race" and unequivocally
established that descent-based discrimination "includes discrimination against members of
communities based on forms of social stratification such as caste and analogous systems of
inherited status which nullify or impair their equal enjoyment of human rights".

50.      The Committee identified several factors that could indicate the existence of
discrimination on the basis of caste and analogous systems of inherited status in affected
communities, including "inability or restricted ability to alter inherited status; socially
enforced restrictions on marriage outside the community; private and public segregation,
including in housing and education, access to public spaces, places of worship and public
sources of food and water; limitation of freedom to renounce inherited occupations or
degrading or hazardous work; subjection to debt bondage; subjection to dehumanizing
discourses referring to pollution or untouchability; and generalized lack of respect for their
human dignity and equality". It also made specific recommendations, including in the areas
of preventing hate speech in the media, administration of justice, political participation and
the right to education.

51.      In addition, the Sub-Commission on the Promotion and Protection of Human Rights,
in its resolution 2000/4, established that discrimination based on work and descent was a
form of discrimination prohibited by international human rights law, and requested
Governments concerned to put in place all necessary constitutional, legislative and
administrative measures, including affirmative action, to prohibit and redress that form of
discrimination, as well as to criminally sanction all persons or entities within their
jurisdictions who might have engaged in practices of discrimination on the basis of work
and descent.

52.      The draft United Nations principles and guidelines for the effective elimination of
discrimination based on work and descent constitute a comprehensive framework to assist
multiple stakeholders, including States, United Nations agencies and civil society
organizations, in identifying caste-based discrimination and in implementing measures to
combat such discrimination. The draft principles and guidelines formulate specific
recommendations to States to develop and implement a legal framework explicitly
prohibiting discrimination based on work and descent and establish plans of action to
enforce the abolition of untouchability and segregation at the national and local levels.
They also recommend that States conduct surveys and research on affected communities,
and combat discrimination based on work and descent in multiple areas, including physical
security, protection against violence, access to justice, equal political participation,
employment, health, food, water, housing and education.

53.      At the regional level, in 2013 the European Parliament adopted a resolution on
caste-based discrimination, in which it called for the European Union to promote the draft
United Nations principles and guidelines as a guiding framework for eliminating
caste-based discrimination and to promote their endorsement by the Human Rights Council.
It also called on the European Commission to recognize caste-based discrimination as a
"distinct form of discrimination rooted in the social and/or religious context" which must be

---

[33]   www.ohchr.org/EN/ProfessionalInterest/Pages/CoreInstruments.aspx.

addressed together with other grounds of discrimination, including ethnicity, race, descent, religion, gender and sexuality, and appealed for the inclusion of caste-based discrimination as a human rights issue in future European Union human rights policies, strategies and action plans.

54.    Other relevant international standards are the International Labour Organization Discrimination (Employment and Occupation) Convention, 1958 (No. 111), along with its accompanying Recommendation No. 111, and the Principles and Guidelines to Address Caste Discrimination in the Private Sector (Ambedkar Principles) of the International Dalit Solidarity Network.

## IV.    Specific areas of impact of discrimination in caste-based and analogous systems

55.    The Special Rapporteur has identified a number of areas of particular concern in relation to caste and analogous systems. The areas described below are not exhaustive but rather provide a general overview of the most serious manifestations of caste-based discrimination.

56.    The Special Rapporteur regrets the scarcity of relevant information outside the South Asian context and stresses the need for further research.

## A.    Civil and political rights

### 1.    Right to life and physical integrity

57.    The use of violence against individuals and communities at the lower end of caste and caste-like systems to maintain the system and perpetuate oppression is common. Attempts to alter the social order by questioning and actively defying caste rules may result in harassment, threats, physical attacks and even murder.

58.    Often, claiming human rights is considered as "forbidden", and deserving of punishment. Inter-caste and inter-group marriages; demands for land rights, increased wages and political participation; and refusal to perform traditional occupations, may trigger not only economic retaliation by those most threatened by changes in the status quo, but also unleash violence.

59.    In South Asia, violence against Dalits is reported to be widespread and driven by the effects of the caste system and the lack of justice for victims.[34] Although official data are scarce, information from some States indicates that the number of reported crimes against Dalits is rising. For instance, data from the National Crime Records Bureau in India reveal that reported crimes against individuals from scheduled castes increased 19 per cent in 2014 from the previous year.[35] In Nepal, Amnesty International reported that in 2014 victims of discrimination on the grounds of caste were subject to torture and other ill-treatment, including sexual violence.[36]

---

[34] Minority Rights Group International, *State of the World's Minorities and Indigenous Peoples 2015*, p. 167 ff.
[35] National Crime Records Bureau of India, *Crime in India* (2014), p. 108. .
[36] Amnesty International, *The State of the World's Human Rights 2014/15* (2015), p. 268.

