JOHN J. SHAEFFER (SBN 138331)
  jshaeffer@FoxRothschild.com
FOX ROTHSCHILD LLP
Constellation Place
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone:  310.598.4150
Facsimile:   310.556.9828

MICHAEL K. TWERSKY (*pro hac vice*)
  mtwersky@foxrothschild.com
BETH L. WEISSER (*pro hac vice*)
  bweisser@foxrothshchild.com
ERIKA PAGE (*pro hac vice*)
  epage@foxrothschild.com
FOX ROTHSCHILD, LLP
980 Jolly Road, Suite 110
Blue Bell, PA 19422
Telephone:  610.397.6500
Facsimile:   610.397.0450

Attorneys for Plaintiffs
Sunil Kumar, Ph.D. and Praveen Sinha, Ph.D.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNIL KUMAR, Ph. D<br>PRAVEEN SINHA, Ph. D.,<br><br>      Plaintiffs,<br><br>      v.<br><br>DR. JOLENE KOESTER, in her official capacity as Chancellor of California State University,<br><br>      Defendant. | Case No. 2:22-CV-07550-RGK-MAA<br><br>**OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date:     June 26, 2023<br>Time:    9:00 a.m.<br>Judge:   R. Gary Klausner<br>Trial:     October 31, 2023 |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................1

II.   FACTUAL BACKGROUND .............................................................3

III.  APPLICABLE LEGAL STANDARD...............................................4

      A.    Plaintiffs Assert a Proper Facial Challenge to the Policy...................5

      B.    The Policy is Unconstitutionally Vague. ................................7

      C.    The Policy Violates the Equal Protection Clause. .............................11

      D.    The Policy Violates the Establishment Clause. ................................14

      E.    The Policy Violates the Free Exercise Clause. ................................16

IV.   CONCLUSION ..............................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adair v. England,*
    183 F.Supp.2d 31 (D.D.C. 2002) ................................................................ 14

*Adarand Const., Inc. v. Pena,*
    515 U.S. 200 (1995) ................................................................................... 11

*Al Saud v. Days,*
    50 F.4th 705 (9th Cir. 2022) ..................................................................... 11

*Ball v. Massanari,*
    254 F.3d 817 (9th Cir. 2001) ............................................................... 11, 13

*Benezet Consulting LLC v. Secretary Commw of Pennsylvania,*
    26 F.4th 580 (3d Cir. 2022) ......................................................................... 5

*Butler v. Resurgence Financial, LLC,*
    521 F. Supp. 2d 1093 (C.D. Ca. 2007) ........................................................ 4

*Cal. Pro-Life Council, Inc. v. Getman,*
    328 F.3d 1088 (9th Cir. 2003) ..................................................................... 6

*California Parents for Equalization of Educational Materials v. Torlakson,*
    973 F.3d 1010 (9th Cir. 2020) ................................................................... 15

*California Teachers Ass'n v. State Bd. of Educ.,*
    271 F.3d 1141 (9th Cir. 2001) ..................................................................... 5

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ......................................................................... 17, 18, 19

*City of Los Angeles v. Patel,*
    576 U.S. 409 (2015) ..................................................................................... 6

*Coalition for Economic Equity v. Wilson,*
    122 F.3d 692 (9th Cir. 1997) ..................................................................... 10

*Doe v. City of San Diego,*
    313 F. Supp. 3d 1212 (S.D. Ca. 2018) ......................................................... 6

*Epperson v. Arkansas,*
    393 U.S. 97 (1968) ..................................................................................... 14

*Everson v. Bd. of Ed. of Ewing Twp.*,
    330 U.S. 1 (1947) .................................................................................. 15

*Fisher v. Univ. of Tex.*,
    570 U.S. 297 (2013) ............................................................................... 11

*Gallion v. Charter Comms. Inc.*,
    287 F. Supp. 3d 920 (C.D. Ca. 2018) ..................................................... 4

*Gammoh v. City of La Habra*,
    395 F.3d 1114 (9th Cir. 2005) ................................................................. 9

*Golinski v. Office of Personnel Mgmt.*,
    824 F.Supp.2d (N.D. Ca. 2012) ............................................................ 11

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ................................................................................. 7

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
    896 F.2d 1542 (9th Cir. 1989) ................................................................. 5

*Hi-Voltage Wire Works Inc. v. City of San Jose*,
    12 P.3d 1068 (Ca. 2000) ........................................................................ 13

*Hunt v. City of Los Angeles*,
    601 F. Supp. 2d 1158 (C.D. Ca. 2009) .............................................. 7, 10

*Johnson v. Calif.*,
    543 U.S. 499 (2005) ............................................................................... 11

*Johnson v. U.S.*,
    576 U.S. 591 (2015) ................................................................................. 7

*Larson v. Valente*,
    456 U.S. 228 (1982) ............................................................................... 14

*Lynch v. Donnelly*,
    465 U.S. 668 (1984) ............................................................................... 16

*Masterpiece Cakeshop Ltd. v. Colo. C.R. Comm'n*,
    138 S.Ct. 1719 (2018) ........................................................................... 14

*Plyler v. Doe*,
    457 U.S. 202 (1982) ............................................................................... 11

*Real v. City of Long Beach*,
    852 F.3d 929 (9th Cir. 2017) ................................................................... 5

