JOHN J. SHAEFFER (SBN 138331)
 jshaeffer@FoxRothschild.com
FOX ROTHSCHILD LLP
Constellation Place
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone:  310.598.4150
Facsimile:   310.556.9828

MICHAEL K. TWERSKY (*pro hac vice*)
 mtwersky@foxrothschild.com
BETH L. WEISSER (*pro hac vice*)
 bweisser@foxrothshchild.com
ERIKA PAGE (*pro hac vice*)
 epage@foxrothschild.com
ALBERTO M. LONGO (*pro hac vice*)
 alongo@foxrothschild.com
FOX ROTHSCHILD, LLP
980 Jolly Road, Suite 110
Blue Bell, PA 19422
Telephone:  610.397.6500
Facsimile:   610.397.0450

Attorneys for Plaintiffs
Sunil Kumar, Ph.D. and Praveen Sinha, Ph.D.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNIL KUMAR, Ph. D<br>PRAVEEN SINHA, Ph. D.,<br><br>Plaintiffs,<br><br>v.<br><br>DR. JOLENE KOESTER, in her official capacity as Chancellor of California State University,<br><br>Defendant. | Case No. 2:22-CV-07550-RGK-MAA<br><br>**PLAINTIFFS' OPENING BRIEF**<br><br>Judge:   R. Gary Klausner<br>Trial:   October 24, 2023<br>(on the briefs) |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   PROCEDURAL BACKGROUND ............................................................ 2

III.  FACTUAL BACKGROUND .................................................................... 3

IV.   LEGAL STANDARD ............................................................................... 8

V.    LEGAL ARGUMENT .............................................................................. 8

    A.    The Policy is Unconstitutionally Vague As A Matter of Law .............. 8

    B.    The Policy Violates the Establishment Clause. ................................... 11

VI.   CONCLUSION AND RELIEF REQUESTED ......................................... 17

CERTIFICATION OF WORD COUNT COMPLIANCE ..................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................... 8

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ...................................................... 13, 14, 15, 16

*Commack Self-Service Kosher Meats, Inc. v. Weiss*,
295 F.3d 415 (2002) ................................................................... 15, 16

*Connally v. General Const. Co.*,
269 U.S. 385 (1926) ............................................................................... 9

*Everson v. Board of Education*,
330 U.S. 1 (1947) ............................................................................... 12

*First Nat'l Bank of Arizona v. Cities Serv. Co.*,
391 U.S. 253 (1968) ............................................................................... 8

*Foti v. City of Menlo Park*,
146 F.3d 629 (9th Cir. 1998) ............................................................. 9

*Gillette v. U.S.*,
401 U.S. 437 (1971) ............................................................................. 13

*Humanitarian Law Project v. U.S. Dept. of Treasury*,
463 F. Supp. 2d 1049 (C.D. Ca. 2006) ......................................... 9, 11

*Johnson v. Poway Unified Sch. Dist.*,
658 F.3d 954 (9th Cir. 2011) ........................................................... 11

*Johnson v. United States*,
576 U.S. 591 (2015) ............................................................................. 8

*Kashem v. Barr*,
941 F.3d 358 (9th Cir. 2019) ............................................................. 8

*Kennedy v. Bremerton Sch. Dist.*
142 S. Ct. 2407 (2022) ....................................................................... 11

*Kolender v. Lawson*,
  461 U.S. 352 (1983) ........................................................................................9

*Kolender v. Lawson*,
  462 U.S. 352 (1983) ........................................................................................9

*Larkin v. Grendel's Den, Inc.*,
  459 U.S. 116 (1982) ......................................................................................16

*Masterpiece Cakeshop Ltd. v. Colo. C.R. Comm'n*,
  138 S.Ct. 1719 (2018) ..................................................................................11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ........................................................................................8

*McCollum v. Bd. of Ed. of Sch. Dist. No. 71, Champaign County*,
  333 U.S. 203 (1948) ......................................................................................12

*McCreary Cnty., Ky. v. ACLU of Ky.*,
  545 U.S. 844 (2005) ......................................................................................11

*McGowan v. Maryland*,
  366 U.S. 420 (1961) ......................................................................................13

*Nunez v. City of San Diego*,
  114 F.3d 935 (9th Cir. 1997) ..........................................................................9

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Bull Mem'l
  Presbyterian Church*,
  393 U.S. 440 (1969) ......................................................................................16

*Regents of the Univ. of California v. Bakke*,
  438 U.S. 265 (1978) ......................................................................................17

*Sch. Dist. of Abington Tp., Pa. v. Schempp*,
  374 U.S. 203 (1963) ..........................................................................12, 13, 17

*Torasco v. Watkins*,
  367 U.S. 488 (1961) ......................................................................................12

