# EXHIBIT "B"

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


SUNIL KUMAR, Ph.D.,

PRAVEEN SINHA, Ph.D.,


                    Plaintiffs,

vs.                                        No. 2:22-CV-O7550-

                                              RGK-MAA


DR. JOLENE KOESTER, in her

official capacity as

Chancellor of California State

University,

                    Defendants.

_____/


                    Zoom Videoconference

                    Deposition of

                    LAURA ANSON

              Friday, August 4, 2023

                    ---oOo---

              Magna Legal Services

                    866.624.6221

                    www.MagnaLS.com


Reported By:  STACY L. LOZANO, CSR No. 12831



Page 11

1   document production that CSU made in this case.

2       Q. Okay.  No notes or anything like that though?

3       A. No.

4       Q. Okay.  Have you ever been a party to a lawsuit?

5       A. No.

6       Q. Do you know either of the plaintiffs in this

7   case, Sunil Kumar or Praveen Sinha?

8       A. No, I don't know either one.

9       Q. Did you review any documents related to their

10  tenure at CSU --

11      A. No, I didn't.

12      Q. -- for this deposition?  Okay.

13          The first thing I want to show you, I'm going to

14  put it on the screen because it's not in the production.

15  And we're going to mark this as Koester 1.

16          This is the Notice of Deposition.  Do you happen

17  to have that?

18      A. Yeah, uh-huh, I think so.

19      Q. Okay, great.  You've seen this before, I assume?

20      A. Yes, counsel provided this to me.

21      Q. Okay.  And you're aware that you're testifying

22  today as Chancellor Koester's designee, right?

23      A. Chancellor Koester, yes.

24      Q. I'm sorry, Koester.  My apologies.  And you

25  agreed to testify as her designee?



Page 12

```
 1        A. Yes.

 2        Q. And you're aware that your testimony will be

 3   binding on the Chancellor, correct?

 4        A. Yes.

 5        Q. Did you discuss with her your deposition in this

 6   case?

 7        A. No, I have not.

 8         (KOESTER EXHIBIT 1 MARKED FOR IDENTIFICATION)

 9   BY MR. TWERSKY:

10        Q. Have you seen the First Amended Complaint that

11   was filed by the plaintiffs in this case?

12        A. I may have seen it at one time, yes.

13        Q. Okay.  I'm not going to ask you to recall

14   anything from memory.  I'd like to direct your attention

15   to Schedule A in the Notice of Deposition.  And, I'm

16   sorry, I don't want to keep making the same mistake.  Can

17   you pronounce again just the Chancellor's name for me?

18        A. "Kester."

19        Q. Koester, okay.  Thank you.

20         I may get that wrong.  I'm going to try really

21   hard not to, so I apologize if I do.

22         Can you just turn to Schedule A in the Notice of

23   Deposition.

24        A. Yes.  You have it on the screen, correct.

25        Q. Okay, great.  I may ask you about some or all of
```



Page 19

1   to pull up the first page.

2        A. Okay.  Uh-huh.

3        Q. You tell me when you're there?

4        A. Oh, yeah.  Hold on a second.

5        Q. No worries.

6        A. Okay.  I think I'm there.

7        Q. Okay.  I was going to explain what a Bates number

8   is, because I'm going to be calling up documents by Bates

9   number.  But as you're a lawyer, I'm assuming you're

10  familiar with Bates numbering, correct?

11       A. Yep.

12       Q. Okay.  I figured.  Is this the current

13  non-discrimination policy that's in effect at CSU?

14       A. Yes.

15       Q. And when did it become effective?

16       A. January 1st, 2022.

17       Q. Okay.  This policy was revised in the last year

18  or so; is that right?

19       A. Yes, uh-huh.

20       Q. Okay.  And what was the process you used to

21  revise the policy?

22       A. A working group was formed, comprised of a number

23  of people, some in the office of general counsel, some in

24  system like human resources, some in student affairs.  And

25  we -- we discussed policy revisions.



Page 20

1            We also sought stakeholder feedback from a number

2     of different organizations, and reviewed that feedback and

3     incorporated some of that feedback into our policy.

