RICHARD A. PAUL (SBN 057976)
rich.paul@quarles.com
JEFFREY P. MICHALOWSKI (SBN 248073)
jeff.michalowski@quarles.com
MATTHEW W. BURRIS (SBN 325569)
matt.burris@quarles.com
ADRIELLI FERRER (SBN 348068)
adrielli.ferrer@quarles.com
**QUARLES & BRADY LLP**
101 West Broadway, Ninth Floor
San Diego, California 92101-8285
Telephone: 619-237-5200
Facsimile: 619-615-0700

Attorneys for Defendant Dr. Jolene Koester

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SUNIL KUMAR, Ph. D., PRAVEEN SINHA, Ph. D.,<br><br>      Plaintiffs,<br><br>      v.<br><br>DR. JOLENE KOESTER, in her official capacity as Chancellor of California State University,<br><br>      Defendant. | Case No. 2:22-cv-07550-RGK-MAA<br><br>**DEFENDANT DR. JOLENE KOESTER'S COMBINED TRIAL BRIEF AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**<br><br>Date:      October 16, 2023<br>Time:     9:00 a.m.<br>Crtrm.:    850<br>Judge:    Hon. R. Gary Klausner<br>Trial Date:  October 24, 2023 |

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................... 8

II.   FACTUAL BACKGROUND ........................................................................... 9

      A.    Caste is a Social Phenomenon and Isn't Coextensive with
            Religion. .................................................................................................. 9

      B.    Caste is an Increasingly Significant Issue in the U.S. and at CSU. ...... 10

      C.    In Response to Growing Concerns About Caste Discrimination,
            CSU Clarified that its Prohibition on Race and Ethnicity
            Discrimination Includes Caste. ............................................................. 11

III.  LEGAL STANDARDS .................................................................................. 12

IV.   DEFENDANT IS ENTITLED TO JUDGMENT IN HER FAVOR ............. 13

      A.    Plaintiffs Lack Standing. ....................................................................... 13

            1.    The evidence shows plaintiffs lack standing to bring an
                  Establishment Clause challenge. .................................................. 13

            2.    The evidence shows plaintiffs lack standing to bring their
                  vagueness challenge ..................................................................... 14

      B.    Plaintiffs' Establishment Clause Claims Fails on the Merits. .............. 15

            1.    The Policy is neutral toward religion, and there isn't a
                  shred of evidence that the Chancellor was hostile to
                  Hinduism. ..................................................................................... 15

            2.    Plaintiffs bear the burden of finding support in history and
                  tradition, and they cannot do so. .................................................. 17

            3.    Even if using the term "caste" had consequences for Hindu
                  practice (it doesn't), that would not amount to an
                  Establishment Clause violation. ................................................... 20

            4.    The California Establishment Clause claim likewise fails. ......... 22

      C.    The Policy Is Not Unconstitutionally Vague. ....................................... 22

            1.    The term "caste" is understandable. ............................................. 23

            2.    CSU's Policy provides fair notice of the prohibited
                  conduct. ........................................................................................ 25

      D.    Judgment in Defendant's Favor is Warranted on Plaintiffs' Cause
            of Action for Declaratory Relief. .......................................................... 27

V.    CONCLUSION .............................................................................................. 27

DEFENDANT DR. JOLENE KOESTER'S COMBINED TRIAL BRIEF
AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Wright*,
  568 U.S. 737 (1984) .................................................................................15

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015) ............................................................14, 15

*Bob Jones Univ. v. United States*,
  461 U.S. 574, (1983) ................................................................................21

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020) .............................................................................26

*Boyce Motor Lines v. U.S.*,
  342 U.S. 337 (1952) .................................................................................23

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) .................................................................................23

*Calop Bus. Sys., Inc. v. City of Los Angeles*,
  984 F. Supp. 2d 981 (C.D. Cal. 2013) ....................................................23

*Catholic League for Religious & Civ. Rights v. City & Cnty. of San Francisco*,
  567 F.3d 595 (9th Cir. 2009) ...................................................................21

*Catholic League for Religious & Civ. Rights v. City & Cnty. Of San Francisco*,
  624 F.3d 1043 ..........................................................................................15

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971) .................................................................................27

*Colgan v. Leatherman Tool Grop., Inc.*,
  135 Cal. App. 4th 663 (2006) ..................................................................26

*Cooper v. Aaron*,
  358 U.S. 1 (1958) .....................................................................................17

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005) .................................................................................. 18

*Davis v. Beason*,
  133 U.S. 333 (1890) .................................................................................. 21

*Dev. Corp. v. State of California*,
  24 Cal. 4th 693 (2000) ............................................................................. 22

*EEOC v. Catastrophic Mgmt. Solutions*,
  852 F.3d 1018 (11th Cir. 2016) ............................................................... 26

*Ervins v. Sun Prairie Area Sch. Dist.*,
  609 F. Supp. 3d 709 (W.D. Wis. July 1, 2022) ....................................... 20

*Espinoza v. Montana Dep't of Rev.*,
  140 S.Ct. 2246 (2020) .............................................................................. 18

*Every Nation Campus Ministries at San Diego State Univ. v. Achtenberg*,
  2006 WL 8455445 (S.D. Cal. May 2, 2006) ........................................... 24

*Firewalker-Fields v. Lee*,
  58 F.4th 104 ............................................................................................. 17

*General Electric Co. v. Gilbert*,
  429 U.S. 125 (1976) .................................................................................. 26

*Gillette v. U.S.*,
  401 U.S. 437 (1971) .................................................................................. 16

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) .................................................................................. 23

*Holy Spirit Ass'n for Unification of World Christianity v. Hodge*,
  582 F. Supp. 592 (N.D. Tex. 1984) ......................................................... 12

*Hynes v. Mayor & Council of Borough of Oradell*,
  425 U.S. 610 (1976) .................................................................................. 15

*Calif. Parents for the Equalization of Educational Materials v. Torlakson*,
  973 F.3d 1010 (9th Cir. 2020) ................................................................. 16

3

*Kennedy v. Bremerton*,
142 S.Ct. 2407 (2022) ................................................................................ 17, 18

*Lee v. Weisman*,
505 U.S. 577 (1992) ........................................................................................ 15

*Loving v. Virginia*,
388 U.S. 1 (1967) ............................................................................................. 19

