JOHN J. SHAEFFER (SBN 138331)
  jshaeffer@FoxRothschild.com
FOX ROTHSCHILD LLP
Constellation Place
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone:  310.598.4150
Facsimile:  310.556.9828

MICHAEL K. TWERSKY (*pro hac vice*)
  mtwersky@foxrothschild.com
BETH L. WEISSER (*pro hac vice*)
  bweisser@foxrothshchild.com
ERIKA PAGE (*pro hac vice*)
  epage@foxrothschild.com
ALBERTO M. LONGO (*pro hac vice*)
  alongo@foxrothschild.com
FOX ROTHSCHILD, LLP
980 Jolly Road, Suite 110
Blue Bell, PA 19422
Telephone:  610.397.6500
Facsimile:  610.397.0450

Attorneys for Plaintiffs
Sunil Kumar, Ph.D. and Praveen Sinha, Ph.D.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNIL KUMAR, Ph. D<br>PRAVEEN SINHA, Ph. D.,<br><br>         Plaintiffs,<br><br>     v.<br><br>DR. JOLENE KOESTER, in her official capacity as Chancellor of California State University,<br><br>        Defendant. | Case No. 2:22-CV-07550-RGK-MAA<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S COMBINED TRIAL BRIEF AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:    R. Gary Klausner<br>Trial:    October 24, 2023<br>        (on the briefs) |

# TABLE OF CONTENTS

**Page**

I.   Plaintiffs' Establishment Clause Claim .......................................................... 1

   A.   Plaintiffs Have Standing To Assert Their Establishment Clause
       Claim. ................................................................................................. 1

   B.   Defendant Applies The Wrong Test For Establishment Clause
       Claims. ............................................................................................... 4

   C.   Plaintiffs Have Shown By A Preponderance Of The Evidence That
       The Policy Is *Not* Neutral Toward Religion. ..................................... 5

   D.   History And Tradition Confirm CSU Violated The Establishment
       Clause ............................................................................................... 11

II.  Plaintiffs' Void-For-Vagueness Due Process Claim .................................. 15

   A.   Plaintiffs Have Standing To Assert Their Vagueness Claim............. 15

   B.   Plaintiffs Have Shown By A Preponderance Of The Evidence That
       The Term "caste" Is Subject To Multiple Interpretations. ................ 16

III. Defendant's Experts Offer Nothing More Than After-The-Fact
    Justifications, Which Have No Impact On The Questions Before The
    Court. ...................................................................................................... 19

IV.  CONCLUSION AND RELIEF REQUESTED .......................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Arce v. Douglas,*
   793 F.3d 968 (9th Cir. 2015) .............................................................................. 15

*Bagget v. Bullit,*
   377 U.S. 360 (1964) ........................................................................................... 15

*Bob Jones University v. U.S.,*
   461 U.S. 574 (1983) ........................................................................................... 14

*Calif. Parents for the Equalization of Educational Materials v.*
   *Torlakson,*
   973 F.3d 1010, 1021, (9th Cir. 2020)................................................8, 10, 19, 20

*Capital Square Rev. & Advisory Bd. v. Pinette,*
   515 U.S. 757 (1995) ............................................................................................. 4

*Capitol Square Rev. & Advisory Bd. v. Pinette,*
   515 U.S. 753 (1995) ............................................................................................. 5

*Catholic League for Religious & C.R. v. Cnty. of San Francisco,*
   624 F.3d 1043 (9th Cir. 2010)...................................................................*passim*

*Catholic League for Religious & C.R. v. Cnty of San Francisco,* 567
   F.3d 595, 607-08 (9th Cir. 2009) .................................................................. 14,

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ...............................................................................4, 5, 6, 7

*City of Pomona v. Sociedad Quimica Y Minera De Chile SA,*
   2018 WL 6424763 (C.D. Ca. Apr. 26, 2018) .................................................. 19

*Cnty. of Allegheny v. ACLU,*
   492 U.S. 573 (1989), *abrogated on other grounds by Town of*
   *Greece v. Galloway,* 572 U.S. 565 (2014) ......................................................... 5

*Colorado Christian Univ. v. Weaver,*
   534 F.3d 1245 (10th Cir. 2008)........................................................................... 5

*Commack Self-Service Kosher Meats, Inc. v. Weiss*,
    294 F.3d 415 (2nd Cir. 2002) ................................................................ 11, 12, 13

*Edwards v. California*,
    314 U.S. 160 (1941) ................................................................................. 14

*Epperson v. Arkansas*,
    393 U.S. 97 (1968) ..................................................................................... 9

*Everson v. Bd. of Ed. of Ewing Tp.*,
    330 U.S. 1 (1947) .................................................................................... 7, 9

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .............................................................................. 15, 19

*Int'l Refugee Assist. Project v. Trump*,
    857 F.3d 554 (4th Cir. 2017) ...................................................................... 4

*Kennedy v. Bremerton Sch. Dist.*,
    142 S.Ct. 2407 (2022) ............................................................................... 11

*Larson v. Valente*,
    456 U.S. 228 (1982) .................................................................................... 3

*Lee v. Weisman*,
    505 U.S. 577 (1992) .................................................................................... 9

*Loving v. Virginia*,
    338 U.S. 1 (1967) ...................................................................................... 14

*Lynch v. Donnelly*,
    465 U.S. 668 (1984) ................................................................ 1, 9, 11, 20

*Masnauskas v. Gonzalez*,
    432 F.3d 1067 (9th Cir. 2005) ..................................................................... 4

*McGowan v. State of Md.*,
    336 U.S. 420 (1961) .............................................................................. 9, 14

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
    752 F.3d 807 (9th Cir. 2014) ..................................................................... 19

