RICHARD A. PAUL (SBN 057976)
rich.paul@quarles.com
JEFFREY P. MICHALOWSKI (SBN 248073)
jeff.michalowski@quarles.com
MATTHEW W. BURRIS (SBN 325569)
matt.burris@quarles.com
ADRIELLI FERRER (SBN 348068)
adrielli.ferrer@quarles.com
**QUARLES & BRADY LLP**
101 West Broadway, Ninth Floor
San Diego, California 92101-8285
Telephone: 619-237-5200
Facsimile: 619-615-0700

Attorneys for Dr. Jolene Koester

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SUNIL KUMAR, Ph. D., PRAVEEN SINHA, Ph. D., <br><br> Plaintiffs, <br><br> v. <br><br> DR. JOLENE KOESTER, in her official capacity as Chancellor of California State University, <br><br> Defendant. | Case No. 2:22-cv-07550-RGK-MAA <br><br> **DEFENDANT DR. JOLENE KOESTER'S OPPOSITION TO PLAINTIFFS' TRIAL BRIEF** <br><br> Trial Date:  October 24, 2023 <br> Judge:  Hon. R. Gary Klausner |

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................. 1

II.     RESPONSE TO FACTUAL BACKGROUND ............................................. 2

    A.    The Working Group Sought Input from Stakeholders Across
        CSU. ........................................................................................... 2

    B.    Plaintiffs Cite No Hostility Toward Hinduism by Defendant. ............... 4

    C.    Even If Students or Faculty Were Hostile Toward Hinduism (and
        There Is No Evidence of That), Such Hostility Could Not Be
        Attributed to CSU. ............................................................................ 5

        1.    There is no evidence of anti-Hindu animus by CFA or
                CSSA. ........................................................................ 5

        2.    The Working Group made an independent
                recommendation. ...................................................... 6

III.    PLAINTIFFS FAIL TO PROVE STANDING ............................................. 7

    A.    Plaintiffs Fail to Prove Any Actual or Future Injury. ............................ 7

    B.    Plaintiffs Fail to Prove a Threat of Imminent Prosecution. ................... 9

IV.     PLAINTIFFS HAVE NOT PROVED THEIR VAGUENESS CLAIMS ...... 10

    A.    Plaintiffs Bear a Heavy Burden. ....................................................... 10

    B.    The Policy Is Readily Understandable................................................ 12

        1.    Plaintiffs present no evidence of confusion by anyone at
                CSU. ....................................................................... 12

        2.    The meaning of "caste" is even clearer when read in
                context.................................................................... 13

        3.    The term "caste" is especially understandable to those for
                whom caste matters in their everyday lives............................... 15

    C.    The Policy Does Not Give Administrators Unfettered Discretion. ...... 16

    D.    The Policy Does Not Restrict First Amendment Activity. ................... 16

V.      THERE IS NO ESTABLISHMENT CLAUSE VIOLATION ...................... 16

    A.    Plaintiffs Fail to Produce Any Evidence of Religious Hostility........... 16

    B.    The Term "Caste" Is Not Inherently Hinduphobic. ............................. 18

    C.    Plaintiffs' Default on Their Burden of Identifying Support in
        History and Tradition. ....................................................................... 19

      D.     The Policy Does Not Assert Control Over Church Doctrine. .............. 20

VI.    CONCLUSION ................................................................................. 20

DEFENDANT'S OPPOSITION TO PLAINTIFFS' TRIAL BRIEF

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Right to Life PAC v. Bayless,*
   320 F.3d 1002 (9th Cir. 2003) ....................................................................9

*Cal. Pro-Life Council, Inc. v. Getman,*
   328 F.3d 1088 (9th Cir. 2003) ....................................................................9

*Cal. Teachers Ass'n v. State Bd. Of Educ.,*
   271 F.3d 1141 (9th Cir. 2001) ............................................................10, 12

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993)..........................................................................17, 18

*Firewalker-Fields v. Lee,*
   58 F.4th 104 ...........................................................................................19

*Foti v. City of Menlo Park,*
   146 F.3d 629 (9th Cir. 1998) ..................................................................11

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ...............................................................................11

*Hill v. Colorado,*
   530 U.S. 703 (2000).................................................................................12

*Humanitarian Law Project v. United States Dep't of Treasury,*
   463 F. Supp. 2d 1049 (C.D. Cal. 2006) ..............................................9, 11

*In Cal. Parents for the Equalization of Educ. Materials v. Torlakson,*
   973 F.3d 1010 (9th Cir. 2020) ................................................................18

*In re Joshua H.,*
   13 Cal. App. 4th 1734 (1993) .................................................................13

*Jordan v. Whelan Security of Illinois, Inc.,*
   30 F. Supp. 3d 746 (N.D. Ill. 2014) .......................................................15

DEFENDANT'S OPPOSITION TO PLAINTIFFS' TRIAL BRIEF

*Kennedy v. Bremerton Sch. Dist.*,
    142 S.Ct. 2407 (2022)............................................................................19

*King v. Burwell*,
    576 U.S. 473 (2015)..............................................................................13

*Kolender v. Lawson*,
    461 U.S. 352 (1983)........................................................................10, 11

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1996)................................................................................8

*McCreary County, Ky. v. ACLU of Ky.*,
    545 U.S. 844 (2005)..............................................................................17

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998)..............................................................................10

*Pickup v. Brown*,
    728 F.3d 1042 (9th Cir. 2013) ........................................................12, 15

*Commack Self-Service Kosher Meats, Inc. v. Weiss,*,
    294 F.2d 415 (2d Cir. 2002) ................................................................20

*Plessy v. Ferguson*,
    16 S. Ct. 1138 (1896)............................................................................19

*Shurtleff v. City of Boston*,
    142 S. Ct. 1583 (2022)..........................................................................20