**2.    Access to justice and policing**

60.    Entrenched caste discrimination within the criminal justice system translates into victims facing multiple obstacles at every stage of the legal process: from lodging a complaint to investigation, trial and judgement. Often, the fear of reprisal prevents victims from reporting attacks, resulting in underreporting and impunity. In South Asia, most violence against Dalits and Dalit communities is underreported and not addressed by Governments.[37]

61.    Due to caste prejudice or deference shown to perpetrators from higher castes, law enforcement officers may refuse to register and/or investigate cases brought by individuals from lower castes.[38] In some instances, these officers perceive caste-based discrimination as a social issue to be solved within the community rather than a crime. Refusal to register such cases as criminal offences is justified as preserving "social harmony".[39]

62.    According to a recent study,[40] the ways in which police refuse to register caste-based atrocities include: (a) showing apathy; (b) discouraging victims and encouraging compromises between the victims and the accused; (c) delaying arrival; (d) threatening or inflicting violence on victims; (e) bringing false cases against victims at the behest of the accused to pressure them to accept a compromise; (f) accepting bribes from the accused to drop the victim's case; and (g) declaring the accused innocent without following due process.

63.    Even if such crimes pass the first stage in the process, there are long pretrial periods and the acquittal rates for these crimes are extremely high. Lower castes are also disproportionately represented in pretrial detention, owing to indiscriminate arrests, slow investigations and prosecutions, weak legal aid systems and inadequate safeguards against lengthy detention periods.[41]

**3.    Right to political participation**

64.    Political marginalization emerges as a consequence of discrimination against caste-affected communities, who are excluded from or underrepresented in both local and national decision-making. Individuals from lower-caste groups may face numerous obstacles to participation in public elections and equal opportunities to run for and be elected to public positions. These include being subject to threats, harassment and physical attacks; being forcibly prevented from standing in elections or, if elected, forced to resign or not to exercise their mandate; being excluded from electoral rolls; and being denied the right to vote.[42]

65.    Caste-affected groups tend to be outvoted and unable to secure proportional representation. For instance, in Mauritania, where the Haratine comprise 40 to 60 per cent of the population, according to statistics collected by the Initiative pour la Résurgence du Mouvement Abolitionniste Mauritanie, only 11 of 147 members of Parliament are Haratine. In Yemen, the Muhamasheen have no political representation at the national level.[43]

[37]  "Caste-based Discrimination in South Asia", p. 4.
[38]  See E/CN.4/Sub.2/2001/16, para. 26.
[39]  OHCHR, "Opening the door to equality: access for justice for Dalits in Nepal" (2011), p. 45.
[40]  Nalori Dhammei Chakma, "Equity watch 2015: access to justice for Dalits in India" (Swadhikar and National Campaign on Dalit Human Rights, 2015), pp. 38-39.
[41]  Amnesty International, *The State of the World's Human Rights 2014/15*, p. 181.
[42]  See CERD/C/IND/CO/19, para. 17.
[43]  See A/HRC/30/31, para. 77.

465
RJN Exhibit 26

66.     Some caste-affected countries, including India and Nepal, have constitutional and legal requirements to reserve seats for disadvantaged caste groups in legislative bodies. In Pakistan, seats are reserved for non-Muslim minorities.

**4.   Freedom of religion or belief**

67.     Caste discrimination exerts a strong influence in the religious sphere. Individuals from the lowest castes may be barred from religious sites, relegated to separate religious buildings or separate spaces and buried in separate cemeteries.

68.     Caste-based discrimination on the grounds of religion has a particular impact on women and girls. The existence of practices labelled as "religious dedication" of girls to temple deities, including the Devadasi system, constitutes a de facto form of forced prostitution and sexual slavery, mainly targeting Dalit girls.[44]

69.     Minority women, many of them from low-caste backgrounds, may be subjected to kidnapping and forced religious conversion. According to the Special Rapporteur on the right to freedom of religion or belief, "such incidents seem to occur in a climate of impunity".[45] Civil society organizations have reported several cases of Dalit Hindu girls being kidnapped and forcibly converted to Islam following marriage in Pakistan.[46]

## B.   Economic, social and cultural rights

**1.   Right to work**

70.     Allocation of labour on the basis of caste is one of the core pillars of caste and caste-like systems, with lower castes typically confined to "polluting", "filthy" or "impure" tasks and occupations. This labour division is characterized by its extreme rigidity and exclusion, preventing individuals from the lowest strata from changing occupations and largely hindering their labour mobility. Attempts to challenge the established order may result in social punishment, including physical and psychological aggression and community boycotts.

71.     Caste-based discrimination confines Dalits in South Asia to certain occupations associated with their caste, which often involve the most menial tasks, such as sanitation jobs.[47] In Bangladesh, India, Nepal and Sri Lanka, street cleaning and the handling of human waste and animal carcasses are almost exclusively performed by Dalits.[48]

72.     In India, manual scavenging constitutes a caste-designated occupation that is mainly imposed upon Dalits, particularly Dalit women, who represent 95 per cent of manual scavengers.[49] Despite the passing of the Prohibition of Employment as Manual Scavengers and their Rehabilitation Act in 2013, the practice reportedly persists, institutionalized

---

[44]   Maggie Black, "Women in ritual slavery: Devadasi, Jogini and Mathamma in Karnataka and Andhra Pradesh, Southern India" (Anti-Slavery International, 2007).

[45]   See A/67/303, para. 43.

[46]   Pakistan Dalit Solidarity Network and International Dalit Solidarity Network, "Scheduled caste women in Pakistan: denied a life in dignity and respect", alternative report to the Committee on the Elimination of Discrimination against Women at its fifty-fourth session (2013), p. 12.

[47]   International Labour Office, *Equality at Work: Tackling the Challenges* (2007), pp. 35-36.