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

*Regents v. Univ. of Calif. v. Bakke,*
    438 U.S. 265 (U.S. 1978) ..................................................................................... 12

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020) .......................................................................................... 19

*Romer v. Evans,*
    517 U.S. 620 (1996) ........................................................................................... 11

*Roulette v. City of Seattle,*
    97 F.3d 300 (9th Cir. 1996) .................................................................................. 5

*Tennison v. Paulus,*
    144 F.3d 1285 (9th Cir. 1998) ............................................................................... 5

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ....................................................................... 16, 17

*Wolfson v. Brammer,*
    616 F.3d 1045 (9th Cir. 2010) ........................................................................... 6, 7

**Other Authorities**

Fed. R. Civ. P. 12(c) ............................................................................................... 4

Guha Krishnamurthi & Charanya Krishnaswami, Title VII & Caste
    Discrimination, 134 Harv. L. Rev. 456, 462 (2021) ............................................ 15

*Merriam-Webster*, https://www.merriam-webster.com/dictionary/caste ............. 1, 2, 9, 12, 14

13A Wright, Miller & Cooper, *Federal Practice and Procedure* § 3532.3 (3d ed.) ..................... 6

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

iv

Plaintiffs, through their undersigned counsel, respectfully submit this memorandum of law in opposition to Defendant's Motion for Judgment on the Pleadings (the "Motion") on the constitutionality of California State University's ("CSU") addition of "caste" to its Nondiscrimination Policy (the "Policy").

## I.    __INTRODUCTION__

What is caste?  CSU and the Policy classify caste as a nationality, race, or ethnicity, but fail to elaborate how or why this is an understanding shared by anyone. While the Policy defines dozens of terms, caste is not among them.  Dkt. 87-3-1 at Ex. 1, Policy at Art. VII(A)(1)-(9); *id.* at Art. VII(B)(1)-(34).

Relying on an academic journal rather than the Policy itself, the Motion defines "caste" as "'encompass[ing] all hereditary systems and derived cultures that constrain the fullest development, acceptance, and recognition of equal right for each and every individual.'" Dkt. 90 at 2 (quoting Laurence Simon, Why A Journal On Caste?  CASTE:  A Global Journal on Social Exclusion, Vol. 1, Issue 1, p. 1 (Feb. 2020) ("Simon Article")).  This definition is so broad that it includes any culture that recognizes any form of class or social status distinctions.   Nothing about this definition suggests caste is a distinction based on race, nationality, or ethnicity consistent with the Policy.  If CSU's intent was to prohibit all forms of discrimination based on class or social status, which the definition it now adopts suggests, it should simply say so.

Conceding that caste is not a term of ordinary parlance, CSU deflects that "an employee or student … unfamiliar with the term caste …. need only reach for a dictionary to find quick and comprehensive information." Dkt. 90 at 19.  The dictionary does not help.  It defines caste as "one of the hereditary social classes in ***Hinduism*** that restrict the occupation of their members and their association with members of other castes." *Merriam-Webster*, Updated May 21, 2023,

https://www.merriam-webster.com/dictionary/caste (emphasis added).[1]  Rather than identify a historically-disadvantaged race or ethnicity, this definition does the opposite.  It identifies a religious system that purportedly discriminates based on class or social status.  Stated another way, if one accepts the dictionary definition of caste and CSU's representation that caste discrimination can be found throughout the world, then, according to CSU, followers of Hinduism, a worldwide religion, discriminate based on social status everywhere regardless of another nationality, race, or ethnicity.

While class and social status discrimination are terms readily understandable in the United States, caste is not.  Because the Policy fails to define caste, it is unconstitutionally vague.  That is not the Policy's only constitutional failing.  It also violates the Equal Protection Clause of the United States and California Constitutions because it treats members of the Hindu religion, as well as those from southeast Asia and other countries identified by CSU, differently than all other similarly-situated CSU employees, faculty and students.  Further, the Policy violates the Free Exercise and Establishment Clauses of the First Amendment (the "Religion Clauses"), as well as California's Constitution, because it incorrectly attributes to Hinduism a caste system that impinges the rights of Hindus in the practice of their religion.

Since the Policy impacts core constitutional rights, it can survive only if it meets the most exacting judicial scrutiny.  CSU cannot meet this standard, and the Motion should be denied.  Because CSU's own Motion demonstrates that this portion

---

[1]  The definition of caste includes: (1) "one of the hereditary social classes in Hinduism that restrict the occupation of their members and their association with members of other castes"; (2) "a division of society based on differences of wealth, inherited rank or privilege, profession, occupation, or race"; and (3) "system of stratification characterized by hereditary status, endogamy, and social barriers sanctioned by custom, law, or religion."  *See Merriam-Webster*, https://www.merriam-webster.com/dictionary/caste.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

2

of its Policy cannot withstand a facial challenge, Plaintiffs cross move for judgment on the pleadings and respectfully ask this Court to find that the Policy violates the United States and California Constitutions.[2]

## II.     **FACTUAL BACKGROUND**

On January 1, 2022, CSU instituted the Policy, which added "caste" as a Protected Status to its anti-discrimination prohibitions.  Dkt. 80 at ¶ 1.  The Policy prohibits "[d]iscrimination based on any Protected Status, *i.e.*, Age, Disability (physical and mental), Gender (or sex, including sex stereotyping), Gender Identity (including transgender), Gender Expression, Genetic Information, Marital Status, Medical Condition, Nationality, Race or Ethnicity (including color, ***caste***, or ancestry), Religion (or religious creed), Sexual Orientation, and Veteran or Military Status."  *Id.* (emphasis added).