*Town of Greece v. Galloway*,
  572 U.S. 565 (2014) ......................................................................................11

*United States v. Wunsch*,
   84 F.3d 1110 (9th Cir. 1996) .................................................................. 9

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ............................................................................... 9

*Walz v. Tax Commission*,
   397 U.S. 664 (1970) ............................................................................. 13

*Zorach v. Clauson*,
   303 U.S. 306 (1952) ...................................................................... 12, 13

**Federal Statutes**

42 U.S.C. § 1983 ............................................................................................. 13


**Other Authorities**

Fed. R. Civ. P. 56(c) ....................................................................................... 8

L.A. Times (Jan. 20, 2022)
   https://www.latimes.com/california/story/2022-02-20/csu-adds-
   caste-to-its-anti-discrimination-policy ................................................ 7

*Merriam-Webster*, https://www.merriam-webster.com/dictionary/caste ............. 3, 6

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

Pursuant to August 2, 2023, Order of the Court (ECF No. 105), Plaintiffs Sunil Kumar and Praveen Sinha ("Plaintiffs") submit the following Trial Brief for the Court's consideration:

## I.  <u>INTRODUCTION</u>

In January 2022, the California State University ("CSU") added to its Nondiscrimination Policy (the "Policy") the term "caste" – a term it admits is subject to multiple definitions and often (albeit erroneously) associated with the Hindu religion and people of Indian and South Asian origin.  Rather than defining the term (as it has for dozens of other terms in the Policy), CSU did the opposite, leaving CSU faculty, staff, and students guessing as to what caste is and how it applies under the Policy.

CSU now takes the position that caste is a system of social stratification based upon inherited status that is linked to race or ethnicity.  That definition (revealed for the first time during the deposition of CSU's designee, Laura Anson) is ***nowhere*** to be found in the Policy or anywhere on CSU's website.  Indeed, CSU admits that the term was left purposely undefined and unpublished to the CSU community.  And while it is entirely unclear what CSU means by a "system of social stratification based upon inherited status and linked to race or ethnicity", it ***is*** clear that CSU, in amending the Policy, admittedly relied upon input from stakeholders who were concerned about caste solely in the context of Hinduism and South Asians.  Specifically, the California Faculty Association ("CFA") and California State Student Association ("CSSA") each passed Resolutions in which they erroneously and improperly tie an oppressive caste system to the Hindu religion.

While CSU may claim that those organizations do not speak for CSU, it cannot escape the reality that they comprise the stakeholders upon which CSU relied in

adding caste to the Policy. In fact, CSU points to no other reason for the inclusion of caste in the Policy other than input from those stakeholders. Nor does CSU identify any other religion or nationality treated the way the Policy treats Hindus and South Asians. For all of these reasons, as explained herein, the Policy violates the First, Fifth, and Fourteenth Amendments to the United States Constitution (and corollary amendments to the California Constitution).

## II.   **PROCEDURAL BACKGROUND**

On January 1, 2022, CSU implemented the amended Policy, which added (among other things) "caste" as a Protected Status to its anti-discrimination prohibitions. *See* First Am. Compl. ("FAC") [Dkt. 80] at ¶ 1; Ex. A, Policy at pp. 1-2, Art. II (A).[1] The Policy prohibits "[d]iscrimination based on any Protected Status, *i.e.*, Age, Disability (physical and mental), Gender (or sex, including sex stereotyping), Gender Identity (including transgender), Gender Expression, Genetic Information, Marital Status, Medical Condition, Nationality, Race or Ethnicity (including color, ***caste***, or ancestry), Religion (or religious creed), Sexual Orientation, and Veteran or Military Status." *Id.* (emphasis added).

Plaintiffs, professors at CSU, filed this action asserting a facial challenge to the constitutionality of the Policy. *See* FAC [Dkt. 80]. They allege that the Policy violates the First, Fifth, and Fourteenth Amendments to the United States Constitution, as well as provisions of the California Constitution, and seek declaratory judgment and other relief. *Id.* Plaintiffs asserted claims for Declaratory Judgment (Claim One); violation of the First Amendment Free Exercise and California Constitution's No Preference Claims (Claims Two and Four); violation of the First Amendment and California Constitution Establishment Clause (Claims Three and Four); violations of the Equal Protection Clause of the Fourteenth

---

[1] Citations to "Ex." herein refer to exhibits to the Declaration of Alberto M. Longo filed contemporaneously with this brief.

Amendment and California Constitution (Claims Five and Six); and violation of the Fourteenth Amendment Due Process Clause (Claims Seven and Eight). *Id.* at ¶¶ 64 – 138. Plaintiffs also allege that CSU implemented the Policy based, in part, on Resolutions passed by the CFA and CSSA. *Id.* at ¶ 38.