4            Q. What is a stakeholder as you've just used that

5     term?

6            A. A stakeholder would be members of the CSU

7     community who would be, you know, governed by this policy.

8            Q. Okay.  And can you just sort of tell me who

9     members of the CSU community governed by this policy would

10    be?

11           A. Well, the stakeholders we consulted were probably

12    20 different groups.  So it was campus Title 9

13    coordinators, campus DHR coordinators, University police

14    departments, student -- vice presidents of student

15    conduct, PROVOS presidents.  The campus ADPs of HR.

16    Campus ADPs of faculty affairs.  The ASSA, it's a student

17    organization.  And all of our labor unions.

18           Q. You said ASSA.  Did you mean CSSA?

19           A. Yeah, sorry CSSA.  Cal State Student Association.

20           Q. No worries.

21           A. There're probably other ones.  Those are the ones

22    that I can remember, kind of, off the top of my head.

23           Q. And how is it determined which stakeholders to

24    seek input from?

25           A. Those are pretty much all of our stakeholders.



Page 23

1    it has all the previous policies -- there are links to all

2    the other previous policies.  You can see from that that

3    it's been revised a number of times over the years.

4         Q. Do you know if the manner in which it was revised

5    was done the way it was done this time?  That is with a

6    workgroup appointed by the Universities -- or CSU?

7         A. I don't have any personal knowledge of that.  I

8    would assume so, but I don't really know.

9         Q. Were you a member of the workgroup?

10        A. I was, yes.

11        Q. Who else was a member of the workgroup?

12        A. Two attorneys in the Office of General Counsel,

13   Stephen Silver, Ruth Jones, the Associate Vice Chancellor

14   of Human Resources, Tammy Kenber.  The systemwide Title 9

15   officer, and that person changed during the time we were

16   working on this.  Because it took us about two years to

17   revise this policy, so there was one person in that role

18   and then a new one came in.  The Associate Director of

19   Title IX, Alex Pursley.  And, let's see, Ray Morillo who

20   is in student affairs was in that group.  I think that's

21   it.

22        Q. Okay.  You'd mentioned two people.  One person

23   that had sort of swapped out for another person during the

24   process.  Who are those two people?

25        A. So the systemwide Title 9 officer initially who



Page 24

1    was involved in this was Linda Hoos, H-o-o-s.  And then

2    she left the CSU and went elsewhere, and then we hired Sue

3    McCarthy.

4         Q. Okay.  Were there any --

5         A. I thought of another person.

6         Q. I'm sorry.

7         A. There was another person named Lolo Hong, who was

8    in student affairs.  And then, like, Ray worked for Lolo.

9    And then Lolo also resigned from the CSU and went

10   elsewhere at some point before the completion of the

11   policy revision.

12        MR. TWERSKY:  Okay.  If I didn't mention this, we

13   marked this policy as Exhibit 2, right?  I think I did

14   mention it, but if I didn't.

15        And the Notice of Dep is 1.

16      (KOESTER EXHIBIT 2 MARKED FOR IDENTIFICATION)

17   BY MR. TWERSKY:

18        Q. Does the workgroup still exist?

19        A. Yes.  Yes, it does.

20        Q. What is the --

21        MR. MICHALOWSKI:  Michael, if I can interject.

22   So the policy we are marking as Exhibit 2, so we're going

23   from CSU 582 on that one to what?

24        MR. TWERSKY:  Give me one second.  582 to 671.

25        MR. MICHALOWSKI:  Thanks.  To 671?  Oh, that



Page 25

1  makes sense.  That makes sense.

2  BY MR. TWERSKY:

3       Q. Okay.  So, Ms. Anson, is CSU 582 to 671, is that

4  the entirety of the policy?

5       A. Yes.

6       Q. Okay.  I just want to make sure we're not missing

7  anything.

8          And I think the question I asked right before

9  this was:  Does the workgroup still exist?  I think you

10  answered yes.

11          And my follow-up to that is, what is the

12  workgroup doing now?

13       A. Well, the workgroup has been working on revising

14  some of the attachments to the policy, right?  Like if you

15  look at CSU 670, you'll see that there are a bunch of

16  attachments to the policy.  And so, we've worked on, kind

17  of, updating some of those attachments.