*Lynch v. Donnelly*,
465 U.S. 668 (1984) ........................................................................................ 15

*Masnauskas v. Gonzales*,
432 F.3d 1067 (9th Cir. 2005) ........................................................................ 13

*Masterpiece Cakeshop Ltd. v. Colo. Civ. Rights Comm'n*,
138 S. Ct. 1719 (2018) ................................................................................... 15

*McGowan v. Maryland*,
366 U.S. 420, 442 (1961) ................................................................................ 20

*Oncale v. Sundowner*,
118 S. Ct. 998 (1998) ...................................................................................... 26

*Our Lady of Guadalupe School v. Morrisey-Berru*,
140 S.Ct. 2049 .................................................................................................. 18

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) ........................................................................................ 27

*People v. Barksdale*,
8 Cal. 3d 320 (1972) ....................................................................................... 24

*Personal Watercraft Coalition v. Board of Supervisors*,
(2002) 100 Cal. App. 4th 129 ........................................................................ 23

*Plessy v. Ferguson*,
16 S. Ct. 1138 (1896) ...................................................................................... 19

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989) ........................................................................................ 26

*Real v. City of Long Beach*,
 852 F.3d 929 (9th Cir. 2017) ...................................................................15

*Reynolds v. Talberg*,
 2020 WL 6375396 (W.D. Mich. Oct. 30, 2020).....................................27

*Reynolds v. U.S.*,
 98 U.S. 145 (1878)..................................................................................21

*Sabra v. Maricopa County CCD*,
 44 F.4th 867 (9th Cir. 2022) ...........................................................13, 17

*Sanford v. MemberWorks, Inc.*,
 625 F.3d 550 (9th Cir. 2010) ..................................................................22

*Schwartzmiller v. Gardner*,
 752 F.2d 1341 (1984)........................................................................23, 27

*Shurtleff v. City of Boston*,
 142 S. Ct. 1583 (2022)............................................................................18

*Spokeo, Inc. v. Robins*,
 578 U.S. 330 (2016).................................................................................13

*Steffel v. Thompson*,
 415 U.S. 452 (1974).................................................................................27

*Students for Fair Admissions v. Harvard College*,
 143 S. Ct. 2141.........................................................................................19

*Tingley v. Ferguson*,
 47 F.4th 1055 (9th Cir. 2022) .................................................................26

*Town of Greece, N.Y. v. Galloway*,
 572 U.S. 565 (2014).................................................................................18

*TransUnion LLC v. Ramirez*,
 141 S. Ct. 2190 (2021).............................................................................13

*U.S. v. Bynum*,
 327 F.3d 986 (9th Cir. 2003) ..................................................................12

*United States v. Doremus,*
   888 F.2d 630 (9th Cir. 1989) ................................................................22

*United States v. Wunsch,*
   84 F.3d 1110 (9th Cir. 1996) ...............................................................27

*United States v. Wyatt,*
   408 F.3d 1257 (9th Cir. 2005) .............................................................24

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
   455 U.S. 489 (1982)............................................................................13

**Rules**

Fed. R. Civ. P. 56.......................................................................................12

**Other Authorities**

*Establishment and Disestablishment at the Founding, Part I: Establishment of Religion,*
   44 Wm. & Mary L. Rev. 2105 (2003) .................................................18

*Title VII and Caste Discrimination,*
   134 Harv. L. Rev. F. 456 .....................................................................26

DEFENDANT DR. JOLENE KOESTER'S COMBINED TRIAL BRIEF
AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR**

**PARTIAL SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on October 10, 2023, at 9:00 a.m., or as soon thereafter as the matter may be heard before Judge R. Gary Klausner in Courtroom 850 of the United States District Court-Central District, located at 255 East Temple Street, Los Angeles, California, Defendant Chancellor Jolene Koester ("Defendant") by and through her attorneys of record, will and hereby does move for summary judgment.  This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on September 5, 2023.  Specifically, Defendant respectfully requests summary judgment or partial summary judgment on the following grounds:

1.      Plaintiffs allege no "injury in fact," and thus lack standing.

2.      Plaintiffs' Establishment Clause claims fail because the challenged Policy is not hostile to religion; because the challenged Policy has a secular purpose; and because history and tradition favor prohibiting discrimination in education.

3.      Plaintiffs' vagueness claims fail because the term "caste" is understandable to people of ordinary intelligence.

4.      Plaintiffs' claim for declaratory relief is derivative and falls with the underlying claims.

The motion is based on this notice of motion, the memorandum of points and authorities, the declarations and exhibits filed herewith, and the pleadings and filings in this action.

**COMBINED TRIAL BRIEF AND MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

After students, faculty, and alumni at California State University called for a policy barring caste discrimination, CSU administrators and its Chancellor listened and took their concerns seriously. CSU engaged a working group, studied the issue, and solicited feedback from the university community. It then implemented a new nondiscrimination policy clarifying that caste discrimination is a form of race or ethnicity discrimination, and is thus barred throughout the CSU system. This reflects a growing recognition that caste discrimination is real, that it is unjust, and that policy and legislative action are necessary.

Plaintiffs are two Hindu professors, and they have two surviving claims. *First*, they claim CSU's Policy violates the Establishment clause by "link[ing] the Hindu religion with a caste system and caste discrimination," and "singl[ing] out their religious beliefs for ridicule." FAC ¶ 20. In reality, CSU's Policy is unambiguously neutral toward religion. It makes no mention of Hinduism, nor of any religion. Rather it bars discrimination **by** any member of the CSU community, regardless of their religion, and it bars discrimination **against** any member of the CSU community, regardless of their religion. Indeed, plaintiffs themselves admit that caste is an issue that impacts not only Hindus, but also Christians, Sikhs, Buddhists, and Muslims. The expert testimony of a Harvard anthropologist is in accord: caste is a social issue that has a life of its own, outside religion.

*Second*, plaintiffs claim the term "caste" is unconstitutionally vague, and is not understandable to people of ordinary intelligence. Their own experiences show that this is untrue, and so too does the extensive public commentary regarding CSU's policy. Plaintiffs and other detractors uniformly contend that the term "caste" offends them, but they have never seriously claimed that they don't know what it means. Plaintiffs have a sufficient understanding of the term "caste"—just like they have a sufficient understanding of other contested terms, like "race" and

8

"sex"—to know what injustices the Policy is designed to address. The term falls well within constitutional boundaries.