*Reynolds v. United States,*
    98 U.S. 145 (1878) ................................................................................... 7

*Santa Fe Indep. Sch. Dist. v. Doe,*
    530 U.S. 290 (2000) .........................................................................*passim*

*Sch. Dist. of Abington Twp. v. Schempp,*
    374 U.S. 203 (1963) .................................................................... 3, 12, 13

*Serbian Orthodox Diocese v. Milivojevich,*
    426 U.S. 696, 708-09 (1976) ................................................................. 9

*Shurtleff v. City of Boston,*
    142 S. Ct. 1583 (2022) ......................................................................... 11

*Town of Greece v. Galloway,*
    572 U.S. 565 (2014) ............................................................................. 11

*Trump v. Int't Refugee Assist.,*
    583 U.S. 912 (2017) ............................................................................... 5

*U.S. v. Wyatt,*
    408 F.3d 1257 (9th Cir. 2005) ............................................................. 18

*Vasquez v. Los Angeles Cnty.,*
    487 F.3d 1246 (9th Cir. 2007) ............................................................... 1

*Wallace v. Jaffree,*
    472 U.S. 38 (1985) ................................................................................. 7

**Other State Cases**

*Minor v. Bd. of Educ. of Cincinnati* ........................................................ 13

**Other Authorities**

Cong. Globe, 39th Cong., 1st Sess. 4312 (1866) ..................................... 14

U.S. Const. First Amendment ...................................................... 12, 15, 16

U.S. Const. Fourteenth Amendment ......................................................... 12

https://www.britannica.com/topic/caste-social-differentiation ................ 18

PLAINTIFFS' OPPOSITION TO DEFENDANT'S COMBINED TRIAL BRIEF
AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

https://www.oed.com/search/dictionary/?scope=Entries&q=caste ......................... 18

*Merriam-Webster*, https://www.merriam-webster.com/dictionary/caste ................. 6

Oxford English Dictionary ....................................................................... 18

Plaintiffs Sunil Kumar and Praveen Sinha respectfully submit this Opposition to Defendant's Combined Trial Brief and Motion for Summary Judgment or Partial Summary Judgment.

## I.    Plaintiffs' Establishment Clause Claim

### A. Plaintiffs Have Standing To Assert Their Establishment Clause Claim.

The Court need not look beyond its prior decision to dispose of CSU's argument that Plaintiffs lack standing.  As this Court recognized, "[a] plaintiff has standing to assert a violation of the Establishment Clause if he suffers a concrete, personal injury as a result of an alleged constitutional violation." *Civil Minutes* (ECF No. 102) at p. 5 (citing *Catholic League for Religious & C.R. v. Cnty. of San Francisco*, 624 F.3d 1043, 1051 (9th Cir. 2010)).  This Court held that Plaintiffs met that burden.  *Id.*  Ninth Circuit and Supreme Court precedent confirms that decision.

Whether Plaintiffs have a "concrete injury under the Establishment Clause turns on the existence of "non-economic interests of a spiritual, as opposed to a physical or pecuniary, nature.'" *Catholic League*, 624 F.3d at 1049 (quoting *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1250 (9th Cir. 2007)).  A constitutional injury extends beyond instances where one "is forced to participate in an act of religious worship[,]" keeping "in mind 'the myriad, subtle ways in which the Establishment Clause values can be eroded.'" *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 314 (2000) (a policy that "has the purpose and perception of government establishment of religion" is one of the ways Establishment Clause values are compromised) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Conner, J., concurring))).

In *Catholic League*, the court identified numerous examples where standing existed under the Establishment Clause "even though ***nothing*** was affected but the religious or irreligious sentiments of the plaintiffs."  624 F.3d 1043, 1050 (9th Cir. 2010) (emphasis added).  Those instances include:

prayer at a football game, a crèche in a county courthouse or public park, the Ten Commandments displayed on the grounds of a state capital or at a courthouse, a cross display at a national park, school prayer, a moment of silence at school, Bible reading at public school, and a religious invocation at graduation.

*Id* at 1049-50 (citations omitted). In each of those cases, "[n]o one was made to pray, or to pray in someone else's church, or to support someone else's church, or limited in how they prayed on their own, or made to worship, or prohibited from worshiping." *Id.* at 1050. Yet the Supreme Court found standing existed in each case. *Id.*

The Ninth Circuit similarly has held standing exists for "crosses on government land, removing a cross from a city seal, disciplining physicians who performed surgery without blood transfusions in a lawsuit by Jehovah's Witnesses, including the words 'under God' in the Pledge of Allegiance, and contracting with the Boy Scouts to administer a city recreational facility." *Id.* Each time the court recognized that "[t]he harm to the plaintiffs . . . was spiritual or psychological harm." *Id.* (alteration added).

In *Catholic League,* the Ninth Circuit held that the plaintiffs – a Catholic civil rights organization and two devout Catholics who resided in San Francisco – possessed standing by alleging they were "directly stigmatized" by the City of San Francisco after it adopted a resolution criticizing their views that same sex marriage and adoption is immoral. *Id.* at 1053. The court found that the city's resolution left the plaintiffs "feeling like second-class citizens" in the community, and the resolution suggested to the city's residents that they were. *Id.* at 1052. The court held that the asserted injury was "not speculative" because the city directly disparaged the plaintiffs' religious beliefs through its resolution. *Id.* The court emphasized the central purpose of the Establishment Clause: "that government neither engage in nor compel religious practices, that it effect no favoritism among sects or between

religion and nonreligion, *and that it work deterrence of no religious belief*." *Id.* (emphasis in original) (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 305, (1963)); *Larson v. Valente,* 456 U.S. 228, 246 (1982) (same).