*Smith v. Goguen*,
    415 U.S. 566 (1974)..............................................................................10

*Students for Fair Admissions v. Harvard College*,
    143 S. Ct. 2141......................................................................................19

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) ...............................................................9

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022) ..............................................................10

DEFENDANT'S OPPOSITION TO PLAINTIFFS' TRIAL BRIEF

*United States v. Doremus*,
   888 F.2d 630 (9th Cir. 1989) ...................................................................12

*United States v. Weitzenhoff*,
   35 F.3d 1275 (9th Cir. 1994) .................................................................16

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989)................................................................................12

**<u>Statutes</u>**

Cal. Gov't Code § 11121 ............................................................................2

DEFENDANT'S OPPOSITION TO PLAINTIFFS' TRIAL BRIEF

# I.    INTRODUCTION

It is undisputed that CSU's Nondiscrimination Policy is neutral toward religion.  It does not mention Hinduism.  And the Policy has not been enforced against Plaintiffs or other Hindus.  In other words, Plaintiffs raise only facial challenges to a facially neutral Policy.

This leaves only two narrow avenues to challenge the Policy, but Plaintiffs default on their burdens of proving either claim.  First, Plaintiffs claim "caste" is beyond the understanding of reasonably intelligent members of the CSU community, and that the Policy is thus unconstitutionally vague.  But they fail to produce evidence that even one member of the CSU community finds the Policy vague.  They produce no surveys; they offer no experts; and they do not submit any declarations – not even by the Plaintiffs.

In reality, the Policy, especially when read in context, is easy enough to understand.  It bars discrimination and harassment in employment and in educational programs, and clarifies that its prohibition on race and ethnicity discrimination also includes discrimination based on caste.  To be sure, there are interesting academic debates about the precise contours of caste, just as there are interesting academic debate about the precise contours of race and ethnicity.  But there is no evidence that anyone at CSU fails to understand the practical requirements of the Policy – that they refrain from discriminating or harassing one another based on impermissible factors.  Indeed, Kumar himself testified that he bases all academic decisions on academic factors, and is 100% confident that caste is not part of his decisions. Ex. 10, 144:15–21 ("Kumar.")

Second, Plaintiffs attempt to read religious animus into the Policy by arguing (i) that the CFA and CSSA resolutions were anti-Hindu; and (ii) that the Chancellor adopted those anti-Hindu views.  Again, however, Plaintiffs fail to present any proof.  They do not introduce any evidence of hostility by the Chancellor, by any representative of CSU, or by the CFA or CSSA for that matter.  After full and fair

discovery, Plaintiffs do not provide a single declaration or deposition admission indicating anti-Hindu animus. Nor do Plaintiffs identify any historical precedent for overturning bans on discrimination, even though they bear this additional burden under *Bremerton*.

More fundamentally though, Plaintiffs have failed to introduce evidence of any injury on account of the Policy. It has not been enforced against them; nor do they believe there is an imminent threat of enforcement; nor have Plaintiffs altered their beliefs or religious practices. Indeed, they acknowledge that the Policy is *complementary* to their religious beliefs and practices, because they *abhor* caste discrimination. Plaintiffs thus lack standing.

There will surely be an occasion, soon enough, to test the constitutionality of caste discrimination prohibitions.[1] But these constitutional questions of first impression should be deferred until an actual controversy exists.

## II.   RESPONSE TO FACTUAL BACKGROUND

Defendant incorporates the factual background from her opening Trial Brief (ECF No. 115, pp. 9–12), and further responds to Plaintiffs' background as follows.

### A.   The Working Group Sought Input from Stakeholders Across CSU.

Plaintiffs claim the decision to add the term "caste" to CSU's Policy was made by "a 'working group' of approximately eight CSU administrators, who met privately, without anyone outside the working group permitted to participate in their deliberations." ECF No. 114, p. 4 ("Plaintiff's Brief"). Even if this were constitutionally relevant (it isn't),[2] Plaintiffs' description is a caricature of what

---

[1] For example, the cities of Fresno and Seattle recently passed ordinances banning caste discrimination. *See* Request for Judicial Notice in Support of Defendant's Opposition, Exs. 42–44 ("RJN").

[2] There was no requirement of public meetings here – the Bagley-Keen Open Meeting Act imposes sets requirements for "state bodies" such as the CSU Board of Trustees, but it does not require internal working groups to be open to the public.

DEFENDANT'S OPPOSITION TO PLAINTIFFS' TRIAL BRIEF

actually happened.

In reality, CSU, like universities across the country, employs a system of shared governance.  When asked if the Human Resources Department had the authority to change the Nondiscrimination Policy, the Chancellor's designee explained: "Yeah.  With input from many people, including all of our stakeholders. We're a system of shared governance, so we don't do anything really without a lot of input from a lot of people.  Meaning, we don't make unilateral decisions."  Ex. 8, 21:21-22:2 ("Anson Dep.").[3]

The latest revision to the Nondiscrimination Policy, which added the word "caste" (among many other changes), was consistent with that approach.  The Chancellor convened a Title IX Working Group to study possible policy changes and to obtain feedback from across the CSU system.  The Working Group included a broad cross-section of University leaders.  Anson Decl. ¶ 4.  It met on at least seven occasions in 2021, and caste discrimination was among the topics discussed at each meeting.  *Id.* ¶ 5.  The Working Group considered including a definition of caste in the Policy, but opted against it, as the term was used only as an illustration of a type of race or ethnicity discrimination that was barred by the Policy.  *Id.* ¶ 7. Moreover, the Working Group was not aware of any members of the CSU community expressing concerns that the term was insufficiently clear.  Anson Dep. 39:8–18.