[48]   Human Rights Watch, "Caste discrimination: a global concern" (2001), p. 12.

[49]   United Nations Development Programme (UNDP) and United Nations Solution Exchange, "Social inclusion of manual scavengers" (UNDP, 2012), p. 7. See also Human Rights Watch, *Cleaning Human Waste: "Manual Scavenging", Caste and Discrimination in India* (2014).

through State practice, with local governments and municipalities employing manual scavengers.[50]

73.     This rigid and stratified allocation of work results in Dalits having not only limited job opportunities, but also lower wages,[51] particularly in rural areas.[52]

74.     In Japan, the Buraku face job discrimination. Hiring detectives to investigate the background of job applicants is reported to be common.[53] Research highlights that, if investigations result in the person being considered as Buraku in origin, the individual is likely not to be further considered in the selection process. Despite the amendments to the Basic Resident Registration Act and to the Family Registration Law to restrict access to the family registry (Koseki), professionals who have access, including public notaries, lawyers and judicial scriveners, are allegedly often paid to obtain such information.[54]

**Intersectionality between caste and contemporary forms of slavery**

75.     Discrimination based on caste increases the vulnerability of affected groups to contemporary forms of slavery.[55] Research indicates that forced and bonded labour is widespread within caste-affected communities, despite legal bans.[56] In South Asia, Dalits comprise the majority of people subjected to domestic bonded labour, and a large number of victims of trafficking in persons, sexual slavery and other forms of labour exploitation are members of low castes.[57]

76.     In Nepal, in the agricultural sector, Haliyas ("ones who plough") are labourers effectively caught in a debt bondage system. They plough the land, a task considered dirty.[58] They are often forced to take out loans from landowners to cover personal expenses and are charged exorbitant rates of interest, making their debts extremely difficult to pay back and effectively trapping them in a never-ending cycle of submission. According to civil society reports, despite criminalization by the Government in 2010, the practice still persists and there is currently no legislation in place for the rehabilitation of Haliyas.[59]

77.     In Pakistan, Dalits, who are mainly minority Hindus, are disproportionately affected by forced and bonded labour, particularly in the Sindh and Balochistan provinces.[60]

78.     In Mauritania, the Haratine are the ethnic group most associated with slavery, suffering from discrimination, marginalization and exclusion as the "slave caste", although

---

[50] See A/HRC/15/55 and Corr.1, para. 75.
[51] ILO, *Equality at Work: Tackling the Challenges* (2011), pp. 43 and 44.
[52] "Caste-based discrimination in South Asia", p. 5.
[53] Kenzo Tomonaga, "The International Convention on the Elimination of All Forms of Racial Discrimination and Buraku discrimination" in *Descent-Based Discrimination* (International Movement against All Forms of Discrimination and Racism, 2004), pp. 47-48.
[54] Buraku Liberation League and International Movement Against All Forms of Discrimination and Racism – Japan Committee, report to the Human Rights Committee on disclosure of evidentiary materials for just and fair justice systems, and the right to privacy and the Japanese family register system "Koseki Seido"(2013).
[55] See A/HRC/24/43, para. 15.
[56] Bethan Cobley, "International consultation on caste-based discrimination" (International Dalit Solidarity Network, 2012), p. 21.
[57] See A/HRC/17/40, para. 33.
[58] See A/HRC/24/43, para. 16.
[59] Asian Legal Resource Centre, submission to the universal periodic review of Nepal (2015), p. 4.
[60] Anti-Slavery International, *Poverty, Discrimination and Slavery: The Reality of Bonded Labour in India, Nepal and Pakistan* (2008), p. 14.

slavery is also reported to affect black African communities there.[61] Despite slavery being formally abolished and a recent anti-slavery bill passed in August 2015, the practice reportedly remains widespread, affecting predominantly the Haratine.[62] According to some estimates, 50 per cent of the Haratine community is subjected to de facto slavery through domestic servitude and bonded or forced labour; 90 per cent of those affected are women.[63]

**2.    Right to housing and right to water and sanitation**

79.    Reports indicate that caste-affected communities face discrimination in accessing adequate housing and housing segregation.[64] They may be forced to live on the outskirts of towns, or in segregated colonies or informal settlements,[65] and may also be subject to forced evictions and displacement.[66]

80.    As highlighted by the Special Rapporteur on the human right to safe drinking water and sanitation, stigma associated with caste manifests, inter alia, in lack of access to drinking water and sanitation facilities and in restricted access to shared or common water and sanitation facilities.[67]

81.    In Yemen, the Muhamasheen mainly reside in underdeveloped neighbourhoods on the outskirts of the capital.[68] More than half of their households rely on external water sources such as dams, streams or wells; only two out of five households have latrines.[69]

82.    In Bangladesh[70] and India,[71] Dalits are often systematically excluded from access to water and sanitation. Reports indicate that Dalits may be prohibited from fetching water; have to wait in different queues when accessing wells; and, in the event of water shortage, must give non-Dalits priority. Dalits may be subjected to large-scale violence and physical attacks by members of the dominant caste when attempting to access facilities in areas inhabited by them.[72] Dalit women are particularly vulnerable to physical violence from members of the dominant castes while collecting water from public wells and taps.[73]

**3.    Right to health**

83.    Studies in South Asia demonstrate patterns of discriminatory behaviour against individuals from lower castes, particularly in health care, including denial of or restrictions on services, lack of treatment and longer waiting periods. Health-care providers spend less

---

[61]   See A/HRC/15/20/Add.2, paras. 9-12; and A/HRC/26/49/Add.1, para. 7.