Plaintiffs, professors at CSU, filed this action asserting a facial challenge to the constitutionality of the Policy.  *See* Dkt. 80.  Plaintiffs allege that the Policy violates the First, Fifth, and Fourteenth Amendments to the United States Constitution, as well as provisions of the California Constitution, and seek declaratory judgment and other relief.  *Id.*  Plaintiffs also allege that CSU implemented the Policy based, in part, on Resolutions passed by the California Faculty Association ("CFA") and California State Student Association ("CSSA").  *Id.* at ¶ 38.

Defendant, CSU's Chancellor, filed an Answer and Motion for Judgment on the Pleadings denying that the Policy violates either the United States or California Constitutions.  CSU argues that "caste," as used in the Policy, is based on "'**Race or Ethnicity** [and] **includes** ancestry, color, **caste**, ethnic group identification, and

---

[2]  On May 19, 2023, counsel for the Parties conferred on Plaintiffs' cross motion pursuant to L.R. 7-3.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

ethnic background.'" Dkt. 90 at 5 (emphasis added) (quoting Policy at Art. 20).  CSU denies that caste is "coextensive with Hinduism or any other religion," notwithstanding the dictionary definition of caste.  *Id.* at 3.

While the Policy fails to define "caste" the Motion adopts an academic journal's definition so broad as to encompass any form of class or social status discrimination, *i.e.* it is not limited to discrimination based on nationality, race, or ethnicity as the Policy suggests.  Additionally, CSU's allegation that caste systems exist throughout the world undermines the Policy's suggestions that caste discrimination is discrimination based on nationality, race, or ethnicity.

## III.   **APPLICABLE LEGAL STANDARD**

Under Fed. R. Civ. P. 12(c), judgment on the pleadings "is proper only when there is no unresolved issue of fact, and no question remains that the moving party is entitled to a judgment as a matter of law." *Butler v. Resurgence Financial, LLC*, 521 F. Supp. 2d 1093, 1095 (C.D. Ca. 2007).  "It must appear beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (citing *Sun Savings & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987)).  "[T]he allegations of the non-moving party are accepted as true, and all inferences reasonably drawn from those facts must be construed in favor of the responding party." *Id.* (citation omitted).

Courts are "generally limited to the pleadings and may not consider extrinsic evidence." *Gallion v. Charter Comms. Inc.*, 287 F. Supp. 3d 920, 924 (C.D. Ca. 2018) (citing Fed. R. Civ. P. 12(c)).  A court may, however, consider documents beyond the pleadings, if their contents are "alleged in the complaint" and they present no question of authenticity.  *Id.*  Contrary to Rule 12(c), CSU's Motion includes nearly ***700 pages*** of exhibits that Defendant asks be judicially noticed, but all of which, except the Policy, are beyond anything referenced in the Amended Complaint.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

4

Among the documents that Defendant seeks to be judicially noticed is the Constitution of India and the Indian Prevention of Atrocities Act, while CSU simultaneously denies that caste, as per the Policy, applies specifically to students, faculty, and staff of Indian origin.  Dkt. 90 at 3.

Because CSU ignores the standard for determining motions for judgment on the pleadings, the Motion is improper on that basis alone.  *See, e.g., Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989)).  Moreover, the arguments contained within CSU's Motion each fail as a matter of law.

### A.    Plaintiffs Assert a Proper Facial Challenge to the Policy.

CSU misapplies well-settled caselaw when it argues that determining the constitutionality of the Policy "should be deferred until an actual controversy arises."  Dtk. 90 at 2.  Facial challenges address the constitutionality of government action *before* an actual controversy occurs.  *See Tennison v. Paulus*, 144 F.3d 1285, 1287 (9th Cir. 1998). Thus, "[a] plaintiff whose constitutional rights have not been violated may nevertheless bring a facial challenge to a law that implicates the First Amendment."  *Id.* (citing *Nunez v. City of San Diego*, 114 F.3d 935, 949 (9th Cir. 1997)).   Rather than waiting for such a violation to occur, courts may address government policies susceptible to a facial challenge to *prevent* harm to constitutional rights.  *See Real v. City of Long Beach*, 852 F.3d 929, 934 (9th Cir. 2017) (holding a plaintiff challenging city zoning ordinance was not required to first apply for, and then be denied, a permit before bringing a First Amendment facial challenge to the city zoning ordinance).

CSU's argument is contrary to the law as recognized in this Circuit and elsewhere.  *See, e.g., id.*; *California Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149 (9th Cir. 2001); *Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

5

1996); *Benezet Consulting LLC v. Secretary Commw of Pennsylvania*, 26 F.4th 580, 585 (3d Cir. 2022). The purpose of a facial challenge to the constitutionality of government action is to attack the action "itself as opposed to a particular application." *Doe v. City of San Diego*, 313 F. Supp. 3d 1212, 1217 (S.D. Ca. 2018) (quoting *City of Los Angeles v. Patel*, 576 U.S. 409, 409 (2015)). Facial attacks do not "raise questions of fact related to the enforcement of the statute in a particular instance[,]" *see Doe*, 313 F. Supp. 3d at 1217, and "have been permitted "under a diverse array of constitutional provisions." *Patel*, 576 U.S. at 409.