Defendant, CSU's Chancellor, filed an Answer and Motion for Judgment on the Pleadings (the "Motion") denying that the Policy violates either the United States or California Constitutions. CSU argues that "caste," as used in the Policy, is based on "'**Race or Ethnicity** [and] **includes** ancestry, color, **caste**, ethnic group identification, and ethnic background.'" Motion [Dkt. 90] at p. 5 (emphasis added) (quoting Policy at p. 16, Art. VII(A)(20)). CSU denies that caste is "coextensive with Hinduism or any other religion," notwithstanding the dictionary definition of caste, which directly ties caste to the Hindu religion. *Id.* at p. 3; *Merriam-Webster*, https://www.merriam-webster.com/dictionary/caste.

Plaintiffs opposed the Motion (*see generally*, Pltfs' Opp. to Motion [Dkt. 91]), and on July 25, 2023, the Court granted in part, and denied in part, Defendant's Motion for Judgment on the Pleadings. *See* Civil Minutes [Dkt. 102] at p. 8. Specifically, the Court dismissed Plaintiffs' federal and state Equal Protection (Counts Five and Six) and Free Exercise claims (Claims Two and Four). *Id.* The Court denied the Motion as to all other claims, leaving Plaintiffs' Establishment Clause and Due Process claims intact, and finding that Plaintiffs possess standing to assert those claims. *Id.* at pp. 5-8.

III.   **FACTUAL BACKGROUND**

Following the Court's decision, the parties engaged in discovery, including deposing Defendant's designee, Laura Anson, on August 4, 2023.[2] Ms. Anson

---

[2] Ms. Anson serves as Senior System Director from DHR Whistleblower Equal Opportunity Compliance Services for CSU. *See* Ex. B, selected pages from Deposition of Laura Anson ("Anson Tr.") at 77:13-16. She was identified as

testified that the decision to add caste to the Policy was made by a "working group" of approximately eight CSU administrators.  Ex. B, Anson Tr. at 19:22 to 20:1; 23:9 to 24:11.  Those administrators met privately, not in a public setting, without anyone outside the working group permitted to participate in their deliberations.[3]  *Id.* at 26:16 to 27:10.

The working group specifically relied on information from CSSA and CFA in concluding that "caste discrimination was a real thing."  *Id.* at 35:21-22.  Ms. Anson further admitted that the working group was aware of the CSSA and CFA Resolutions that unequivocally tie caste to the Hindu religion, and that the working group "reached out to th[e CSSA] … before putting the Policy in effect …."  *Id.* at 55:2-5 (alteration added).

The CFA Resolution provides that "Caste is present in the Hindu religion and common in communities in South Asia and in the South Asian Diaspora."  Ex. C, CFA Resolution at p. 1.  The CFA Resolution identifies "four main caste groups: Brahmins, Kshatriyas, Vaishyas, and Shudras," and a group outside of the four called Dalits.  *Id.*  The CSSA Resolution identifies those same "four main caste groups" and notes that "Caste is a structure of oppression … based in birth that determines social status and assigns 'spiritual purity'…."  Ex. D, CSSA Resolution at p. 1.  Ms. Anson also noted that CSU was aware of an additional Resolution from the Cal Poly ASI Board of Directors (which is part of the CSU community) stating essentially the same – that there are "four main caste groups" as well as a group outside the caste system known as Dalits. Ex. B, Anson Tr. at 53:5-12; Ex. E, California Polytechnic State University Resolution ("Cal Poly Resolution") at p. 1.

---

Defendant's designee, and Defendant agreed to be bound by Ms. Anson's testimony. *Id.* at 11:21-25; 12:1-4.

[3]  In fact, Defendant takes that position that because the working group contained two CSU lawyers, the minutes to their meetings are privileged and were not produced to Plaintiffs.  *See* Ex. B, Anson Tr. at 26:21 to 27:10.

The CFA Resolution expressly ties caste to the Hindu religion and South Asians.  And while the CSSA and Cal Poly Resolutions do not specifically mention Hindus, the "four main castes" referenced are part of a "Hindu tradition" called "varna".  Ex. F, selected pages from deposition of Praveen Sinha ("Sinha Tr.") at 45:2-4.  Varna, a Sanskrit word, is not an oppressive caste system as the Resolutions claim; to the contrary, it is based on occupation or social function, and people are not tied to any one varna for life.  *Id.* at 45:2-4; 88:14-22; 111:16-21.  Thus, varna (and the related term jati) is not immutable like race or ethnicity.  In fact, Plaintiffs hold the sincere religious beliefs that there is no oppressive caste system in the Hindu religion, but the varna and jati system that is part of Hinduism "have been misrepresented in the form of caste.  And now there are multiple stereotypes for people because of it."  *Id.* at 44:14-16; *see also* FAC at ¶¶ 18, 19.  Regardless, however, CSU is not constitutionally permitted to define the contours of the Hindu religion to include a caste system.