18          We're also -- I guess you could say we're gearing

19  up for the next revision, because we know that OCR is

20  about to issue some new regulations that they've said are

21  going to be coming out in October.  So we think that, you

22  know, it's obviously going to require more revisions to

23  this policy.

24       Q. Okay.  Do any of the attachments in the policy

25  relate to caste?



Page 26

1        A. No.

2        Q. Within the workgroup, was -- were tasks divided

3   in any way?

4        A. Yeah, I mean, sort of informally, we would kind

5   of parcel out things.  Like, you know, does someone want

6   to come up with some new draft language for this, that was

7   unclear, or better language.

8            But, you know, frankly we did a lot of collective

9   wordsmithing, you know, on Zoom.  We spent hours and hours

10  of agonizing meetings going over different sections of the

11  policy, and coming up with, you know, new or updated

12  language.

13       Q. Was anyone in the workgroup assigned to address

14  caste?

15       A. No.

16       Q. The Zoom meetings that you talked about, were

17  those recorded?

18       A. You mean, like video recorded?  No.

19       Q. Okay.  You just had the meeting and that was it?

20  That was the end of it, there was no recording of it?

21       A. There were some minutes taken, I believe.

22       Q. Okay.  Who took the minutes?

23       A. I think they were taken, for the most part, by

24  Alex Pursley.

25       Q. Were those produced yet?



Page 27

1          MR. MICHALOWSKI:  No.  Those are identified in

2  our privilege log.  The communications within the

3  workgroup, which included two representatives of the

4  Office of General Counsel, are privileged.  So you're

5  asking about the structure of this group and assignments,

6  that's fine, but the communications within it are

7  privileged.

8          MR. TWERSKY:  So your position is discussions

9  within the group are privileged?

10          MR. MICHALOWSKI:  Correct.

11          MR. TWERSKY:  Okay.

12          Okay.  I'm going to mark this next exhibit as 3.

13  It's CSU 12 to 14.

14      (KOESTER EXHIBIT 3 MARKED FOR IDENTIFICATION)

15  BY MR. TWERSKY:

16      Q. Just let me know when you're there.

17      A. Okay.

18      Q. This is a December 18th, 2021, email from Tammy

19  Kenber to a number of people; is that right?

20      A. Yes.

21      Q. Are these all the people in the workgroup?

22      A. They are -- you mean in the "to" section?

23      Q. The "to" and the "cc" section, because you're in

24  the cc section, so...

25      A. No.  These are not -- the people in the "to"



Page 29

1          Our policy and procedures must comply with both

2     federal and state laws, and there have been many numerous

3     and significant changes over the past two years, in

4     particular in both areas."

5          You agree that those were the goals of the work

6     group?

7          A. Yes.

8          Q. Okay.  The next page, which is I guess CSU13, the

9     fifth bullet point notes that one of the changes to the

10    non-discrimination policy is, "Clarification that caste is

11    a subset of existing protected categories."

12          Do you see that?

13          A. Yes, I do.

14          Q. Okay.  What protected category of the

15    non-discrimination policy is caste a subset of?

16          A. Race or ethnicity.

17          Q. Anything else?

18          A. No.

19          Q. Is caste related to social status?

20          MR. MICHALOWSKI:  Vague.  Ambiguous.

21          You can answer.

22          THE WITNESS:  No, I mean caste is -- my

23    understanding of caste is that it's a system of social

24    stratification or ranking based on inherited status and

25    linked to race and ethnicity.



Page  32

1   people that are classified as having common racial or

2   national or tribal, linguistic, religious, or cultural

3   origin or background.

4           So, I think race and ethnicity, sort of, overlap

5   or intersect each other.  And so caste is considered to

6   just be included in that group of things that sort of

7   falls within that protected status.

8           Q. Where -- the definition that you provided of

9   caste, which is a system of social stratification or

10  ranking based on inherited status and linked to race or

11  ethnicity, that definition.  Where is that located in the

12  CSU community?  Where can I find that?

13          A. It is not located, I'm just telling you what the

14  CSU's general view of it is.  It's not -- there is no

15  definition of it in the policy.  Caste was just used as

16  a -- to illustrate another term, race and ethnicity.