## II.     FACTUAL BACKGROUND

### A.     Caste is a Social Phenomenon and Isn't Coextensive with Religion.

The paradigmatic caste systems are those of India and South Asia, but caste systems exist throughout the world.  Broadly speaking, caste systems are descent-based systems of social stratification that exists in many parts of the world, including South Asia, East Asia, Africa, and the Americas.  Michalowski Decl. Ex. 26, Subramanian Expert Report, at p. 3 ("Subramanian").

Caste systems organize every realm of social life by hierarchically ranked status differences.  For example, in the South Asian caste system, Dalits, the group once known as "untouchables" who occupy the lowest level in the caste hierarchy, have less social and economic mobility than the intermediate and upper castes. They are often segregated into more polluted and poorly serviced neighborhoods, and they tend to be concentrated in less desirable jobs.  Caste systems even limit whom one can or cannot marry.  The norm in South Asia is still that a member of a caste must marry within that same caste.  Inter-caste marriage, especially when it is between a Dalit man and a woman of a higher caste, can even provoke vigilante violence.  Subramanian 4–10.

Caste is not coextensive with Hinduism or any other religion.  Rather, it is best understood as an institution that undergirds social relations across all populations and spheres.  Accordingly, its impacts are not limited to Hindus. Rather, as Plaintiffs acknowledge, caste systems also impact Christians, Buddhists, Sikhs, and Muslims.  Kumar Dep. 78:10–16 ("Kumar") ("Q. You go on to state 'caste is an unfortunate social practice among most communities and all the major religions (Hindus, Muslims, Sikhs and Christians) in South Asia.' Do you agree with your statement there? Is that accurate? A. It is a fact.  So, I agree, yeah."). *See also* Sinha Dep., 53:10–15 ("Sinha"); Subramanian 5.

DEFENDANT DR. JOLENE KOESTER'S COMBINED TRIAL BRIEF
AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

### B.     Caste is an Increasingly Significant Issue in the U.S. and at CSU.

Caste has shaped patterns of migration of the United States, and the current social makeup of the South Asian American population, which is highly educated and affluent, is made up disproportionately of historically privileged castes. Members of historically disadvantaged castes in the United States are a "minority within a minority," and are uniquely vulnerable to discrimination.  Subramanian 15. Recent lawsuits in Silicon Valley, New Jersey, and New York have alleged caste discrimination against Dalits, and public accounts of caste discrimination have grown increasingly common.  Subramanian 18–19.

The CSU system is the largest university system in the country, and has a remarkably diverse student body, faculty, and staff.  It draws students from around the world, including from countries where caste systems are prominent.  For example, last year, there were 7,199 students from India including 5,942 students on an academic student F-1 Visa.   CSU likewise enrolled students from Nigeria and Senegal.   Sullivan Decl. ¶ 5.  Both have recognized caste systems.  Subramanian 3, fn. 3.  CSU also employs hundreds of faculty and staff members from South Asia, and likewise employs workers from Nigeria.  Hernandez Decl. ¶ 6.

Members of the CSU community have expressly voiced concerns about caste discrimination – not just abroad, but also in their experiences in California and at CSU.  *See* Compendium of Public Comment ("Compendium"); *see also* Michalowski Decl. Ex. 13.  Additionally, one CSU student has even reported that he was the victim of caste-based violence.  Specifically, a CSU student (who described himself as Indian, Christian, and Dalit) reported that his roommate (another CSU student who he described as Indian and Hindu) repeatedly called him a "Madhiga Lanja" (a "sub-caste prostitute"); hit him with a water bottle 10–15 times, knocking his glasses to the floor; and pepper sprayed the back of his neck, causing him the greatest pain he'd ever experienced.  The police were notified, but the student declined to sign a police report, fearful that prosecuting his roommate would lead to

10

his deportation.  Instead, the student was transferred to emergency student housing. Mulet Decl. ¶¶ 4–12.

### C.    In Response to Growing Concerns About Caste Discrimination, CSU Clarified that its Prohibition on Race and Ethnicity Discrimination Includes Caste.

In 2021, students at CSU became increasingly vocal about concerns with caste discrimination, and following extensive public comment by students, the California State Students Association ("CSSA") passed a resolution calling for a policy barring caste discrimination.  *See* ECF No. 1 (Cmplt. ¶ 38, Exh. E p. 1).

The Title IX and DHR Policy Revision Workgroup (the "Title IX Working Group"), which had been convened by the Chancellor to address systemwide policy issues, began studying the issue.  It met and discussed the issue of caste at least seven times, and solicited feedback from the entire campus community.  Anson Decl. ¶¶ 5, 10–11.  It then made an independent recommendation to the Chancellor and his Senior Leadership Council that the word "caste" be added to CSU's nondiscrimination policy, as an illustration of the types of Race and Ethnicity discrimination that are barred by CSU policy.  Anson Decl. ¶¶ 6–7.

The Working Group's recommendation was accepted, and the new Policy became effective on January 1, 2022.  Anson Decl. ¶ 13.  It reads:

> The CSU prohibits the following conduct, as defined in Article VII. Discrimination based on any Protected Status: i.e., Age, Disability (physical and mental), Gender (or sex, including sex stereotyping), Gender Identity (including transgender), Gender Expression, Genetic Information, Marital Status, Medical Condition, Nationality, **Race or Ethnicity (including color, caste, or ancestry)**, Religion (or religious creed), Sexual Orientation, and Veteran or Military Status.

Anson Decl. Ex. 3, p. 1–2.  The Policy further states: "Race or Ethnicity includes ancestry, color, caste, ethnic group identification, and ethnic background." *Id*. at 16.

11

There is no mention of Hinduism anywhere in the Policy.  Nor is there any mention of any country or geography, such as India or South Asia.  Nor is there any mention of Dalits, Brahmins, or any other caste.  Rather, the policy prohibits all forms of caste discrimination, regardless of the race, religion, or national origin of the victim, and regardless of the race, religion, or national origin of the perpetrator.  Plaintiffs themselves acknowledge that the Policy applies regardless of religion and regardless of national origin.  *See* Sinha 135:13–136:15; Kumar 81:10–18.