Plaintiffs' claims here are directly in line with *Catholic League* and its progeny – as this Court already determined. *See Civil Minutes* (ECF No. 102) at p. 5. Plaintiffs assert that CSU's Nondiscrimination Policy unconstitutionally defines Hinduism as including an oppressive caste system. *See, e.g.*, First Amended Compl. ("FAC") (ECF No. 80) at ¶¶ 5, 14, 20 49, 51, 86. Plaintiffs also assert (and this Court found) that the Policy's "inclusion of the term caste is the source of their injury." *See Civil Minutes* (ECF No. 102) at p. 5. For standing purposes, Plaintiffs' claims are indistinguishable from the claims asserted in *Catholic League* because they assert the Policy defines (and disparages) Hinduism as including an oppressive caste system that singles them out in the CSU community and stigmatizes them directly. *See, e.g.*, FAC (ECF No. 80) at ¶¶ 6, 9, 21, 49, 57, 113.

Plaintiffs here are ***not*** simply passively observing conduct with which they disagree. Nor are they merely disgruntled taxpayers. They are professors at CSU who are bound by the Policy's inclusion of caste and the constitutional implications of it. That is precisely the type of harm found to be sufficient for standing in *Catholic League*, 624 F.3d at 1052. This case is no different. Here, "Plaintiffs' injuries are concrete and personal as they are CSU employees and practitioners of the Hindi faith" and they "have alleged a sufficient causal connection between the Policy and their injury as the inclusion of the term 'caste' is the source of their injury." *Civil Minutes* (ECF No. 102) at p. 5. No further injury is required in this facial challenge. *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 316 ("We need not wait for the inevitable to confirm and magnify the constitutional injury.").

It is therefore entirely immaterial for purposes of standing whether the "Chancellor or any CSU administrator ever said anything negative about Hinduism." Def's Br. (ECF No. 115) at 14.  Nor does it matter whether the Policy is facially neutral because facial neutrality is ***not*** determinative.  *See, e.g., Santa Fe Indep. Sch. Dist.*, 530 U.S. at 307, n.21 ("Even if the plain language of the . . . policy were factually neutral, 'the Establishment clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions.'") (quoting *Capital Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 757, 777 (1995) (O'Connor, J., concurring))); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) (recognizing "the Establishment Clause[] extends beyond facial discrimination").  CSU's entire argument is thus belied by decades of binding precedent.  Accordingly, Plaintiffs have more than adequately asserted standing on their Establishment Clause claim as the Court found.

**B. Defendant Applies The Wrong Test For Establishment Clause Claims.**

There are several deficiencies in CSU's Establishment Clause argument. Perhaps most significant is CSU's suggestion that rational basis review "attaches to Establishment Clause challenges to facially neutral language." Def.'s Br. at 13.  CSU does not provide any legitimate authority for that proposition (which is telling) and, instead, cites only to *Masnauskas v. Gonzalez*, 432 F.3d 1067, 1071 (9th Cir. 2005). But *Masnauskas* has nothing to do with the Establishment Clause.  It is an immigration case concerning an Equal Protection Challenge to the Nicaraguan Adjustment and Central American Relief Act. 432 F.3d at 1071.  CSU points to nothing more for the proposition that the Court employ rational basis review.

In fact, "courts do not apply rational basis review to Establishment Clause challenges, because that would mean dispensing with the purpose inquiry that is so central to Establishment Clause review." *Int'l Refugee Assist. Project v. Trump*, 857

F.3d 554, 589 n.14 (4th Cir. 2017), *vacated and remanded on other grounds by Trump v. Int'l Refugee Assist.*, 583 U.S. 912 (2017); *see also id.* ("suggesting that rational basis review cannot be used to evaluate an Establishment Clause claim" (citing *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1255 n.2 (10th Cir. 2008). If all that was required to overcome the Establishment Clause was rational basis review, its protections and prohibitions would be of little worth. *See Colorado Christian Univ. v. Weaver*, 534 F.3d at 1255, n.2.[1]

### C. Plaintiffs Have Shown By A Preponderance Of The Evidence That The Policy Is *Not* Neutral Toward Religion.

It is well settled in the Ninth Circuit (and beyond) that the Establishment Clause, "at the very least, prohibits government from appearing to take a position on questions of religious beliefs or from making adherence to a religion relevant in any way to a person's standing in the political community.'" *Catholic League*, 624 F.3d at 1058 (quoting *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 594 (1989), *abrogated on other grounds by Town of Greece v. Galloway*, 572 U.S. 565 (2014)).

CSU asserts the Policy comports with the Establishment Clause because it is neutral toward religion. Def.'s Br. at 16. Yet the Supreme Court recognized more than two decades ago that "the Establishment Clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions." *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 307, n.21 (quoting *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 777 (1995) (O'Connor, J., concurring in part); *see also Lukumi*, 508 U.S. at 534-35. Thus, what Defendant describes as a "critical weakness" of Plaintiffs' Establishment Clause claim – "that the Policy, 'on its face, simply does not discriminate on the basis of religious

---

[1] CSU's own Establishment Clause expert, Prof. Frank Ravitch, acknowledged that rational basis should not be applied to Establishment Clause challenges. *See* Declaration of Michael K. Twersky, Esq. ("Twersky Decl.") at Ex. G, 66:22-67:25.

affiliation or religious belief'" – is not a critical weakness at all.  Def.'s Br. at 16.
Defendant's own Establishment Clause expert admitted that a law need not mention
any religion to violate the Establishment Clause.  Twersky Decl. at Ex. G, 58:13-25
("Does a law need to mention a specific religion to violate the Establishment Clause?
No, of course not.").