Once the group formulated a draft policy, it circulated its proposed language to a broad cross-section of CSU stakeholder groups, which in turn represented all students, faculty, and employees.  Specifically, the group circulated its draft to Campus Title IX Coordinators, Campus DHR Administrators, Campus Police

---

*See* Cal. Gov't Code § 11121.

[3] Exhibits 1 through 28 were introduced with Defendant's Trial Brief (ECF 115). Exhibits introduced with Defendant's Opposition continue at Exhibit 29.

1   Chiefs, Campus Clery Coordinators, Campus Student Conduct Administrators,

2   Campus Confidential Sexual Assault Victim Advocates, Campus Diversity Officers,

3   Campus AVPs-Human Resources, Campus AVPs-Faculty Affairs, Campus Vice

4   Presidents for Student Affairs, Campus Vice Presidents for Administration and

5   Finance, Campus Provosts, the CSU Academic Senate, the Cal State Student

6   Association ("CSSA"), and all CSU labor unions, including the California Faculty

7   Association ("CFA").  Anson Decl. ¶ 9.  Notably, the CFA represents all faculty

8   members at CSU, ***including both Plaintiffs***.

9          None of these stakeholder groups objected to the addition of the term "caste."

10  None of them complained of vagueness.  And none of them asked that the term

11  "caste" be separately defined.  Anson Dep. 39:8–25.  The Chancellor accepted the

12  proposed policy without changes.  Anson Decl. ¶ 13.

13          **B.      Plaintiffs Cite No Hostility Toward Hinduism by Defendant.**

14          Plaintiffs do not contend and offer no evidence whatsoever that Defendant

15  (Chancellor Koester), the Chancellor's office or staff, any members of the Working

16  Group, or any other CSU administrator held any animosity toward Hinduism.

17  Instead, Plaintiffs point only to the text of resolutions passed by the Cal State

18  Student Association (CSSA), California Faculty Association (CFA), and Cal Poly

19  San Luis Obispo (SLO) Associated Students, Incorporated (ASI).  *See* Plaintiffs'

20  Brief, pp. 4–5.  However, none of these organizations speak for CSU.  Rather, they

21  are distinct legal entities that speak on behalf of their respective constituents.

22          The CFA is a union of 29,000 professors, lecturers, librarians, counselors, and

23  coaches at CSU.  RJN Ex. 38, pp. 4–5.  The CFA and CSU are often at odds, and

24  CFA certainly does not speak for CSU.  Ex. 12, 143:16–144:7 ("Sinha") ("Q.  [I]t's

25  not uncommon for CFA and the administration to be in disagreement; is that

26  correct?  A.  Not uncommon.  That's possible, yeah. . . .  Q.  CFA does not speak for

27  the chancellor; right?  A.  CFA will make recommendations.  Chancellor may or

28  may not accept it.  Sometimes they don't accept it.  Sometimes they accept it.").

The CSSA is a "student-led organization" that engages and advocates for CSU students, but "maintain[s] autonomy from the CSU Office of the Chancellor in the stances it takes [and] the work it carries out."  RJN Ex. 39.  Likewise, Cal Poly ASI is a "student body organization" that serves as "the official voice of Cal Poly Students.  RJN Ex. 40.  None of these organizations speak for the Chancellor.

**C.    Even If Students or Faculty Were Hostile Toward Hinduism (and There Is No Evidence of That), Such Hostility Could Not Be Attributed to CSU.**

Plaintiffs claim the resolutions adopted by the CSSA, CFA, and Cal Poly SLO ASI are hostile to Hinduism.  And they further claim CSU adopted or endorsed those anti-Hindu views.  The first point is not supported by any evidence.  The second point is simply wrong.

**1.    There is no evidence of anti-Hindu animus by CFA or CSSA.**

Plaintiffs do not present any evidence of anti-Hindu animus by any authors of the resolutions, nor by any supporters.  Even after full discovery, and even though they bear the evidentiary burdens here at trial, they do not cite any depositions, declarations, or writings to show that the resolutions were passed out of hatred for Hindus.  And even though the CSSA resolution was preceded by three hours of public comment (*see* Ex. 25), Plaintiffs do not identify a single commenter that showed any hostility to Hinduism or to Hindus.  In reality, the commenters objected to ***discrimination***.  They did not object to Hindus or their faith.  *See* Exs. 24, 25; ECF No. 115-39 ("Compendium of Public Comments").

Instead of presenting any evidence of intent, Plaintiffs point only to the text of the resolutions themselves, and posit that any mention of a connection between Hinduism and caste is necessarily anti-Hindu.  Specifically, they object to the statement in the CFA Resolution that "[c]aste is present in the Hindu religion and common in communities in South Asia and in the South Asian Diaspora."  Plaintiffs' Brief, Ex. C, p. 1.  The CSSA and Cal Poly SLO ASI resolutions do not

mention Hinduism at all.  *Id.* Exs. D, E.  However, Plaintiffs object to the statement that "[t]here are four main caste groups," i.e., "Brahmins, Kshatriyas, Vaishyas, and Shudras."  Plaintiffs' Brief 5:2–4.

But when the resolutions are read as a whole, they cannot be understood as a critique of Hinduism.  Rather, the resolutions are critical of *discrimination* and *injustice*, not of any particular faith or religious practice.  There is no discussion of any religious text; any religious practice; nor any religious leader.  Rather, the focus is on the harms of caste discrimination – regardless of who perpetrates them.  *See* Plaintiffs' Brief, Ex. C, p. 1 ("Caste-oppressed groups continue to experience profound injustices including socioeconomic inequalities, usurpation of their land, rights, and experience brutal violence at the hands of the 'upper' Castes"); *Id.* Ex. D, p. 1 (same); *Id*. Ex. E, p. 2 (same).  Moreover, the resolutions did not call for policies barring caste discrimination by Hindus or by South Asians.  Rather, they called for CSU to add caste to its anti-discrimination policy, without regard to religion.