[62]   Anti-Slavery International and others, *Enforcing Mauritania's Anti-Slavery Legislation: The Continued Failure of the Justice System to Prevent, Protect and Punish* (2015), pp. 3-6.

[63]   Unrepresented Nations and Peoples Organization, alternative report submitted to the Human Rights Committee at its 107th session during the consideration of the first periodic report of Mauritania (2013), p. 4.

[64]   See, inter alia, E/C.12/NPL/CO/3, para. 11, and CERD/C/JPN/CO/3-6, para. 19.

[65]   See A/HRC/22/46, para. 11.

[66]   See E/C.12/IND/CO/5, para. 31.

[67]   See A/HRC/21/42, para. 36.

[68]   See A/HRC/30/31, para. 77.

[69]   United Nations Children's Fund (UNICEF) Yemen situation report: Muhamasheen mapping update (2015), p. 2.

[70]   See A/HRC/15/55 and Corr.1, para. 76.

[71]   Rashtriya Garima Abhiyan and others, "Violations of the right to water and sanitation" (2014), p. 11.

[72]   See A/HRC/21/42, para. 36.

[73]   Robert F. Kennedy Center for Justice and Human Rights and Navsarjan Trust, "Understanding untouchability, a comprehensive study of practices and conditions in 1589 villages" (2010), p. 19.

468
RJN Exhibit 26

time with them, and staff use derogatory or demeaning words and avoid physical contact when examining them.[74]

84.     Caste-based discrimination has a direct impact on the health status of affected individuals. Statistics reveal significant disparities in health indicators, with individuals in lower castes presenting poorer health indicators than those in higher castes.

85.     Women in lower castes present the worst health outcomes. For instance, a study in India[75] demonstrated stark disparities between Dalit and non-Dalit women in terms of life expectancy and access to prenatal and postnatal care.

86.     In 2009, a survey by the Ministry of Health[76] in Nepal found that the maternal mortality rates for Dalit women and women from the Therai and Madhesi castes were significantly higher than those for women from higher castes.

87.     Manual scavenging, the digging of graves, the cleaning of human excretions and forced prostitution also expose individuals in lower castes to a range of health hazards.[77] Research further indicates that children in lower castes are at greater risk of infections and nutritional deficiencies.[78]

**4.     Right to education**

88.     Marginalization of caste-affected groups translates into considerable disparities in educational opportunities, educational attainment and treatment by school teachers. Such differences undermine equality of opportunity in employment and hinder social advancement. According to the Special Rapporteur on contemporary forms of racism, racial discrimination, xenophobia and related intolerance, discrimination against Dalits at all levels of the educational system is widespread in caste-affected countries.[79]

89.     The types of structural discrimination and abuse faced by Dalit children in schools are particularly disturbing, as they are carried out by teachers and replicated by fellow students. They include segregation in classrooms, the use of derogatory terms for their caste, forcing them to perform manual work such as cleaning toilets and picking up garbage, and corporal punishment.[80]

90.     Caste-based discrimination in education results in higher rates of illiteracy, a larger number of dropouts from school, and a higher risk of children from lower castes being recruited as child labourers, soldiers or sex workers and subjected corporal punishment and torture.[81]

---

[74]   Sanghmitra Acharya, "Access to health care and patterns of discrimination: a study of Dalit children in selected villages of Gujarat and Rajasthan", working paper series, vol. 1, No. 2 (Indian Institute of Dalit Studies and UNICEF, 2010), pp. 15 ff.

[75]   Vani Borooah and others, "Gender and caste-based inequality in health outcomes in India", working paper series, vol. VI, No. 3 (Indian Institute of Dalit Studies, 2012), pp. 14-15.

[76]   Bal Krishna Suvedi and others, "Nepal: maternal mortality and morbidity study 2008/2009 – summary of preliminary findings" (Family Health Division of the Department of Health Services of the Ministry of Health, 2009).

[77]   See A/68/333, para. 65.

[78]   P. Vart and others, "Caste-based social inequalities and childhood anemia in India: results from the National Family Health Survey 2005-2006" in *BMC Public Health* (2015).

[79]   See A/HRC/23/56, para. 46.

[80]   Human Rights Watch, *"They Say We're Dirty": Denying an Education to India's Marginalized* (2014), pp. 20 ff.

[81]   See CERD/C/IND/CO/19, para. 25.

91.     In Japan, the dropout rate for Buraku high school students is reported to be two to three times the national average. In addition, despite modest increases in college enrolment, the percentage of Buraku university students is still well below the national average.[82] In Yemen, 80 per cent of the Muhamasheen are reported to be illiterate and suffer from extreme poverty.[83] In Mauritania, over 80 per cent of the Haratine do not complete primary school; they constitute only 5 per cent of students pursuing higher education.[84] In Madagascar, most of the Andevo are reportedly illiterate.[85] In Senegal, civil society reports state that children from lower castes were prevented from sitting with classmates from higher castes.[86]

### 5.     Humanitarian assistance

92.     Evidence indicates that communities in lower positions in caste and analogous systems are more vulnerable and more likely to be exposed to natural and human-made disasters and hazards than those from higher castes, for several reasons.[87] For example, their marginalized socioeconomic status may translate into a lack of or limited access to amenities and information. The location and infrastructure of their homes, usually in remote and marginal lands such as floodplains, coastal towns and unstable hillsides, on the periphery of settlements and poorly equipped in terms of basic amenities such as drains, flood barriers and drinking water, may also increase their vulnerability to natural disasters.