The Ninth Circuit applies "the requirements of ripeness and standing less stringently in the context of First Amendment claims." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010); *see also Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003). Thus, a CSU employee or student need not wait until they are harmed by the Policy before challenging it. *See Wolfson*, 616 F.3d at 1058 (quoting *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)); 13A Wright, Miller & Cooper, *Federal Practice and Procedure* § 3532.3 (3d ed.) ("First Amendment rights of free expression and association are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss").

Courts within this Circuit weigh two considerations in evaluating ripeness in this context: (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Wolfson*, 616 F.3d at 1060. "[A] claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Id.* (alteration added and in original) (quoting *U.S. West Commc'ns v. MFS Intelenet, Inc.*, 194 F.3d 1112, 1118 (9th Cir. 1999)). "To meet the hardship requirement, a litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss.'" *Id.* (quoting *Stormans, Inc. v. Selecky*, 586 F.3d

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

6

1109, 1126 (9th Cir. 2009)).  The hardship prong requires considering whether the government action (the Policy) "requires an immediate and significant change in plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Id.* (quoting *Stormans, Inc.*, 586 F.3d at 1126).  These criteria are met here.

First, Plaintiffs' claims are fit for judicial decision because the constitutionality of the Policy is a purely legal question and does not require further substantial development. *Id.* at 1060.  Second, CSU has acknowledged that the Policy is "final" as of January 1, 2023.  Dkt. 90 at 1.  Withholding review of the Policy would result in direct and immediate hardship beyond mere financial loss because CSU stands ready to enforce it (if it has not already) and subject its students, faculty, and staff to discipline for violations when it is unclear how the policy even applies. Consequently, Plaintiffs have met the requirements to assert a facial challenge to the Policy.

## B.    The Policy is Unconstitutionally Vague.

The Policy is unconstitutionally vague because no one – not even CSU – can define "caste" such that it falls within the categories of nationality, race, or ethnicity. In these circumstances, government laws or policies are particularly susceptible to facial attack. *See, e.g., Johnson v. U.S.*, 576 U.S. 591, 637 n.2 (2015) ("A void-for-vagueness challenge is a facial challenge.").

A vagueness challenge is "rooted in the basic guarantees of due process." *Hunt v. City of Los Angeles*, 601 F. Supp. 2d 1158, 1169 (C.D. Ca. 2009).  Indeed, "[v]ague laws offend several important values." *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104 (1972)).  They "trap the innocent by not providing fair warning," present the risk of "arbitrary and discriminatory enforcement …. [and] impermissibly delegate basic policy matters" to those responsible for enforcement "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

7

application." *Grayned*, 408 U.S. at 108-09.  Importantly, where, as here, a vague policy encroaches "upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of [those] freedoms." *Id.* (quoting *Cramp v. Board of Public Institution*, 368 U.S. 278, 287 (1961)).

The Motion's arguments detail precisely why the Policy is unconstitutionally vague.  First, CSU explains that it "clarified that caste discrimination is a form of race or ethnicity discrimination and is thus barred throughout the CSU system."  Dkt. 90 at 1.  But, neither the Policy nor the Motion defines the "race or ethnicity" of caste members.  Instead, and contrary to being a specific race or ethnicity, CSU contends that discriminatory caste systems exist throughout the world, and its currently-adopted definition in no way limits the reach of caste discrimination to any particular nationality, race, or ethnicity.  CSU fails to explain how one responsible for enforcement of the Policy can distinguish caste discrimination from race or ethnicity discrimination.  Can a member of one Indian caste discriminate against another Indian of a different caste when they are of the same race and ethnicity?  Who determines what caste is ascribed if, as with Plaintiffs here, they do not identify with any caste?  We are left to wonder since caste is not defined.

Second, while CSU asserts the Policy bars discrimination based on the "often-discussed caste systems found in India, Nepal, Sri Lanka, Bangladesh, and Pakistan" as well as "other caste systems – including systems originating in Japan, Africa, the Middle East, and beyond," it does not explain what those caste systems are so that perceived discrimination can be identified and addressed.  *Id.* at 3.  Is it based on geography, national origin, religion, social status, or something else entirely?  Does it apply to caste systems found in North America or Europe?  What is an "often-discussed caste system" compared to one that is not often-discussed?  If the policy maker does not understand the term, how can the CSU community, which is bound

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

8

by the Policy, have an understanding of what caste means?  Simply identifying where "caste systems" are located does not define what caste is under the Policy.