The "four main castes" that CFA, CSSA and Cal Poly reference in their Resolutions and which CSU relied on in amending the Policy are not generic "castes" meant to apply to any "caste" in any part of the world.  Quite the opposite – they are varna that is part of Hindu tradition and thus improperly tied exclusively to the Hindu religion.  Even CSU's designee admitted that these Resolutions identified the "historic castes found in India and South Asia" and not anywhere else.  Ex. B, Anson Tr. at 53:10-24.

The Policy does not define caste even though CSU admits that "there is no one universally accepted definition of caste."  *Id.* at 38:16-17; 98:13-20.  CSU also admits that its newly proffered definition of caste – "a system of social stratification or ranking based on inherited status and linked to race or ethnicity" – is not defined in

the Policy and cannot be found anywhere in CSU's system. [4]  *Id.* at 29:22-25; 32:8-20.  It also is not one of the dictionary definitions of caste.  *See Merriam-Webster*, https://www.merriam-webster.com/dictionary/caste.

Even when CSU sought to educate its community as to the definition of caste, it was unable to do so.  For example, CSU produced a "Q&A" for the inclusion of caste in the Policy.  The very first question and answer demonstrates that CSU itself cannot define the term:

> **Q1:  What does "caste" mean or how is it defined in the CSU's discrimination policy?**
>
> A1:  While caste protections were inherently included in previous CSU non-discrimination policies, the decision to specifically name caste in the [Policy] reflects the university's commitment to inclusivity and respect, making certain each and every one of our 23 CSU campuses today … and always … is a place of access, opportunity and equity for all.

Ex. G, "Q&A" (CSU000009) (omissions in original and alteration added).

It is difficult to imagine a more evasive response to a simple question (drafted by CSU) asking for a definition.  CSU admits that the Q&A "doesn't directly answer" the question of "what does caste mean."  Ex. B, Anson Tr. at 42:10-15.

Many other terms in the Policy were defined, including terms that are contained in parenthesis (like caste) that supposedly modify other terms.  *Id.* at 34:5-25; 38-39.  But not caste.  Instead of defining a term that Defendant admits is subject to numerous definitions, CSU elected not to tell anyone in its community what it meant so they could better understand the Policy.  *Id.* at 32:13-20.  And it is clear that

---

[4] The definition proffered by Ms. Anson is different that the one offered by Defendant in the Motion for Judgment on the Pleadings.  That definition was found in an academic journal that Ms. Anson had never heard of (Ex. B, Anson Tr. at 101:11-14), thus demonstrating that it was not the definition CSU had in mind when the Policy became effective on January 1, 2022.

the CSU community does not know what caste means.  Ex. H, Jan. 18, 2022 Equality Labs Press Release at p. 2 (quoting Prof. Dr. Sarah Taylor, Chair, Dept. of Social Work, CSU East Bay that "[f]or many of us, caste is not yet part of our regular lexicon, but it needs to be."); *see also* Ex. I, Nani Walker, *Cal. System Adds Caste to Anti-Discrimination Policy in Groundbreaking Decision*, L.A. Times (Jan. 20, 2022) https://www.latimes.com/california/story/2022-02-20/csu-adds-caste-to-its-anti-discrimination-policy (noting that for "most South-Asians, caste practice in the U.S. is a faraway and foreign concept").

Equally troubling are CSU's admissions that (a) it had no working definition of caste as used in the Policy – notwithstanding a February 14, 2022 email in which CSU acknowledges multiple definitions of caste discussed in the CSU working group (Anson Tr. at 23:9 to 24:11; 96:14 to 97:12); (b) it did not do anything to learn whether its community understood the term caste (*id.* at 104:9-14); and (c) the students and faculty who raised concerns about caste "may have had different understandings" of the definition of caste. *Id.* at 104:15-18.  Curiously, Ms. Anson's February 14, 2022 email asks "where the definition of caste is that we were discussing in the workgroup back in December" and further confirms that CSU considered (and rejected) several definitions, "although [they] ultimately decided not to include a definition in the policy." *Id.* at 96:14 to 97:12 (alteration added); Ex. J email dated February 14, 2022 (CSU000936-000937).  One of those definitions considered (and rejected) by the working group ironically is the first (and primary) definition of the Merriam Webster definition of caste.  Anson Tr. at 100:10-20. *See also id.* at 72:23 to 73:1 (defining caste as "[o]ne of the hereditary social classes in Hinduism that restricted the occupation of their members and their association with members of other castes") (alteration added).