17          Q. So there's nowhere in CSU that I can find that

18  definition of caste or any definition of caste; is that

19  what you're telling me?

20          A. That's what I'm telling you, yes.

21          Q. Okay.  And you're aware that caste has other

22  definitions, correct?

23          A. Yeah, I think there is not one universally

24  accepted definition of caste.

25          Q. How is it determined that caste should be added



Page 34

1    decided to add caste to the non-discrimination policy as a

2    subcategory of race and ethnicity.

3         Q. And is that why it's in parenthesis?

4         A. Yes.

5         Q. So the other terms that are in the parenthesis in

6    the policy, I think it's Article 2 of the policy, are

7    those also subcategories?  I'm just trying to understand

8    how that works.

9         A. Yeah, I mean, there are terms that illustrate

10   what we're talking about by -- what we mean by race and

11   ethnicity.

12         So, you know, when we say race and ethnicity, the

13   things in parenthesis are intended to put people on notice

14   of, you know, the types of things we believe are included

15   within race and ethnicity.

16         Q. Okay.  So if we go back to Exhibit 2, the policy,

17   on page CSU 582, Article 2.

18         A. Uh-huh.

19         Q. So, a subset of race or ethnicity is color and

20   ancestry as well as caste; is that correct?

21         A. Yes.  Uh-huh.

22         Q. And a subset of gender identity is transgender?

23         A. Yes.

24         Q. Okay.  Gotcha.  And a subset of gender is sexual

25   stereotyping?



Page 35

1        A. Yes.

2          MR. MICHALOWSKI:  I'm sorry, Michael.  Could you

3    ask that again?

4    BY MR. TWERSKY:

5        Q. A subset of gender is -- includes sexual

6    stereotyping?

7        A. Yes.

8        Q. Okay.  I'm just trying to understand how it

9    works.  There's nothing, sort of, secretive about the

10   question?

11         Were there any documents that were relied on by

12   the working group and adding caste to the

13   non-discrimination policy?

14       A. No.

15       Q. So, it was simply, sort of, anecdotal

16   information?

17       A. Well, I don't know if you call it -- I don't know

18   what the -- your definitions of anecdotal information.

19         We were hearing from CSSA, you know, student

20   groups, our CFA, the California Faculty Association.  You

21   know, a labor union expressing to us that caste

22   discrimination was a real thing that they were being

23   subjected to.  And we decided that we were going to take

24   that seriously and prohibit it.

25       Q. Did you also receive -- did the workgroup receive



Page 38

1        A. Well, we do our best to define terms, but we

2   can't define every single term in the entire policy.  It's

3   a very voluminous policy.

4        So, you know, we -- I can't say there's anything

5   in writing about we must define this and not that, it's

6   just we did our best to define key terms.

7        Q. Why were -- what was the -- well, let's just --

8   why isn't caste defined?

9        A. Well, caste is not defined because it's just used

10  to illustrate another term, other terms, race and

11  ethnicity.  And we just -- we put it, you know, we put

12  caste as a subcategory of race and ethnicity just because

13  we felt that that's where it fit the best.

14       Q. And you didn't -- there was no need to -- you

15  felt no need to define it?

16       A. That's correct.  I mean, as I'm sure you know,

17  there is no one universally accepted definition of caste.

18  So we just used it as a term to illustrate another -- what

19  we considered to be included within race and ethnicity.

20       Q. But some of the terms you defined have multiple

21  definitions, right?

22       A. Probably so, yes.

23       Q. So you defined those but not caste?  I'm trying

24  to figure out how you distinguish caste from, for example,

25  transgender.  Transgender is a parenthetical, right, in


LEGAL SERVICES

Page 42

1        A. Well, I think that's a matter of opinion.

2        Q. I'm asking you if Q1 answers the question.

3        A. I don't think it directly answers the question.

4   But it gets at the answer, which is it was -- that caste

5   was included, based on the feedback that we were hearing

6   from, you know, our students, our faculty, other groups

7   that, you know, that they're experiencing this, and that

8   -- that we wanted to do something about it so we included

9   it as a parenthetical reference under race and ethnicity.