Nor was the *intent* of the Policy to single out any particular religion or religion more generally.  Anson Decl. ¶ 8.  As the Chancellor's designee testified at deposition: "[O]ur policy is religion neutral. It's not – we don't associate caste with any specific religion."  Anson Dep. 50:1–3.

## III.   LEGAL STANDARDS

Summary judgment or adjudication is proper where "there is no genuine issue as to any material fact and the [moving party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Facial constitutional challenges are uniquely well-suited for summary judgment, as the Court ordinarily need only assess the language of the challenged policy or legislation.  *U.S. v. Bynum*, 327 F.3d 986, 990 (9th Cir. 2003) ("[A] facial challenge to the constitutionality of a statute is a question of law. . . ."); *Holy Spirit Ass'n for Unification of World Christianity v. Hodge*, 582 F. Supp. 592, 595 (N.D. Tex. 1984) ("[W]ether the ordinance is void on its face because it impinges upon constitutionally protected activities is a legal, not factual, question.").  Here, the language of the policy is not subject to dispute, and the remaining undisputed facts (*see* Separate Statement) are more than sufficient to foreclose plaintiffs from ever meeting their burden.

To the extent that the Court finds it necessary to weigh the evidence, then the burden rests squarely on plaintiffs to prove each of their claims, and here, that burden is heavy.  Specifically, under rational basis review—which attaches to Establishment Clause challenges to facially neutral language—"a statute is

12

presumed constitutional" and the party challenging the law bears the burden of proving no legitimate government purposes exists.  *Masnauskas v. Gonzales*, 432 F.3d 1067, 1071 (9th Cir. 2005).  And a party challenging a statute for vagueness must show that it is impermissibly vague in all of its applications.  *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982) (emphasis supplied) ("*Hoffman*").  Here, plaintiffs cannot meet their burden on either claim.

## IV.    DEFENDANT IS ENTITLED TO JUDGMENT IN HER FAVOR

### A.    Plaintiffs Lack Standing.

"The Article III standing inquiry serves a single purpose: to maintain the limited role of courts by ensuring they protect against only concrete, non-speculative injuries." *Sabra v. Maricopa County CCD*, 44 F.4th 867, 879 (9th Cir. 2022). Accordingly, plaintiffs must allege an "injury in fact" that is "concrete and particularized" and "actual or imminent." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).  A fear of future harm will not suffice unless plaintiffs demonstrate a sufficient likelihood that the harm will materialize.  Speculation about future harm is not enough.  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2211–12 (2021).

### 1.    The evidence shows plaintiffs lack standing to bring an Establishment Clause challenge.

In its Order denying in part defendant's motion for judgment on the pleadings (ECF No. 102), this Court found that plaintiffs had plausibly alleged an injury, and thus had standing, because they claimed the Policy stigmatizes Hinduism.  In particular, the Court noted: "Although not entirely clear, Plaintiffs appear to argue that the Policy treats Hinduism differently from other religions because it defines Hinduism as including an inhumane and racist caste system." *Id.* at p. 5.

Discovery and depositions have since confirmed that Plaintiffs' allegations have no support in the evidence.  In reality, the Policy does not define Hinduism, or even mention it.  Plaintiffs acknowledged that the Policy applies regardless of

13

religion.  *See* Sinha 135:13–136:15; Kumar 81:10–18.  And Plaintiffs have no evidence that the Chancellor or any CSU administrator ever said anything negative about Hinduism, or that they even mentioned Hinduism.  Kumar 135:23–138:2.  There is no injury here, and plaintiffs lack standing.

**2.      The evidence shows plaintiffs lack standing to bring their vagueness challenge.**

This Court earlier held that Plaintiffs plausibly alleged standing.  Because "the [vagueness] challenge implicates their First Amendment rights" . . . "it is subject to a relaxed injury in fact requirement under *Arce*."  ECF No. 102 p. 7.

But discovery confirms that plaintiffs' vagueness challenge is *not* directed to conduct protected by the First Amendment.  Rather, the Policy clarifies that acts of defined Discrimination or Harassment—*i.e.*, actions "that have a substantial and material adverse effect on the complainant's ability to participation in a university program, activity, or employment" or that create a "hostile or offensive work or educational environment"—are prohibited.  Anson Decl. Ex. 3, p. 7–8.  There is certainly no First Amendment right to discriminate or harass based on caste.

Perhaps if Plaintiffs claimed the Policy infringed upon their First Amendment rights to practice their religion, then then they might have a plausible claim that the standing requirements should be relaxed under *Arce*.  But that is not what Plaintiffs contend.  Indeed, they claim the opposite.  *See* FAC ¶ 51 ("Plaintiffs here do not believe in nor engage in caste discrimination at all.  Rather, they abhor it . . . .").  Accordingly, neither Plaintiff has changed their religious beliefs or practices, or even felt the need to, as a result of the revised Policy.  *See* Kumar 106:10–20; 108:13–20; Sinha 89:5–20; 90:23–91:17; 93:6–19.  Indeed, both Plaintiffs acknowledge that the Policy is entirely ***complimentary*** with their religious beliefs.  FAC ¶ 18; Kumar 159:8–160:3; Sinha 91:2–17.

Based on plaintiffs' own admissions, then, the Policy does not infringe upon their conduct.  *See Hoffman* at 494 ("In a facial challenge to the . . . vagueness of a

14

law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.").  This case, then, is readily distinguishable from cases where standing is relaxed – *i.e.*, cases implicating the First Amendment right to receive information (*Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015)); the First Amendment right to canvas for political purposes (*Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 611 (1976)); or the First Amendment right to engage in "purely expressive activities" (*Real v. City of Long Beach*, 852 F.3d 929, 933 (9th Cir. 2017)).

There is no injury here, and certainly no infringement on First Amendment rights.  The relaxed *Arce* standard does not apply, and Plaintiffs must show they suffered a distinct and palpable injury.  Any claim of "abstract stigmatic injury" is not enough.  *Allen v. Wright*, 568 U.S. 737, 755–56 (1984); *Catholic League for Religious & Civ. Rights v. City & Cnty. Of San Francisco*, 624 F.3d 1043, 1052 (disagreement with government policies is not enough; plaintiffs must show "exclusion or denigration").  For the same reasons this Court dismissed the Equal Protection and Free Exercise claims for lack of standing, so too should it find that Plaintiffs lacks standing to pursue a vagueness challenge.  *See* ECF No. 102 pp. 3–5.