In *Santa Fe Indep. Sch. Dist.*, the Supreme Court dispensed with a similar
argument that a school policy permitting student-led, student-initiated prayer before
football games was "one of neutrality rather than endorsement."  530 U.S. at 305.
The Court examined "the realities of the situation" which "plainly reveal[ed] that [the
school's] policy involve[d] both perceived and actual endorsement of religion." *Id.*
To do so, the Court considered the "text and history" of the school prayer policy and
"the circumstances surrounding its enactment" in holding it violated the
Establishment Clause.  530 U.S. at 308, 315.   The same is true in *Lukumi*, where the
Court considered the record and resolutions upon which the City of Hialeah relied in
impermissibly targeting the Santeria religion.  508 U.S. at 534.

As in that case, the realities of CSU's Policy plainly reveal that CSU targeted
(or at the very least, took an official position on) what it perceives to be part of the
Hindu religion; that is, an oppressive caste system.  First, by using the word caste
(without defining it) CSU incorporated into its Policy a word with religious
connotations.    *See    Merriam-Webster*,    https://www.merriam-
webster.com/dictionary/caste (defining caste as "one of the hereditary social classes
in Hinduism").   CSU's own caste expert, Dr. Ajantha Subramanian, testified that
caste is "often associated with Hinduism."  Twersky Decl. at Ex. H, 106:11-23.

Second, in revising the Policy to include caste, CSU admits it considered input
and concerns from its stakeholders, including the California State Student
Association ("CSSA") and the California Faculty Association ("CFA") – and the

Resolutions passed by the CFA, CSSA, and ASI (defined below) Resolutions that specifically tie an oppressive caste system to Hinduism. Pl. Tr. Br. at Exs. C (ECF No. 114-4), D (ECF No. 114-5) & E (ECF No. 114-6); Twersky Decl., Ex. B at 35:19-24. Accordingly, as in *Sante Fe Indep. Sch. Dist.* and *Lukumi*, this Court's examination of CSU's Policy "need not stop at an analysis of the text of the [P]olicy." *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 315. Rather, the Court must consider the materials considered by CSU – the CSSA and CFA Resolutions – and the interests of its stakeholders. *Id.* (recognizing courts have a duty to "distinguis[h] a sham secular purpose from a sincere one (quoting *Wallace v. Jaffree*, 472 U.S. 38, 75 (1985)). Those Resolutions, coupled with use of the undefined term "caste" – a word with religious connotations and a dictionary definition linked to Hinduism – confirm that the Policy runs afoul of the Establishment Clause by targeting only Hinduism.

CSU provides no objective (or any other) evidence for adding caste to the Policy other than the belief of its "stakeholders" (the CFA and CSSA) that Hindus ascribe to an oppressive caste system. CSU tries to save its Policy by suggesting it does not vilify Hinduism. Def.'s Br. at p. 15. But whether CSU directed hostility toward Hinduism is completely irrelevant because the Establishment Clause is violated even if government action is favorable toward religion. *Everson v. Bd. of Ed. of Ewing Tp.*, 330 U.S. 1, 15 (1947) ("Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another."). The key takeaway (and point missed by CSU) is that the Establishment Clause "was intended to erect 'a wall of separation between Church and State'" regardless of whether the government is aiding, advancing, or acting with hostility toward religion. *Id.* (quoting *Reynolds v. United States*, 98 U.S. 145, 164 (1878)). Here, the Policy does, in fact, act in a hostile manner (or at the very least, targets) Hinduism. The documents

1  produced by CSU, deposition testimony of its designee, and its own experts confirm

2  exactly that.

3  Plaintiffs' Opening Brief (ECF No. 114) detailed the deposition testimony of

4  CSU's designee (Laura Anson) and CSU's consideration of the interest of the CFA

5  and CSSA in revising the Policy. *See* Pl. Tr. Br. at Ex. B (ECF No. 114-3). Those

6  Resolutions specifically associate Hinduism with an oppressive caste system. *Id.* at

7  Exs. C (ECF No. 114-4) (describing caste as a "structure of oppression" that is

8  "present in the Hindu religion and common in communities in South Asia and in the

9  South Asian Diaspora.") & Ex. D (ECF No. 114-5) (describing caste as including

10 four classes of people, known as varna, which are Hindu terms expressly found in

11 Hindu scripture). Twersky Decl. at Exs. G at 88:14-22; D at 100:22-25-101:3-12 &

12 A at 31:1-6; 53:5-15. Ms. Anson testified that CSU relied on those  stakeholders'

13 interests in revising the Policy.  Twersky Decl. at Ex. A at 20:11-20.

14 In addition, CSU's Interim Executive Vice Chancellor, Fred Wood,

15 acknowledged in a July 26, 2021 email – well *before* this litigation commenced and

16 *before* the Policy was implemented – that CSU "received a resolution from the SLO

17 ASI [(the "ASI Resolution")] which was followed by a CSSA resolution."  Twersky

18 Decl. at Ex E. The ASI Resolution also associates Hinduism with an oppressive caste

19 system, and the letter accompanying the Resolution, which was directed to then

20 Chancellor Castro, explains that "[c]aste is a structure of oppression in Hindu society

21 . . . ." *Id*.  Thus, at the time CSU revised its Policy – not after it was sued for it –

22 CSU admits it relied on materials that exclusively define Hinduism as containing an

23 oppressive caste system.