### 2.      The Working Group made an independent recommendation.

Even if Plaintiffs had presented evidence that the resolutions were based on anti-Hindu animus, they have not presented any evidence that the Chancellor, the Working Group, or any other CSU administrator adopted such views.

The Working Group was not affiliated with the CSSA or the CFA, and no CSSA or CFA representatives were included in the Title IX Working Group.  Anson Decl. ¶ 10.  While the Title IX Working Group solicited and considered feedback from stakeholders campus-wide and took all feedback seriously, the charter of the Title IX Working Group was to make independent recommendations after vetting and considering various inputs.  The Title IX Working Group did not simply adopt the views or positions of any stakeholder group.  *Id*.

Plaintiffs strain to draw a connection between the CFA and CSSA resolutions and the Working Group's recommendation (*see* Plaintiff's Brief at 4:6–11), but their

evidence falls short.  In reality, the Working Group did not adopt or ratify the resolutions.  It took seriously students and faculty members who insisted that "caste discrimination is a real thing," but Plaintiffs present no evidence of anything more.  Anson Dep. 35:25–36:9 ("Q.  Did you also receive – did the workgroup receive [a] resolution from CFA?  A.  I don't recall us ever reviewing a resolution from CFA.  I think we may have been told about it.  I think we were generally aware of it.  I don't recall that we specifically reviewed it.  Q.  How about a resolution from CSSA?  A. Same thing.  I think we were aware of it generally.  I don't know that we actually reviewed the actual document.")

Moreover, the Working Group's proposed policy and the final Policy were neutral toward religion.  Ex. 3 (CSU Nondiscrimination Policy).  The Policy made no mention of Hinduism, nor of any country of geography, such as India or South Asia.  *Id.*  Nor does the Policy mention Dalits, Brahmins, or any other caste.  *Id.* Plaintiffs themselves acknowledge that the Policy applies regardless of national origin and regardless of religion.  *See* Sinha 135:13–136:15; Kumar 81:10–18.

The Working Group did not single out any particular religion or religions. The Working Group's sole objective was to prohibit caste discrimination by anyone, and against anyone.  Anson Dep. 73:10–11 ("Our policy is religion neutral.  We don't link it to any particular religion."); *id.* 50:1-3 ("[It's not – we don't associate caste with any specific religion.").

### III.   PLAINTIFFS FAIL TO PROVE STANDING

#### A.    Plaintiffs Fail to Prove Any Actual or Future Injury.

The Court previously found that based on the Complaint's **allegations** Plaintiffs had established standing to pursue the instant two remaining claims. However, Plaintiffs must now offer actual evidence establishing their standing. Strikingly absent from Plaintiffs' Trial Brief is any discussion or showing of how they were or will be injured.  Indeed, ***there is no discussion of Plaintiffs' experiences at all***.  Plaintiff Sunil Kumar's name is mentioned only once in the

7

brief, and only as a prefatory formality.  *See* Plaintiffs' Brief, p. 1:3–4 ("Plaintiffs
Sunil Kumar and Praveen Sinha ('Plaintiffs') submit the following Trial Brief for
the Court's consideration.").  Plaintiff Praveen Sinha is mentioned only to discuss
his opinions on the definition of caste (Plaintiffs' Brief, p. 5:5–12), even though he
acknowledges he is not an expert on the topic (Sinha 102:13–15).  *Neither* Plaintiff
contends they have been injured, or that they might suffer a future injury, or
otherwise speaks to how they have been adversely impacted or affected.  Both
Plaintiffs are silent regarding any actual injury or even any possible injury.

Defendant could rest on this default alone.  Specifically, the "irreducible
constitutional minimum of standing" requires that Plaintiffs must have "suffered an
'injury in fact' . . . which is concrete and particularized," "actual or imminent, not
'conjectural' or 'hypothetical.'"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560
(1996).  "Since [these requirements] are not mere pleading requirements but rather
an indispensable part of the plaintiff's case, each element must be supported in the
same was as any other matter on which the plaintiff bears the burden of proof, *i.e.*,
with the manner and degree of evidence required at the successive stages of the
litigation."  *Id.*  "[A]t the final stage [*i.e.*, trial], those facts (if controverted) must be
supported adequately by the evidence adduced at trial."  *Id.*

However, Plaintiffs not only defaulted on their burden of proof, but
affirmatively admitted that no injury to them has occurred or will occur.  They admit
not only that the Policy has not been enforced against them, but also that they have
not even been threatened with enforcement.  Kumar 147:22–148:8; Sinha 27:2 –
28:22.  They have no desire to violate the Policy, and cannot envision any way in
which they would ever discriminate based on caste.  Indeed, Professor Sinha
admitted he does not even subjectively fear enforcement.  *See* Sinha 30:21–32:4
("Q.  Are you afraid that CSU would find that they – that you actually discriminated
against somebody based on caste?  . . . A.  No."); *see also* Kumar 144:7–146:15.
Plaintiffs have not and cannot prove an injury sufficient to confer standing.

### B.     Plaintiffs Fail to Prove a Threat of Imminent Prosecution.

Plaintiffs may respond by noting that this is a facial challenge, and that the requirements of standing are thus relaxed.  There are two problems with this argument.  ***First***, standing requirements are not relaxed for *all* facial policy challenges.  They are relaxed only when a plaintiff contends that a policy infringes upon conduct protected by the First Amendment – *e.g*., by restricting speech, petitioning, or religious practice.  *See* Defendant's Brief 14:7–15:17.