93.     Research[88] has found that, when emergencies arise, such communities are often not only the most affected but are also less likely to receive humanitarian aid and rehabilitation. Analysis of emergency responses to natural disasters in South Asia, including in India, Pakistan, Sri Lanka[89] and, most recently, Nepal,[90] have demonstrated that Dalits suffer from acute caste discrimination throughout all the phases of disaster response, from rescue to rehabilitation. They are also the most affected by climate change due to their living in flood- and drought-prone areas.[91]

94.     Reports indicate that discriminatory practices against Dalits in humanitarian response include priority given to dominant castes in rescue operations; denial of or unequal access to relief camps, food, water, health services, shelter, housing and education; segregation in camp facilities; prohibition of use of the common sanitation facilities; segregation in commensal groups; lack of compensation or restitution of assets due to lack of documentation to claim entitlements related to land and property; and lack of participation of affected communities in decision-making regarding reconstruction.[92]

---

[82]  Kenzo Tomonaga, "The International Convention on the Elimination of All Forms of Racial Discrimination and Buraku discrimination", pp. 54-55.

[83]  See CCPR/C/YEM/CO/5, para. 12.

[84]  According to the Haratine manifesto ("Manifeste pour les droits politiques, économiques et sociaux des Haratines au sein d'une Mauritanie unie, égalitaire et réconciliée avec elle-même" (April 2013).

[85]  See A/HRC/24/43/Add.2, para. 12.

[86]  African Assembly for the Defense of Human Rights and International Dalit Solidarity Network, "Alternative report on the situation of castes in Senegal" (July 2012), p. 3.

[87]  International Dalit Solidarity Network, "Equality in aid: addressing caste discrimination in humanitarian response" (2013), pp. 3-4.

[88]  National Dalit Watch-National Campaign on Dalit Human Rights, "Addressing caste discrimination in humanitarian response" (2011).

[89]  Timothy Gill, "Making things worse: How 'caste-blindness' in Indian post-tsunami disaster recovery has exacerbated vulnerability and exclusion" (Dalit Network Netherlands, 2007).

[90]  www.amnesty.org/en/documents/asa31/1753/2015/en.

[91]  Bethan Cobley, "International consultation on caste-based discrimination", p. 18.

[92]  International Dalit Solidarity Network, "Equality in aid: addressing caste discrimination in humanitarian response", pp. 4-5.

## V.   Situation of caste-affected women and girls

95.    Caste is one of the factors that result in multiple and intersecting forms of discrimination against certain groups of women.[93] Women and girls from low castes are particularly vulnerable to violation and denial of their rights in both public and private life.

96.    They are often the victims of caste-based violence, particularly sexual violence.[94] A study[95] identified 12 major forms of violence against Dalit women: nine in the community (physical assault, verbal abuse, sexual harassment and assault, rape, sexual exploitation, forced prostitution, kidnapping or abduction, forced incarceration and medical negligence), and three within the family (female feticide and infanticide, child sexual abuse and domestic violence).

97.    Available data indicate that caste-based violence against women and girls, in particular sexual violence, may be increasing. Violence and the threat of violence are frequently hidden and go unreported in villages and rural areas, forming a culture of invisibility, silence and impunity which, in many instances, places the burden of shame on victims instead of perpetrators.

98.    Women from disadvantaged caste groups are also the main victims of trafficking,[96] and are especially vulnerable to early and/or forced marriage,[97] bonded labour[98] and harmful cultural practices. Accusations of witchcraft are sometimes made to deprive Dalit women of their basic economic and social rights, including access to land and their assets.[99]

99.    Atrocities against women from marginalized castes are often committed when they try to assert their rights and challenge caste and gender norms.[100] Perpetrators include dominant caste landlords, police officers, doctors and teachers, with the "punishment" both being expressive of caste outrage and intended to teach the woman and her community a lesson.[101]

100.   Dalit women face obstacles in accessing formal justice systems. These include the refusal by police officers to register criminal complaints or delays in filing complaints, lack of proper investigation into complaints of violence and ill-treatment, and insensitivity by law enforcement officials.[102]

101.   Women from caste-affected communities, particularly in rural areas, are often excluded from political processes and relegated to secondary or subordinate roles in decision-making. It is reported that rural Dalit women holding seats in the local panchayat

---

[93]  See Committee on the Elimination of Discrimination against Women, general recommendation No. 25 (2004) on article 4 (1) of the Convention (temporary special measures), para. 12; and general recommendation No. 28 (2010) on the core obligations of States parties under article 2 of the Convention, para. 18.

[94]  See A/HRC/26/38/Add.1, para. 15, and A/HRC/26/38/Add.2, para. 16.

[95]  Aloysius Irudayam and others, "Dalit women speak out, violence against Dalit women in India" (National Campaign on Dalit Human Rights, 2006), pp. 3-4.

[96]  See A/HRC/26/38/Add.1, para. 28.