Third, CSU claims the Policy is neutral toward, and unrelated to, religion.  *Id.* at 1.  But Merriam-Webster's first (and primary) definition of caste is "one of the hereditary social classes in ***Hinduism*** that restrict the occupation of their members and their association with members of other castes."  *Merriam-Webster*, https://www.merriam-webster.com/dictionary/caste (emphasis added).  This is where CSU advises we look if we are unsure of what caste means.  Dkt. 90 at 19.  Thus, CSU directs the CSU community to the very place where, contrary to Defendant's argument, caste is defined as associated with a religion.[3]  *Id.*

All of this leads to one simple question (which CSU cannot answer):  How is someone to know whether they are engaged in caste discrimination?[4]  Caste could, under the first dictionary definition, apply only to historical Hindu castes (of which there are thousands, not including castes of other religions) but to no other "caste system."[5]  Thus, at best, CSU is attempting to prohibit only members of the Hindu faith from discriminating against anyone.

---

[3]  Defendant cites to a scholarly journal (the Simon Article) for the proposition that, "'[c]aste, in its simplest definition, encompasses all hereditary systems and derived cultures that constrain the fullest development, acceptance, and recognition of equal rights for each and every individual.'"  Dkt. 90 at 2.  But, Defendant fails to quote the very next sentences in the article, where the author notes that caste is "often" based on "religious" hierarchies and "sanctioned by religion and theology."  *Id.* and Dkt. 87-32 at 69, Ex. 30(i).

[4]  Alternatively, how will someone know if they are the *victim* of caste discrimination versus discrimination based upon some other protected status – or even unprotected status?

[5]  This definition is consistent with the position taken by the State of California, as well as the CFA Resolution relied on by CSU in adopting the Policy.  *See* Dkt. 80 at ¶¶ 37-38.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

9

No court anywhere has endorsed an anti-discrimination policy directed to a class of purported discriminators rather than a class discriminated against. Surely CSU cannot enforce a policy against prohibited conduct without identifying the conduct the Policy proscribes. Merely saying "caste" is not enough, particularly where, as here, the Policy implicates significant First Amendment concerns. *See, e.g., Gammoh v. City of La Habra*, 395 F.3d 1114, 1119 (9th Cir. 2005) ("A greater degree of specificity and clarity is required when First Amendment rights are at stake").

Despite obvious issues defining caste, CSU maintains caste is understandable to people of ordinary intelligence. But, the dictionary alone includes four definitions, confirming that there is no single definition of caste, much less one that is understandable to people of ordinary intelligence. *See* fn. 1, *supra*. Equally problematic is CSU's claim that the Policy provides fair notice of prohibited conduct. Dkt. 90 at 19. There can be no fair notice of what is prohibited if the Policy does not define caste. *See Hunt*, 601 F. Supp. 2d at 1171 (holding ordinance that failed "to provide guidelines to be used by officials as they make [enforcement] decisions" as "permit[ting] arbitrary enforcement and run[ning] afoul of the void-for-vagueness doctrine").

Caste is not a term understood by the vast majority of Americans (or the employees, professors, and students at CSU), as required under the Constitution. *See* Dkt. 80 at ¶ 62 (quoting *Los Angeles Times* article that "caste practice in the U.S. is a faraway and foreign concept"); *id*. at ¶ 63 (quoting CSU professor and Dept. of Social Work chair that "caste is not yet part of our regular lexicon …."). As such, "caste" is a foreign concept in the United States, recognized largely through prejudicial stereotypes. Without a definition, those who fall under the Policy have no way of determining what violates its strictures. Consequently, the Policy is

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

10

unconstitutionally vague in violation of the Due Process Clause and, therefore, the Motion should be denied and judgment entered in favor of Plaintiffs.

### C.     The Policy Violates the Equal Protection Clause.

"The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." *Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 701 (9th Cir. 1997) (quoting U.S. Const. amend. XIV, § 1). The "Clause directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (citation omitted). Consequently, "the Constitution neither knows nor tolerates classes among citizens." *Romer v. Evans,* 517 U.S. 620, 623 (1996).  "This principle embodies a commitment to neutrality where the rights of individual persons are at stake." *Golinski v. Office of Personnel Mgmt.*, 824 F.Supp.2d, 968, 981 (N.D. Ca. 2012) (citations omitted). "It is because of this commitment to neutrality that legislative provisions which arbitrarily or irrationally create discrete classes cannot withstand constitutional scrutiny." *Id.* (citing *Romer*, 517 U.S. at 623); *see also Al Saud v. Days*, 50 F.4th 705, 709-10 (9th Cir. 2022).

"[A]ny official action that treats a person differently on account of his race or ethnic origin is inherently suspect." *Fisher v. Univ. of Tex.*, 570 U.S. 297, 310 (2013) (citations omitted).  Where government action treats an individual differently on the basis of race, religion, ethnicity, or national origin, strict scrutiny is applied.  *Id.*; *Johnson v. Calif.*, 543 U.S. 499, 505 (2005); *Adarand Const., Inc. v. Pena*, 515 U.S. 200, 227 (1995); *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001).  The Supreme Court "insist[s] on strict scrutiny in every context, even for so-called 'benign' racial classifications, such as race-conscious university admissions policies, race-based preferences in government contracts, and race-based districting intended to improve

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

11

minority representation." *Johnson*, 543 U.S. at 505 (citations omitted); *see also Al Saud*, 50 F.4th at 709-710.

Whether the Court accepts Plaintiffs' argument that caste is based on religion or CSU's that it is based on race, ethnicity, or national origin, the test to be applied is the same:  the Policy must be narrowly tailored to serve a compelling government interest because all of those categories are considered suspect classes and the Policy burdens Plaintiffs' constitutional rights.  *See, e.g., Ball*, 254 F.3d at 823 ("If the statute employs a suspect class (such as race, religion, or national origin) or burdens the exercise of a constitutional right, the court must apply strict scrutiny ….").