## IV.    LEGAL STANDARD

This Court should apply the standard for summary judgment given the procedural posture of this case.   Summary Judgment is appropriate where the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co*., 391 U.S. 253, 289 (1968)).

Further, Plaintiff has proven by a preponderance of the evidence that (1) the term caste is unconstitutionally vague and (2) its inclusion in the Policy violates the Establishment Clause.  Accordingly, the Court should grant judgment in Plaintiffs' favor and against Defendant.

## V.    LEGAL ARGUMENT

This action following the Court's decision on Defendant's Motion for Judgment on the Pleadings presents two issues for the Court's consideration:  (A) whether inclusion of the term caste in CSU's Policy renders the Policy unconstitutionally vague under the Fourteenth Amendment Due Process Clause; and (B) whether inclusion of the term caste in CSU's Policy violates the Establishment Clauses of the United States and California Constitutions.

### A.    The Policy is Unconstitutionally Vague As A Matter of Law

A law or government policy "is unconstitutionally vague when it 'fails to give ordinary people fair notice of the conduct it punishes.'"  *Kashem v. Barr*, 941 F.3d 358, 365 (9th Cir. 2019) (quoting *Johnson v. United States*, 576 U.S. 591, 595-96 (2015)).  A challenge to any such government law or policy "based on vagueness grounds requires the court to consider whether [it] is 'sufficiently clear so as not to

cause persons of common intelligence . . . [to] guess at its meaning and [to] differ as to its application.'" *Humanitarian Law Project v. U.S. Dept. of Treasury*, 463 F. Supp. 2d 1049, 1057 (C.D. Ca. 2006) (alterations added and in original) (quoting *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996)); *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926).

Policies like the one at issue here are deemed void for three reasons: "(1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Humanitarian Law Project*, 463 F. Supp. 2d (quoting *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998)). Where as here, a policy "inhibit[s] the exercise of constitutionally protected rights" a "more stringent vagueness test should apply." *Id.* (alteration added) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)).

To avoid "unconstitutional vagueness," a governmental policy must be defined with "sufficient definiteness" such that ordinary people can understand what is prohibited and the standards for non-arbitrary and non-discriminatory enforcement. *Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). To that end, courts have not hesitated to find laws unconstitutionally vague in (and beyond) the Ninth Circuit. *See, e.g.*, *Kolender v. Lawson*, 462 U.S. 352, 357 (1983) (holding unconstitutionally vague a law requiring that individuals show "credible and reliable" identification); *Humanitarian Law Project*, 463 F. Supp. 2d at 1073 (finding executive order vague on its face where it delegated authority to the Secretary of Treasury without any explanation of criteria used); *Foti*, 146 F.3d at 639 (holding as unconstitutionally vague law prohibiting posting of signs on vehicles that were "parked to attract attention").

CSU's Policy is unconstitutionally vague because no one – not even CSU – knows what the definition of caste is or how it applies at CSU.  This is confirmed by CSU's admission that "there is no universally accepted definition of caste."  Ex. B, Anson Tr. at 38:16-20.  CSU's own lack of understanding of the term caste is further confirmed by its attempt to define it (for the first time) during Ms. Anson's deposition.  When asked whether "caste is related to social status[,]" Ms. Anson responded "___No.___ I mean, caste is -- my understanding of caste is that it's a system of ___social stratification___ or ranking based on inherited status and linked to race and ethnicity."  *Id*. at 29:19-25 (emphasis added).[5]

Notwithstanding that CSU's proffered definition is itself entirely vague and unclear, Ms. Anson further testified that a working group of CSU administrators in a Zoom meeting came up with the Policy's definition of caste that would govern the entire CSU community – but told no one – declining to publish ***any*** definition to the student body, faculty or staff.  *Id*. at 96:14 to 97:12.  When asked where CSU's definition of caste could be found, the following colloquy ensued:

> Ms. Anson:  It is not located, I'm just telling you what the CSU's general view of it is. It's not -- there is no definition of it in the policy. Caste was just used as a -- to illustrate another term, race and ethnicity.
>
> Counsel for Plaintiffs:  So there's nowhere in CSU that I can find that definition of caste or any definition of caste; is that what you're telling me?
>
> Ms. Anson:  That's what I'm telling you, yes.
>
> Counsel for Plaintiffs:  And you're aware that caste has other definitions, correct?

---

[5] Thus Defendant denies that caste is related to social status and then proceeds to define it as a system of social stratification.

1
2

> Ms. Anson:   Yeah, I think there is not one universally accepted definition of caste.