10       Q. If I want to know what caste means, does A1

11  answer that for me?

12           MR. MICHALOWSKI:  Argumentative.

13           You can answer.

14           THE WITNESS:  I guess it doesn't directly answer

15  it.

16  BY MR. TWERSKY:

17       Q. Does it indirectly answer it?

18       A. I think it indirectly answers it.

19       Q. How so?

20       A. Well, it's just talking about our commitment to

21  inclusivity and respect, and making our campuses, you

22  know, places of access for opportunity and equity.  Okay.

23           Caste systems treat people unequally, so we're

24  trying to do something about it.

25       Q. When the stakeholders mentioned that they wanted



Page 50

1        A. Not in -- our policy is religion neutral.  It's

2    not -- we don't associate caste with any specific

3    religion.

4        Q. Did the workgroup hear from people who believe

5    the policy might be harmful to them?

6        A. Before or -- yes, we did after the policy was

7    enacted, or went into effect.

8        Q. Before the policy went into effect?

9        A. No, after the policy went into effect.  I don't

10   recall us hearing any in advance of the effective date

11   anybody telling us they thought it would be harmful to

12   them.

13       Q. Got it.  Okay.  Okay.  Let's go to CSU 1217 to

14   1219.  Just let me know when you're there.

15       A. Okay, I'm getting there.  All right.  I think I'm

16   there.

17           MR. MICHALOWSKI:  Hold for me to find it as well.

18   1217?

19           MR. TWERSKY:  1217 to 1219, yep.

20           THE WITNESS:  Okay, I have it.

21           MR. MICHALOWSKI:  Yeah, me too.  Go ahead.

22   BY MR. TWERSKY:

23       Q. Okay.  This is -- we're going to mark this as

24   Koester 6.  This is an April 6, 2021, letter from Tess

25   Loarie, the Chair of the Associated Students, Inc. Board



Page 53

1   to direct your attention to the third whereas clause.

2        A. Okay.  Let me find it.

3        Q. Just tell me when you're there.

4        A. Okay, I'm there.

5        Q. Okay.  This resolution states, "There are four

6   main caste groups," and then there is a group outside the

7   caste system referred to as Dalits.

8           Do you see that?

9        A. Yes.  Uh-huh.

10       Q. Are you aware that those are the historic castes

11  found in India and South Asia?

12       A. I'm generally aware of that, yes.

13       Q. Are you aware of those castes found anywhere

14  else?

15       A. No, but I am aware that there are caste systems

16  in other countries outside of India.  Caste systems are

17  not exclusive to India.  They're found in other countries

18  like Pakistan, Sri Lanka, Nepal, Japan.

19       Q. Does this resolution on 1218 and 1219 reference

20  any of those other caste systems you just referred to?

21       A. I don't believe so.

22       Q. It just refers to the one associated with India

23  and South Asia?

24       A. It looks like it.

25       Q. Is caste a structure of oppression in Hindu



Page 55

1   information from, correct?

2        A. Yes.  And we reached out to this group, I think

3   as part of the -- you know, before we put the policy in

4   effect, we had stakeholders review the policy.  I think

5   this was one of the stakeholder groups.

6        Q. This resolution is similar to the last resolution

7   we looked at with regard to defining caste through four

8   main groups.

9           Do you see that in the third whereas clause?

10       A. I do see it, yes.

11       Q. And these are the groups associated with India

12  and South Asia, correct?  The four main caste groups in

13  the third whereas clause which we talked about earlier?

14       A. I'm not an expert on that, but it appears to be

15  so.

16       Q. And is there a reference to any other caste

17  systems in this resolution, other than the one associated

18  with India and South Asia?

19       A. No.

20       Q. Footnote 1 on page 1296 references a website of

21  Qualitylabs.org/caste survey.

22          Do you see that?

23       A. I do.

24       Q. Are you familiar with the Equality Labs?

25       A. To be honest, I never heard of them before I



Page 72

1    definition is the primary definition in the dictionary,

2    correct?