### B.  Plaintiffs' Establishment Clause Claims Fails on the Merits.

#### 1.  The Policy is neutral toward religion, and there isn't a shred of evidence that the Chancellor was hostile to Hinduism.

Government conduct violates the Establishment Clause when it favors one religion over another, involves coercion, or expresses hostility towards any religion. *Lee v. Weisman*, 505 U.S. 577, 591–92 (1992); *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984) (the Constitution "forbids hostility towards any religions"). Unconstitutional hostility is apparent when government conduct "passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop Ltd. v. Colo. Civ. Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (internal citation omitted).

Here, the Policy is neutral toward religion, not hostile to it, as even one p plaintiff acknowledges. *See* Sinha 140:1–25;135:4–137:15. The language of the Policy bars caste discrimination by individuals regardless of their religion and protects individuals from caste discrimination regardless of their religion, too. The "critical weakness" of Plaintiffs' Establishment Clause claim, then, is that the Policy, "on its face, simply does not discriminate on the basis of religious affiliation or religious belief." *Gillette v. U.S.,* 401 U.S. 437, 450 (1971).

Nor is there a shred of evidence that defendant intended to target or vilify Hinduism. Anson Decl. ¶ 8. Indeed, after full and fair discovery, Plaintiffs have no evidence at all of any hostility toward Hinduism by the Chancellor or anyone involved with the drafting, recommendation, or passage of the Nondiscrimination Policy. Sinha 140:1–25;135:4–137:15.[1]

Even if the Policy had expressly or implicitly drawn a connection between caste and Hinduism (it didn't), that still would not violate the Establishment Clause. A recent Ninth Circuit decision is instructive. In *Calif. Parents for the Equalization of Educational Materials v. Torlakson*, 973 F.3d 1010 (9th Cir. 2020); the plaintiffs claimed that California's curricular guidance materials described the caste system as a "social and cultural structure as well as a religious belief." *Id.* at 1014. But the Ninth Circuit found no violation: "As the district court noted, an 'objective, reasonable observer would find much of the challenged material entirely unobjectionable.' But even if isolated passages could be read as implying some hostility toward religion—which they do not—they would not violate the Establishment clause unless that were the 'principal or primary effect.'" *Id.* at 1022.

All told, then, even if the Policy had specifically tied caste discrimination to

---

[1] Plaintiffs allege that the CSSA and CFA passed objectionable resolutions, and that students and faculty made objectionable remarks during public remarks. But even if that were true, CSSA (a student organization) and CFA (the faculty union) do not speak for the Chancellor, the sole defendant in this action.

DEFENDANT DR. JOLENE KOESTER'S COMBINED TRIAL BRIEF
AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1  Hinduism (it did not), that still would not be sufficient.  Any reasonable observer
2  would understand that the overarching purpose of the Policy is to eliminate
3  discrimination, not to vilify Hinduism.

> ### 2.  Plaintiffs bear the burden of finding support in history and tradition, and they cannot do so.

6  In *Kennedy v. Bremerton School District*, the Supreme Court mandated an
7  additional consideration, that Establishment Clause claims "must be interpreted by
8  reference to historical practices and understanding."  *Kennedy*, 142 S.Ct. 2407, 2428
9  (2022).  "The line that courts and governments must draw between the permissible
10 and the impermissible has to accord with history and faithfully reflect the
11 understanding of the Founding Fathers."  *Id.*; *Sabra v. Maricopa Cnty. Cmty. Coll.*
12 *Dist.*, 44 F. 4th 867, 888 (9th Cir. 2022).

13 Here, this Court has agreed that there is a long history of preventing racial
14 discrimination in education.  ECF No. 102 p. 6; *see also Cooper v. Aaron*, 358 U.S.
15 1, 19 (1958) (right to be of discrimination in education is "so fundamental and
16 pervasive that it is embraced in the concept of due process of law").  This Court
17 held, however, that defendant, at least as part of its pleading challenge, "ha[d] not
18 adequately demonstrated that there is a history or tradition or incorporating words
19 with religious connotations to curb racial discrimination."  ECF No. 102, p. 6.  For
20 two reasons, the Court should now reach a different result.

21 ***First***, the burden of producing historical support under *Bremerton* rests
22 squarely on the plaintiff, not on the defendant.  As the Fourth Circuit explains: "[I]n
23 Establishment Clause cases, the plaintiff has the burden of proving a set of facts that
24 would have historically been understood as an establishment of religion. That
25 requires proving both a set of facts, like in all litigation, and proving that those facts
26 align with a historically disfavored establishmentarian practice."  *Firewalker-Fields*
27 *v. Lee*, 58 F.4th 104, 122 & n. 7 (4th Cir. 2023).  Here, Plaintiffs cannot meet their
28 burden of showing that the facts of this case—a ban on caste discrimination, or on

17

*any* form of discrimination for that matter—would have been historically viewed as an establishment of religion.

The framers of the Constitution recognized only a few specific traits of state establishments of religion – control over doctrine and personnel; mandatory church attendance; punishment of dissenting churches; restricting political participation by members of dissenting churches; providing financial support for a church; and using churches to carry out civil functions. *Shurtleff v. City of Boston,* 142 S. Ct. 1583, 1609 (2022) (Gorsuch, J., concurring) (discussing M. MCCONNELL, ESTABLISHMENT AND DISESTABLISHMENT AT THE FOUNDING, PART I: ESTABLISHMENT OF RELIGION, 44 Wm. & Mary L. Rev. 2105, 2131–2181 (2003)) ("ESTABLISHMENT AND DISESTABLISHMENT").[2]

The only category that even remotely relates to Plaintiffs' allegations is the first category: state control over church doctrine. *Compare* FAC ¶ 49 (the "Policy violates these basic tenets of the Religion Clauses by ascribing an oppressive and discriminatory caste system to the entire Hindu religion"); *Shurtleff*, 142 S. Ct. at 1609. But to the founders, the evil of state control over church doctrine was not implicated by policies "ascribing" negative characteristics to a church (*see* FAC ¶ 49). Rather, the framers' concerns were focused on tangible and coercive government actions – chartering of an official state church; requiring "all persons" to obey the state church under pain of censure; forbidding "all ministers" from deviating from the canons of the church of England; refusing to charter any competing churches, attempting to create religious uniformity; barring public