24 Relying on *Calif. Parents for the Equalization of Educational Materials v.*

25 *Torlakson* (Def.'s Br. at 16), CSU asserts that the Policy would not violate the

26 Establishment Clause even if it drew a connection between caste and Hinduism.

27

28

Def.'s Br. at 16. This is incorrect for at least two reasons: First, the Policy need not vilify Hinduism to violate the Establishment Clause because (as explained above) government action is constitutionally prohibitive under the Establishment Clause whether it advances or inhibits, aids or denigrates religion. *See Everson*, 330 U.S. at 15. Merely seeking to define the contours of any religion violates the Establishment Clause. *Lee v. Weisman*, 505 U.S. 577, 603 (1992) ("government may not aid, foster, or promote one religion or religious theory against another or event against the militant opposite" (Blackmun, J., concurring) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). Even CSU's Establishment Clause expert testified that if a policy is "making a decision that caste is part of Hinduism and there is a debate within Hinduism about that . . . it's a violation of the Establishment Clause, it's also a violation of church autonomy and things like that." Twersky Decl. at Ex. G, 57:21-58:22. Indeed, courts have been clear and unambiguous on the prohibition on any civil determination of religious doctrine. *See, e.g.*, *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708-09 (1976).

Second, the Supreme Court has long been concerned with the "subtle ways in which Establishment Clause values can be eroded." *Lynch*, 465 U.S. at 694 (O'Connor, J., concurring). The Supreme Court "has given the Amendment broad interpretation in light of its history and the evils it was designed forever to suppress." *Id.* (quoting *McGowan v. State of Md.*, 336 U.S. 420, 441-42 (1961)). Thus any official position CSU takes on Hinduism – no matter how minor, whether in support or against – is presumptively unconstitutional. Moreover, even if CSU could provide overwhelming support that caste discrimination has no doctrinal support in Hindu religious text, such an argument is irrelevant, if, as is the case here, ordinary persons believe there is a link, even if their belief is wrong.

In concluding that the plaintiffs' Establishment Clause claim failed in *Torlakson*, the Ninth Circuit explained that the teaching standards and framework at issue did not call for the teaching of "biblical events or figures as historical fact" thereby endorsing religion.  973 F.3d 1010, 1021, (9th Cir. 2020).  The court further recognized that the "materials do not take a position on the historical accuracy of the stories or figures" at issue.  *Id.*  Applying that reasoning to the materials on Hinduism, the Ninth Circuit held no Establishment Clause violation existed.  *Id.*  This case is unlike *Torlakson* because CSU ***did*** take an official position on Hinduism.  CSU relied upon its stakeholders in revising the Policy, and, based on their Resolutions and concerns about the allegedly oppressive Hindu caste system, CSU amended the Policy.  If anything, *Torlakson* further substantiates Plaintiffs' Establishment Clause argument by suggesting that CSU may not make assertions of fact about Hinduism, as they have done here.

Finally, CSU attempts to disentangle itself from the CSSA and CFA Resolutions by suggesting that they "do not speak for the Chancellor, the sole defendant in this action."  Def.'s Br. at 16, n.1.  Why, then, did CSU rely on their interests in revising the Policy?  Twersky Decl. Ex. A at 20:1-3 ("We also sought stakeholder feedback from a number of different organizations, and reviewed that feedback and incorporated some of that feedback into our policy.").  CSU has offered no other justification beyond placating its stakeholders' concerns because there are none.[2]

---

[2] Even if CSU did not rely on the Resolutions (which it did), the Resolutions themselves provide stark proof how the addition of caste to the Policy will be understood by ordinary persons in the CSU community.  Those Resolutions offer an unvarnished understanding of how the CSU faculty (CFA) and students (CSSA and ASI) believe caste is a part of Hinduism.  *See* pp. 16-18 *infra*.  If CSU believed otherwise, or truly believed the Policy was not directed at Hindus, it did nothing to disavow CFA, CSSA or ASI of their understanding.

**D.     History And Tradition Confirm CSU Violated The Establishment Clause**

*Kennedy v. Bremerton Sch. Dist.* instructs that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" 142 S. Ct. 2407, 2427 (2022) (quoting *Town of Greece*, 572 U.S. at 576). Courts must draw the line between "permissible and impermissible" in accord with history and in a way that historically and "faithfully reflec[ts] the understanding of the Founding Fathers.'" *Id.* (quoting *Town of Greece*, 572 U.S. at 577).

Defendant cites *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1609 (2022), for the proposition that the "framers of the Constitution recognized only a few specific traits of state establishments of religion," including state control over church doctrine. Def.'s Br. at 18. Nothing about *Shurtleff* remotely suggests that the "few specific traits" referenced by Defendant are the *sole* means in which the clause is violated. To the contrary, the Supreme Court held in *Santa Fe Indep. Sch. Dist.* that the opposite is true. There, the Court explained that "[w]hether a government activity violates the Establishment Clause is 'in large part a legal question to be answered on the basis of judicial interpretation of social facts. Every government practice ***must*** be judged in its unique circumstances." 530 U.S. at 315 (alteration and emphasis added) (quoting *Lynch*, 465 U.S. at 693-694).

For example, in *Commack Self-Service Kosher Meats, Inc. v. Weiss*, the Second Circuit held that laws defining the term "kosher" to mean preparation with orthodox Hebrew requirements violated the Establishment Clause because New York had to take "an official position as to what kosher requirements are" to determine whether a food article conforms with them. 294 F.3d 415, 427 (2d Cir. 2002). The court explained, "[i]n doing so, the Department must either interpret religious doctrine or defer to the interpretations of religious officials in reaching its official

position." *Id.* The same is true here with regard to Hinduism containing an oppressive caste system.