As the Ninth Circuit explained, "particularly in the First Amendment-protected speech context . . . the Supreme Court has endorsed a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences.'"  *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003).  But Plaintiffs are not claiming a threat of imminent prosecution here, nor do they contend that the Policy infringes on any First Amendment freedom.  To the contrary, Sinha admits that the Policy has no impact on his religious beliefs on his religious practices.  Sinha 90:23–91:5.  Kumar attempted to dodge the question, but ultimately admitted he cannot identify any impact on his religious beliefs or practices.  Kumar 106:10–108:20.  Indeed, both Plaintiffs expressly admit they have no plans or desire to violate the ban on caste discrimination, and acknowledge that the ban is entirely consistent with their religious beliefs and practices.  FAC ¶ 18; Kumar 159:8–160:3; Sinha 91:2–17.

***Second***, even if a relaxed standard applied here, Plaintiffs would still need to present *some* evidence of injury.  Standing is never automatic.  *Humanitarian Law Project v. United States Dep't of Treasury*, 463 F. Supp. 2d 1049, 1068 (C.D. Cal. 2006); *see also Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003).  Instead, in the absence of an actual injury, a plaintiff must come forward with evidence of "genuine threat of imminent prosecution."  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc).  For example, a plaintiff can establish standing with evidence they had a concrete plan to violate

the policy, and that the government specifically warned against doing so. *See, e.g., Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022) (pre-enforcement plaintiff must show, *inter alia*, a concrete plan to violate law and a threat of enforcement).

Here, Plaintiffs cite *no* evidence of such a plan, of any threat, or any evidence of injury. Indeed, they present no evidence at all, not even a declaration.

## IV.  PLAINTIFFS HAVE NOT PROVED THEIR VAGUENESS CLAIMS

### A.  Plaintiffs Bear a Heavy Burden.

Plaintiffs are simply wrong when they say "courts have not hesitated to find laws unconstitutionally vague in (and beyond) the Ninth Circuit." *See* Plaintiffs' Brief, p. 9:19–20. To the contrary, the Ninth Circuit has expressly held that "facial invalidation of a statute on vagueness grounds . . . should not be used except as a last resort." *Cal. Teachers Ass'n v. State Bd. Of Educ.*, 271 F.3d 1141, 1155 (9th Cir. 2001), quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998). Plaintiffs' own cases confirm this. In each, the Court struck down statutes only because they clearly (i) invited arbitrary enforcement; and (ii) impinged on constitutionally protected activity.

Their first case, *Kolender v. Lawson*, 461 U.S. 352 (1983), involved a Penal Code provision requiring individuals subject to *Terry* stops to provide "credible and reliable" identification and to "account for his presence . . . to the extent that it assists in producing credible and reliable identification." *Id.* at 356. The statute did not provide any guidance to officers, and instead "entrust[ed] lawmaking 'to the moment-to-moment judgment of the policeman on his beat.'" *Id.* at 359, quoting *Smith v. Goguen*, 415 U.S. 566 (1974). Accordingly, a jogger without identification could be subject to different requirements based on the whims of the particular officer he encountered – one officer might require "a series of questions concerning the route that he followed to arrive at the place where the officers detained him," while another might require only that the jogger "recit[e] his name and address." *Id.* at 360. The Court struck the statute down, finding that the provision invited

DEFENDANT'S OPPOSITION TO PLAINTIFFS' TRIAL BRIEF

1   "arbitrary suppression of First Amendment liberties" and threatened "the

2   constitutional right to freedom of movement." *Id.* at 358.

3        Plaintiffs' second case, *Humanitarian Law Project,* 463 F. Supp. 2d 1049,

4   also raised concerns of (i) unfettered discretion; and (ii) impingement on

5   constitutional rights.  There, the plaintiffs wished to provide humanitarian aid to the

6   Kurdistan Workers' Party and the Liberation Tigers of Tamil Eelam, both of which

7   were designated as foreign terrorist organizations by an Executive Order issued in

8   the days after September 11, 2001.  The Court found the Executive Order void for

9   vagueness because it gave the Secretary of the Treasury authority to designate

10  organizations as terrorist groups if they assist, sponsor, or provide services to

11  terrorist groups, and if they are "otherwise associated with" a terrorist group.  *Id*. at

12  1073.  Because the term "otherwise associate with" was not susceptible of a clear

13  meaning, it effectively gave the Government "unfettered discretion" in enforcing it.

14  *Id.* at 1070.  Moreover, the provision impinged on the freedom of association.  *Id.*

15       Plaintiffs' third and final case, *Foti v. City of Menlo Park*, 146 F.3d 629 (9th

16  Cir. 1998) likewise turned on excessive discretion and impingement on First

17  Amendment activity.  The plaintiffs were two pro-life protestors who regularly

18  picketed and distributed leaflets in front of a Planned Parenthood facility.

19  Additionally, they left numerous signs on their car, which was parked near the

20  facility.  In response to complaints, the City adopted an ordinance banning the

21  posting of signs on vehicles that were "parked to attract attention."  *Id.* at 634.

22       The Court found the Ordinance unconstitutionally vague, noting that (i) it

23  "delegate[d] basic policy matters to police . . . for resolution on an *ad hoc* and

24  subjective basis," and (ii) it was "obviously adopted to specifically target" the

25  plaintiffs' activities, which were entitled to protection under the First Amendment.

26  *Id.* at 639, quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972).

27       Conversely, unless a statute invites arbitrary enforcement and impinges on

28  constitutionally protected activity, courts are tolerant of ambiguity and imprecision.

*See Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity").  It follows that "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'"  *Cal. Teachers Ass'n*, at 1151, quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000).  Likewise, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications."  *Pickup v. Brown*, 728 F.3d 1042, 1058 (9th Cir. 2013), quoting *Hill*, 530 U.S. at 733.