[97]  See A/HRC/29/40, para. 23.

[98]  Anti-Slavery International, *Poverty, Discrimination and Slavery*.

[99]  See A/HRC/20/16, para. 39.

[100] Evidence, "Atrocities against Dalit women and access to justice"(2011), p. 4.

[101] International Dalit Solidarity Network and others, "Violence against Dalit women", briefing note for the eleventh session of the Human Rights Council.

[102] Minority Rights Group International, written contribution to the general discussion on access to justice at the fifty-fourth session of the Committee on the Elimination of Discrimination against Women (2013).

(town assembly) have been forced to stay at home and be represented by their husbands at meetings. Those who have attempted to speak in the panchayat have been subjected to backlash, and even violence, against members of their caste.[103]

102.   Outside South Asia, information on caste-affected women and girls is scarce. In Japan, a survey by the Buraku Liberation League revealed that Buraku women experienced discrimination in a wide range of areas, including marriage, employment and health care, and approximately 30 per cent had suffered from sexual violence.[104] In Mauritania, Haratine women are reported to be at greater risk of violence, in both the public and private spheres, and to suffer from high levels of sexual violence, including rape and marital rape, domestic violence and sexual assault.[105]

103.   Human rights violations against women and girls because of their caste status also include extremely disadvantaged social and economic conditions that have a direct impact on the enjoyment of their economic, social and cultural rights. Women and girls from lower castes have lower literacy levels and are more likely to be prevented from pursuing education. Many perform dangerous and unprotected work, including manual scavenging, and receive lower salaries. Many also have no or limited access to public services, including health care, as well as to government schemes and entitlements, and are de facto prohibited from owning land.[106]

## VI.   Initiatives and good practices to address caste-based discrimination

### A.   United Nations system

104.   The issue of discrimination based on descent and, in particular, caste-based discrimination, has been gaining momentum in the United Nations system for the past two decades. The Committee on the Elimination of Racial Discrimination has been instrumental, as it first addressed discrimination based on caste and on similar forms of social hierarchy as a form of discrimination based on descent, as provided in article 1 (1) of the International Convention on the Elimination of All Forms of Racial Discrimination, and has also addressed the issue in its reviews of affected States. The adoption of general recommendation No. 29 (2002) consolidated the Committee's interpretation of article 1 (1) and formulated a global definition of caste-based discrimination: "discrimination based on caste and analogous systems of inherited status".

105.   The work of the former Sub-Commission on the Promotion and Protection of Human Rights has been of vital importance in the process of giving visibility to the issue of caste-based discrimination. Following its resolution 2000/4, declaring that discrimination based on work and descent was a form of discrimination prohibited by international human

---

[103]   Navsarjan Trust and others, "The situation of Dalit rural women", submission to the general discussion on rural women of the Committee on the Elimination of Discrimination against Women (2013), p. 3.

[104]   Buraku Liberation League Central Women's Division, "What the survey findings tell us: Buraku Women" in *Minority Women Rise Up: A Collaborative Survey on Ainu, Buraku and Korean Women in Japan* (International Movement against All Forms of Discrimination and Racism, 2004), sect. 1.2.

[105]   Unrepresented Nations and Peoples Organization and Initiative pour la résurgence du mouvement abolitionniste Mauritanie, submission for the second periodic review of Mauritania (2015), p. 6.

[106]   Navsarjan Trust and others, alternative report to the Committee on the Elimination of All Forms of Discrimination against Women for its examination of the fourth and fifth periodic reports of India (2014).

rights law, the Sub-Commission appointed an expert to prepare a working paper on the topic to identify communities in which discrimination based on occupation and descent was ongoing, as well as to make concrete recommendations for the effective elimination of such discrimination. The outcome document (E/CN.4/Sub.2/2001/16) focused on countries in Asia only. Two Special Rapporteurs with the task of preparing a comprehensive study on discrimination based on work and descent were subsequently appointed, which led to the draft United Nations principles and guidelines for the effective elimination of discrimination based on work and descent, yet to be formally endorsed by the Human Rights Council.

106.   In 2013, the guidance note of the Secretary-General on racial discrimination and protection of minorities explicitly recommended that United Nations action and policies "reflect the fact that persons targeted for discrimination based on descent, in particular caste-based discrimination and related practices, are in a number of contexts in a particularly marginalized position and in need of focused attention".

107.   In 2014, the United Nations network on racial discrimination and the protection of minorities developed an action plan to support the implementation of those recommendations, including preparing "guidance for the United Nations system on key challenges, priorities and strategic approaches to combat discrimination based on work and descent". At the time of writing the present report, a guidance tool on descent-based discrimination, including key challenges and strategic approaches to combat caste-based and analogous forms of discrimination, was being finalized.

108.   Special procedure mandate holders have also begun to address caste-based discrimination in their communications to States and in thematic and country visit reports.

## B.   National legislation and special measures

109.   Progressive and instrumental steps that can be taken by States to protect caste-affected communities include the following: identification of communities who suffer from discrimination on the basis of caste and analogous systems of inherited status; explicit recognition of caste-based discrimination as a human rights violation in national normative frameworks; ad hoc legislation to combat specific forms of discrimination on the grounds of caste and analogous systems; the establishment of special measures, including reservations, quotas and targeted schemes; and the effective implementation of legislation and special measures.