Even accepting CSU's position, the Policy still amounts to a "benign" suspect classification that targets individuals from India and South Asia, as well as those from "often-discussed caste systems" (whatever that phrase may mean), in an effort to protect them.  *See* Dkt. 90 at 1.  In so doing, CSU imposes a burden on, and singles out, individuals based on race or ethnicity.  Indeed, the Policy singles out Plaintiffs (as well as others similarly situated) with stereotypes that they adhere to a "caste system" characterized as a racist and inhumane system of discrimination and violence against others.  Dkt. 80 at ¶ 57 ("erroneously concluding that caste is 'a structure of oppression,' where '[c]aste oppressed groups …  experience brutal violence at the hands of 'upper' castes ….'") (quoting CSSA Resolution [Dkt. 1-1 at Ex. E] at p. 117).  The Supreme Court held decades ago that offering assistance to "perceived victims of 'social discrimination' does not justify a classification that imposes disadvantages" upon others.  *See Regents v. Univ. of Calif. v. Bakke*, 438 U.S. 265, 310 (U.S. 1978).  Yet, the Policy does exactly that.  Stated more simply, anti-discrimination laws are drawn to protect persons against discrimination, not to classify certain groups as historic discriminators.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

12

Further, the Policy offers preferential treatment to caste members (without defining who or what they are) by offering protections available only to those in "often-discussed caste systems." Thus, to benefit from the Policy's protection the "caste system" must be one that is "often-discussed," thereby permitting those rarely discussed "caste systems" to be ignored. For example, generationally poor White or Black Americans apparently would not get the same favored status as someone from India, Sri Lanka, or the Middle East. The former would be members of a disenfranchised caste within the United States, as secondarily defined by the dictionary CSU tells us to consult, but their disenfranchisement is not "often-discussed" as caste discrimination. *See Merriam-Webster*, https://www.merriam-webster.com/dictionary/caste (defining caste as "a division of society based on differences of wealth, inherited rank or privilege, profession, occupation, or race.").

Certainly, an argument can be made that a caste system based on generational wealth versus generational poverty exists in the United States, but such discrimination is "often discussed" here as class of social status discrimination, and not caste discrimination. Moreover, the Policy as drafted, however, cannot be read to reach such discrimination because it circumscribes caste to racial or ethnic distinctions only. Consequently, the Policy as adopted provides no protection to faculty or students victimized by discrimination because they come from historically poor families. Whether CSU should afford such victim protection as a protected class is not now before the Court, but California recognizes that discrimination includes making "distinctions in treatment" by "show[ing] partiality (*in favor of*) or prejudice (*against*)" individuals based upon their membership in a protected class. *Hi-Voltage Wire Works Inc. v. City of San Jose*, 12 P.3d 1068, 1082 (Ca. 2000).

As laudable as it may be, CSU must prove that the Policy survives strict scrutiny. Even crediting that CSU has a compelling interest in prohibiting caste

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

13

discrimination (whatever caste means), the Policy is not "narrowly tailored to serve" that interest. *Ball*, 254 F.3d at 823.  In fact, there are few government actions that meet the strict scrutiny test.  Here, CSU recognizes caste discrimination as a form of race or ethnicity discrimination (Dkt. 90 at 5) and therefore the Policy's purpose necessarily can be achieved through a lesser restrictive means, *i.e.,* through the existing prohibition against race or ethnicity discrimination.

Because the Policy cannot meet strict scrutiny, it violates the Equal Protection Clause.  Thus, the Motion should be denied and judgment entered in favor of Plaintiffs.

### D.    The Policy Violates the Establishment Clause.

The First Amendment *requires* that government "proceed in a manner neutral toward and tolerant" of people's "religious beliefs." *Masterpiece Cakeshop Ltd. v. Colo. C.R. Comm'n*, 138 S.Ct. 1719, 1731 (2018).  While neutrality is compelled as between religious and secular groups, there must be "strict adherence to the 'principal of denominational neutrality . . .'" where, as here, one religion is treated differently than all others (based on the primary definition of caste that CSU tells its community to consult). *Adair v. England*, 183 F.Supp.2d 31, 48 (D.D.C. 2002) (quoting *Larson v. Valente*, 456 U.S. 228, 246-47 (1982)).  This has been bedrock constitutional law for decades. *See, e.g., Epperson v. Arkansas*, 393 U.S. 97, 98 (1968) ("The First Amendment mandates governmental neutrality between religion and religion . . . . The State may not aid or oppose any religion . . . . ***This prohibition is absolute***.") (emphasis added) (citations omitted).

The Policy violates the Establishment Clause by defining the contours of the Hindu religion as including a caste system, characterized as a racist and inhumane system of discrimination and violence against others, and treats it differently than other religions. *See* Dkt. 80 at ¶ 57.  Where, as here, government policy favors one

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

14

religion over another, it is treated "as suspect and [the Court must] apply strict scrutiny in adjudging its constitutionality." *Larson*, 456 U.S. at 246. CSU's argument that the Policy is neutral toward religion necessarily fails and it therefore cannot survive strict scrutiny.