3  Anson Tr. at 32:13-24.

4       CSU thus elected to include, but not define in its Policy or publish a definition

5  to those required to adhere to it, a term that it acknowledges is susceptible to

6  numerous meanings.  Ms. Anson's deposition testimony confirms that no one – not

7  even CSU which is charged with enforcing the Policy – understands what caste is as

8  it relates to the Policy, prompting an immediate and imminent risk of subjective and

9  arbitrary enforcement.  *See Humanitarian Law Project*, 463 F. Supp. 2d at 1058

10 (recognizing that laws are declared void to prevent subjective enforcement based on

11 "arbitrary and discriminatory enforcement").  Accordingly, CSU's Policy –

12 undefined, unpublished, and ultimately unconstitutional – should be declared void as

13 a matter of law to the extent it includes the term caste.

14       **B.**   **The Policy Violates the Establishment Clause.**

15       The First Amendment *requires* that government "proceed in a manner neutral

16 toward and tolerant" of people's "religious beliefs."  *Masterpiece Cakeshop Ltd. v.*

17 *Colo. C.R. Comm'n*, 138 S.Ct. 1719, 1731 (2018).  Government neutrality is the

18 touchstone of the First Amendment's Establishment Clause – "neutrality between

19 religion and religion, and between religion and nonreligion.'"  *Johnson v. Poway*

20 *Unified Sch. Dist.*, 658 F.3d 954, 971 (9th Cir. 2011) (quoting *McCreary Cnty., Ky.*

21 *v. ACLU of Ky.*, 545 U.S. 844, 860 (2005)).

22       The Supreme Court reiterated in *Kennedy v. Bremerton Sch. Dist.* that "the

23 Establishment Clause must be interpreted by 'reference to historical practices and

24 understandings.'"  142 S. Ct. 2407, 2428 (2022) (quoting *Town of Greece v.*

25 *Galloway*, 572 U.S. 565 (2014)).  "[T]he line that courts and governments 'must draw

26 between permissible and the impermissible' has to 'accor[d] with history and

27 faithfully reflec[t] the understanding of the Founding Fathers.'"  *Id.* (alterations in

28

original) (quoting *Town of Greece*, 572 U.S. at 577); *Sch. Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 294 (1963) (same) (Brennan, J., concurring).   The Supreme Court has stressed that an "analysis focused on original meaning and history . . . has long represented the rule rather than some 'exception' within the 'Court's Establishment Clause jurisprudence.'" *Kennedy*, 142 S. Ct. at 2428 (quoting *Town of Greece*, 572 U.S. at 575); *Torasco v. Watkins*, 367 U.S. 488, 492-93 (1961) (discussing the importance of the "documented history behind the First Amendment").

Historical practices and understandings of the Establishment Clause confirm that the First Amendment "requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State Power is no more to be used so as to handicap religions, than it is to favor them." *Schempp*, 374 U.S. at 218 (citing *Everson v. Board of Education*, 330 U.S. 1, 18 (1947)); *see also Everson*, 330 U.S. at 15-16 (recognizing a law may not, among other things, "force [a person] to profess a belief or disbelief in any religion" or permit the government from "openly or secretly[] participat[ing] in the affairs of any religious organizations or groups and vice versa") (alterations added).   Nor may the government become "embroiled, however innocently, in the destructive religious conflicts of which the history of even this country records some dark pages." *Schempp*, 374 U.S. at 219 (quoting *McCollum v. Bd. of Ed. of Sch. Dist. No. 71, Champaign County*, 333 U.S. 203, 229 (1948) (Frankfurter, J., concurring).

It is thus binding precedent that separation between state actors and religion is a "a requirement to abstain from fusing functions of Government and of religious sects, not merely to treat them all equally." *Id.*  Since at least 1952 with its decision in *Zorach v. Clauson*, the Supreme Court has embraced the principle that "[t]here cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated." *Schempp*, 374 U.S. at 219 (quoting *Zorach*

*v. Clauson*, 303 U.S. 306, 312 (1952)).   That "separation must be complete and unequivocal" and the "First Amendment permits no exception; the prohibition is absolute." *Id.* at 220 (citing *Zorach*, 303 U.S. at 312).   These principles are especially profound in the education setting.   *See Schempp*, 347 U.S. at 252 (Brennan, J., concurring).   In that setting, the Supreme Court "has given the Amendment a 'broad interpretation in light of its history and the evils it was designed forever to suppress.'" *Schempp*, 374 U.S. at 220 (quoting *McGowan v. Maryland*, 366 U.S. 420, 442 (1961)).