3              MR. MICHALOWSKI:  Vague and ambiguous.

4    Foundation.  Calls for potentially a legal conclusion and

5    opinion.

6              But you can answer.

7              THE WITNESS:  What's the question again?

8              (THE COURT REPORTER READS BACK THE QUESTION)

9    BY MR. TWERSKY:

10        Q. So let me lay some foundation.  Have you used a

11   dictionary before?

12        A. Yes.

13        Q. Okay.  When you go to a dictionary and you see

14   multiple definitions, what do you consider the first

15   definition in the dictionary?

16        A. I consider it to be the first one listed.  I -- I

17   don't necessarily consider it to be a quote, unquote,

18   "prominent" -- what did you call it, the primary?

19        Q. The primary definition?  Primary?

20        A. Yeah.  I don't necessarily consider that to be

21   true.  I just consider it one of several definitions that

22   related to the term listed.

23        Q. Okay.  And that first definition reads -- defines

24   caste as, "One of the hereditary social classes in

25   Hinduism that restricted the occupation of their members



Page 73

1    and their association with members of other castes."

2         Did I read that correctly?

3         A. Yes.

4         Q. And that is not - your testimony is that's not

5    what the definition of caste is in the policy, correct?

6         A. Well, the policy does not contain a definition of

7    caste, as I've testified to earlier, as the document

8    itself reflects.

9         It is not CSU's understanding of caste that was

10   adopted for the policy.  Our policy is religion neutral.

11   We don't link it to any particular religion.

12        Q. Did the workgroup look at the dictionary

13   definition of caste when considering adding it to the

14   non-discrimination policy?

15        A. I think we did, along with other definitions.

16        Q. When you don't know what the word means, do you

17   consult a dictionary?

18        A. Sometimes, yes.

19        Q. What else do you consult?

20        A. I'd say the dictionary would be the primary

21   source -- or there's other sources, you know, like, I

22   don't know, Wikipedia, or other sources of definitions.

23        Q. You consult Wikipedia before you consult a

24   dictionary?

25             MR. MICHALOWSKI:  Foundation.



Page 77

1    CSU 517 to 540 as Koester 13.

2         (KOESTER EXHIBIT 13 MARKED FOR IDENTIFICATION)

3    BY MR. TWERSKY:

4         Q. This is a document titled, "CSU Revised Title IX

5    and DHR Policy and Procedures."

6              Do you see that?

7         A. Yeah, uh-huh.

8         Q. It's dated January 21, 2022, correct?

9         A. Yes.

10        Q. Do you know what this document is?

11        A. I think we may have used it to for some training

12   with our campuses on what the changes to the policy were.

13        Q. As the Senior Systemwide Director for DHR

14   Whistleblower and Equal Opportunity Compliance Service, is

15   this a document that would have been in your purview in

16   that role?

17        A. Yes.  I'm just not sure whether this was the

18   document we used.  I mean, we did a few different

19   trainings about changes to the policy.  So, yes.

20        Q. And this is dated, I think, the day after the

21   policy became effective?

22        A. Well, it says January 21st.  I think it became

23   effective January 1st.

24        Q. Okay.  So it -- a few weeks after the policy

25   became effective, correct?



Page 79

1        Do you see that?

2        A. I do see it.  I'm sorry, my phone's ringing.

3        Yes, I do see it.

4        Q. Did you want to take a break?

5        A. I'm okay.

6        Q. Okay.  Just remember any time if you need to take

7    a call or you need to -- we're happy to -- I'm happy to

8    break.

9        A. Okay.  No problem.

10        Q. Okay.  How are claims based on race, ethnicity,

11    or national origin analyzed by the CSU?

12        MR. MICHALOWSKI:  Compound.

13        You can answer.

14        THE WITNESS:  Okay.  So, basically, the inquiry

15    would be whether a person would be -- was subjected to an

16    adverse action based on their race or ethnicity or some

17    other protected status.

18    BY MR. TWERSKY:

19        Q. And is that procedure outlined anywhere in a

20    document?

21        A. In the policy it talks about under the -- I think

22    it's under the definition of discrimination and

23    harassment.