---

[2] Retired Judge McConnell's article is the leading text guiding the analysis of what types of "establishments of religion" the framers sought to prohibit. Supreme Court Justices relied on it in *Kennedy*, 142 S.Ct. at 2429, n. 5; *Shurtleff v. City of Boston, Mass.*, 142 S.Ct. 1583, 1609 (2022) (Gorsuch, J. concurring); *Our Lady of Guadalupe School v. Morrisey-Berru*, 140 S.Ct. 2049, 2060 and n. 9 (2020); *Espinoza v. Montana Dep't of Rev.*, 140 S.Ct. 2246, 2264 (2020) (Thomas, J., concurring); *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 608 (2014); and *Cutter v. Wilkinson*, 544 U.S. 709, 729 (2005) (Thomas, J., concurring).

preaching without prior approval; conditioning incorporation on subscribing to specific articles of faith; detailing how a church would be organized; and appointing, disciplining, and removing church ministers.  *See* ESTABLISHMENT AND DISESTABLISHMENT, at p. 2131–2144.  The Policy thus bears no resemblance to a founding-era understanding[3] of an establishment of religion.

***Second***, even if the burden fell on CSU, CSU would readily satisfy it.  As defendant's expert explains, CSU's policy is consistent with the history and tradition relating to religion in the antidiscrimination context.  Ravitch Expert Report 5 ("Ravitch").  Neither the framers of the Constitution nor of the Fourteenth Amendment would have found anti-discrimination laws to constitute an establishment of religion.  *Id.* at 6.  Nor is there any indication that the framers would have found the word "caste" to have religious connotations.  Indeed, there is a long judicial history of using the term "caste" to signify social stratification, not to signify any particular religion.  Specifically, Justice Harlan's dissent in *Plessy v. Ferguson*, 16 S. Ct. 1138 (1896) understood "caste" as a social concept, not a religious one.  And of the fifteen times "caste" was mentioned in last term's affirmative action decision, ***none*** of them had anything to do with religion.  *Students for Fair Admissions v. Harvard College*, 143 S. Ct. 2141, 2175, 2181, 2187, 2191–2192, 2203–2204, 2230–31, n. 3 (2023).  *See also* Ravitch 6–9.

Moreover, settled precedent demonstrates that limitations on discrimination do not offend the Constitution any time they infringe upon the beliefs or preferences of some religious actors.  In *Loving v. Virginia*, 388 U.S. 1 (1967), the groundbreaking decision striking down anti-miscegenation statutes, the trial court had defended the anti-miscegenation laws on purportedly religious grounds:

---

[3] If assessed by the understandings of the incorporators of the Fourteenth Amendment, the analysis is clear that they too would not have considered the Policy, or the use of the word "caste" in it, to be an establishment of religion. (Ravitch 6–8, n.3).

DEFENDANT DR. JOLENE KOESTER'S COMBINED TRIAL BRIEF
AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1   God created the races white, black, yellow, malay and red, and he

2   placed them on separate continents. And but for the interference with

3   his arrangement there would be no cause for such marriages. The fact

4   that he separated the races shows that he did not intend for the races to

5   mix.

6   *Id.* at 3.  This perspective, of course, was not a sufficient justification to uphold

7   discriminatory marriage laws.  Instead, the Supreme Court unanimously held that

8   Virginia's anti-miscegenation law violated both the equal protection clause and due

9   process clause of the Fourteenth Amendment.  *Id.* at 12.

10            **3.      Even if using the term "caste" had consequences for Hindu**

11                   **practice (it doesn't), that would not amount to an**

12                   **Establishment Clause violation.**

13          In evaluating a claim under the Establishment Clause, courts must determine

14   "whether the challenged practice is religious in nature." *Ervins v. Sun Prairie Area*

15   *Sch. Dist.*, 609 F. Supp. 3d 709, 725 (W.D. Wis. July 1, 2022).  If a practice is not

16   religious, then the Establishment Clause does not apply.  *Id.*  Moreover, the fact that

17   a practice has some level of overlap with a religious practice does not mean that it is

18   immune from regulation.

19          [T]he 'Establishment' Clause does not ban federal or state regulation

20          of conduct whose reason or effect merely happens to coincide or

21          harmonize with the tenets of some or all religions. In many instances,

22          the Congress or state legislatures conclude that the general welfare of

23          society, wholly apart from any religious considerations, demands such

24          regulation. Thus, for temporal purposes, murder is illegal. And the

25          fact that this agrees with the dictates of the Judaeo-Christian religions

26          while it may disagree with others does not invalidate the regulation.

27          So too with the questions of adultery and polygamy.

28   *McGowan v. Maryland*, 366 U.S. 420, 442 (1961).

20

1   A Ninth Circuit case is particularly instructive.  At issue in *Catholic League*

2   *for Religious & Civ. Rights v. City & Cnty. of San Francisco*, 567 F.3d 595 (9th Cir.

3   2009) was a resolution by the County urging a Catholic Cardinal to "withdraw his

4   discriminatory and defamatory directive that Catholic Charities . . . stop placing

5   children in need of adoption with homosexual households."  The Catholic League

6   argued that the County's resolution had attacked "Catholic religious beliefs" but the

7   County countered by arguing that its purposes was to "champion needy children,

8   gays, lesbians, and same-sex couples within its jurisdiction."  *Id.* at 600, 602. The

9   Ninth Circuit held that the overlap between the conduct criticized and Catholic

10   doctrine did not result in an Establishment Clause violation:

11   　　　[C]ertain secular beliefs, views, and positions coincide with religious

12   　　　beliefs, views, and positions. . . . [G]overnment speech or action with

13   　　　respect to a secular issue is not considered endorsement of religion

14   　　　simply because the government's views are consistent with religious

15   　　　tenets. That is, the same belief can have both religious and secular

16   　　　dimensions; the government is not stripped of its secular purpose

17   　　　simply because the same concept can be construed as religious.

18   *Id.* at 603.