Thus, violation of the Establishment Clause is ***not***, as CSU argues, limited to certain specific, narrow scenarios. And the framers certainly were not limited in their recognition of the various ways the Clause might be violated. *See Schempp*, 374 U.S. at 233 (Brennan, J., concurring); *see also Catholic League*, 624 F.3d at 1050. The Supreme Court recognized more than forty years ago in *Schempp* that:

> [Although] the Framers' immediate concern was to prevent the setting up of an official federal church the kind of which England and some of the Colonies had long supported . . . . nothing in the text of the Establishment Clause supports the view that the prevention of the setting up of an official church was meant to be the full extent of the prohibitions against official involvements in religion. If the framers of the Amendment meant to prohibit Congress merely from the establishment of a church, one may properly wonder why they didn't so state. That the words church and religion were regarded as synonymous seems highly improbable …. Plainly, the Establishment Clause, in the contemplation of the Framers, did not limit the constitutional proscription to any particular, dated form of state-supported theological venture. What Virginia had long practiced, and what Madison, Jefferson and others fought to end, was the extension of civil government's support to religion in a manner which made the two in some degree interdependent, and thus threatened freedom of each…. In sum, the history which our prior decisions have summoned to aid interpretation of the Establishment Clause permits little doubt that its prohibition was designed comprehensively to prevent those official involvements of religion which would tend to foster or discourage religion worship or belief.

*Schempp*, 374 U.S. at 233-34.[3] These constitutional maxims underlying the Establishment Clause have been recognized by the Supreme Court for over a hundred

---

[3] Justice Brennan's concurrence in *Schempp* further explained that, "[t]here is no doubt that, whatever 'establishment' may have meant to the Framers of the First Amendment in 1791, the draftsmen of the Fourteenth Amendment three quarters of

years.  *Id.* at 214-15 ("Almost a hundred years ago in *Minor v. Bd. of Educ. of Cincinnati*, Judge Alphonso Taft . . . stated the ideal of our people as to religious freedom as one of 'absolute equality before the law, and of all religious opinions and sects. The government is neutral, and, while protecting it all, it prefers none, and it disparages none.")

Viewing the Establishment Clause from the historical and traditional perspective *Kennedy* requires, the Clause commands government neutrality and forbids the government from taking a position on religion.  *See id.* (recognizing in 1963 that the "clause withdrew all legislative power respecting religious belief or the expression thereof."); *see also Commack*, 294 F.3d at 428 ("This prohibition is violated . . . by the requirement that the State adopt an official position on a matter of religious doctrine . . . .").

As explained above, the evidence in this case overwhelmingly demonstrates that CSU ran afoul of that by taking an official position on Hinduism as including an oppressive caste system.  And context here is critical:  at the time the Policy was revised, the ***only*** things considered by CSU were the interests of its stakeholders:  the CSSA and CFA – and the Resolutions they submitted in support of their interests (along with the ASI Resolution that was sent to Chancellor Castro).  Twersky Decl. at Ex. A, 42:25-44:5; *id.* at 33:14-23 & 52:22-24. Those Resolutions specifically tie an oppressive caste system to Hinduism, and discovery confirms that nothing else was considered.  Looking at the evidence in context, nothing suggests (even remotely) that CSU had any other group in mind other than Hindus when it added caste to the Policy.

---

a century later understood the Establishment Clause to foreclose many incidental forms of government aid to religion which fell far short of creation or support of an official church."  *Schempp*, 374 U.S. at 258,  n. 24.

Nonetheless, CSU suggests that the framers would not have found the word "caste" to have religious connotations, or that "anti-discrimination laws" like its Policy "constitute an establishment of religion." Def.'s Br. at 19. But again, context matters. Courts have used the term caste to describe a number of things, including wealth and social status. *See Edwards v. California*, 314 U.S. 160, 181 (1941) (discussing caste in terms of classifications based on the "poor and destitute"); Cong. Globe, 39th Cong., 1st Sess. 4312 (1866) at 390 (discussing the "superior caste of the rich"). Yet all of the evidence adduced here demonstrates that CSU intended to address a (mistaken) belief that Hinduism contains an oppressive (and evil) caste system. Thus, in context, it is clear CSU meant caste to be associated with Hinduism.[4]

CSU also relies on *Catholic League for Religious & C.R. v. Cnty of San Francisco*, 567 F.3d 595, 607-08 (9th Cir. 2009) purportedly to offer after-the-fact justifications for why it included caste in the Policy. *See* Def.'s Br. at 21. CSU ignores a key aspect of *Catholic League*: that the resolutions at issue there "did not 'take sides in a religious matter,' nor an 'official position on religious doctrine" (567 F.3d at 607) – unlike the CFA, CSSA, and ASI Resolutions here, which ***do*** take the position that Hinduism contains an oppressive caste system. And for that reason, this is not a case where the Policy "happens to coincide or harmonize with the tenets" of Hinduism. *See Bob Jones University v. U.S.*, 461 U.S. 574, 604 n.30 (1983) ("[i]t is equally true" that a regulation does not violate the Establishment Clause merely because it "happens to coincide or harmonize with the tenets of some or all

---

[4] Equally unpersuasive is Defendant's reliance on *Loving v. Virginia* for the proposition that "limitations on discrimination do not offend the Constitution any time they infringe upon the beliefs or preferences of some religious actors." Def.'s Br. at 19. *Loving* has nothing to do with the Establishment Clause. *See* 338 U.S. 1 (1967). It is not germane to the legal issues before this Court or the facts of this case, and should be disregarded accordingly.

religions.") (quoting *McGowan*, 366 U.S. at 442)). This is a case where CSU took an official position that Hinduism contains an oppressive caste system (which Plaintiffs dispute), and revised its Policy based on input from the CFA, CSSA, and ASI.