### B.    The Policy Is Readily Understandable.

####     1.    Plaintiffs present no evidence of confusion by anyone at CSU.

Plaintiffs, of course, bear the burden of proving their vagueness claim.  To do so, they must present affirmative evidence that "people of ordinary intelligence" did not understand its terms.  *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989), *cert. denied*, 498 U.S. 1046 (1991).  Plaintiffs default on their burden.  They do not present any surveys or academic studies.  They do not offer any expert testimony.  They do not present a declaration from a single one of CSU's 560,000 students or 29,000 faculty and staff who allegedly believe the term is vague.  And perhaps most tellingly – ***Plaintiffs themselves*** do not submit declarations attesting that they do not understand the term.  Moreover, all affirmative evidence in the case shows that "caste" is readily understandable to persons of ordinary intelligence.  Of the 206 speakers who participated in public comment, only *one* individual claimed he didn't understand the term.  The other 205 used the term caste freely, without definition.  *See* Compendium of Public Comment.

Plaintiffs' only effort to characterize the term as vague is based on two statements by the Chancellor's designee, Laura Anson.  Specifically, Ms. Anson testified that there is no universally accepted definition of caste (*see* Plaintiffs'

Brief, p. 10:3) and that "caste" has multiple definitions (*see id.* 10:14–11:3).  But this evidence falls far short of proving unconstitutional vagueness.  If it were otherwise, "race"—which has no universally accepted definitions and is defined in *myriad* ways[4]—would also be unconstitutionally vague.  So too would ethnicity.  No court has ever found these terms unconstitutionally vague, despite having over fifty years to do so.  *Cf. In re Joshua H.*, 13 Cal. App. 4th 1734 (1993) (declining to strike down as unconstitutionally vague California's hate crime statute, which states that "race or ethnicity" includes "ancestry, color, and ethnic background").

> **2.     The meaning of "caste" is even clearer when read in context.**

Plaintiffs ignore one of the cardinal rules of interpreting statutes and policies. Words must be read in the context in which they are used.  *King v. Burwell*, 576 U.S. 473, 486 (2015) ("[W]e must read the words 'in their context and with a view of their place in the overall statutory scheme.  Our duty, after all, is to construe statutes, not isolated provisions.").  This case cannot be framed as a vocabulary quiz, in which the question is whether CSU members have a ready definition of "caste" at their fingertips.  Rather, the relevant question for purposes of a vagueness challenge is whether members of the CSU community are on fair notice of what conduct is proscribed by the Policy, and what conduct is permitted.

Here, context matters in two ways.  ___**First**___, the only conduct prohibited by the statute is discrimination and harassment.  *See* Ex. 3, Art. VII (A)(1)–(2).  To be actionable as discrimination, conduct must rise to the level of an "adverse action," *i.e.*, conduct that "has a substantial and material adverse effect on the Complainant's ability to participate in a university program, activity or employment."  *Id*. at Art. VII (A)(1).  The Policy further clarifies that "[m]inor or trivial actions or conduct not reasonably likely to do more than anger or upset a Complainant does not constitute an Adverse Action."  *Id.*  Likewise, harassment is only barred if it is

---

[4] *See* Ex. 29, pp. 26–28 (citing ten dictionary definitions of "race").

1   "sufficiently severe or pervasive" that it "creat[es] an intimidating, hostile or

2   offensive work or educational environment."  *Id*. at Art. VII (A)(2).

3        Accordingly, even if a CSU community member were unclear on the precise

4   contours of what "caste" is, they could readily avoid a finding of caste

5   discrimination by refraining from discriminatory or harassing conduct.  Tellingly,

6   ***Plaintiffs admittedly understand how to comply with the Policy***.  Kumar testified

7   that there is a discreet universe of decisions that he makes regarding students'

8   academic progress (*e.g.*, grading, letters of recommendation, etc.), and that he does

9   not take into account their caste.  *See generally* Kumar 140:24–145:4; *see also id.*

10  144:18–21 ("Q. So, you're a hundred percent confident that you don't take into

11  account their caste; is that right? A. I do not, yes.").  The same is true of his

12  decisions with respect to his academic peers and to staff member.  Kumar 145:8–11

13  ("Q. Is there ever an occasion where you would consider caste in a decision about

14  your academic peers? A. No."); Kumar 146:11–15 ("Q. So are you equally

15  confident that caste isn't a factor, as race isn't a factor, as sex isn't a factor? A.

16  Yeah. In my field none of that is a factor.").  Sinha, too, is confident that he has

17  always followed the Policy, and that the university would never find he had violated

18  it.  Sinha 29:18–32:4 ("[I]f a student were to raise a complaint of caste

19  discrimination by you, they would be wrong, is that correct?  A. Yes, they would be

20  wrong. Q. Are you afraid that CSU would find that they – that you actually

21  discriminated against somebody based on caste? A. No.") (objections and colloquy

22  omitted).  Plaintiffs are not left guessing about what the Policy means; they admit

23  they understand how to comply.

24       **Second,** the term "caste" is not listed as a standalone protected category.

25  Rather, it is used as an illustration.  In other words, "caste" clarifies how existing

26  terms ("Race or Ethnicity") operate in the context of the Policy.  In this respect,

27  "caste" is similar to the clarifying term "color."  Including the term "color" makes it

28  clear that the Policy prohibits individuals of one race from discriminating against

1  individuals of the same race, as they may do if they discriminate based on color.  *Cf.*

2  *Jordan v. Whelan Security of Illinois, Inc.*, 30 F. Supp. 3d 746, 752 (N.D. Ill. 2014)

3  (African-American stated viable claim against African-American manager who

4  alleged disfavored light-skinned African-Americans).  Likewise, addition of the

5  term "caste" helps clarify that an individual of one race and ethnicity may

6  discriminate against another individual from the same race and ethnicity, as they

7  may do if they discriminate based on caste.  *Cf.* Ex. 13 (CSU professor declines

8  Kumar's invitation to protest caste policy because he had been victim of "by Indians

9  toward Indians" discrimination at CSU).  In other words, the addition of the term

10 "caste" to the policy, as a parenthetical clarification, would not be confusing to

11 ordinary members of the CSU community.  Rather, as Defendant's expert linguist

12 testified, addition of the term "caste" helps eliminate ambiguity.  Rich, pp. 26–28.