### Constitutional provisions

110.   In South Asia, several constitutions explicitly refer to "caste" as one of the grounds for prohibited discrimination, including those of Bangladesh (art. 28), India (arts. 15 and 16), Nepal (art. 18), Pakistan (arts. 22, 26 and 27) and Sri Lanka (art. 12.2 and 12.3). Furthermore, the constitutions of India (art. 17) and Nepal (art. 24) explicitly outlaw "untouchability".

111.   Outside South Asia, constitutional references to "caste" are limited. Examples include the constitutions of Burkina Faso (arts. 1 and 23) and Mauritius (art. 16.3). Some constitutions do not list "caste" as one of the prohibited grounds for discrimination, but provide specific references to discrimination based on analogous systems of inherited status. For example, in Japan constitutional provisions prohibit discrimination based on, inter alia, "race, social status or family origin" (art. 14). In the Constitution of Somalia, "clan" affiliation is one of the prohibited grounds for discrimination (art. 11).

112.   Specific constitutional or legislative provisions establishing reservations or quota systems for caste-affected groups have been adopted in some countries. In India, the

RJN Exhibit 26

Constitution and its amendments permit special measures for the social and educational advancement of marginalized communities, including scheduled castes, and provide reservations of electoral seats in the Lower House and state legislatures for scheduled castes. The new Constitution of Nepal contains several provisions for safeguarding the rights of Dalits, including in employment, education and health care, and articulates a political system based on proportional representation for disadvantaged groups, including Dalits, minorities and women, at the local and national levels.

**Specific legislation**

113.   Specific legislation to combat caste-based discrimination in all its manifestations is instrumental to criminalize discriminatory practices, bring perpetrators to justice and provide redress to victims. Nevertheless, poor levels of both implementation of legislative measures and accountability, or a lack thereof, result in prevailing impunity and the perpetuation of caste-based discrimination.

114.   In South Asia, India and Nepal have enacted specific legislation to combat caste-based discrimination. In India, two of the most recent laws are the Scheduled Castes and the Scheduled Tribes (Prevention of Atrocities) Amendment Bill (2015) and the Prohibition of Employment as Manual Scavengers and Their Rehabilitation Act (2013). Nepal enacted the Caste Based Discrimination and Untouchability (Offence and Punishment) Act in 2011, which criminalizes such discrimination in private and public spheres.

115.   In Japan, the Law on Special Measures for Dowa Projects, enacted in 1969 and in force until 2002, was aimed at improving the living conditions in identified Buraku districts (Dowa districts) by improving access to welfare, employment and education, and providing redress in cases of discrimination against Buraku people.

116.   In the United Kingdom, the passing of the 2010 Equality Act brought the caste-discrimination issue into the public arena. Since its amendment in 2013, the Act now includes caste as an aspect of race, following advocacy from civil society organizations and the recommendation of the Committee on the Elimination of Racial Discrimination in its 2011 review of the State.[107]

**Specialized institutions**

117.   In its general recommendation No. 29 (2002), the Committee requested States to "establish statutory mechanisms, through the strengthening of existing institutions or the creation of specialized institutions, to promote respect for the equal human rights of members of descent-based communities".

118.   In 2002, Nepal established a National Dalit Commission tasked with a twofold objective: to increase the participation of Dalit communities "in the mainstream of national development" and to create a favourable environment for Dalit communities.[108]

119.   In 2004, India established the National Commission for Scheduled Castes as a separate body[109] with a wide-range of functions, including monitoring implementation of legislation on scheduled castes, investigating complaints and reporting periodically on the status of implementation of legislation.

---

[107]   See CERD/C/GBR/CO/18-20, para. 30.
[108]   http://ndc.gov.np/site/cms/12.
[109]   www.ncsc.nic.in.

474
RJN Exhibit 26

## C.   Civil society initiatives

120.   Civil society organizations are instrumental in advancing the cause of caste-affected communities through advocacy at both the national and international levels, networking and implementation of specific programmes and campaigns to combat caste and caste-like discrimination. There are numerous good practice initiatives led by civil society actors to eradicate caste-based discrimination against Dalit communities in South Asia;[110] however, similar initiatives to combat discrimination against other caste-affected groups in other regions are, with some exceptions, still emerging.

121.   In Mauritania, the Initiative pour la résurgence du mouvement abolitionniste Mauritanie was established in 2008 by a prominent Haratine leader to advocate for the eradication of slavery and slavery-like practices, as well as to take specific cases before judicial courts.

122.   In Yemen, the All Youth Network for Community Development was set up by young people belonging to the Akhdam minority (Muhamasheen) to work at the local level to eliminate caste discrimination. Its programmes target education, political participation, human rights education and capacity-building.

## VII.   Conclusions and recommendations

123.   **Discrimination based on caste and analogous systems is a global phenomenon, affecting more than 250 million people worldwide. This serious human rights violation infringes upon the basic principles of universal human dignity and equality, as it differentiates between "inferior" and "superior" categories of individuals because of their inherited caste status. It also leads to extreme exclusion and dehumanization of caste-affected communities, who are often among the most disadvantaged populations, experience the worst socioeconomic conditions and are deprived of or severely restricted in the enjoyment of their civil, political, economic, social and cultural rights.**

124.   **Discrimination based on caste and analogous systems is deeply embedded in interpersonal and communal relationships in caste-affected countries. Therefore, overcoming it will require not only legal and political responses, but also community-based approaches aimed at changing the mindsets of individuals and the collective conscience of local communities. In this regard, formal and informal community education and open dialogue from an early age are essential elements to ensure that the principles of human dignity and equality generally are accepted and respected**.