Caste inherently implicates religion because it is defined primarily as "one of the hereditary social classes in Hinduism that restrict the occupation of their members and their association with members of other castes." *See Merriam-Webster*, https://www.merriam-webster.com/dictionary/caste. In fact, the purported interplay between caste and Hinduism is widely recognized, ***including in literature upon which CSU relies***. *See* Dkt. 87-32 at 69, Ex. 30(i) (Simon Article) (recognizing history is "rife with 'natural' hierarchies that have their own ***often religious*** justifications" and introducing the caste system to readers as "an ancient organization ***of the Hindu*** that involves the division of the ***Hindu society*** into five groups called castes."); *see also* Guha Krishnamurthi & Charanya Krishnaswami, Title VII & Caste Discrimination, 134 Harv. L. Rev. 456, 462 (2021) ("the caste system is rooted in Hinduism"). CSU therefore cannot regulate caste discrimination without implicating religious considerations. And, because caste is defined (at least in part) as a hereditary class within Hinduism, the Policy prohibiting caste discrimination cannot be neutral toward religion. CSU could easily avoid any implication of religious discrimination, while wholly preserving a potentially laudable intent, by substituting for "caste" the religiously neutral terms of "class" or "social status."

CSU's reliance upon *Torlakson* to defeat this argument is misplaced. *Torlakson* addressed whether the California public school curriculum discriminated against Hindus based upon its focus on, and lessons about, the caste system. *California Parents for Equalization of Educational Materials v. Torlakson*, 973 F.3d 1010, 1014-15 (9th Cir. 2020). Here, CSU desires not to teach about the origins of

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

15

caste, but rather seeks to define the contours of Hinduism and subject CSU students, faculty and staff to punishment based upon what it perceives to be discrimination.

On the other hand, assuming caste is inextricably linked with Hinduism, the Policy can be viewed as impermissibly imposing unique burdens on members of the Hindu faith. But "the Establishment Clause means at least this: Neither a state nor the Federal Government … can pass laws which aid one religion, aid all religions, or prefer one religion over another." *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 15 (1947). No decision by any court anywhere has declared any religion inherently discriminatory such that unique laws may be enacted against its followers to prohibit discrimination that goes above and beyond the anti-discrimination policies that apply to all citizens with respect to protected classes.

No matter the angle, the Policy delves impermissibly into aspects of religious practice because it extends specialized treatment based upon caste. The purpose of the Establishment Clause is to prevent "intrusion of either [the church or the state] into the precincts of the other." *Lynch v. Donnelly*, 465 U.S. 668, 672 (1984) (alteration in original) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971), *overruled on other grounds by Kennedy v. Bremerton School Dist.*, 142 S. Ct. 2407 (2022)). CSU's Policy does the opposite. Accordingly, it cannot pass strict scrutiny as explained above. Therefore, the Motion should be denied and judgment entered in favor of Plaintiffs.

### E.    The Policy Violates the Free Exercise Clause.

Concerning its Free Exercise Clause argument, CSU argues, on one hand that, the Court should not consider statements made by the CSSA and the CFA, but on the other hand acknowledges that the addition of "caste" in the Policy was made "after students and faculty raised concerns about caste discrimination." *Compare* Dkt. 90 at 1 with *id.* at 12-13. CSU cannot have it both ways. The Free Exercise Clause

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

16

prohibits the government from defining any religion.  That is what the Policy does by identifying "caste" as a prohibited class.  CSU's after-the-fact remedial efforts to now define "caste" otherwise fails.

In assessing whether a government action violates the Free Exercise Clause, courts begin by "evaluat[ing] the object of the law." *Tingley v. Ferguson*, 47 F.4th 1055, 1085 (9th Cir. 2022).  "If the purpose of the law is to restrict practices *because* of the religious motivations of those performing the practices, the law is not neutral." *Id.* (emphasis in original). "The next step in evaluating a law for neutrality is to examine the text of the law to determine if it is neutral on its face." *Id.* (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).  A law is not neutral if it "refers to a religious practice without a secular meaning discernable from the language or context." *Id.* (quoting *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 533).

Courts also consider the "circumstances of the law's enactment, including the historical background, precipitating events, and legislative history." *Id.*  Finally, courts "consider the real-world operation of a law to determine if it is neutral." *Id.* (recognizing that "In *Church of the Lukumi*, a city's ordinance against animal sacrifices contained so many exemptions that in practice, the city effectively accomplished a 'religious gerrymander'").

Without a definition in the Policy, and relying on the dictionary and how California and CFA has defined it (Dkt. 80 at ¶¶ 37-38), caste as contained in the Policy is a component of the Hindu religion.  Thus, CSU's inclusion of caste as a "Protected Status" cannot be facially neutral because it specifically refers to what California and the dictionary claim is a religious practice of Hinduism.  *Id.*; *see also Kennedy*, 142 S.Ct. at 2422 (policy "is specifically directed at a religious practice."). Despite the fact that this characterization is false, the Policy burdens Plaintiffs'

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

17

sincere religious practice by falsely associating derogatory and demeaning conduct with only the Hindu religion, exposing Plaintiffs' sincere religious beliefs to public ridicule.  The Policy therefore must pass strict scrutiny to survive.