CSU attempts to save its Policy from Establishment Clause violation by claiming that it is "religion neutral" because it does not "link [caste] to any particular religion." Ex. B, Anson Tr. at 50:1-3; 73:9-11 (alteration added).   But a law does not *per se* comply with the Establishment Clause merely because it appears facially neutral.   *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).  To the contrary, "the Establishment Clause [] extends beyond facial discrimination." *Id.* "The question of government neutrality is not concluded by the observation that [a law] on its face makes no discrimination between religions, for the Establishment Clause forbids subtle departures from neutral . . . as well as obvious abuses." *Gillette v. U.S.*, 401 U.S. 437, 451 (1971) (citing *Walz v. Tax Commission*, 397 U.S. 664, 696 (1970) (Harlan, J., Concurring)).   *Lukumi* illustrates the point and should guide the Court's analysis here.

In *Lukumi*, a church practicing the Santeria religion brought an action under 42 U.S.C. § 1983 alleging various violations of its First Amendment rights after the City of Hialeah, Florida issued several enactments addressing the ritual slaughter of animals, including Resolution 87-66, which "noted the 'concern' expressed by residents of the city 'that certain religions may propose to engage in practices which are inconsistent with public morals, peace or safety,' and declared that '[t]he City reiterates its commitment to a prohibition against any and all acts of any and all

religious groups which are inconsistent with public morals, peace or safety.'" 508 U.S. at 526.

The city also approved an emergency ordinance, Ordinance 87-40, which incorporated Florida's animal cruelty laws. *Id.* After the attorney general determined that the "ritual sacrifice of animals for purposes other than food consumption" was not a "necessary" killing, and therefore prohibited by Florida law, the city enacted Resolution 87-90, which "noted its residents' 'great concern regarding the possibility of public ritualistic animal sacrifices' and the state-law prohibition." *Id.* at 527. The resolution further declared the city policy "to oppose the ritual sacrifices of animals" in the city and indicated that "any person or organization practicing animal sacrifice 'will be prosecuted.'" *Id.* The city thereafter adopted three additional ordinances specifically addressing religious animal sacrifice. *Id.* at 527-28.

In evaluating whether the city's actions violated the First Amendment, the Court focused on the underlying purpose of the laws and examined the record in concluding that the ordinance targeted the Santeria religion. *Id.* at 534. The Court reached its decision *even though the ordinances were facially neutral*, explaining that while "use of the words 'sacrifice' and 'ritual' does not compel a finding of improper targeting of the Santeria religion, the choice of these words is support for our conclusion." *Id.* The Supreme Court also relied upon the city's resolutions, explaining that Resolution 87-66 recited the concerns of city residents over certain religious practices. *Id.* Accordingly, the Court concluded that "[n]o one suggests, and on this record it cannot be maintained, that city officials had in mind a religion other than Santeria." *Id.* The same is true here with respect to caste and the Hindu religion.

First, the very inclusion of the term "caste" supports the conclusion that CSU intended to target Hindus. The dictionary – to which CSU referred Plaintiffs **and** the Court – specifically associates caste to Hinduism. *Merriam-Webster*,

https://www.merriam-webster.com/dictionary/caste. In fact, CSU admitted that it consulted Merriam Webster's Dictionary (among others) – which defines caste as a Hindu concept – although it declined to define caste in the Policy.  Ex. B, Anson Tr. at 72:23 to 73:15.  CSU even admitted that the dictionary is the "primary source" of learning the definition of a word.  *Id.* at 73:16-22.  CSU could have defined caste in the Policy to clear up any confusion as to its meaning, but it did not.  To the contrary, CSU admits "the Policy does not contain a definition of caste[,]" which was a decision the working group conclusively made (*id.* at 73:6-8).  Thus, those looking for clarification about the meaning of "caste" are left either guessing or looking to the dictionary for a definition, which brings it back to the Hindu religion.

Second, the purpose of CSU's inclusion of caste in its Policy can be gleaned from the underlying Resolutions upon which CSU relied.  Just as the defendant relied upon resolutions from its residents in *Lukumi*, CSU relied upon Resolutions from the CFA and CSSA – its stakeholders – in amending its Policy to include caste.  *Id.* at 35:21-22. Those resolutions specifically tie caste to Hinduism. Ex. C, CFA Resolution at p. 1; Ex. D, CSSA Resolution at p. 1.  The CFA does so ***expressly*** by describing caste as "a structure of oppression" that is "present in the Hindu religion and common in communities in South Asia and in the South Asian Diaspora."  Ex. C, CFA Resolution at p. 1.  The CSSA resolution (along with the CFA) does so by referring to the four classes, known as varna, which are expressly ***Hindu*** terms found in ***Hindu*** scripture and typically, but erroneously, thought to comprise an oppressive caste system.  Ex. D, CSSA Resolution at p. 1.  CSU offers no other reason for including caste in the Policy other than its stakeholders' Resolutions.