24        Q. When CSU analyzes claims based on race,

25    ethnicity, or national origin as set forth in -- on



Page 96

1        Q. When did you come up with that definition?

2        A. It's just my general understanding of how CSU

3   views caste discrimination based on my work in the

4   workgroup.

5        Q. Well, that definition isn't in Koester 16, is it?

6        A. Is that this document?  No, it's not.

7        Q. Yes.  I'm sorry.  Okay.

8           So is it fair to say that on -- well, let me take

9   a step back, I apologize.

10          Do you know why you asked Ms. Pursley for, "The

11  definition Ray found specifically"?

12       A. No.  Honestly, I don't remember why I was asking

13  her for this.

14       Q. As of February 14th, 2022, did you have a working

15  definition of caste as used in the policy?

16       A. You mean a written definition somewhere?  No, we

17  didn't.  I mean, our general understanding is as I

18  previously testified to.

19       Q. Okay.  But that's not what this document says.

20          So, if you look at -- if you look at this,

21  your -- if you go to 937, this is your email to

22  Ms. Pursley.  It reads, "Hi, Alex.  Do you know where the

23  definition of caste is that we were discussing in the

24  workgroup back in December?  I think we liked the

25  definition that Ray found, although we ultimately decided



Page 97

1    not to include a definition in the policy.  I can't

2    remember which folder this is in.  Do you happen to

3    recall?  Thanks in advance, Laura."

4           Did I read that correctly?

5       A. Yep, yes.

6       Q. Okay.  And Ms. Pursley says, "I'm not sure about

7    the definition Ray found specifically, but I did find the

8    following notes.  Not sure if it's one of these."

9           Do you see that?

10      A. Yep.  Yes.

11      Q. And your response was, "Thanks, Alex.  I think

12   it's the last one.  Much appreciated, Laura."

13          Do you see that?

14      A. Yes.

15      Q. Did you not know the definition of caste as of

16   February 14, 2022?

17          MR. MICHALOWSKI:  Vague and ambiguous as to

18   "definition."

19   BY MR. TWERSKY:

20      Q. You can answer the question.  I'm literally just

21   reading the words that are in this email.  It uses the

22   word "definition."

23      A. Yeah, my understanding was as I've previously

24   testified to today.

25      Q. So then why did you need a definition from



Page 98

1   Ms. Pursley?

2        A. As I think I just said, I don't recall why I was

3   asking her for this.

4        Q. Who is Ray?

5        A. Ray Morillo.  She's also a member of the working

6   group.

7        Q. And this email says that you write that, "The

8   workgroup ultimately decided not to include a definition."

9           And why was that?  Why did the workgroup make

10  that decision?

11          MR. MICHALOWSKI:  Asked and answered.

12          You can answer again.

13          THE WITNESS:  Why did the work group -- well, as

14  I previously testified, I think, there is no one

15  universally accepted definition of caste.  And we included

16  it as a subcategory of race and ethnicity to try to, you

17  know, respond to the concerns that we were hearing from

18  our student body, our faculty, other members of our

19  communities, our campus communities, that this was

20  something that they were experiencing.

21          And, you know, that caste discrimination is a

22  real thing that they felt was adversely impacting their

23  educational environment, their employment environment.

24  And we decided we didn't want to tolerate it, so we

25  included it as a subcategory in -- at -- to race and



Page 100

1        Q. The second is from the UC Davis policy; is that

2    correct?

3        A. It looks like it.

4        Q. Okay.  And does the second definition actually

5    define caste?

6        A. I'm just trying to read it.  Sorry, I've got a...

7        Q. No problem.

8        A. I have small print.  You're talking about the

9    UC Davis?

10       Q. Correct.

11       A. Okay.  No, it looks like they included it as a

12   sub category of national origin.

13       Q. That's different than what the workgroup

14   included, defined it as a subcategory of, correct?

15       A. Yes.

16       Q. Or included it as a subcategory?

17       A. Yeah.

18       Q. The third definition is the Merriam Webster

19   definition, which we talked about already, right?

20       A. Yes, it looks like it.

21       Q. And the fourth definition is from what looks like

22   sociologydictionary.org; is that right?