19   　　　As another example, every state in the country has laws barring polygamy.

20   And even though polygamy is associated with the Church of Latter-Day Saints in

21   the public consciousness, these laws have never been struck down as violations of

22   the Establishment Clause.  Ravitch 9.  *See also Reynolds v. U.S.*, 98 U.S. 145 (1878)

23   (upholding anti-polygamy laws over religious challenge); and *Davis v. Beason*, 133

24   U.S. 333 (1890) (same).

25   　　　This same principle applies in the discrimination context.  In *Bob Jones Univ.*

26   *v. United States*, 461 U.S. 574, (1983), the Court assessed whether the Internal

27   Revenue Service could revoke the tax-exempt status of a university and a primary

28   school based on discriminatory admissions and discipline policies.  At the

university, "[t]he sponsors . . . genuinely believe[d] that the Bible forbids interracial dating and marriage." *Id.* at 580.  The school generally admitted only Caucasians, based on sincerely held religious beliefs that mixing of races violated "God's command." *Id.* at 583, n. 6.  The Supreme Court held that revocation of the schools' tax-exempt status did not violate the First Amendment: "[T]he Government has a fundamental, overriding interest in eradicating racial discrimination in education . . . That governmental interest substantially outweighs whatever burden denial of tax benefits placed on petitioners' exercise of their religious beliefs."  *Id.* at 604.

Here, the Policy barring caste discrimination serves an obvious secular purpose.  It prohibits acts of Discrimination and Harassment in order to protect and ensure equal access to educational and employment opportunities at CSU regardless of race or ethnicity, including caste.  Even assuming the Policy had incidental effects on those who practice Hinduism (and there is no evidence that it does), such incidental effects would not be actionable under the Establishment Clause.

### 4.     The California Establishment Clause claim likewise fails.

If this Court finds no violation of the federal Establishment Clause, there can be no violation of the California Establishment clause. *E. Bay Asian Loc. Dev. Corp. v. State of California*, 24 Cal. 4th 693, 718–19 (2000).  At a minimum, this Court should decline supplemental jurisdiction. *See Sanford v. MemberWorks, Inc*., 625 F.3d 550, 561 (9th Cir. 2010).

### C.     The Policy Is Not Unconstitutionally Vague.

An enactment is void for vagueness only "if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement."  *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989), *cert. denied*, 498 U.S. 1046 (1991).  For an enactment to be intolerably vague on its face, it must be impermissibly vague in ***all*** of its applications.  *See Hoffman* at 495.

"The Ninth Circuit has cautioned that the void for vagueness doctrine should

be used sparingly." *Calop Bus. Sys., Inc. v. City of Los Angeles*, 984 F. Supp. 2d 981, 994 (C.D. Cal. 2013).  Specifically: "'Under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.'  This consideration limits the strong medicine of striking down statutes as facially vague." *Schwartzmiller v. Gardner,* 752 F.2d 1341, 1346 (1984), quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973).  California law is in accord.  *See Personal Watercraft Coalition v. Board of Supervisors* (2002) 100 Cal. App. 4th 129, 137 ("All presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity.").

Here, Plaintiffs' vagueness challenge fails for two reasons.

### 1.    The term "caste" is understandable.

"[C]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford,* 408 U.S. 104, 109–12 (1972).  "Consequently, no more than a *reasonable* degree of certainty can be demanded." *Boyce Motor Lines v. U.S.*, 342 U.S. 337, 340 (1952) (emphasis added).

The term "caste" is not unconstitutionally vague.  Rather, people of ordinary intelligence are likely to understand the term.  Plaintiffs certainly do.  They routinely use the term in their writings, correspondence, and presentations, and do so without defining the term.  Michalowski Decl. Exs. 14, 15, 17.  Notably, they have an understanding of how caste relates to other complex terms, and they understand that caste discrimination is wrong.  In a letter to the CSSA Student Association Board of Directors, they wrote:

> When incidents of caste discrimination do occur, they should be
> brought to light, thoroughly investigated in the same way claims of
> discrimination on the basis of ethnicity, ancestry, national origin, or
> religion are investigated, and rectified.  Several of these classes have

23

1      been interpreted to be inclusive of birthplace, ancestry (lineage),

2      culture, or linguistic characteristics closely associated with an ethnic

3      group – all of which are characteristics commonly associated with

4      'caste' or indigenous community-based identities.

5   Michalowski Decl. Exs. 14; *see also id.* at Exs. 15–17.  Plaintiffs' own writings,

6   then, show that they have no problem understanding what "caste" means.  Similarly,

7   during public comment at meetings of the California State Students Association and

8   the CSU Board of Trustees, over 206 speakers addressed their views on caste, and

9   97 objected to the addition of the term.  Only one speaker objected to the term being

10  undefined; the other 205 used the term caste freely, without definition.  *Id.*

11          Moreover, if an employee or student were unfamiliar with the term caste, that

12  would be easy enough to cure.  They would need only reach for a dictionary (or

13  more, likely, consult Google or other online resources) to find quick and

14  comprehensive information.  *Consider United States v. Wyatt*, 408 F.3d 1257, 1261

15  (9th Cir. 2005) (resolving ambiguity in allegedly vague terms by consulting

16  dictionary); *People v. Barksdale*, 8 Cal. 3d 320, 327 (1972) ("Where the requisite

17  certainty is not apparent on the face of the statute the deficiency may be satisfied by

18  common understanding and practices or from any demonstrably established

19  technical or common law meaning of the language in question.").  This Court should

20  decline Plaintiffs' request to "embark on a quest for ambiguity . . ." where none

21  exists.  *Every Nation Campus Ministries at San Diego State Univ. v. Achtenberg*,

22  2006 WL 8455445, at *5 (S.D. Cal. May 2, 2006) (rejecting claim that the term

23  "sexual orientation" in CSU policy was unconstitutionally vague).

24          Plaintiffs will note that dictionaries provide multiple definitions of "caste";

25  some of which reference Hinduism, and some of which do not.  For example,

26  Merriam Webster offers the two following definitions:

27          1. : one of the hereditary social classes in Hinduism that restrict the

28          occupation of their members and their association with the members

of other castes.  2. a. : a division of society based on differences of wealth, inherited rank or privilege, profession, occupation, or race.