## II.    Plaintiffs' Void-For-Vagueness Due Process Claim

### A. Plaintiffs Have Standing To Assert Their Vagueness Claim.

Plaintiffs' standing has already been assessed (*and* determined to exist) by the Court. The Court recognized that "[i]n the First Amendment context, a vague policy threatens Due Process rights because 'uncertain meanings inevitably lead individuals to steer wider of potentially prohibited speech than they would if the meaning of the policy was clear." *Civil Minutes* (ECF No. 102) at p. 6 (alteration added) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)); *Bagget v. Bullit*, 377 U.S. 360, 372 (1964) (same).

But even if the Court had not already settled this issue (it has), Plaintiffs' claims place this controversy at the heart of the First Amendment.  As the Court observed, "[b]ecause Plaintiffs' Due Process challenge implicates their First Amendment rights, they are entitled to a relaxed injury in fact requirement." *Civil Minutes* (ECF No. 102) at p. 7 (citing *Arce v. Douglas*, 793 F.3d 968, 987-88 (9th Cir. 2015)).

Despite this Court's findings, CSU attempts to claim that Plaintiffs' "vagueness challenge is *not* directed to conduct protected by the First Amendment." Def.'s Br. at 14.  CSU even suggests that "[p]erhaps if Plaintiffs claimed the Policy infringed upon their First Amendment rights to practice their religion, then they might have a plausible claim that the standing requirements should be relaxed under *Arce*." *Id.*  But the First Amendment protects *more* than just Plaintiffs' right to practice their religion; it generally protects, *inter alia*, speech (or the right not to speak), conduct construed as speech, the right to practice one's own religion (or not

practice a religion), the right to associate (or not associate), and the right to keep government out of religion under the Establishment Clause. *See* U.S. Const. Amend. 1. ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

Plaintiffs have asserted since the inception of this litigation a multitude of First Amendment claims.  The Court agreed standing exists for at least some of those claims.  It need not revisit issues already determined.  And Plaintiffs need not assert that their religious practices are burdened to possess standing, contrary to Defendant's belief.[5]  *See Catholic League*, 624 F.3d at 1050-51.

### B. Plaintiffs Have Shown By A Preponderance Of The Evidence That The Term "caste" Is Subject To Multiple Interpretations.

CSU asserts the term "caste" is understandable and that CSU's Policy provides fair notice of the prohibited conduct.  The evidence shows neither is true.

First, the record shows that CSU agrees that caste has multiple meanings.  It is not defined in the Policy and CSU admitted: "I don't believe there is one universally accepted definition of caste."  Twersky Decl. at Ex. B, 30:2-4.  When asked, "[i]s caste related to social status," CSU's designee responded:   "No, I mean caste is -- my understanding of caste is that it's a system of social stratification based on

---

[5]  CSU unilaterally selects which First Amendment rights to consider and which to ignore.  The Policy reaches a substantial amount of constitutionally protected conduct because Plaintiffs are unaware how to comply with it.  Plaintiffs are unaware whether something they say or do constitutes caste discrimination.  The concept of "fair notice" – recognized by this Court in its decision on Defendant's Motion for Judgment on the Pleadings – is at the core of First Amendment values.  This all could have been avoided had CSU elected to define caste.  It did not.

inherited status and linked to race and ethnicity."[6]  *Id.* at 29:19-25.  Ms. Anson's testimony is far from clear:  how is caste not related to social status, but a system of social stratification?  She later described caste as "an inherited ranking from birth." *Id.* at 30:21-23.  She offered no explanation how to reconcile all of the definitions she provided at her deposition.

CSU's experts, ostensibly retained to help clarify caste, further confuse it.[7] When Professor Camille Gear Rich, CSU's expert on language, was asked simply, "what is caste?" she rambled: "What is caste, you leave me a little bit short of rudderless because those terms always get defined in a functional sense in relation to what it is that particular legal provision is attempting to do . . . . when you ask me more generally what caste is, I say, you know, what is caste, how is caste operating within a particular regime, and is there enough there to help us define what is meant by that?" Twersky Decl. at Ex. B, 19:14-20:22. Eventually, she explained that "caste is an ancestrally determined designation system of hierarchy . . . definitely often correlated with stereotypes and can be a source of subordination." *Id.* at 21:15-21.

Dr. Subramanian, CSU's caste expert, admitted that caste "is not derived from Hinduism, but yes, it is often associated with Hinduism."  Twersky Decl. at Ex. D, 106:21-23.  Dr. Subramanian also noted that while the term "caste" has a Western European origin, it is synonymous with the Hindu term jati, which means birth in Hindi and refers to an expansive hierarchical classification in South Asia based on descent that predates colonialism.  *Id.* at 104:16-19.  Although Dr. Subramanian

---

[6] Even if we accept Ms. Anson's definition as the Policy's definition (which it is not, given that no definition exists in the Policy and CSU refuses to add one), it is entirely unclear what is meant by "a system of social stratification or ranking based on inherited status" that is **also** linked to race **and** ethnicity.  Indeed, Ms. Anson's definition is arguably more confusing than the Policy including no definition at all.

[7] Significantly, none of these experts were involved with amending the Policy.  They were retained only after CSU was sued to offer after-the-fact justifications.

admitted that her expertise is limited to South Asia and the South Asian diaspora, she believed that descent-based discrimination exists in other cultures. *Id.* at 24:3-13. She, however, could not provide a coherent explanation why substituting the more inclusive term "descent" would not address caste discrimination in a neutral way. *Id.* at 148:25-149:20.

Lastly, CSU's Establishment Clause expert, Prof. Ravitch, testified that the *Merriam-Webster* dictionary definition of caste is ***wrong*** (and presumably any dictionary that ties caste to Hinduism). Twersky Decl. at Ex. C, 27:12-18 ("usually Merriam-Webster would not make an error like that"). Yet CSU argues "if an employee or student were unfamiliar with the term caste . . . . [t]hey would need only reach for a dictionary (or more, likely, consult Google or other online resources to find quick and comprehensive information.").[8] Def.'s Br. at 24. Even assuming *arguendo* that Merriam-Webster's dictionary is wrong, other dictionary definitions are nearly identical – including the dictionary used by the Ninth Circuit in *United States v. Wyatt*, which CSU cites in support of turning to the dictionary to resolve ambiguity. 408 F.3d 1257, 1261 (9th Cir. 2005) (referring to the Oxford English Dictionary to resolve the meaning of the term "lines"); *see also* Twersky Decl. at Ex. I (defining caste as "[a]ny of the (usually hereditary) classes or social ranks into which Hindu society is traditionally divided . . . any of the four classes of the varna system . . . . The ancient Hindu texts discuss four classes or varnas . . . .); *see also* https://www.oed.com/search/dictionary/?scope=Entries&q=caste.

---

[8] If one were to Google the term caste, the first entry at the top of the results page states: "[a]ny of the ranked, hereditary, endogamous social groups, often linked with occupation, that together constitute traditional societies in South Asia, particularly among ***Hindus in India***." *See* https://www.britannica.com/topic/caste-social-differentiation (emphasis added).

### III.   Defendant's Experts Offer Nothing More Than After-The-Fact Justifications, Which Have No Impact On The Questions Before The Court.

CSU has done nothing to help people of ordinary intelligence understand the term caste. In fact, they have done the opposite by involving experts in this litigation. This Court recognizes that expert testimony is admissible when it is helpful to the trier of fact. *See City of Pomona v. Sociedad Quimica Y Minera De Chile SA*, 2018 WL 6424763, at *5 (C.D. Ca. Apr. 26, 2018) (Klausner, J.,) (citing *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014)). There are presently two issues before this Court:  (1) whether CSU's inclusion of caste in the Policy is unconstitutionally vague; and (2) whether the Policy violates the Establishment Clause by taking an official position on Hinduism.  Expert testimony is not required to resolve either issue. In fact, such testimony should be precluded on these issues.

First, whether a law is unconstitutionally vague requires that the Court consider whether the Policy gives a "person of ***ordinary intelligence*** a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned*, 408 U.S. at 108 (emphasis added).  It is entirely irrelevant what any of Defendant's experts  think regarding caste (unless they have some insight into the ordinary person, which they do not).   In fact, CSU's experts seek to determine how ***courts*** – not the "person of ordinary intelligence" – should interpret caste. *See, e.g.*, Def. Br. at 23-25.  When asked if she was "offering any opinions on how an ordinary American would understand the term caste," CSU's expert, Dr. Subramanian, responded:  "I don't know how – you know, what different Americans come to the term with.  I mean it probably varies widely depending on who the person is." Twersky Decl. at Ex. D, 17:20-25 to 18:3-5.

Second, the Ninth Circuit explained in *Torlakson* that in evaluating whether an Establishment Clause violation exists, courts must view the challenged terms "from the perspective of an objective, reasonable, observer, and not that of an academic who is an expert in the field." 973 F.3d at 1021. Indeed, "[a]n expert's understanding of the terms is irrelevant." *Id.* Thus, this Court should disregard any expert opinion in deciding whether CSU took an official position on Hinduism. *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 315 ("Our inquiry into this question . . . **must** include an examination of the circumstances surrounding its enactment . . . . Every government practice must be judged in its unique circumstances." (quoting *Lynch*, 465 U.S. at 693-95 (O'Connor, J., concurring)).

CSU's experts do a commendable job of discussing the etymology of the term caste and it anthropological, sociological and legal implications as understood in academia. While interesting, these discussions are simply irrelevant to how the term caste will be understood among ordinary citizens. In fact, one of the experts candidly admitted in a 2021 essay she co-authored – *before she was retained in this case* – that the term caste is not well understood by ordinary people. Twersky Decl. at Ex. D, 74:14-25 to 76:5. Ultimately, CSU's experts offer nothing to overcome Plaintiffs' vagueness or Establishment Clause challenge. Instead, they offer nothing more than after-the-fact justifications for why CSU included caste in the Policy (none of which were relayed before the litigation) and should be disregarded accordingly.[9]

## IV.   CONCLUSION AND RELIEF REQUESTED

For all the reasons set forth herein, and in their principal brief, judgment should be entered for Plaintiffs on their claims.

---

[9]  Significantly, CSU fails to offer the one thing that might possibly aid the Court:  a survey of CSU's community on its understanding of caste.  Plaintiffs suggest this has not been offered because the results would support their argument – not Defendant's position.

Dated: October 3, 2023

Respectfully submitted,

*/s/ John Shaeffer*

**FOX ROTHSCHILD LLP**
John Shaeffer, Esq. (SBN 138331)
Michael Twersky, Esq. (*pro hac vice*)
Beth Weisser, Esq. (*pro hac vice*)
Erika Page, Esq. (*pro hac vice*)
Alberto M. Longo Esq. (*pro hac vice*)

## CERTIFICATION OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Sunil Kumar, Ph. D. and Praveen Sinha, Ph. D., certifies that this brief contains 5990 words and does not exceed 20 pages, which complies with the word limit of L.R. 11-6.1 and the Standing Order Regarding Newly Assigned Cases applicable in this action (ECF No. 13).

Dated: October 3, 2023                    **FOX ROTHSCHILD, LLP**

                                          */s/ John Shaeffer*
                                          John Shaeffer, Esq. (SBN 138331)

                                          *Attorneys for Plaintiffs*