### 3.    The term "caste" is especially understandable to those for whom caste matters in their everyday lives.

15       Citing press releases and newspaper articles, Plaintiffs claim that caste is not

16 "part of our regular lexicon," and that "caste practice is a faraway and foreign

17 concept."  Plaintiffs' Opening Brief 6:23–7:8).  Even if this were true, and even if

18 Plaintiffs presented any admissible evidence to support it (they didn't), this would

19 not support their vagueness claim.  What matters under a vagueness challenge is

20 whether the term is understandable to those for whom caste is a meaningful concept.

21 "If the statutory prohibition involves conduct of a select group of persons having

22 specialized knowledge, and the challenged phraseology is indigenous to the idiom of

23 that class, the standard is lowered and a court may uphold a statute which uses

24 words or phrases having a technical or other special meaning, well enough known to

25 enable those within its reach to correctly apply them."  *Pickup*, 728 F.3d  at 1059,

26 quoting *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1994).

27       Here, "caste" is readily understandable to those for whom caste personally

28 matters – individuals who are connected to caste systems know all too well what

caste means.  *See* Ex. 1 (CSU student called another CSU student a "sub-caste prostitute," pepper-sprayed him, and knocked his glasses to the floor).  This Court should not strike down a provision that is both understandable and consequential for many, based on the theoretical possibility—unsupported by any evidence—that the term is not understandable (and not consequential) to some.

**C.     The Policy Does Not Give Administrators Unfettered Discretion.**

Plaintiffs do not argue that the Policy will give administrators unfettered discretion.  And the language and structure of the Policy forecloses any such argument.  The addition of "caste" does not create a new protected category that administrators are free to interpret however they wish.  Rather, "caste" is listed as an illustrative subcategory of two protected categories—Race and Ethnicity—that have been recognized as protected categories for over 50 years.  *See* Anson Dep. 98:24–99:3 ("[W]e included it as a subcategory in – at – to race and ethnicity, because we were just trying to make an incremental change, not a wholesale revision to the policy.").  The Policy effectuates a modest, incremental change, and there is no unfettered discretion here.

**D.     The Policy Does Not Restrict First Amendment Activity.**

While higher scrutiny may attach when statutes implicate conduct protected by the First Amendment, this is not such a case.  There is no evidence that the Policy restricts any conduct protected by the First Amendment—such as speaking, petitioning, associating, or practicing religion.  No witness has claimed such an impact, not even Plaintiffs.  Moreover, Plaintiffs' affirmative admissions are to the contrary.  As noted above (*see* Section III(A), *supra*, pp. 9–10), neither Plaintiff can identify *any* way in which the Policy restricts their religious beliefs or practice.  Indeed, by banning caste discrimination, the Policy is consistent with their religion.

**V.     THERE IS NO ESTABLISHMENT CLAUSE VIOLATION**

**A.     Plaintiffs Fail to Produce Any Evidence of Religious Hostility.**

Plaintiffs argue the Policy is hostile toward Hinduism because the CSSA and

CFA Resolutions connect caste discrimination with Hinduism.  Plaintiffs' Brief 15:11–23.  As fully discussed above, Plaintiffs have not presented no plausible or meaningful evidence of hostility toward religion by the Chancellor, by any CSU administrator, by the Working Group, or by CSSA nor CFA.  *See* Section II(B)–(C), *supra*, pp. 5–7.  Plaintiffs thus default on their evidentiary burden.

Plaintiffs' theory, then, collapses into a request that this Court assume without any evidence that the CSSA and CFA acted out of religious hostility, and that the Chancellor endorsed that animus and imported it into her decision to accept the Working Group's recommendation.  But it is well-settled that the Establishment Clause turns on the objective evidence, not on such assumptions.  "Establishment Clause analysis does not look to the veiled psyche of government officers" because "an understanding of official objectives emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." *McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844, 861–62 (2005).  Here, the Court can determine CSU's intent objectively: from the text of the Policy itself, which makes no reference to Hinduism or any other specific religion (Kumar 136:20-137:14; Sinha 140:1–11), and which applies to every member of the CSU community, regardless of their religion (Sinha 135:13–24, 136:24–137:15).

Plaintiffs counter only with *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993), but *Lukumi* is irrelevant here for three reasons. ***First***, *Lukumi* is a Free Exercise case, not an Establishment Clause case.  This Court dismissed Plaintiffs' Free Exercise challenges, so *Lukumi* is categorically inapposite.  ***Second***, the City Ordinance at issue in *Lukumi* specifically targeted ritual animal sacrifice by adherents of the Santeria faith.  *Id.* at 524–26.  Here, Plaintiffs do not contend that the Policy targeted their religious practices.  To the contrary, their religious beliefs *bar* them from discriminating based on caste.  FAC ¶ 18, 51.  *See also* Kumar 106:10–20, 108:13–20; Sinha 89:5–20, 90:23–91:17, 93:6– 19. ***Third***, the petitioners in *Lukumi* presented actual and direct evidence of

religious animus – including a comment by one of the decisionmakers that Santaria was "in violation of everything this country stands for." *Id.* at 526, 541–42.  Here, Plaintiffs present no evidence of animus whatsoever.

### B.   The Term "Caste" Is Not Inherently Hinduphobic.

Plaintiffs claim the term caste is inherently hostile to Hinduism.  In support, they cite one definition from one dictionary (Merriam Webster) that refers to caste as a feature of Hinduism.  Plaintiffs' Brief 14:25–15:10.  The theory fails under settled law and under the weight of the evidence.

*First*, the Ninth Circuit has already rejected the notion that drawing a connection between "caste" and religion violates the Establishment Clause.  In *Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010 (9th Cir. 2020), the plaintiffs claimed that California's curricular guidance materials described the caste system as a "social and cultural structure as well as a religious belief."  *Id.* at 1014.  But the Ninth Circuit found no constitutional violation.  Rather, it found that such passages could *not* "be read as implying some hostility toward religion."  *Id.* at 1022.

*Second*, although the term "caste" may be associated with South Asia, dictionaries also provide general definitions of caste that are not tied to any particular geography or religion.  *See, e.g.,* Merriam-Webster (second definition – "a division of society based on differences of wealth, inherited rank or privilege, profession, occupation, or race"; Dictionary.com (first definition – "an endogamous and hereditary social group limited to persons of the same rank, occupation, economic position, etc., and having mores distinguishing it from other such groups").  Reasonable readers understand the provisions should be read together, and caste is not exclusively associated with Hinduism.  *See* Rich, pp. 25–26.

*Third,* as a social reality, caste is not coextensive with Hinduism.  Subramanian, pp. 7–10; s*ee also* Ex. 28, p. 10 ("Ravitch").  Plaintiffs themselves know this.  Kumar testified that "Hinduism does not teach caste," caste is not an

inherent facet of Hinduism, is not intertwined with Hinduism, and "religion does not specify the caste." Kumar 63:1–21, 66:6–66:7. Rather, he explained that "in India you can understand caste from the geographical location you originate from." Kumar 42:23–43:6. Sinha agreed that caste can be used in the context of Hindus, Muslims, Christians, and Sikhs. Sinha 41:4–20.

**Fourth,** judges throughout American legal history have used the term "caste" in a manner that has no relationship to Hinduism. Justice Harlan's dissent in *Plessy v. Ferguson*, 16 S. Ct. 1138 (1896) understood "caste" as a social concept, not a religious one. And of the fifteen times the Supreme Court mentioned "caste" in its recent affirmative action decision, ***none*** of them had anything to do with religion. *Students for Fair Admissions v. Harvard College*, 143 S. Ct. 2141, 2175, 2181, 2187, 2191–2192, 2203–2204, 2230–31, n. 3 (2023). *See also* Ravitch, pp. 6–9.

## C.    Plaintiffs' Default on Their Burden of Identifying Support in History and Tradition.

Establishment Clause claims must "be interpreted by reference to historical practices and understanding." *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2428 (2022). The burden of identifying historical support under *Kennedy* rests on the plaintiff. *Firewalker-Fields v. Lee*, 58 F.4th 104, 122, n. 7 (4th Cir. 2023).

Plaintiffs cite no such historical practices, and instead direct the Court to general First Amendment principles at the highest levels of abstraction. *See* Plaintiffs' Opening Brief 12:9–13:8 (state may not "handicap religions"; government may not become "embroiled . . . in [] destructive religious conflict"; "the Church and State should be separated"). But *Bremerton* requires more than citations to First Amendment truisms. It requires Plaintiffs to identify "a historically disfavored establishmentarian practice." *Id.* As Defendant and its expert historian have explained (*see* Defendant's Brief 18:3–19:5), the framers recognized only a few specific traits of state establishments of religion – control over doctrine; mandatory church attendance; punishment of dissenting churches; restrictions on

DEFENDANT'S OPPOSITION TO PLAINTIFFS' TRIAL BRIEF

political participation by members of dissenting churches; providing financial support for a church; and deputizing churches to carry out civil functions. *See Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1609 (2022) (Gorsuch, J., concurring). These weighty concerns are not remotely present here, and the framers would have no objection to a university policy barring caste discrimination.

### D. The Policy Does Not Assert Control Over Church Doctrine.

Plaintiffs' final case, *Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.2d 415 (2d Cir. 2002), has no bearing here. In *Commack*, as part of an effort to protect consumers from fraud in the kosher food market, New York state developed a statutory framework defining and policing kosher food labelling. Under the statute, "kosher" meant that food was "prepared in accordance with Orthodox Hebrew religious requirements." *Id.* at 425–27.

In *Commack*, then, the government took sides in an intra-religious debate between Orthodox rabbis and Conservative rabbis, who held different views on kosher practices. That is not at all analogous to the Policy at issue here. The Policy bars discrimination and harassment based on caste, regardless of the religion of the accuser, and regardless of the religion of the accused. The Policy makes no mention of Hinduism, and certainly does not weigh in on any intra-religious debates over religious doctrine. Plaintiffs fail to prove an Establishment Clause violation here.

## VI. CONCLUSION

Plaintiffs have not met their burden of proving standing, nor have they proved the elements of their claims. Judgment should be entered for Defendant.

Dated: October 3, 2023          QUARLES & BRADY LLP


By:  s/ *Jeffrey P. Michalowski*
      JEFFREY P. MICHALOWSKI
      Attorneys for Defendant

## CERTIFICATION OF WORD COUNT COMPLIANCE

The undersigned, counsel of records for Defendant Dr. Jolene Koester certifies that this brief contains 6,623 words and does not exceed twenty pages, which complies with the word limit of L.R. 11-6.1 and the Standing Order Regarding Newly Assigned Cases applicable in this action (ECF No. 13).

Dated:  October 3, 2023          QUARLES & BRADY LLP

                                 By:  s/ *Jeffrey P. Michalowski*
                                      JEFFREY P. MICHALOWSKI
                                      Attorneys for Defendant

21