125.   **The Special Rapporteur acknowledges that further in-depth studies of caste-affected communities, particularly outside of South Asia, are needed in order to comprehensively assess the situation of and specific challenges facing such groups and implement adequate measures to combat caste-based discrimination that affects them. To that end, the collection of data disaggregated by, inter alia, caste, sex, ethnicity, religion and language is essential to adequately map affected groups in caste-affected countries. Data collection programmes should allow for diverse forms of self-identification and comply with international standards regarding the right to privacy.**

126.   **Discrimination on the basis of caste and analogous systems is a major cause of poverty, inequality and social exclusion of affected communities. In the implementation of the 2030 Agenda for Sustainable Development, States should**

---

[110]   Bethan Cobley, "International consultation on caste-based discrimination", pp. 48-54.

consider including caste-specific indicators to ensure that the Sustainable Development Goals and their targets address the situation of affected groups.

127.	The Special Rapporteur believes that relevant elements and standards emanating from the minority rights framework, including equality, non-discrimination, consultation, participation and special measures, can contribute to the protection of the rights of caste-affected communities and should be applied to combat discrimination based on caste and analogous systems.

128.	States should adopt specific legislation prohibiting discrimination on the grounds of caste and/or analogous systems. Existing legal frameworks to combat caste discrimination must be adequately and fully implemented and include appropriate penalties for acts of caste-based discrimination.

129.	States should conduct awareness-raising campaigns at the national and local levels, targeting both affected communities and the wider public to sensitize them against caste discrimination and analogous forms of such discrimination. These campaigns should inform the public about the various manifestations, legal prohibitions and penalties associated with caste discrimination, and victims should be informed of their rights and available means of legal recourse to bring to light caste-based discriminatory practices and obtain redress.

130.	Comprehensive national action plans and budgets to combat discrimination based on caste and analogous systems should be urgently developed and implemented in caste-affected countries. Plans should have clear objectives and measures in a wide range of areas, including poverty reduction strategies, employment, health, housing, education and access to basic services, including water and sanitation. They should include specific attention to the issues of caste-affected women, be developed in coordination with affected groups and local organizations working with them and be provided with sufficient funding. Their progress should be regularly monitored.

131.	Special measures, including reservations, quota systems and/or schemes, should be put into place and enforced in specific areas, including employment, education, and public and political institutions, in order to guarantee the effective participation and representation of affected communities in public life.

132.	Women and girls are particularly vulnerable to caste discrimination, as they suffer from multiple and intersecting forms of discrimination owing to both their gender and unprivileged caste status. They are disproportionately subjected to dire human rights violations, including violence and, particularly, sexual violence, trafficking, early and/or forced marriage and harmful traditional practices. They face obstacles in accessing justice and redress and are excluded or relegated to a secondary or subordinate role in decision-making processes. Caste-affected States should urgently take robust action to eradicate such violations through, inter alia, the enactment and effective implementation of specific legislation and the adoption of special measures, policies and programmes to address the entrenched situation of marginalization and exclusion experienced by women and girls owing to their caste status.

133.	Ad hoc supervisory bodies or specific departments in national human rights institutions should be established to address and monitor caste-based discrimination, where relevant. They should analyse existing domestic legislation, and recommend programmes and provide advice on public policies to enhance the implementation of non-discrimination legislation. They should provide complaint-handling services, including by receiving complaints, conducting investigations and initiating or pursuing legal actions in relation to cases involving caste-based discrimination. These

476
RJN Exhibit 26

bodies should be independent and provided with sufficient funding, resources and staff to adequately fulfil their mandate.

134.   Law enforcement officers should receive training to identify and adequately respond to cases of caste-based discrimination, particularly those involving caste-based violence. Rapid-response protocols should be developed and implemented by police officers to attend to victims and conduct in situ investigations. Criminal penalties should be established for law enforcement officers who neglect or intentionally decide not to investigate and/or prosecute complaints filed by individuals regarded as "low caste". Recruitment of members of affected communities into law enforcement agencies should be encouraged, including through the establishment of a quota system for caste-affected individuals.

135.   Human rights education in schools should be a mandatory subject. Language in school textbooks should be revised to eliminate stereotypical and prejudicial portrayals of caste-affected communities and contest the social construction of caste and caste-like systems and related notions, including untouchability and segregation.

136.   Specific measures should be developed to tackle discrimination, including on the grounds of caste, in all development and disaster recovery actions and programming. Implementation of caste-analysis methodology in the humanitarian assistance framework to adequately identify affected communities, as well as the implementation mechanisms to ensure that humanitarian relief is equally distributed, is fundamental to prevent caste-based discrimination from being replicated in humanitarian response actions.

137.   States should extend invitations to special procedure mandate holders to assess the situation of caste-affected communities in their respective countries and request their assistance for technical cooperation.

138.   The draft United Nations principles and guidelines for the effective elimination of discrimination based on work and descent should be promoted by States and endorsed by the Human Rights Council.

————————

RJN Exhibit 26