Courts have rarely, if ever, upheld violations of a plaintiff's Free Exercise rights when applying the strict scrutiny test.  *See, e.g., Lukumi*, 508 U.S. at 546 (finding that a "law that targets religious conduct . . . will survive strict scrutiny only in rare cases.").  To survive strict scrutiny, the government must demonstrate "its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest."  *Kennedy*, 142 S.Ct. at 2422 (citing *Lukumi* 508 U.S. at 546).

Even if the Court deems the inclusion of caste in the Policy serves a compelling interest, it is not narrowly tailored to meet that interest.  To the contrary, the CSSA Resolution relied on by CSU in promulgating the Policy notes that the Policy would protect against discrimination based on caste *without* the explicit addition of that term because such discrimination is already subsumed by the general and neutral terms – like ancestry, national origin, and ethnicity.  *See* Dkt. 1-1 at Ex. E, pp. 118-119.  Thus, CSU can accomplish the goal of guarding against such discriminatory conduct without imposing a chilling effect on the free exercise rights of CSU's Hindu employees, professors, and students.  Or the Policy could have used neutral and generally ***defined*** terms to achieve the goal of addressing discrimination based on social or economic status.  But, CSU chose not to do this.  Instead, the inclusion of caste crosses the line of what is permissible under the Religion Clauses.

Because the Policy is not narrowly tailored, it cannot survive strict scrutiny.  *See, e.g. Lukumi*, 508 U.S. at 546 (internal citation marks and alterations omitted) ("[A] law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests.  The compelling interest

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

18

standard that we apply once a law fails to meet the *Smith* requirements is not watered down but really means what it says.").

The Supreme Court's decision in *Lukumi* demonstrates why CSU's Policy fails here. In that case, the Court concluded that the laws at issue – multiple ordinances prohibiting the "ritual" of animal "sacrifice" – were neither neutral nor generally applicable, where "almost the only conduct subject to the [ordinances involved] the religious exercises of Santeria church members." *Lukumi*, 508 U.S. at 534–36. One of the ordinances exempted "almost all killings of animals except for religious sacrifice, and the primary purpose requirement narrow[ed] the proscribed category even further . . . by exempting kosher slaughter[.]" *Id.* at 536. A second ordinance – punishing anyone who unnecessarily killed an animal – declared killings for religious reasons unnecessary but deemed most other killings to fall outside of the prohibition. *Id.* at 537. Accordingly, strict scrutiny applied, and the ordinances were held to be unconstitutional. *Id.* at 546–47.

Unlike the Policy, the ordinances in *Lukumi* did not reference a specific religious practice; rather, it generally proscribed something that could only be applicable to the plaintiff. The Policy at issue here, however, is more specific – and thus more constitutionally egregious: it identifies a specific practice (caste discrimination) that the State of California and the CFA claim is associated with the Hindu religion and India (or South Asia). Dkt. 80 at ¶¶ 37-38.

Looking to the factors the Supreme Court articulated in *Mastercake* confirms that the Policy is neither neutral nor generally applicable. As with the prohibition at issue in *Mastercake*, the historical background underlying the Policy and the contemporaneous comments made by the CFA – *i.e.*, "[c]aste is present in the ***Hindu*** religion and ***common in communities in South Asia and the South Asian Diaspora*** …." – demonstrate that CSU applies the term only to the Hindu religion and people

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

19

of Indian/South Asian origin. *See* Dkt. 80 at ¶ 38 (emphasis added); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (churches showed likelihood of success on the merits on claim for preliminary injunction where statements made in connection with the rules for attending religious services during the Covid-19 pandemic could be seen as targeting the Orthodox Jewish community). This is confirmed by the dictionary definition of caste and the lack of definition in the Policy – it can only be associated with Hinduism and people from India and South Asia.

Such an impermissible singling out of just one religion fails to satisfy the strict scrutiny test particularly where, as here, CSU has multiple other alternatives to combat perceived discrimination on CSU campuses. *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 66.

## IV.  **CONCLUSION**

For all of the reasons set forth herein, CSU's Motion for Judgment on the Pleadings should be denied, Plaintiffs' Cross Motion granted, and judgment should be entered for Plaintiffs.

Dated: May 26, 2023                Respectfully submitted,


                                   */s/ John Shaeffer*
                                   **FOX ROTHSCHILD, LLP**
                                   John Shaffer, Esq. (SBN 138331)
                                   Michael Twersky, Esq. (*pro hac vice*)
                                   Beth Weisser, Esq. (*pro hac vice*)
                                   Erika Page, Esq. (*pro hac vice*)

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

20

**CERTIFICATION OF WORD COUNT COMPLIANCE**

The undersigned, counsel of record for Plaintiffs Sunil Kumar, Ph. D. and Praveen Sinha, Ph. D., certifies that this brief does not exceed 20 double-spaced pages pursuant to Judge Klausner's Standing Order of January 2020, and further certifies that this brief consists of 6,124 words as determined by Microsoft Word's word count, which complies with the word limit of L.R. 11-6.1.

Dated: May 26, 2023                    **FOX ROTHSCHILD, LLP**

                                       */s/ John Shaeffer*
                                       Jon Shaffer, Esq. (SBN 138331)

                                       *Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
PLAINTIFFS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

21