Under the First Amendment, the government may not take an official position on religious doctrine (*i.e.*, by asserting either directly or indirectly that Hinduism contains an oppressive caste system) without running afoul of the Establishment Clause.  In *Commack Self-Service Kosher Meats, Inc. v. Weiss*, 295 F.3d 415, 425

1   (2002), the Second Circuit considered whether defining the term "kosher" to mean

2   "prepared in accordance with orthodox religious requirements" violated the

3   Establishment Clause in the context of New York statutes addressing fraud in the

4   kosher food industry. *Id.* at 418.

5          The Second Circuit determined that the challenged laws violated the

6   Establishment Clause because they required the state to adopt an official position on

7   a key point of religious doctrine – that is, what it means to be kosher. *Id.* at 427.  The

8   court explained that "to assert that a food article does not conform to kosher

9   requirements, New York must take an official position as to what are the kosher

10  requirements," which "impermissibly 'weigh[s] the significance and the meaning of

11  disputed religious doctrine.'"  *Id.* (alteration in original) (quoting *Presbyterian

12  Church in the U.S. v. Mary Elizabeth Blue Bull Mem'l Presbyterian Church*, 393

13  U.S. 440, 452 (1969) (Harlan, J., concurring)).  The court further held the challenged

14  laws departed from the "core rationale underlying the Establishment Clause[, which]

15  is preventing a fusion of governmental and religious functions." *Id.* at 428 (alteration

16  in original) (quoting *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 126 (1982)).

17         Here, CSU took an official position as to what being Hindu means.  Relying

18  on its stakeholders, as the defendant in *Lukumi* relied on its residents, CSU advised

19  its community that the Hindu religion includes an oppressive caste system.  Thus, in

20  attempting to remediate concerns of its stakeholders, CSU takes the position that an

21  oppressive caste system is a Hindu belief and practice.  This is expressly prohibited

22  by the Establishment Clause.

23         CSU's Policy already protects against discrimination based on *inter alia*

24  nationality, race, and ethnicity (including color or ancestry) and religion.  Ex. A,

25  Policy at pp. 1-2, Art. II(A); Ex. B, Anson Tr. at 79:10-17; 105:5-8.  And CSU claims

26  that caste is part of (and therefore already protected by) CSU's policy governing race

27  or ethnicity.  Anson Tr. at 29:14-17.  Why, then, would CSU include caste in its

28

Policy if not to narrow the scope of the Policy's application – that is, to focus on the Hindu community where it (and its stakeholders) perceives this problem of "caste" to exist?

Seeking to end discrimination in any form is a laudable goal of government. No matter how worthy, however, the manner in which that goal is achieved cannot violate the rights of others. *See Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 310 (1978) ("[T]he purpose of helping certain groups . . . does not justify a classification that imposes disadvantages upon persons . . . who bear no responsibility for whatever harm the beneficiaries . . . are thought to have suffered.").

The First Amendment does not provide "that some forms of establishment are allowed; it says that 'no law respecting an establishment of religion' shall be made.'" *Schempp*, 374 U.S. at 229.  "What may not be done directly may not be done indirectly lest the Establishment Clause become a mockery." *Id.*  Accordingly, this Court should hold CSU's inclusion of caste in its Policy constitutionally prohibitive and in violation of the Establishment Clause.

## VI.    <u>CONCLUSION AND RELIEF REQUESTED</u>

For all of the reasons set forth herein judgment should be entered for Plaintiffs on their Declaratory Judgment claim (Claim One), Establishment Clause claims (Claims Three and Four) and their Due Process claims (Claims Seven and Eight), together with any other relief the Court deems just and proper, including attorneys' fees and costs.

1

2   Dated: September 12, 2023                    Respectfully submitted,

3

4                                                */s/ John Shaeffer*
                                                 **FOX ROTHSCHILD, LLP**
5                                                John Shaeffer, Esq. (SBN 138331)
                                                 Michael Twersky, Esq. (*pro hac vice*)
6                                                Beth Weisser, Esq. (*pro hac vice*)
7                                                Erika Page, Esq. (*pro hac vice*)
                                                 Alberto M. Longo Esq. (*pro hac vice*)
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
_____

## CERTIFICATION OF COMPLIANCE PURSUANT TO L.R. 11-6.2

The undersigned, counsel of record for Plaintiffs Sunil Kumar, Ph. D. and Praveen Sinha, Ph. D., certifies that this brief does not exceed 20 pages double-spaced or 5600 words pursuant to Judge Klausner's Standing Order of May 2023, and further certifies that this brief consists of 5194 words as determined by Microsoft Word's word count, which complies with the word limit of L.R. 11-6.1.

Dated: September 12, 2023                                **FOX ROTHSCHILD, LLP**

                                                        */s/ John Shaeffer*
                                                        John Shaeffer, Esq. (SBN 138331)

                                                        *Attorneys for Plaintiffs*