23       A. Yeah.  Uh-huh.

24       Q. And then the last is from Wikipedia, correct?

25       A. It looks like it, yes.



Page 101

1          Q. Were there any other definitions considered by

2     the workgroup or anyone else for what caste means under

3     the non-discrimination policy?

4          A. Not that I recall.

5          Q. Are you aware of any document that discusses what

6     the workgroup considered the definition of caste?

7          A. No.

8          Q. Did the workgroup consider academic journals when

9     looking for the definitions of the term caste?

10         A. I don't believe we did.

11         Q. Did the workgroup consult an academic journal

12    called, "Caste a Global Journal of Social Exclusion," for

13    the definition of caste in the policy?

14         A. Not that I recall.

15         Q. Are there any other definitions that the

16    workgroup considered that are not included in

17    Ms. Pursley's email that you recall?

18         A. No.

19         Q. Okay.  You responded to Ms. Pursley's email that

20    you think it's the last one, the Wikipedia definition,

21    correct?

22         A. I think so.

23         Q. That's not actually the definition that we talked

24    about earlier, but that's the definition that at least you

25    thought was the one people thought was the best, at least



Page 104

1   document is still complicated, because we have to comply

2   with legal and regulatory frameworks.  But we were trying

3   to use more plain language, that sort of thing, when we

4   drafted this.

5   BY MR. TWERSKY:

6       Q. Did CSU conduct any surveys to determine if its

7   community understood the word caste?

8       A. Not that I know of.

9       Q. Did CSU do anything to understand -- to learn

10  whether its community understood the word caste?

11      A. No.  Other than, you know, we heard from our

12  students, from our faculty, that they believed they were

13  experiencing caste discrimination.  So I would assume

14  those individuals know what caste means.

15      Q. Well, how do you know those individuals all had

16  the same understanding of caste?

17      A. I don't.  They may have had different

18  understandings.

19      Q. And so there was no -- the fact that -- strike

20  that.

21          So, if caste isn't defined in the policy, how is

22  the CSU community supposed to know what caste means?

23      A. Well, the term caste was used to illustrate

24  another term, race and ethnicity.  And to, kind of, list

25  things that we considered to be within race and ethnicity.



Page 105

1    That's where we felt caste fit best in the policy.

2         Q. But when you -- you didn't feel that the same

3    applied to transgender as a subset of gender identity?

4    Because you defined transgender.

5         A. Yeah.  As I said, we did our best to define

6    terms, but we obviously didn't define every term.  We

7    didn't define color or ancestry either.  We didn't define

8    every single term that's used in the policy.

9         Q. Are you aware that the California Department of

10   Fair Employment and Housing sued Cisco and two of its

11   employees for alleged caste discrimination?

12        A. I'm generally aware of that litigation, yes.  I

13   don't know the details of it.  I know it's been going on a

14   really long time.

15        Q. Did the workgroup consider the complaint in that

16   case when deciding to add caste to the non-discrimination

17   policy?

18        A. No.

19        Q. Was Leora Freedman a member of the workgroup?

20        A. Yeah.  She was kind of like an ad hoc member.  I

21   mean, she didn't come to all of our meetings, but she

22   would come from time to time.

23        Q. Did Ms. Friedman or Ms. Kenber raise the CISCO

24   complaint, or the allegations in the Cisco complaint with

25   the work group?



Page 114

1                    CERTIFICATE OF REPORTER

2          I, STACY L. LOZANO, hereby certify that the

3   witness in the foregoing deposition was by me duly sworn

4   to tell the truth, the whole truth, and nothing but the

5   truth in the within-entitled cause;

6

7          That said deposition was taken in shorthand by

8   me, a Certified Shorthand Reporter of the State of

9   California, and was thereafter transcribed into

10  typewriting, and that the foregoing transcript constitutes

11  a full, true, and correct report of said deposition and of

12  the proceedings which took place;

13

14         That I am a disinterested person to the said

15  action.

16

17         IN WITNESS WHEREOF, I have hereunto set my hand

18  this 10th day of August, 2023.

19

20  _____

21         STACY L. LOZANO, CSR No. 12831

22                   ---oOo---

23

24

25