Dictionary.com likewise offers multiple definitions, one of which mentions Hinduism:

1. Sociology.  a. an endogamous and hereditary social group limited to persons of the same rank, occupation, economic position, etc., and having mores distinguishing it from other such groups.  b. any rigid system of social distinctions.  2. Hinduism. any of the social divisions into which Hindu society is traditionally divided, each caste having its own privileges and limitations, transferred by inheritance from one generation to the next.

But the presence of multiple definitions does not render the term inherently vague or difficult to understand.  Rather, a person of ordinary intelligence would understand that the definitions are complementary and consistent with one another.  As defendant's expert explains:

When dictionaries refer to caste and offer Hindu castes as a paradigmatic case, the second definition simply articulates the same principles in broader form. . . . It would still likely be interpreted to mean that the parallel second definition, which points to the broader category, is teaching us that ancestrally-connected economic positions, which become cultural barriers to cross group contact, are also caste and recognized as morally wrong as well.

Rich Expert Report 25–26 ("Rich")

### 2.    CSU's Policy provides fair notice of the prohibited conduct.

Plaintiffs note the Policy does not provide a definition of "caste." But due process does not require that all terms be defined, especially outside the context of criminal law. *Hoffman* at 498–99 (Supreme Court has "greater tolerance of enactments with civil rather than criminal penalties because the consequences of

DEFENDANT DR. JOLENE KOESTER'S COMBINED TRIAL BRIEF
AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

1   imprecision are qualitatively less severe").

2       For example, Title VII does not define "race" and the EEOC has not issued

3   regulations defining the term (*EEOC v. Catastrophic Mgmt. Solutions*, 852 F.3d

4   1018, 1026 (11th Cir. 2016)), even though the term "race" is ambiguous and often

5   contested, and even though the dictionary contains numerous definitions for "race."

6   *See* Charanya Krishnaswami & Guha Krishnamurthi, *Title VII and Caste*

7   *Discrimination*, 134 Harv. L. Rev. F. 456, 473 & n. 93 (June 20, 2021) ("What

8   exactly 'race is, and how 'races' are properly defined, is an almost impenetrably

9   difficult question."); Rich 21–23.

10      Other protected categories, too, leave room for discussion and debate —

11  consider "ancestry," "ethnicity," "gender expression," "sexual orientation," and

12  "sex."  The use of general terms is not a defect in statutory drafting.  Rather, the

13  terms provide unambiguous guidance in the vast run of cases, while preserving the

14  space to make incremental interpretive adjustments when harder cases arise.  *See*

15  Rich 17, 19–20.  Any ambiguities or questions of meaning are resolved by an

16  orderly process of interpretation over time.[4]  *See Colgan v. Leatherman Tool Grop.,*

17  *Inc.*, 135 Cal. App. 4th 663, 692 (2006) ("A statute is not unconstitutionally vague

18  merely because its meaning must be refined through application.").

19      A recent Ninth Circuit case confirms that statutes may rely on terms that are

20  open to varying definitions.  In *Tingley v. Ferguson*, 47 F.4th 1055, 1063 (9th Cir.

21  2022), the Ninth Circuit considered a challenge to a statute banning licensed health

22  care providers from practicing conversion therapy on children.  The statute defined

23  conversion therapy as "a regime that seeks to change an individual's sexual

---

24  [4] The term "sex" in Title VII has undergone a 50+ year process of orderly

25  interpretation, and has never been deemed vague.  *See General Electric Co. v.*

    *Gilbert*, 429 U.S. 125 (1976) ("sex" does not include pregnancy); *Price Waterhouse*

26  *v. Hopkins*, 490 U.S. 228 (1989) ("sex" includes sex stereotyping); *Oncale v.*

27  *Sundowner*, 118 S. Ct. 998, 1103 (1998) ("sex" includes same-sex harassment);

    *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ("sex" includes gender identity

28  and sexual orientation).

orientation or gender identity . . . ."  The plaintiff challenged the terms "sexual orientation" and "gender identity" as "vague terms without consistent definitions." *Id*. at 1065, 1089.  The Ninth Circuit disagreed, finding that their common meanings were clear enough to defeat a vagueness challenge.  *Id*. at 1089–90; *see also Reynolds v. Talberg*, 2020 WL 6375396 at *9 (W.D. Mich. Oct. 30, 2020) (terms "transgender" and "gender expression" are not overly vague).[5]

"Caste" is well within the understanding of persons of ordinary intelligence. This is not the type of case appropriate for the "strong medicine of striking down [a policy] as facially vague."  *Schwartzmiller v. Gardner,* 752 F.2d 1341, 1346 (1984).

### D.    Judgment in Defendant's Favor is Warranted on Plaintiffs' Cause of Action for Declaratory Relief.

The claim for declaratory judgment is derivative of Plaintiffs' other claims (*see* FAC ¶ 65), and fails with them. It further fails because Plaintiffs cannot show a likelihood of injury "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Steffel v. Thompson*, 415 U.S. 452, 460 (1974); *see also Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (injury must be "certainly impending").

## V.    CONCLUSION

For all the foregoing reasons, Defendant requests judgment.

Dated:  September 12, 2023          QUARLES & BRADY LLP


                                    By:  /s/ *Jeffrey P. Michalowski*
                                        JEFFREY P. MICHALOWSKI
                                        Attorneys for Chancellor Koester

---

[5] In contrast, terms that have been found to be unconstitutionally vague are those that genuinely leave the reader scratching their head. *See Coates v. City of Cincinnati*, 402 U.S. 611, 612–14 (1971) (ordinance prohibiting "conduct . . . annoying to persons passing by" found vague); *United States v. Wunsch*, 84 F.3d 1110 (9th Cir. 1996) (restrictions on "offensive personality" found vague).

1

<u>Certificate of Compliance</u>

2        The undersigned, counsel of record for defendant Dr. Jolene Koester, certifies

3   that this brief contains 6,628 words and does not exceed 20 pages, which complies

4   with the word limit of L.R. 11-6.1 and the Standing Order Regarding Newly

5   Assigned Cases applicable in this action (ECF No. 13).

6

7   Dated:  September 12, 2023     QUARLES & BRADY LLP

8

9        By:  <u>/s/ *Jeffrey P. Michalowski*</u>

10           JEFFREY P. MICHALOWSKI

11           Attorneys for Chancellor Koester

DEFENDANT DR. JOLENE KOESTER'S COMBINED TRIAL BRIEF
AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT